**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                         No. CR 10-1761 JB

WILLIS YAZZIE,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on: (i) the Letter from Willis J. Yazzie, Sr. to Judge James O. Browning, sent June 7, 2013, filed June 10, 2013 (Doc. 113)("Motion to Reconsider"); (ii) the Defendant's Motion to Withdraw Plea of Guilty, filed November 29, 2011 (Doc. 59)("1st Motion"); and (iii) the Defendant's Motion to Withdraw Plea of Guilty, filed April 4, 2012 (Doc. 64)("2nd Motion").  The Court held hearings on February 4, 2013, and September 13, 2013.  The primary issues are: (i) whether the Court should reconsider its previous decision to deny Defendant Willis Yazzie's 1st Motion and 2nd Motion, in which Yazzie requested the Court to allow him to withdraw his guilty plea; and (ii) whether Yazzie has given the Court a fair and just reason to allow him to withdraw his guilty plea.  The Court has reconsidered its previous decision, but reaches the same conclusion: after weighing the seven factors the United States Court of Appeals for the Tenth Circuit requires the Court to consider when determining whether to allow a defendant to withdraw a guilty plea, the Court determines that the factors as a whole weigh against permitting Yazzie to withdraw his plea.  The Court, therefore, grants the Motion to Reconsider in part and will reconsider its previous decision, but will deny it in part and will continue to deny the 1st Motion and 2nd Motion.

## FACTUAL BACKGROUND

Yazzie lived in an "eight-foot-by-eight-foot shack" in Two Grey Hills, New Mexico, with his wife and their four children, two of which were Jane Doe 1 and Jane Doe 2, Yazzie's step-daughters.  United States' Response to Defendant's Motion Withdraw [sic] His Plea of Guilty at 1, filed December 30, 2011 (Doc. 62)("Response")(citation omitted).  The Navajo Tribal Police Department learned that Yazzie was allegedly abusing Jane Doe 1, who was thirteen years old at the time, and Jane Doe 2, who was then ten years old, on May 3, 2010.  Response at 1.  On May 10, 2010, the Navajo Police interviewed Yazzie regarding the allegations.  See Response at 4. Before the interview, Yazzie gave an oral and written waiver of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).[1]  See Response at 4.  Yazzie admitted that he had an intimate relationship with Jane Doe 1, which involved him kissing Jane Doe 1, holding hands with her, putting his penis on her cheek and telling her to suck it, which she would not, and touching her vagina, both over her clothes and under clothes, including penetration with his finger.  See Response at 4.  Yazzie denies ever having intercourse with Jane Doe 1.  See Response at 1-2.

---

[1] Miranda v. Arizona "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

Yazzie admitted that he touched Jane Doe 2's vagina one night, but contends that he thought it was his wife's, and not Jane Doe 2's, which he was touching.  See Response at 5.  He denies having intercourse with Jane Doe 2.  See Response at 5.

## PROCEDURAL BACKGROUND

In the Criminal Complaint, filed May 12, 2010 (Doc. 1), Plaintiff United States of America charged Yazzie with committing "multiple acts of aggravated sexual abuse to two minor children under the ages of twelve and sixteen years in violation of" 18 U.S.C. §§ 2241(c) and 2246(2)(C)(D).  Criminal Complaint at 1.  A person convicted under 18 U.S.C. § 2241(c) "shall be fined under this title and imprisoned for not less than 30 years or for life."  18 U.S.C. § 2241(c).  A Grand Jury indicted Yazzie on two counts of aggravated sexual abuse: as to Jane Doe 1, the Grand Jury indicted Yazzie for violating 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(C), and as to Jane Doe 2, the Grand Jury indicted him for violating 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(D).  See Indictment at 1-2, filed June 10, 2010 (Doc. 12).  Yazzie pled not guilty to the two counts in the Indictment.  See Clerk's Minutes of Arraignment at 1, filed June 16, 201 (Doc. 14).

### 1.    The Plea Agreement and Plea Hearing.

As part of a Plea Agreement, filed February 9, 2011 (Doc. 38), the United States charged Yazzie with Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 1153, 2241(a), and 2246(2)(C).  See Information at 1, filed February 9, 2011 (Doc. 35).  A person convicted under 18 U.S.C. § 2241(a) "shall be fined under this title, imprisoned for any term of years or life, or both."  18 U.S.C. § 2241(a).  That same day, Yazzie agreed to plead guilty to the Information, charging a violation of 18 U.S.C. § 2241(a), that being Aggravated Sexual Abuse of Jane Doe 1.  See Plea Agreement ¶ 3, at 2, filed February 9, 2011 (Doc. 38).  The United States and Yazzie

made an agreement to a specific sentence "between 15 years (180 months) and 19 years (228 months) imprisonment," pursuant to rule 11(c)(1)(c) of the Federal Rules of Criminal Procedure. Plea Agreement ¶ 10(a), at 4. In the Plea Agreement, in the section titled "Defendant's Admission of Facts," the statement from Yazzie reads, in part:

> Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense to which I am pleading guilty beyond a reasonable doubt. I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:
>
> . . . .
>
> **During March of 2010, I, Willis Yazzie, inserted my finger into the vaginal opening of my stepdaughter, A.N., a/k/a Jane Doe. A.N. was 13 years old at the time. In doing so, I used force against A.N.**

Plea Agreement ¶ 8, at 3 (emphasis in original). Yazzie also stipulated:

> [T]he Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

Plea Agreement ¶ 10(c), at 5.

At the plea hearing, Yazzie swore that the testimony he gave was the "truth, the whole truth, and nothing but the truth." For The Record at 12:05:45-05:58 (Sanchez, Yazzie)("FTR"); Transcript of Plea Hearing at 2:13, taken February 9, 2011, filed January 17, 2012 (Doc. 63)("Plea Tr.")(stating that the Defendant was sworn). The Honorable Richard L. Puglisi, former Chief United States Magistrate Judge for the District of New Mexico,[2] asked Yazzie

---

[2] Judge Puglisi is currently a United States Magistrate Judge for the District of Hawaii.

whether he had been recently treated for any mental illness or addiction to narcotic drugs, and whether Yazzie was under the influence of alcohol or drugs of any kind; Yazzie answered "no" to both questions.  Plea Tr. at 2:24-3:7 (Judge Puglisi, Yazzie).  Yazzie responded "yes" to Judge Puglisi's question whether Yazzie was satisfied "in all respects with his attorney Mr. Loonam." Plea Tr. at 3:8-11 (Judge Puglisi, Yazzie).  Yazzie affirmed that he had read the Consent to Proceed Before United States Magistrate Judge in a Felony Case, filed February 9, 2011 (Doc. 37), the Waiver of Indictment, filed February 9, 2011 (Doc. 36), and the Plea Agreement, and Yazzie stated that he had also reviewed the documents with his counsel.  See Plea Tr. at 3:12-21 (Judge Puglisi, Yazzie).  Yazzie stated that he did not have any questions about those documents.  See Plea Tr. at 3:22-24 (Judge Puglisi, Yazzie).  Yazzie stated that he understood the information in those documents.  See Plea Tr. at 3:25-4:2 (Judge Puglisi, Yazzie).  Yazzie affirmed that he had signed the documents.  See Plea Tr. at 4:3-6 (Judge Puglisi, Yazzie). Yazzie affirmed that he understood that, by signing the Consent to Proceed Before United States Magistrate Judge in a Felony Case, he had given up right to have the District Judge receive his plea.  See Plea Tr. at 4:7-10 (Judge Puglisi, Yazzie).  Yazzie stated that he understood that, by signing the Waiver of Indictment, he had given up his right to have a grand jury indict him before he pled.  See Plea Tr. at 4:11-16 (Judge Puglisi, Yazzie).  On the basis of Yazzie's statements, Judge Puglisi approved the Consent to Proceed Before United States Magistrate Judge in a Felony Case and the Waiver of Indictment, finding that Yazzie had "full knowledge" of their meaning and effect.  Plea Tr. at 4:17-19 (Judge Puglisi).

Assistant Federal Public Defender James C. Loonam, Yazzie's counsel at the time, stated that he was convinced that Yazzie understood the rights he gives up by pleading guilty and his likely sentence under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  See Plea Tr.

at 4:20-25 (Judge Puglisi, Loonam).   When Judge Puglisi asked Yazzie whether the Plea

Agreement is his only agreement with the United States, Yazzie stated that he wants "another

agreement."   Plea Tr. at 5:2-5 (Judge Puglisi, Yazzie).   Loonam informed Judge Puglisi that,

while Yazzie was detained pretrial, his wife gave birth to Yazzie's child, and Yazzie wants an

agreement that will allow him to see his baby in person, in the presence of United States

Marshalls.  See Plea Tr. at 5:7-19 (Loonam).  Judge Puglisi asked Yazzie whether he understood

that the only agreement that was binding at the time of the plea hearing was the Plea Agreement,

and Yazzie responded: "Yes."   Plea Tr. at 5:21-25 (Judge Puglisi, Yazzie).   Yazzie responded

"no" to Judge Puglisi's question whether anybody had attempted to force him to plead guilty, in

any way, and Yazzie responded "yes" to Judge Puglisi's question whether he was pleading guilty

because he is "in fact guilty."   Plea Tr. at 6:1-6 (Judge Puglisi, Yazzie).

        Judge Puglisi stated that he would not read through the Plea Agreement word-for-word at

the plea hearing with Yazzie, because Yazzie indicated that he understood the Plea Agreement.

Plea Tr. at 6:7-10 (Judge Puglisi).   Judge Puglisi stated that he would, rather, ask Yazzie

questions on particular parts of the Plea Agreement to assure that Yazzie understood it.  See Plea

Tr. at 6:10-11 (Judge Puglisi).   Judge Puglisi asked Yazzie whether he could affirm that his

statement in the Plea Agreement is true.   See Plea Tr. at 6:12-17 (Judge Puglisi)(citing Plea

Agreement at 3-4).   Yazzie stated that his statement in the Plea Agreement is "not all true" and

that he had tried everything he could to change it, but could not change the statement, and,

therefore, he would "have to say it's true."   Plea Tr. at 6:18-20 (Yazzie).   Judge Puglisi informed

Yazzie that he did not have to say that his statement is true.   See Plea Tr. at 6:21 (Judge Puglisi).

Judge Puglisi asked Yazzie which portion of his statement in the Plea Agreement is not true.   See

Plea Tr. at 6:22-23 (Judge Puglisi).   Yazzie responded that the statement inaccurately indicates

that he used "force" on Jane Doe 1.  Plea Tr. at 6:24 (Yazzie).  Judge Puglisi asked Yazzie why it

is not true that Yazzie used "force," and Yazzie stated that he did not use force and that, rather,

Jane Doe 1 kept "coming to" him.  Plea Tr. at 6:24-7:2 (Judge Puglisi, Yazzie).  Judge Puglisi

asked whether everything in his statement, besides the allegation of force, is true, and Yazzie

responded: "Yes."  Plea Tr. at 7:3-5 (Judge Puglisi, Yazzie).  Judge Puglisi noted that both the

Information and the Plea Agreement state that Yazzie used "force," but also noted that a child of

Jane Doe 1's age at the time -- thirteen -- cannot consent to sexual contact, so Judge Puglisi

expressed that he was not certain whether Yazzie must admit to using force.  Plea Tr. at 7:6-18

(Judge Puglisi).  Judge Puglisi asked the United States whether Yazzie is required to admit that

he used force to be found guilty of aggravated sexual abuse of a minor.  See Plea Tr. at 7:19-21

(Judge Puglisi).  The United States responded that the second element of the charge against

Yazzie is that he used force, and, therefore, Yazzie must admit to using force to plead guilty to

the Information.  See Plea Tr. at 7:22-24 (Henderson).

Judge Puglisi then asked Yazzie whether, in light of the United States' evidence against

him, Yazzie believed it was "more probable than not" that a jury would find that he used force to

commit a sexual act with Jane Doe 1, regardless whether Yazzie believed that Jane Doe 1

consented to the act:

> Well let me ask you this, Mr. Yazzie: You feel that you didn't use force.  You
> said that the minor in this information charging you with the crime of aggravated
> sexual abuse kept coming to you.  But do you, after considering all of the
> evidence that the United States has marshaled against you, do you feel that it is
> more probable than not that a jury would find that you did use force?  In other
> words, that they would believe the evidence in this case, aside from what you
> have to say?

Plea Tr. at 7:25-8:8 (Judge Puglisi).  Yazzie conferred with Loonam and stated that, based on his

conversation with Mr. Loonam, he understood that a jury would find he had used force on Jane

Doe 1, because "of the age of the victim."  Plea Tr. at 8:10-15 (Yazzie, Judge Puglisi).  Judge

Puglisi asked Yazzie: "And so even though you feel that there wasn't force used, after you have

looked at all the evidence in the case is it your belief that a jury would not believe you and find

that you did use force?"  Plea Tr. at 8:16-19 (Judge Puglisi).  Yazzie responded: "Yes."  Plea Tr.

at 8:20 (Yazzie).  Judge Puglisi then announced that, after reviewing Yazzie's statement in the

Plea Agreement, he found the facts provided an adequate foundation to the Information charging

Yazzie with aggravated sexual abuse.  See Plea Tr. at 8:21-24 (Judge Puglisi).  The United States

did not request that Judge Puglisi question Yazzie further regarding the crime.  See Plea Tr. at

8:25-9:2 (Judge Puglisi, Henderson).

      Judge Puglisi then asked Yazzie whether he understood that he had agreed to a sentence

"between 15 years and 19 years or 180 months and 220 months," and that, if Judge Puglisi

accepts his plea, Yazzie will receive a sentence of imprisonment in that range.  Plea Tr. at 9:3-9

(Judge Puglisi).  Yazzie responded: "[Y]es."  Plea Tr. at 9:10 (Yazzie).  Judge Puglisi asked

Yazzie whether he understood that he could withdraw from the Plea Agreement if the Court

rejects the Plea Agreement, and Yazzie responded that he did.  See Plea Tr. at 9:11-15 (Judge

Puglisi, Yazzie).  Judge Puglisi asked Yazzie: "Are you sure you want to agree to a sentence that

is in the range that I just mentioned to you?"  Plea Tr. at 9:16-17 (Judge Puglisi).  Yazzie stated

that the sentence is "too much for me," and that he "tried everything to get it something lower,"

but could not, and, therefore, "yes," he accepted the agreed sentencing range.  Plea Tr. at 9:18-20

(Yazzie).  Judge Puglisi asked Yazzie whether he "still want[ed] to proceed with this plea?"  Plea

Tr. at 9:21-22 (Judge Puglisi).  Yazzie replied: "Yes."  Plea Tr. at 9:23 (Yazzie).  Judge Puglisi

asked Yazzie whether he understood that, if Judge Puglisi accepts the plea, Yazzie will be

required to register as a sex offender, and Yazzie replied: "Yes."  Plea Tr. at 9:24-10:1 (Judge

Puglisi, Yazzie).   Yazzie affirmed that he had discussed with Mr. Loonam, in detail, the requirement for registration as a sex offender.  See Plea Tr. at 10:2-5 (Judge Puglisi, Yazzie).

Judge Puglisi asked Yazzie whether he understood that, in the Plea Agreement, he has waived the right to appeal any sentence up to the maximum allowed by law, which Judge Puglisi notes the Plea Agreement states is a sentence of up to life imprisonment.  See Plea Tr. at 10:6-11 (Judge Puglisi).   Yazzie responded: "Yes."   Plea Tr. at 10:12 (Yazzie).   Judge Puglisi asked whether Yazzie understood that, if the Court rejects the Plea Agreement, Yazzie may be subject to the maximum statutory penalty and not to the agreed sentencing range in the Plea Agreement, and Yazzie replied: "Yes."  Plea Tr. at 10:13-16 (Judge Puglisi); FTR at 12:19:00-19:17 (Judge Puglisi, Yazzie).[3]  Judge Puglisi asked Yazzie whether he understood that, if the Court sentences him in accordance with the Plea Agreement, he has waived his right to appeal, and Yazzie responded: "Yes."  Plea Tr. at 10:17-20 (Judge Puglisi, Yazzie).

Judge Puglisi then asked Yazzie how he wanted to plead to the Information.  See Plea Tr. at 10:24-11:2 (Judge Puglisi).  Yazzie stated: "Guilty."  Plea Tr. at 11:3 (Yazzie).  Judge Puglisi then announced that he found Yazzie competent and capable of entering a plea, and that his plea is knowing and voluntary, and Judge Puglisi accepted Yazzie's plea of guilty and found him guilty of the offense.  See Plea Tr. at 11:4-12 (Judge Puglisi).  Judge Puglisi explained that the Court may accept or reject the Plea Agreement up to the date of Yazzie's sentencing hearing. See Plea Tr. at 11:13-17 (Judge Puglisi).

---

[3] Although the Plea Tr. states that Yazzie did not give an audible response, see Plea Tr. at 10:16, the Court listened to the FTR several times and heard Yazzie respond, "Yes," albeit faintly, see FTR at 12:19:13-19:17.

2.      **Dismissing Mr. Loonam as Counsel**.

On May 2, 2011, Yazzie wrote the Court stating his concern with the Plea Agreement and his counsel.  See Letter to the Court from Willis Yazzie, dated May 2, 2011, filed May 2, 2011 (Doc. 43)("May 2, 2011 Letter").  Yazzie asserted that Mr. Loonam was not helping him and requested that the Court replace his appointed counsel.  Yazzie also stated that he was not happy with the Plea Agreement, and that he wants to proceed to trial, because he agreed to a sentence of 15 to 19 years, but the United States, he alleges, is now seeking to imprison him for life.  See May 2, 2011 Letter at 1.  Yazzie sent a subsequent letter to the Court, in which he asserts that the Federal Bureau of Investigation ("FBI") agents "badgered" him to make a statement.  Letter to the Court from Willis Yazzie, dated May 15, 2011, filed May 15, 2011 (Doc. 46)("May 15, 2011 Letter").  Yazzie wants to suppress a confession he made to FBI agents on May 7, 2010.  See May 15, 2011 Letter at 1.  Yazzie states that he does not remember whether he was read his rights under Miranda v. Arizona before he made the statement.  See May 15, 2011 Letter at 1. Yazzie also asserts that he did not penetrate Jane Doe 1's vagina, and that, therefore, if the Court does not suppress his confession, the Court should sentence him for a lesser offense.  See May 15, 2011 Letter at 1-3.  Yazzie requests that the Court provide him with new counsel, because, Yazzie asserts, Mr. Loonam told him "to cut my bullshit out on the day of my sentence at the court."  May 15, 2011 Letter at 4.

The Court concluded that communications had broken down between Mr. Loonam and Yazzie.  See Memorandum Opinion and Order at 1-2, filed October 6, 2011 (Doc. 54).  On October 7, 2011, the Court appointed P. Jeffrey Jones to replace Mr. Loonam.  See CJA 20 Appointment of and Authority to Pay Court Appointed Counsel, filed October 7, 2011 (Doc. 55).

3.     **Motions to Withdraw Guilty Plea.**

On November 29, 2011, Yazzie filed his 1st Motion.  Yazzie asserts that, at the time he entered into the Plea Agreement, he did not understand the law, and he believes that the Court should suppress his confession.  See 1st Motion at 2.  Yazzie contends, therefore, that the Plea Agreement may not have been voluntary, because Yazzie agreed to the Plea Agreement without a full understanding of the law.  Yazzie states that granting the 1st Motion will avoid unnecessary time and expense.  See 1st Motion at 2.

The United States opposes the 1st Motion.  The United States asserts that Judge Puglisi corrected any error in the plea colloquy -- "Judge Puglisi misstated the burden of proof as to the element of force with, 'it is more probable than not' that a jury would find that Yazzie used force against his victims" -- when Yazzie "conceded that [because of] the age of the victim a jury would find that he used force."  Response at 6.  The United States asserts that Yazzie's further exchange with Judge Puglisi, in which he admitted that a jury would not believe him, corrected Judge Puglisi's earlier error.  See Response at 6.  The United States contends that Yazzie "benefitted substantially by entering into the plea agreement," because the Plea Agreement provides for a sentencing range of 15 to 19 years, whereas, if he had not pled guilty, he could face life imprisonment.  Response at 7.  The United States points out that Yazzie has not asserted his innocence in his 1st Motion.  See Response at 9.  The United States states that it will be prejudiced if Yazzie is allowed to withdraw his plea, because the victims' "confidence in the finality of the criminal justice system would be shaken to its core."  Response at 9-10.  The United States contends that Yazzie delayed filing the 1st Motion.  The United States contends that Yazzie's former counsel, Mr. Loonam, did not prevent Yazzie from withdrawing his plea earlier, as Yazzie could have notified the Court independent of his counsel.  See Response at 10.

The United States also asserts that withdrawal will substantially inconvenience the Court, because the Court maintains an "extremely large criminal docket" and permitting Yazzie to withdraw will "needlessly add another case back to this Court's ever expanding trial calendar." Response at 11.  The United States asserts that Yazzie has had the close assistance of competent counsel throughout this case, noting that Mr. Loonam obtained an "extremely generous plea agreement that reduced Yazzie's imprisonment range exposure significantly."  Response at 11. The United States asserts that Yazzie knowingly and voluntarily pled, and states that Yazzie has not provided the Court with "specific information as to why or how the plea was not knowing or voluntary."  Response at 11.  The United States asserts that the "plea hearing demonstrates reasoned discussion about Yazzie's admission of the force element of the offense."  Response at 11.  The United States contends that, even though Yazzie did not explicitly admit to using force on Jane Doe 1, his plea was knowing and voluntary, and akin to a plea under North Carolina v. Alford, 400 U.S. 25 (1970), because he agreed that the United States could prove that element at trial.[4]  See Response at 11.  The United States asserts that withdrawing Yazzie's plea would

---

[4] A plea pursuant to North Carolina v. Alford, also referred to as an "Alford plea," "is a plea denominated as a guilty plea but accompanied by protestations of innocence.  Courts determining whether to accept Alford pleas are to treat them as pleas of nolo contendere." United States v. Buonocore, 416 F.3d 1124, 1127 n.2 (10th Cir. 2005)).  "'Before accepting a plea of nolo contendere, the court must consider the parties' views and the public interest in the effective administration of justice.'"  United States v. Buonocore, 416 F.3d at 1130 (quoting Fed. R. Crim. P. 11(a)(3)).  Although Judge Puglisi did not state on the record whether he considered the parties' views and the public interest before accepting Yazzie's plea, the plea colloquy for a guilty plea, an Alford plea, and a nolo contendere plea are nearly identical.  In the Benchbook for U.S. District Court Judges, the Federal Judicial Center provides a guide for judges taking pleas of guilty or nolo contendere; the only difference is that, for a guilty plea or Alford plea, the judge should, pursuant to rule 11(b)(3) of the Federal Rules of Criminal Procedure, "have the government counsel make a representation concerning the facts the government would be prepared to prove at trial (to establish an independent factual basis for the plea)," and for nolo contendere pleas, the Federal Judicial Center explains that rule 11(b)(3) is not applicable, but encourages the court to "consider having the government make a representation concerning the facts of the case."  Federal Judicial Center, Benchbook for U.S. District Court Judges § 2.01(P),

waste judicial resources, because the "District of New Mexico is among the busiest per judge in all of the United States."  Response at 12.  The United States asserts, therefore, that, although Yazzie may have second thoughts about his Plea Agreement, he has not given the Court a "reasonable rationale" for withdrawing his plea.  Response at 12.

On April 4, 2012, Yazzie filed the 2nd Motion, apparently without the assistance of counsel, as the 2nd Motion is handwritten.  Yazzie requests that the Court permit him to withdraw his guilty plea, because he did not "knowingly and voluntarily" enter into the Plea Agreement.  2nd Motion at 1.  Yazzie attaches two affidavits to the 2nd Motion -- from Jane Doe 1 and Jane Doe 2, the victims of his offense.  Both victims state a desire to change their previous statements alleging that Yazzie sexually abused them.  See Affidavit of Jane Doe 1, dated March 7, 2012, filed April 4, 2012 (Doc. 64 at 2)("I think it was very hard for me to accept a new parent in my life.  Well all I could say is that most of those reports were not true and he did not do all of those things to me, and my family."); Affidavit of Jane Doe 2, dated March 5, 2012, filed April 4, 2012 (Doc. 64 at 3)("I . . . have a different point of view since now that I'm older.").

### 4.     Dismissing Mr. Jones as Counsel and the Competency Evaluation.

On July 6, 2012, Yazzie requested that the Court dismiss Jones, because of Jones' "[l]ack of communication" with him.  Motion for Dismissal of Counsel, filed July 6, 2012 (Doc. 73).  On August 8, 2012, because of Mr. Jones' retirement for health reasons from the practice of law,

---

at 71 (6th ed. March 2013).  Judge Puglisi did not ask the United States to describe the facts that it would have been prepared to prove at trial, nor did he ask the United States to make a representation about the facts; rather, he noted that Yazzie admitted to facts in the Plea Agreement and that his admission provided an "adequate foundation to the information charging the crime of aggravated sexual abuse."  Plea Tr. at 8:21-24 (Judge Puglisi).

the Court appointed Kimberly A. Middlebrooks to represent Yazzie.  See CJA 20 Appointment

of and Authority to Pay Court Appointed Counsel, filed August 8, 2012 (Doc. 74).

On October 15, 2012, Ms. Middlebrooks informed the Court that she is not certain

Yazzie is competent to assist in his own defense.  See Unopposed Motion for Psychological

Evaluation to Determine Competency, filed October 15, 2012 (Doc. 84)("Competency Motion").

Ms. Middlebrooks expressed that every time she meets with Yazzie she must explain to him the

same information she previously relayed to him regarding his case.  See Competency Motion

¶¶ 2-3, at 1-2 ("Every encounter with Yazzie and counsel requires starting from scratch to

explain again the issues already explained previously.").   Ms. Middlebrooks requested a

psychological evaluation of Yazzie to determine his competency.  See Competency Motion ¶ 4,

at 2.  The Court granted the Competency Motion on October 18, 2012.  See Order for

Psychological Evaluation to Determine Competency, filed October 18, 2012 (Doc. 86).  After a

psychological examination, the parties stipulated to Yazzie's competency.  See Stipulation of

Parties as to Competency, filed December 27, 2012 (Doc. 90).

###    5.    Hearing on the Motions to Withdraw Guilty Plea.

The Court held a hearing on February 4, 2013.  See Transcript of Hearing, taken February

4, 2013 ("Feb. 4 Tr.").[5]   The Court stated that it will accept the Stipulation of Parties as to

Competency, and that it agrees Yazzie is competent to understand the proceedings before the

Court and to assist in his own defense.  See Feb. 4 Tr. at 3:10-20 (Court).  During the hearing,

Yazzie gave Ms. Middlebrooks some motions he drafted, including a motion to dismiss the

Complaint, filed May 12, 2010 (Doc. 1), and the Indictment.   See Feb. 4 Tr. at 4:3-11

_____

[5] The Court's citations to the Feb. 4 Tr. and the Transcript of Hearing, taken September
13, 2013 ("Sept. 13 Tr."), refer to the court reporter's original, unedited versions.  Any final
transcripts may contain slightly different page and/or line numbers.

(Middlebrooks).  Ms. Middlebrooks informed the Court that she would discuss the motions with Yazzie and address them with the Court at a later date.  See Feb. 4 Tr. at 4:12-15 (Middlebrooks).  Ms. Middlebrooks stated that she had advised Yazzie that it is not wise, in her opinion, for him to persist in his desire to withdraw his plea.  See Feb. 4 Tr. at 4:21-24 (Middlebrooks).  Ms. Middlebrooks stated that she had informed Yazzie that he may be facing life imprisonment if he were to succeed in withdrawing his plea, but, nevertheless, Yazzie desires to withdraw his plea.  See Feb. 4 Tr. at 4:25-5:14 (Middlebrooks).

Ms. Middlebrooks stated that it is her position that Yazzie must present the Court with a fair and just reason for requesting the withdrawal, and because Judge Puglisi accepted Yazzie's guilty plea, rule 11(d)(2) of the Federal Rules of Criminal Procedure governs whether Yazzie may withdraw his plea.  See Feb. 4 Tr. at 5:15-6:23 (Middlebrooks)(citing United States v. Salas-Garcia, 698 F.3d 1242 (10th Cir. 2012); United States v. Byrum, 567 F.3d 1255 10th Cir. 2009)).  Ms. Middlebrooks stated that, although Yazzie has not asserted innocence, he denies one of the factual allegations against him -- specifically, that he penetrated Jane Doe 1 with his finger.  See Feb. 4 Tr. at 6:24-7:8 (Middlebrooks).  Ms. Middlebrooks stated that Yazzie asserts that he told Mr. Loonam that he did not penetrate Jane Doe 1, but that statement remains in the Plea Agreement.  See Feb. 4 Tr. at 7:9-14 (Middlebrooks).  Ms. Middlebrooks noted that Yazzie did not assert at the plea hearing that he did not penetrate Jane Doe 1.  See Feb. 4 Tr. at 7:15-8:7 (Middlebrooks, Court).  Ms. Middlebrooks noted that Yazzie conceded at the plea colloquy that, because of Jane Doe 1's age, the United States could prove that Yazzie used force when committing a sexual act with Jane Doe 1.  See Feb. 4 Tr. at 8:15-9:1 (Middlebrooks).

Ms. Middlebrooks stated that, from her review of the plea colloquy, Yazzie did not want to enter into the Plea Agreement, because he wanted a sentence of less time.  See Feb. 4 Tr. at

9:4-20 (Middlebrooks).  Ms. Middlebrooks stated, however, that she believes the plea colloquy was constitutionally adequate, notwithstanding Judge Puglisi's apparent initial misstatement of the United States' burden of proof.  See Feb. 4 Tr. at 9:21-10:6 (Court, Middlebrooks).

Ms. Middlebrooks conceded that withdrawal would prejudice the United States, given the length of time that has passed and that evidence has likely grown stale.  See Feb. 4 Tr. at 10:8-17 (Middlebrooks).  Ms. Middlebrooks asserted, however, that a withdrawal of Yazzie's plea would not heavily prejudice the United States.  See Feb. 4 Tr. at 10:17-18 (Middlebrooks).  Ms. Middlebrooks stated that the reason for Yazzie's delay in requesting to withdraw his plea is that he has dismissed multiple attorneys.  See Feb. 4 Tr. at 10:19-11:3 (Middlebrooks).  Ms. Middlebrooks noted that Jane Doe 1 has not recanted her previous statement in detail, and Ms. Middlebrooks was not certain how much of any statements Jane Doe 1 previously made were "not true any more."  Tr. Feb. 4 at 11:3-17 (Middlebrooks).  Ms. Middlebrooks stated that the alleged victims' recantations give credence to Yazzie's contention that the Plea Agreement lacks a factual basis.  See Feb. 4 Tr. at 11:18-12:1 (Middlebrooks).

Ms. Middlebrooks conceded that withdrawal would inconvenience the Court, given that Yazzie would file a motion to suppress his statement and the case may proceed to trial, which would require the expenditure of more judicial resources.  See Feb. 4 Tr. at 12:8-13 (Middlebrooks).  Ms. Middlebrooks contended, however, that the Court should not give much weight to the judicial resources expended, given Yazzie's assertion that the United States lacks a factual basis to convict him.  See Feb. 4 Tr. at 12:13-16 (Middlebrooks).

Ms. Middlebrooks stated that, in her understanding, Yazzie's plea was knowing and voluntary, and that the psychological examination of Yazzie did not reveal any evidence that the United States or Mr. Loonam coerced Yazzie into his plea.  See Feb. 4 Tr. at 12:17-18:13

- 16 -

(Middlebrooks).  Ms. Middlebrooks stated that Yazzie believed that the Plea Agreement would allow his wife to receive custody of their children, but Ms. Middlebrooks conceded that there was no evidence that custody of Yazzie's children was an issue addressed in the Plea Agreement or negotiations thereof.[6]  See Feb. 4 Tr. at 13:4-19 (Middlebrooks).

Ms. Middlebrooks also conceded that judicial resources would likely be wasted by allowing Yazzie to withdraw his plea, as the case would proceed to trial.  See Feb. 4 Tr. at 13:20-25 (Middlebrooks).  Ms. Middlebrooks stated that Yazzie had the close assistance of his former attorney -- Mr. Loonam -- during the plea negotiations, and that Mr. Loonam reviewed the Plea Agreement with him on several occasions before signing it.   See Feb. 4 Tr. at 14:1-8 (Middlebrooks).  In conclusion, Ms. Middlebrooks noted that, although not all of the factors weigh in Yazzie's favor, his main contention is that the United States now lacks the factual basis for his conviction.  See Feb. 4 Tr. at 14:9-20 (Middlebrooks).

The Court stated that it has not seen "the withdrawal of a plea agreement that's gone well for the defendant."   Feb. 4 Tr. at 14:22-25 (Court).   The Court stated that a defendant withdrawing his or her plea is often a "train wreck," and the Court noted that a plea agreement is usually a substantial reduction from a defendant's guideline sentence.  Feb. 4 Tr. at 15:1-7 (Court).  Ms. Middlebrooks stated that she had discussed with Yazzie the outcome of United States v. Jim, in which the Court allowed a defendant to withdraw his plea of guilty.  See Feb. 4 Tr. at 15:8-13 (Middlebrooks)(referring to United States v. Jim, No. CR 10-2653 JB, 2011 WL 6013093 (D.N.M. Nov. 22, 2011)(Browning, J.), in which the Court found a fair and just reason

_____

[6] Ms. Middlebrooks referred to Yazzie's "girlfriend" at the hearing, but the Court believes she meant to say "wife," as the information before the Court indicates that any children belonged to Yazzie and his wife, Margaret Harjo.  Feb. 4 Tr. at 13:4-13 (Middlebrooks).  See Response at 2, 3.

to permit the defendant Derrick Jim to withdraw his guilty plea that would have resulted in a sentencing range between 151 and 181 months; United States v. Jim, 839 F. Supp. 2d 1157 (D.N.M. 2012)(Browning, J.), in which the Court denied Jim's motion in limine to exclude admissions and statements he made in the course of his plea agreement and during the plea colloquy; and United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), in which, after the jury found Jim guilty, the Court sentenced him to 360 months imprisonment). Ms. Middlebrooks also stated that Yazzie adamantly believes that he would be able to suppress his statement to the FBI. See Feb. 4 Tr. at 15:14-17 (Middlebrooks). Ms. Middlebrooks stated that she is concerned that, even if Yazzie were able to suppress his initial statement to the FBI, he has written numerous letters to the Court in which he admits his guilt, which could be used against him at trial. See Feb. 4 Tr. at 15:17-24 (Middlebrooks). Ms. Middlebrooks expressed that she believes the outcome at trial would be a "train wreck that would not go well for Mr. Yazzie." Feb. 4 Tr. at 16:2-11 (Middlebrooks). The Court agreed that Yazzie would be in a very bad position if he withdraws his plea, and the Court inquired of Ms. Middlebrooks whether Yazzie still wants to withdraw his plea notwithstanding the position in which he would find himself. See Feb. 4 Tr. at 16:12-24 (Court). Ms. Middlebrooks stated that Yazzie desires nonetheless to withdraw his plea. See Feb. 4 Tr. at 16:25-17:1 (Middlebrooks).

Yazzie then spoke on his own behalf. See Feb. 4 Tr. at 17:6-7 (Court, Yazzie). Yazzie stated that, under rule 11(e) of the Federal Rules of Criminal Procedure, his plea negotiations would be inadmissible against him. See Feb. 4 Tr. at 17:7-9 (Yazzie). Yazzie stated that he would not have accepted the Plea Agreement if the United States had not agreed to investigate the victims further, and he stated that he agreed to a lesser sentence:

> [Mr. Loonam] came to me . . . with 15 to 20, and I told him, I said, I want lesser [sic] years, and he came back with 15 to 19 and he said that's the . . . best he can

> do, and I told him I said the only way I'll take the plea is if the . . . Government says they will totally investigate the girls because I didn't do what they're saying I did.  I said that's the only way I'll take the plea.  So Mr. Loonam says he'll go ask the prosecutor, so he went back to the prosecutor and he came back with the plea and that statement was in the plea, it says to reinvestigate the girls.  It says it's in there.  I said okay I'll take the plea now.  Under [rule 11(e)] the plea is inadmissible to offer.

Feb. 4 Tr. at 17:9-20 (Yazzie).  The Court asked Ms. Middlebrooks to clarify Yazzie's statement, and Ms. Middlebrooks stated she had discussed United States v. Jim with Yazzie, and that she told Yazzie that, if he succeeds in withdrawing his guilty plea, his Plea Agreement would be admissible as evidence against him at trial.  See Feb. 4 Tr. at 17:23-18:10 (Middlebrooks).  The Court then addressed Yazzie and explained to him that, under case law from the Tenth Circuit, if Yazzie withdraws his guilty plea, the Plea Agreement and his statements to Judge Puglisi would likely be admissible as statements against him at trial.  See Feb. 4 Tr. at 18:11-23 (Yazzie).  The Court stated, therefore, that it is very concerned about allowing Yazzie to withdraw his plea, because of the difficult situation in which he would be placed with the statements admissible against him.  See Feb. 4 Tr. at 18:24-19:4 (Court).  The Court also explained to Yazzie that rule 11(c)(1)(A) does not prohibit the United States from using Yazzie's statements in the Plea Agreement against him.  See Feb. 4 Tr. at 19:11-20:21 (Defendant, Court, Middlebrooks).

The United States responded to Yazzie's contention that it lacks the factual basis to convict him, and the United States stated that the word "force" in the Information can refer to the ability of an older person to coerce a younger person, even if physical force, as it is commonly understood, was not used.  Feb. 4 Tr. at 21:9-20 (Wishard).  The United States distinguished United States v. Gould, No. CR 03-2274 JB, 2006 WL 4061159 (D.N.M. Sept. 23, 2006)(Browning, J.), from Yazzie's case, in which the Court allowed a defendant to withdraw his plea of guilty, because the defendant in that case found new evidence, and the United States

was ready to proceed to trial at the time.  See Feb. 4 Tr. at 21:21-22:4 (Wishard).  The United States noted that, in United States v. Begaye, No. CR 10-0456 JB, 2012 WL 119602 (D.N.M. Jan. 3, 2012)(Browning, J.), the Court did not allow a defendant to withdraw his guilty plea, in part because the defendant's attorney achieved a very favorable result for him.  See Feb. 4 Tr. at 22:5-11 (Wishard).  The United States stated that it telephoned the biological mother of the two victims in this case -- Jane Doe 1 and Jane Doe 2 -- and that their mother gave the United States the impression that the mother and the victims want to recant their previous statements that they made against Yazzie.  See Feb. 4 Tr. at 22:15-23:2 (Wishard).

The United States conceded that its case is "substantially more weak today than it was when he entered into the plea."  Feb. 4 Tr. at 23:3-4 (Wishard).  The United States noted that the witnesses have not made previous statements under oath and that, if this matter were to proceed to trial, the United States would have Yazzie's inculpatory statements and confession, but no corroborating witnesses.  See Feb. 4 Tr. at 23:5-9 (Wishard).  The United States asserted, therefore, that Yazzie's case is substantially different from that of United States v. Jim, because the United States' evidence has diminished with the passage of time.  See Feb. 4 Tr. at 23:15-18 (Wishard).  The United States stated, however, that it still believes it could prosecute the case, given the witnesses that are available and Yazzie's inculpatory statements.  See Feb. 4 Tr. at 23:18-22 (Wishard).

The United States contended that Yazzie is not asserting his innocence, but, rather, he is contending that the law is inapplicable to him.  See Feb. 4 Tr. at 23:23-25 (Wishard).  The United States asserted, however, that the most persuasive factor for not allowing Yazzie to withdraw his plea is that there is no evidence that he did not knowingly and voluntarily enter into the Plea Agreement.  See Tr. at 24:14-19 (Wishard).  The United States pointed out that, unlike

the defendant in United States v. Jim -- who thought he would still proceed to trial after entering

into the Plea Agreement -- "[t]here's nothing in the record to suggest that Mr. Yazzie [] entered

into this plea agreement with the United States" unknowingly or involuntarily. Feb. 4 Tr. at 251-

11 (Wishard). The United States expressed that Yazzie is not asserting his innocence in his

correspondence with the Court, but, rather, is "taking exception to the meaning of legal terms of

argument that were contained in that plea agreement." Feb. 4 Tr. at 25:12-26 (Wishard). The

United States contended that Yazzie is expressing remorse over having entered into the Plea

Agreement, "but to say at this point it would be fair and just to allow him to withdraw his plea

would be to commit him to a course of procedures that we saw end very badly for Mr. Jim."

Feb. 4 Tr. at 25:17-23 (Wishard).

       The Court stated that it is concerned about Judge Puglisi's reference to "more probable

than not" in the plea colloquy. See Feb. 4 Tr. at 26:3-12 (Court). The United States stated that it

believes Judge Puglisi's mistake was a harmless error, because the Plea Agreement adequately

sets out Yazzie's rights. See Feb. 4 Tr. at 26:13-23 (Wishard). The United States contended that

it was "clear to everyone there that he was entering a plea of guilty, he was admitting to

penetration, and that he just couldn't g[e]t past the plain language -- the plain definition of the

word 'force.'" Feb. 4 Tr. at 27:11-16 (Wishard). The Court expressed that, on appeal, the Tenth

Circuit might review the Court's work for whether there was a harmless error, but that, at the

trial level, the Court is concerned whether the work was done correctly. See Feb. 4 Tr. at 27:17-

23 (Court). The United States admitted that the Court is correct, but that, nonetheless, Yazzie's

plea was knowingly and voluntarily given. See Feb. 4 Tr. at 28:4-10 (Wishard). The United

States stated that Yazzie's case is much more similar to United States v. Begaye than to United

States v. Jim, because of the judicial resources that would be spent if this case goes to trial.  See

Feb. 4 Tr. at 28:19-29:8 (Wishard).

After the hearing, the Court issued an Order Finding Defendant Competent.  See Order

Finding Defendant Competent, filed February 7, 2013 (Doc. 93).  The Court relied on a report in

which Dr. William Foote found that Yazzie was competent in the proceedings.  See Order

Finding Defendant Competent ¶ 2, at 1.

### 6.    Memorandum Opinion and Order Denying 1st Motion and 2nd Motion.

The Court denied Yazzie's 1st Motion and 2nd Motion in a Memorandum Opinion and

Order, filed June 4, 2013 (Doc. 100)("MOO").  After weighing the Tenth Circuit's seven factors

from United States v. Yazzie, 407 F.3d 1139 (10th Cir. 2005), and the likelihood of conviction,

the Court concluded that Yazzie did not give "the Court a fair and just reason for permitting him

to withdraw his plea."  MOO at 1, 26.

> Regarding the first factor, whether Yazzie has asserted his innocence,
> although Yazzie contests some of the factual basis underlying his statement in the
> Plea Agreement, he has not clearly asserted that he is innocent of the charged
> offense.  To satisfy the first factor based on an assertion of legal innocence, the
> Tenth Circuit has held that a defendant must present a "credible claim of legal
> innocence," United States v. Hamilton, 510 F.3d 1209, 1214 (10th Cir. 2007), and
> that a "defendant's subjective belief in his own innocence does not mandate
> allowing him to withdraw his plea of guilty," United States v. Hickok, 907 F.2d
> 983, 985 n.2 (10th Cir. 1990).  Yazzie contests that he did not use "force" to
> penetrate Jane Doe 1's vagina, as his statement in the Plea Agreement reads.  May
> 2[, 2011] Letter at 1; [Plea Tr. at 6:24 (Yazzie)].  He also asserts that he did not
> touch Jane Doe 1's genitalia under her clothing, and, therefore, did not commit a
> sexual act within the meaning of 18 U.S.C. § 2246(2)(c), which criminalizes "the
> penetration, however, slight, of the anal or genital opening of another by a hand or
> finger . . ." and is the charged offense in the Information.  18 U.S.C. § 2246(2)(c).
> See Information at 1; May 15[, 2011] Letter at 2; Plea Agreement ¶ 3, at 2.  He
> has also attached affidavits from Jane Doe 1 and Jane Doe 2 to his 2nd Motion.
> Jane Doe 1 states that "most of those reports were not true and he did not do all of
> those things to me," Jane Doe 1 Aff. at 1, and Jane Doe 2 states that she has a
> "different point of view since now that I'm older," Jane Doe 2 Aff. at 1.  These
> affidavits are exculpatory, but only to a limited extent; they suggest that some
> reports remain true and give no indication of what Jane Doe 2's new point of view

is.  Indeed, Yazzie continues to admit that he committed a sexual act with a minor, see [Plea Tr. at 8:10-15] (Yazzie, Judge Puglisi), and he admits that "[y]es I did wrong with JD1 but we did that with no madness or force and she the one that like me but I should of not did what I did with her," May 2[, 2011] Letter at 1.  Although Yazzie is contesting certain factual elements of the offense, he does not contest that, because of Jane Doe 1's age, a jury would find him guilty of sexual abuse under 18 U.S.C. § 2241(a).  See [Plea Tr. at 8:10-15] (Yazzie, Judge Puglisi).  The Tenth Circuit has previously found that a guilty plea was knowing and voluntary, despite a defendant's refusal to acknowledge that she had the requisite intent to commit the crime.  See United States v. Vidal, 561 F.3d 1113 (10th Cir. 2009).  The Tenth Circuit noted that, because the defendant conceded that the United States had sufficient evidence to establish that she committed the crime, her plea was knowingly and voluntarily given.  See 56[1] F.3d at 1119.  Similarly, Yazzie's contention that he did not use force does not render his plea unknowing or involuntary, as he concedes that the United States could prove he sexually abused Jane Doe 1.

To the extent Yazzie is asserting he has new evidence that would make it difficult for the United States to prove its case, the existence of new evidence does not controvert Yazzie's other, repeated, confessions of guilt.[7]  See, e.g., May 15[, 2011] Letter at 1 ("I'm sorry for what I have done and forgive me.").  On the other hand, Yazzie contests that he did not touch Jane Doe 1 underneath her clothing, which, if true, raises the possibility that Yazzie pled guilty to the incorrect statute.  On the whole, this factor is either neutral, as Yazzie asserts he is guilty of a lesser offense than the Information charges, or weighs against allowing him to withdraw his plea, because he has repeatedly admitted that he did wrong.

Second, the prejudice that Yazzie's withdrawal of his plea will pose to the United States weighs against allowing him to withdraw his plea.  The United States has informed the Court that its evidence has diminished with the passage of time, as it would primarily present witness testimony against Yazzie, and recollections have faded or changed in the two years that have passed since this case began.  See [Feb. 4] Tr. at 23:3-4 (Wishard)(expressing that the United States case is "substantially more weak today than it was when [Yazzie] entered into the plea").  The Tenth Circuit has recognized that requiring the United States to try a case it would not otherwise have to try, particularly when preparation for the trial will be difficult, results in prejudice to the United States.  See United States v.

_____

[7] Even if the Court construed Yazzie's 2nd Motion liberally, and inferred that, by attaching the affidavits, Yazzie is somehow asserting his innocence, the affidavits are not much help to Yazzie.  Neither victim states a desire to recant all of her previous allegations that Yazzie never committed a sexual act with her and that Yazzie is innocent.  See Jane Doe 1 Aff. at 1 ("[A]ll I could say is that most of those reports were not true and he did not do all of those things to me, and my family."); Jane Doe 2 Aff. at ("I . . . have a different Point [sic] of view now that I'm older.").

Jones, 168 F.3d 1217, 1220 (10th Cir. 1999)(finding that allowing the defendant to withdraw his plea "could also prejudice the government," because the "government will face the presumably difficult task of locating confidential informants").  Indeed, if every defendant were allowed to wait until the evidence against him or her had grown stale, and was then permitted to withdraw a guilty plea, the United States would be severely handicapped in its ability to prosecute criminal cases.  On the other hand, the United States maintains that it can prosecute this case.  While this factor does not weigh heavily in any one direction, it weighs somewhat in favor of not permitting Yazzie to withdraw his guilty plea.

The third factor weighs slightly against Yazzie's 1st Motion and 2nd Motion.  Yazzie filed his 1st Motion approximately nine months after the plea hearing, which is a significant portion of time, but his delay is somewhat excusable because he was experiencing difficulties with his counsel at the time.  On the other hand, Yazzie has taken the opportunity to write to the Court without the assistance of an attorney on multiple occasions.  He could have, therefore, written to the Court earlier to request a withdrawal of his plea.  See United States v. Kramer, 168 F.3d 1196, 1202 (10th Cir. 1999)(recognizing that an eight-month delay and a motion to withdraw a guilty plea filed on "the eve of sentencing" constituted delay).  This factor, thus, weighs slightly against permitting Yazzie to withdraw his plea.

Turning to the fourth and seventh factors -- whether the withdrawal will substantially inconvenience the Court or waste judicial resources -- the Court notes that there will almost always be some inconvenience or resource allocation when a case that has settled goes to trial. In previous cases, the Court has recognized that the gravity of the defendant's circumstances in a given case influences whether "the withdrawal of his plea, with all that it implies, would substantially inconvenience the Court or waste judicial resources." United States v. Harmon, 871 F. Supp. 2d at 1172.  See United States v. Gould, 2006 WL 4061159, at *3 (same).  Yazzie pled guilty to a significant charge, which carries a possible sentence of life imprisonment.  If the Court allows Yazzie to withdraw his guilty plea, it will likely have to hold a suppression hearing, decide the suppression motion, decide what, if any, previous statements of Yazzie's are admissible, and would then proceed to a jury trial.  There is no doubt that is a lot judicial work in a busy district like New Mexico.  On the other hand, the Court is in the justice business, not trying to avoid work.  If justice requires a trial, so be it.  Although the underlying facts of this case do not appear particularly complex or suggest that the trial would require more time than other sexual abuse cases off the reservations, the distinguishing fact here is that the prospect of Yazzie securing an acquittal appear low.  If the Court allows Yazzie to withdraw his plea and this matter proceeds to trial, the United States may have a difficult time cross-examining witnesses who may attempt to recant their previous statements, but Yazzie has made numerous admissions of guilt in various forms which may be used against him at trial.  See United States v. Carr, 80 F.3d [421,] 421[ (10th Cir.

1996)].[8]  Indeed, Yazzie has agreed that his statements in the Plea Agreement are admissible against him under rule 801(d)(2) in any subsequent proceeding or trial. See Plea Agreement ¶ 10(c), at 5; United States v. Mitchell, 633 F.3d at 999-1002 (upholding a defendant's waiver of any challenges to statements made in a plea agreement).  It is very likely that the statements he made in the Plea Agreement will be admissible and will be highly prejudicial; they probably will, alone, defeat a directed verdict.  Moreover, if the United States is concerned that its evidence no longer matches the Indictment, it can supersede the Indictment, probably coming up with something that matches even Yazzie's latest version of events.  In sum, the United States' likely ability to be nimble with the charges and Yazzie's multiple admissions likely creates more problems for Yazzie than problems for the United States.

        The Court has no sound basis to conclude that he would receive a more favorable sentence after trial than that which he has in the Plea Agreement, which is a very favorable sentence.  The Court concludes therefore, that allowing Yazzie to withdraw his plea will cause more inconvenience to the Court and waste more judicial resources than in most cases in which a defendant proceeds to trial without a protracted litigation around the defendant's guilty plea, and this factor counsels against allowing Yazzie to withdraw his plea, particularly given the busy criminal docket in this district.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  See United States v. Carr, 80 F.3d at 421 n.5 (recognizing that the Tenth Circuit has "suggested an additional factor to consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th Cir. 1990)).  The Court believes that consideration of likelihood of conviction is relevant here, either in the context of the two factors of whether withdrawal would substantially inconvenience the Court or waste judicial resources, or as an additional factor. The Court concludes, however, that the inconvenience to the Court and waste of judicial resources would be severe, not because a trial would be so hard on the Court, but because it would be a waste of time and get us to the same point that Yazzie is in today -- convicted.  Thus, these factors weigh against withdrawal.

        The Court finds that Yazzie had close assistance of counsel before and during his plea hearing.  The Court may consider whether a defendant was represented by "skilled and respected counsel."  United States v. Siedlik, 231 F.3d at 750.  See United States v. Byrum, 567 F.3d 1255, 1265 (10th Cir. 2009). Although Yazzie's relationship with Mr. Loonam broke down after the plea

---

        [8] The Tenth Circuit recognized in United States v. Carr that, while "[t]he anticipated length and complexity of the government's case . . . should not necessarily weigh against [a defendant] since he originally had a right to a jury trial," the "disruption of [the court's] docket and consequent delays in pending cases" justified this factor weighing against the defendant in that case.  United States v. Carr, 80 F.3d at 420-21.

hearing, that subsequent break down does not appear to have affected the Plea Agreement or plea negotiations.  There is no evidence that Mr. Loonam did not adequately prepare Yazzie for the plea colloquy and to sign the Plea Agreement. Although Yazzie is now asserting that he did not penetrate Jane Doe 1, and that he told Mr. Loonam that he did not penetrate Jane Doe 1, and that Mr. Loonam failed to negotiate the removal of that statement from the Plea Agreement, the Court is reluctant to attach much weight to these assertions.  See May 15[, 2011]  Letter at 3; [Feb. 4] Tr. at 7:9-14 (Middlebrooks).  It is odd that Yazzie did not raise this factual issue at the plea hearing, where he felt confident to raise other factual disputes with the Plea Agreement, and where he ultimately admitted that the United States could prove its charges against him.  See [Plea Tr. at 8:16-19] (Judge Puglisi: "Even though you feel that there wasn't force used, after you have looked at all the evidence in the case is it your belief that a jury would not believe you and find that you did use force?"  Yazzie: "Yes.").  It is also troubling to the Court that Yazzie makes this allegation after securing new counsel and after the evidence has grown considerably more stale in his case, and, therefore, the likelihood of this allegation being contradicted has diminished.  Although the Court determined that Yazzie's relationship with Mr. Loonam broke down after the plea hearing, at the plea hearing, Yazzie affirmed that he had been satisfied with Mr. Loonam "in all respects" in his representation.  [Plea Tr. at 3:8-11] (Judge Puglisi, Yazzie).  The Court finds that Mr. Loonam secured a very favorable Plea Agreement for Yazzie, as his offense carries a possibility of life imprisonment, but the parties have stipulated to a sentence between fifteen and nineteen years.  See Plea Agreement ¶ 4(a), at 2; id. ¶ 10(a), at 4.  The Court has previously noted Mr. Loonam's professionalism in representing other criminal defendants, and the Court has confidence in his abilities.  See United States v. Jim, 2011 WL 6013093, at *9 ("[T]he Court noted Mr. Loonam's professionalism and that it was reluctant to allow Jim to change counsel.").  Although Yazzie may not like the seriousness of the charges against him, and indeed desires a lesser sentence, Yazzie's discontentment with his situation does not mean that Mr. Loonam's performance was deficient in any respect.  If anything, taking Yazzie's allegation as true -- that Mr. Loonam failed to advocate for a lesser offense in the plea negotiations -- this factor may be neutral with regards to Yazzie's 1st Motion and 2nd Motion, or weigh against withdrawal.  Mr. Loonam might have focused his professional attention on the bottom line -- the length of Yazzie's sentence -- rather than focusing on getting a different charge.

Last, the Court gives substantial weight to the sixth factor -- whether the plea was knowingly and voluntarily given.  The Tenth Circuit has recognized that a defendant's guilty plea must be knowing, voluntary, and intelligent.  See United States v. Libretti, 38 F.3d 523, 529 (10th Cir. 1994). To enter a plea that is knowing and voluntary, a defendant must have "a full understanding of what the plea connotes and of its consequence."  Boykin v. Alabama, 395 U.S. 238, 244 (1969).  A defendant must understand only the plea's "direct consequences." United States v. Hurlich, 293 F.3d 1223, 1230 (10th Cir. 2002).  Although Yazzie makes a conclusory assertion that his plea was not knowing and voluntarily given,

see 1st Motion at 2-3; 2nd Motion at 1, Yazzie has provided the Court with no basis to find that he pleaded guilty without a full understanding of the plea and its consequences.  Unlike the defendant in United States v. Jim, who asserted that he did not understand that he was giving up other rights by entering into the Plea Agreement, Yazzie's main contention with the Plea Agreement appears to be that he believes he did not use force, that he thinks he should receive a lesser sentence, and that he thought his wife would receive custody of their children if he entered into the Plea Agreement.  Compare United States v. Jim, 2011 WL 6013093, at *13 (finding that a defendant's assertion that he did not understand that by pleading guilty he gave up a right to trial demonstrated that his plea was not knowingly and voluntarily given), with [Feb. 4] Tr. at 13:4-19 (Middlebrooks)(stating that Yazzie thought his wife would receive custody of their children if he entered into the Plea Agreement, but conceding that the custody of Yazzie's children was never part of the plea negotiations), and May 2[, 2011] Letter at 1 (stating that Yazzie did not use force on Jane Doe 1), and May 15[, 2011]  Letter at 3 (stating that Yazzie should qualify for a lesser sentence because he did not touch Jane Doe 1 underneath her clothing).  Although Yazzie may have sought to make other arrangements with the United States, he affirmed at the plea hearing that the Plea Agreement was the only binding agreement between the United States and him.  See [Plea Tr. at 5:21-25] (Judge Puglisi, Yazzie).

A concern to the Court with the plea colloquy was Judge Puglisi's reference to a "more probable than not" standard.  [Plea Tr. at 7:25-8:8] (Judge Puglisi).  After careful review of the transcript of the plea hearing, however, the Court concludes that using this term does not create a constitutional problem with Yazzie's plea colloquy.  Judge Puglisi did not inform Yazzie that the United States need prove his guilt by only a "more probable than not" standard; rather, Judge Puglisi's reference to this standard was in a discussion of the likelihood that a jury would find Yazzie guilty.  Judge Puglisi's question to Yazzie was:

> You feel that you didn't use force, you said that the minor in this Information charging you with the crime of aggravated sexual abuse kept coming to you, but do you, after considering all of the evidence that the United States has marshaled against you, do you feel that it is more probable than not that a jury would find that you did use force?   In other words, that they would believe the evidence in this case aside from what you have to say?

[Plea Tr. at 7:25-8:8] (Judge Puglisi).  Judge Puglisi did not, therefore, misstate the United States' burden of proof.  Yazzie affirmed that he was pleading guilty because he is "in fact guilty." [Plea Tr. at 6:1-6] (Judge Puglisi, Yazzie).  Further, the Plea Agreement, which Yazzie signed, includes an admission under penalty of perjury in which Yazzie states that, if he "chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense to which I am pleading guilty beyond a reasonable doubt."   Plea

Agreement ¶ 8, at 3.  Yazzie affirmed at the plea hearing that he had reviewed the Plea Agreement with his attorney, that he understood the Plea Agreement, and that he had no questions about the information in the Plea Agreement.  See [Plea Tr. at 3:12-21] (Judge Puglisi, Yazzie).  Yazzie further admitted that, notwithstanding his contention that he did not use force, he believed a jury would find he used force, and that the rest of his statement in the Plea Agreement is true.  See [Plea Tr. at 7:3-5] (Judge Puglisi, Yazzie); [Plea Tr. at 8:16-20] (Judge Puglisi, Yazzie).  Yazzie affirmed that he had not been forced to enter a guilty plea, and that he was not under the influence of a mental illness, alcohol, or addition to drugs at the plea hearing.  See [Plea Tr. at 2:24-3:7] (Judge Puglisi, Yazzie); [Plea Tr. at 6:1-6 (Judge Puglisi, Yazzie)].  Additionally, any question regarding Yazzie's competency has been resolved, and the Court finds that Yazzie has been competent throughout these proceedings.  See Order Finding Defendant Competent ¶ 2, at 1 ("In a written opinion dated November 29, 2012, Dr. Foote finds that Willis Yazzie is competent in these proceedings.").  The Court concludes, therefore, that Judge Puglisi's reference to Yazzie's belief in the probability of his conviction is not an error that caused Yazzie to not understand the consequences of his plea.  Rather, Yazzie has demonstrated through his letters to the Court that he understands the consequences of pleading guilty to the specific offense charged in the Information.  See May 15[, 2011]  Letter at 3 (distinguishing between a conviction under 18 U.S.C. § 2246(2)(D) and 18 U.S.C. § 2246(2)(C)).  The Court determines, therefore, that this factor counsels against allowing Yazzie to withdraw his guilty plea.

When the Court first confronted motions to withdraw early in its career, it was inclined to grant them, reasoning that, if someone wants to go to trial, he or she should have that right.  The Court watched a few of those trials end very badly for the defendants.  Since those train wrecks, the Court has been more rigorous in its application of the United States v. Yazzie factors.  The most troubling aspect is not Judge Puglisi's colloquy, but the victims' affidavits.  While it concerns th[e] Court that the victims may be prepared to testify differently than they were earlier, that fact cuts both ways.  It always concerns the Court deeply that it may convict an innocent man, but it also concerns the Court that Yazzie -- through his wife and others -- has used the time to persuade witnesses to change their testimony and then move to withdraw his plea.  In the end, however, the affidavits do not point to a just and fair reason; indeed, they may be a reason, on reflection, to not allow withdrawal.

On balance, the Court determines that Yazzie has not given the Court a fair and just reason for permitting him to withdraw his guilty plea.  No factor weighs in favor of allowing him to withdraw his plea.  The Court believes that, in light of Yazzie's mostly uncontested guilt, and the favorable result he has in the Plea Agreement, Yazzie does not have a reasonable expectation of better prospects at trial.  "The plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom."  United States v. Morrison,

967 F.2d[ 264,] 268[ (8th Cir. 1992)].  The Court, thus, will not permit Yazzie to withdraw his guilty plea.

MOO at 26-36.

### 7.    Presentence Investigation Report, Objections, and Addendums.

The United States Probation Office ("USPO") disclosed a Presentence Investigation Report ("PSR") for Yazzie on April 27, 2011.  In the PSR, the USPO notes that, according to the Plea Agreement, the parties agreed that the appropriate sentence is 15 to 19 years, and that Yazzie "cannot seek a downward departure, variance, or deviation of any kind from the agreed upon sentencing range."  PSR ¶ 4(a)-(b), at 3.  After comparing the 2009 edition of the United States Sentencing Guideline Manual to the 2010 edition, the USPO determined that neither edition was more beneficial and used the 2010 edition for the computations.  See PSR ¶ 29, at 9. The USPO calculates Yazzie's base offense level at 30 under U.S.S.G. § 2A3.1(a)(2).  See PSR ¶ 30, at 9.  It increases the calculation by 4 levels pursuant to § 2A3.1(b)(1), which provides that "if the offense involved conduct described in 18 U.S.C. § 2241(a) or (b), increase by 4 levels." PSR ¶ 31, at 10.  18 U.S.C. § 2241(a) defines aggravated sexual abuse by force or threat: "Whoever . . . knowingly causes another person to engage in a sexual act -- (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempts to do so . . . ." 18 U.S.C. § 2241(a).  The USPO relies on this background for a 4-level enhancement:

> The defendant was charged with Aggravated Sexual Abuse by force or threat. [Jane Doe 1] described being alone with Yazzie on numerous occasions when he would force her onto the bed then sit on her abdomen so she was unable to move. He would then kiss her, forcing her to kick, and hit him until he let her go.  [Jane Doe 1] also reported that the defendant threatened to hurt their mother if she or her sister disclosed the abuse.

PSR ¶ 31, at 10.   The USPO applied an additional 4-level enhancement under U.S.S.G. § 2A3.1(b)(2), see PSR ¶ 32, at 10; that provision provides for a 4-level increase if the "victim had not attained the age of twelve years," or a 2-level increase if the "victim had attained the age of twelve years but had not attained the age of sixteen years," U.S.S.G. § 2A3.1(b)(2).   The PSR calculates that Jane Doe 1 "was 12 years old at the time the abuse charged in the Information occurred, however, reports reflect and the defendant admitted that the abuse began in 2008, when [Jane Doe 1] was less than 12 years of age."   PSR ¶ 32, at 10.   Further, the PSR calculates that Jane Doe 2 was 10 years old when Yazzie sexually abused her.   See PSR ¶ 32, at 10.   The USPO applied a 2-level increase under U.S.S.G. § 2A3.1(b)(3), which requires the 2-level increase "if the victim was in the custody, care, or supervisory control of the defendant."   PSR ¶ 33, at 10. "The defendant was in a long term relationship with the victim's [sic] mother and was considered their stepfather.   The victim's [sic] mother stated she occasionally left the children alone to be supervised by Yazzie."   PSR ¶ 33, at 10.   The USPO also increases the offense by 5 levels pursuant to § 4B1.5(b)(1), an adjustment for repeat and dangerous sex offenses against minors; that provision applies "in any case in which the defendant's instant offense of conviction is a covered sex crime and the defendant engaged in a pattern of activity involving prohibited sexual conduct . . . ."   PSR ¶ 37, at 10.   The USPO asserts that this increase is appropriate because of Yazzie's conduct with Jane Doe 1 between 2008 and 2010, and his conduct with Jane Doe 2 during the several months before his arrest.   See PSR ¶ 37, at 10-11.   Based on Yazzie's acceptance of responsibility, the USPO reduces the calculation by 2 levels pursuant to U.S.S.G. § 3E1.1 and an additional 1 level for a motion it expects the United States to make at sentencing. See PSR ¶ 38-39, at 11.   The USPO calculates that Yazzie has 2 criminal history points, based on an arrest on December 31, 2003, resulting in a criminal history category of II.   See PSR ¶ 49, at

- 30 -

14.  "Based on the total offense level of 42 and a criminal history category of II, the guideline imprisonment range is 360 months to life."  PSR ¶ 73, at 19.

Mr. Loonam, on Yazzie's behalf, objected to the PSR's 5-level enhancement under U.S.S.G § 4B1.5(b)(1), which raises Yazzie's offense level to 45 before reducing the range for acceptance of responsibility.  See Letter from James Loonam to Victoria Gutierrez, United States Probation Officer, at 1, dated April 29, 2011, filed April 29, 2011 (Doc. 129)("PSR Objections"). "Mr. Yazzie does not dispute the factual basis for this suggestion.  Mr. Yazzie does dispute raising his Offense Level beyond level 43.  There can be no offense level beyond level 43."  PSR Objections at 1-2.  He cites an application note to the sentencing table that provides: "In rare cases, a total offense level of . . . more than 43 may result from application of the guidelines. . . . An offense level of more than 43 is to be treated as an offense level of 43."  PSR Objections at 2 (citing U.S.S.G. Sentencing Table, Ch. 5 Pt. A, application note 2).  He argues that the pre-plea offense level should be capped at 43; with the acceptance of responsibility reductions, his final offense level would be 40, resulting in a sentencing range of 324 to 405 months.  See PSR Objections at 2.

The USPO responds to this objection by attaching a copy of United States v. Houser, 70 F.3d 87 (11th Cir.), to the Addendum to the Presentence Report, disclosed May 3, 2011 ("First Addendum"); United States v. Houser explains that a district court should follow the sentencing guidelines' sequential instructions to determine a defendant's offense level and should not apply the level 43 cap until after it has applied any reductions for acceptance of responsibility.  See 70 F.3d at 92.  The USPO did not adjust its sentencing guidelines range.  See First Addendum at 1-2.

In his May 15, 2011 Letter, Yazzie challenges the PSR's conclusion that he "touched the victim's genitalia underneath as opposed to over her clothing." May 15, 2011 Letter at 2. He argues that he did not commit a sexual act as 18 U.S.C. § 2246(2) defines that term, see May 15, 2011 Letter at 3 -- "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person," or "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person," 18 U.S.C. § 2246(2)(c)-(d). Yazzie asserts that the record does not support the conclusion that he committed a sexual act and that, had the PSR applied the provisions for sexual contact rather than for a sexual act, the guidelines range would be lower. May 15, 2011 Letter at 3-4. He cites United States v. Poor Bear, 359 F.3d 1038 (8th Cir. 2004), in which the Eighth Circuit determined that the United States did not offer evidence that the defendant touched the victim's genitalia under her clothing as opposed to through her clothing, and so the PSR should have calculated the sentencing guidelines range for sexual conduct rather than a sexual act. See 359 F.3d at 1040-41. Yazzie also repeats the PSR's enhancements without objecting. See May 15, 2011 Letter at 3.

In the Second Addendum to the Presentence Report, disclosed July 11, 2011 ("Second Addendum"), the USPO responds to the objections that Yazzie submitted on May 12, 2011.[9] Yazzie objects to the USPO's application of U.S.S.G. § 2A3.1(b)(2), because he contends that

---

[9] The Second Addendum states that Yazzie submitted objections to the Court on May 12, 2011, and that the USPO received a copy of the objections dated April 30, 2011. See Second Addendum at 1. The Court is unable to locate Yazzie's objections. The Court included Yazzie's factual objection from the May 15, 2011 Letter, but that letter does not include the objections that the Second Addendum describes.

the victim had attained age 13; the USPO corrected the PSR to reflect that, at the time of the reported abuse in 2010, Jane Doe 1 was approximately 14 years old and Jane Doe 2 was approximately 11 years old.  See Second Addendum at 1.  The USPO concludes, however, that the 4-level increase under § 2A3.1(b)(2) still applies, because Yazzie's conduct with Jane Doe 2 is relevant conduct.  See Second Addendum at 1.  Yazzie also objects that the PSR incorrectly assessed his criminal history points; based on the length of time he served for a prior conviction, he asserts that he has 1, not 2, criminal history points, which should result in a criminal history category of I.  See Second Addendum at 2.  The USPO agrees and corrects the PSR to reflect 1 criminal history point and a criminal history category of I.  See Second Addendum at 2.  The USPO notes, however, "this change in criminal history category does not change the guideline imprisonment range of 360 [months] to life."  Second Addendum at 2.  Yazzie objects to the 5-level increase under U.S.S.G. § 4B1.5(b)(1); the USPO says it based that adjustment "on the information obtained from the discovery material," and that "[t]he pattern of sexual conduct involved the abuse of [Jane Doe 1] over a two year period of time and the abuse of [Jane Doe 2] for several months."  Second Addendum at 2.  The USPO maintains that it correctly applied the 5-level increase under § 4B1.5(b)(1).  See Second Addendum at 2.  The USPO calculates that Yazzie's offense level is 42 and his criminal history category is I, resulting in a guideline imprisonment range of 360 months to life.  See Second Addendum at 5.

In the Defendant's Amended Sentencing Memorandum in Support of Rule 11(c)(1)(C) and Objections to PSR, filed June 19, 2013 (Doc. 107)("Sentencing Memo."),[10] Yazzie reiterates his argument that the 4-level increase pursuant to § 2A3.1(b)(2) should not apply; because Jane

---

[10] The Sentencing Memo. amended the Defendant's Sentencing Memorandum in Support of Rule 11(c)(1)(C) and Objections to PSR, filed June 19, 2013 (Doc. 106): "This document is amended from the original Sentencing Memorandum and Objections in order to attach the signature block that was inadvertently not included on the original."  Sentencing Memo. at 1.

Doe 1 was 14 at the time, he argues that he should receive only a 2-level increase.  See Sentencing Memo. at 1-3.  He contests characterizing any actions with Jane Doe 2 as relevant conduct; he argues that he did not plead to any act involving Jane Doe 2 and denies any criminal conduct with her.  See Sentencing Memo. at 2.

> For purposes of argument only, assuming the conduct did occur, in Yazzie's statement to the FBI, which he states he was forced to make, he did not believe that he was touching [Jane Doe 2].  Rather, he believed he was touching his wife and when he realized it was not his wife, he stopped.  He therefore did not have the intent to commit this crime.  18 U.S.C. § 2241 requires a person to act with intent to engage in a sexual act with a person who has not attained the age of 12 years and to knowingly engage in a sexual act.  Yazzie lacked the requisite intent with regard to [Jane Doe 2].

Sentencing Memo. at 2-3.

Yazzie next argues that the USPO incorrectly applied a 4-level enhancement under U.S.S.G. § 2A3.1(b)(1).  See Sentencing Memo. at 3.  Although the USPO purports to rely on "§ 2241(a) 'force or threat' to justify the enhancement," Yazzie argues that the conduct the USPO describes -- "that Yazzie forced JD1 onto the bed and sat on her while he tried to kiss her" -- does not constitute a "sexual act" or "sexual contact" under 18 U.S.C. § 2246(2) and (3).  Sentencing Memo. at 3.  He also denies that he engaged in the conduct the USPO describes.  See Sentencing Memo. at 3.

Although Yazzie "requested defense counsel to further object to the application of § 4B1.5(b)(1), Ms. Middlebrooks explains that, based on her review, the USPO correctly applied this adjustment.  See Sentencing Memo. at 4-5.[11]  Yazzie asserts that, if the Court sustains his objections, it "would yield a total offense level of 188-235 months (which is also the exact amount of time contemplated in the Rule 11(c)(1)(C) plea agreement)."  Sentencing Memo. at

---

[11] Yazzie also argues for a variance.  See Sentencing Memo. at 5-12.

12.[12]   Yazzie asks the Court to "honor the Rule 11(c)(1)(C) plea agreement and award the low-end guideline range proposed in that agreement of 15 years."  Sentencing Memo. at 12.

The USPO addresses these objections in the Third Addendum to the Presentence Report, disclosed June 24, 2013 ("Third Addendum").  Regarding Yazzie's objection to the 4-level increase under U.S.S.G. § 2A3.1(b)(2), the USPO maintains its position in the Second Addendum, which applies the 4-level increase based on relevant conduct with Jane Doe 2, who was 11 years old.  See Third Addendum at 1.  The USPO also maintains that, although Yazzie denies the conduct that led the USPO to apply the 4-level increase under U.S.S.G. § 2A3.1(b)(1), "the Probation office obtained the information from the discovery pertaining to this case."  Third Addendum at 2.  The USPO reiterates its previous position regarding the 5-level increase under U.S.S.G. § 4B1.5(b)(1), based on Yazzie's pattern of activity over two years with Jane Doe 1 and over several months with Jane Doe 2.  See Third Addendum at 2.

In the Defendant's Addendum to Amended Sentencing Memorandum in Support of Rule 11(c)(1)(C) and Objections to PSR, filed July 26, 2013 (Doc. 110)("Sentencing Memo. Addendum"), Yazzie again objects to the USPO's application of the 5-level upward adjustment under U.S.S.G. § 4B1.5(b)(1).  Sentencing Memo. Addendum at 1.  Yazzie argues that the prohibited sexual conduct must be a prior sex offense conviction; he starts with Application Note 4(A) to U.S.S.G. § 4B1.5(b), which defines "prohibited sexual conduct" as "any offense described in 18 U.S.C. § 2426(b)(1)(A) or (B)."  Sentencing Memo. Addendum at 2 (quoting U.S.S.G. § 4B1.5(b) application note 4(A)).  That statute in turn defines the term "prior sex offense conviction" as

---

[12] According to the Court's calculations, this sentencing guideline range is based on an offense level of 36.  To reach this offense level, the Court would have to sustain Yazzie's objections to the enhancement under U.S.S.G. §§ 2A3.1(b)(1) and 2A3.1(b)(2), but would not sustain Yazzie's objection to the enhancement under U.S.S.G. § 4B1.5(b)(1).

"a conviction for an offense . . . (A) under this chapter, chapter 109A, chapter 110, or section 1591 . . . or; (b) under State law for an offense consisting of conduct that would have been an offense under a chapter referred to in paragraph (1) if the conduct had occurred within the special maritime and territorial jurisdiction of the United States . . . ."

Sentencing Memo. Addendum at 2 (quoting 18 U.S.C. § 2426(b)).  Yazzie argues that U.S.S.G. § 4B1.5(b) thus requires the prohibited sexual conduct to be a prior sex offense conviction, and, because he does not have any prior convictions, he argues that the upward adjustment should not be applied.  See Sentencing Memo. Addendum at 2-3.  The USPO responds, in the Fourth Addendum to the Presentence Report, disclosed July 31, 2013 ("Fourth Addendum"), that Application Note 4(B)(i) to U.S.S.G. § 4B1.5 and the 2011-2012 Federal Sentencing Guideline Handbook indicates that the 5-level increase "does not require a prior conviction and the 'pattern' can be conduct in the present offense."  Fourth Addendum at 1.

In the Fifth Addendum to the Presentence Report, disclosed August 6, 2013 ("Fifth Addendum"), the USPO revisited Yazzie's objection to the 4-level increase under U.S.S.G. § 2A3.1(b)(2), based on the age of the victims.  See Fifth Addendum at 1.  The USPO explains that, because Yazzie was not charged and did not plead guilty to the conduct with Jane Doe 2, that conduct is not relevant conduct in this case; instead, the USPO explains that U.S.S.G. § 2A3.1(b)(2)(B) applies, resulting in a 2-level increase.  See Fifth Addendum at 1.  The USPO calculates that the offense level is 40 and the criminal history category is I, resulting in a guideline imprisonment range of 292 to 365 months, but that, if the Court accepts the Plea Agreement, the sentence is 180 to 228 months.  See Fifth Addendum at 3.

**8.     Motion to Reconsider.**

In a handwritten letter dated June 7, 2013, Yazzie wrote to the Court, asking it to "please reconsider my plea to withdraw or put me on a lesser charge."  Motion to Reconsider at 1.

- 36 -

Yazzie explains that he "did not understand the law," and that he accepted the plea deal because Mr. Loonam, his attorney at the time, convinced him that he would lose at trial.  See Motion to Reconsider at 1.  He says that Mr. Loonam tried to convince him that he would lose, because Jane Doe 2 had an STD, and Yazzie had an STD in 2008, "but I did not know that a person cannot carry STD [sic] that long."  Motion to Reconsider at 1.  He says that the Shiprock Police in Shiprock, New Mexico, have Jane Doe 2's diary, in which she states that her uncle's son sexually assaulted her, and that Yazzie's wife has asked for the diary so Yazzie can use it in his case.  See Motion to Reconsider at 1.  According to Yazzie, Mr. Loonam also convinced him that he would lose at trial because of the statements he made to the FBI regarding Jane Doe 1.  See Motion to Reconsider at 1.  Yazzie asserts that he did not understand how Miranda v. Arizona works, and Mr. Loonam told him that they could not suppress the statement he made to the FBI, but that he does not think Miranda v. Arizona applies to him, because "there was no formal arrest."  Motion to Reconsider at 1.  Further, he contends that the FBI forced him to say that he penetrated Jane Doe 1, but that she has never stated that he penetrated her.  See Motion to Reconsider at 1.  Yazzie states:

> The way I see it I was force[d] to plea [be]cause [Mr. Loonam] has knowledge of the law and I did not.  I would of never took the plea even if [Mr. Loonam] try to convince me that I'll lose.  I would of got convicted on a lesser offense[]. . . . When the Judge ask[ed] me if I was force[d] to plea I said no [be]cause [Mr. Loonam] convince[d] me I would lose and I see that as force [be]cause he knew that I did not know the law to say that its wrong what the FBI did . . . .

Motion to Reconsider at 1.  Yazzie argues again that he did not use force and that establishing the victims' ages does not establish that he used force.  See Motion to Reconsider.  Yazzie asks the Court to reconsider its decision to deny the 1st Motion and 2nd Motion, and to allow him to withdraw his guilty plea; he says that he should be found guilty on a lesser charge, because "the plea was not knowing[] when I took it."  Motion to Reconsider.

On July 26, 2013, Yazzie's counsel, Ms. Middlebrooks, requested permission from the Court to withdraw from representing Yazzie "after his sentencing is complete on August 8, 2013 or whatever date his sentencing may be complete."  Motion to Withdraw and for Appointment of Appellate Counsel, filed July 26, 2013 (Doc. 111)(Motion to Withdraw).  Ms. Middlebrooks states as grounds that she is retiring from the practice of law, and "Yazzie intends to appeal this matter and will need counsel appointed to perfect the appeal."  Motion to Withdraw at 1.

On August 13, 2013, Yazzie, through his attorney Ms. Middlebrooks, supplemented his *pro se* Motion for Reconsideration, explaining that the basis of his Motion for Reconsideration is that "he was not apprised of the law regarding his options for a motion to suppress his statement to the FBI and had he known the law and his options, he would have requested his lawyer to file a suppression motion instead of entering into a plea."  Supplement to Motion for Reconsideration of Motion to Withdraw Plea of Guilty at 1, filed August 13, 2013 (Doc. 114)("Supplement").  Further, "Yazzie contends that had he taken his case to trial, he may only have been convicted on lesser charges and thereby, received less time than that contemplated in the plea agreement."  Supplement at 1.  He contends that, "[a]lthough the Federal Rules of Criminal Procedure do not expressly authorize a motion to reconsider," courts normally apply the same standards as those used in civil cases for motions to reconsider; he asserts that the Court "has not clearly comprehended his position," and thus, a motion to reconsider is appropriate.  Supplement at 2. He explains that the majority of his argument is based on the issues raised in his earlier requests to withdraw his guilty plea, but he also "provides a new argument that he was 'forced' to take the plea by virtue of the fact his lawyer allegedly withheld law regarding suppression of statements." Supplement at 2.  Ms. Middlebrooks asserts that, "even if this was Yazzie's argument in support of his motion to withdraw his plea, this argument was not clear to counsel and was not argued in

that specific way to the Court . . . ."   Supplement at 2.   Regarding the grounds that Yazzie

contends the Court did not fully appreciate, Ms. Middlebrooks explains that the Court "was fully

aware and apprised of Yazzie's contentions of suppression and the fact he believed he could

receive a lesser sentence if convicted of a lesser charge," and that the Court "thoroughly and

extensively considered the evidence presented and applied the law" when it denied Yazzie's

request to withdraw his guilty plea.   Supplement at 3.   Further, Ms. Middlebrooks notes that the

Court was required "only to conclude whether Yazzie had a 'full understanding of what the plea

connotes and of its consequences,'" and that, although Yazzie may not have understood "his

suppression options and suppression law," this knowledge is not the "equivalent to

understanding the plea and its consequences.   There is no new evidence that Yazzie did not

understand the plea and its consequences."   Supplement at 3-4 (quoting Boykin v. Alabama, 395

U.S. 238, 244 (1969)).

    Regarding Yazzie's new argument --"that he was 'forced' to take a plea because his

lawyer withheld case law from him on suppression matters" -- Ms. Middlebrooks says that there

is evidence that Yazzie was concerned about the statements he made to the FBI before he entered

his plea, but that Mr. Loonam "did not discuss the issue of custodial statements with Yazzie until

after the plea hearing," and that "[i]t is unclear whether Mr. Loonam discussed any other basis

for suppression of statements such as force or coercion, prior to the plea."   Supplement at 4.

Ms. Middlebrooks states that, while "a plea may be involuntary if counsel informs the defendant

that he has no choice" but to plead guilty, a lawyer's role is to "assimilate and synthesize

information" to help a client make the best choice, and "'[a]dvice -- even strong urging by

counsel does not invalidate a guilty plea.'"   Supplement at 5 (quoting Fields v. Gibson, 277 F.3d

1203, 1214 (10th Cir. 2002)).   Ms. Middlebrooks states that she does not know what Mr.

Loonam considered, such as suppression issues in light of "the overwhelming evidence against Yazzie, including Yazzie's own multiple admissions of guilt to the Court," and whether Yazzie could be convicted of a lesser offense, such as criminal sexual contact.  Supplement at 5. Ms. Middlebrooks notes that, although Yazzie says "that he was strong-armed by Mr. Loonam to take the plea," Mr. Loonam's "'strong urging' . . . may not invalidate a plea unless Yazzie clearly was not advised of all potential defenses and allowed to make a meaningful and knowledgeable decision whether to plead."  Supplement at 5 (quoting Fields v. Gibson, 277 F.3d at 1214).  Ms. Middlebrooks expresses concern that, if Yazzie withdraws his guilty plea, he may be "found guilty by a jury of the offenses for which he is indicted and receive a substantially hefty penalty and sentence."  Supplement at 5.

Yazzie filed the Unopposed Motion to Continue Sentencing, filed August 14, 2013 (Doc. 115)("Motion to Continue"), requesting the Court to vacate the sentencing set for August 16, 2013, and to continue the sentencing to a later date; as grounds, Ms. Middlebrooks states that she "has had discussions with Yazzie's previous counsel, Jim Loonam, which contradict and impact the supplement filed on Yazzie's behalf."  Motion to Continue ¶ 2, at 1.

> Undersigned counsel requests additional time in order to visit with Yazzie, review the supplement, case law pertaining to reconsideration motions, and to discuss the conversation with Mr. Loonam.  Depending on the outcome of this meeting, undersigned counsel may either withdraw the motion to reconsider or will be filing an amendment to the supplement.

Motion to Continue ¶ 3, at 1.  The Court granted the Motion to Continue on August 16, 2013. See Order Granting Motion to Continue August 16, 2013 Sentencing Hearing, filed August 16, 2013 (Doc. 116).

In the Second Supplement to Motion for Reconsideration of Motion to Withdraw Plea of Guilty, filed August 19, 2013 (Doc. 117)("Second Supplement"), Yazzie, through his counsel,

- 40 -

reasserts his position that the Court did not "have a sufficient understanding of his position pertaining to his request to withdraw his guilty plea," and that Mr. Loonam "did not sufficiently advise him of his legal defenses in order to allow him to make an informed decision as to whether to enter into a guilty plea," essentially forcing him to enter the plea.  Second Supplement at 1.  Yazzie explains that he "personally believes Mr. Loonam withheld relevant case law from him," but "concedes that he does not have evidence that Mr. Loonam intentionally withheld case law from him in order to coerce him to take a plea."  Second Supplement at 1-2.  Nonetheless, Yazzie argues that "he was forced to take a plea by actions of his attorney and by his lack of knowledge of law he believes supports a suppression of his statement to the FBI as well as suppression of other evidence."  Second Supplement at 2.

Yazzie concedes several issues regarding his interactions with Mr. Loonam, and waives at least some attorney-client privilege related to these discussions:

> Prior to the plea, Mr. Loonam discussed the issues regarding a forced and coerced confession with Yazzie and advised Yazzie that the FBI can force a defendant to make statements and that in his opinion, there was no way to challenge the statement Yazzie gave to the FBI.  Mr. Loonam told Yazzie that he would "fight for" Yazzie if he chose to do that.  Mr. Loonam also advised Yazzie that the evidence consisting of Yazzie's medical records that were obtained by the FBI showed that Yazzie had a sexually transmitted disease ("STD") and that Jane Doe #2 also had an STD.  Mr. Loonam advised Yazzie that he felt this evidence and his statement to the FBI would result in a conviction for Yazzie.  One week prior to the trial date, Mr. Loonam met with Yazzie again and told him he better take the plea because the trial date was the following week.

Second Supplement at 2.  Yazzie argues that Mr. Loonam did not request the Court to continue the trial date to allow Yazzie further time to consider the plea and did not discuss with him the merits of suppressing the plea under 18 U.S.C. § 3501(c), which excludes a confession that was made more than six hours after arrest but before arraignment, when the delay between arrest and arraignment is unreasonable, even if the confession was voluntary.  See Second Supplement at 2-

3.  Yazzie explains that Shiprock Police arrested him on a bench warrant for an unrelated matter,

and that the Shiprock court was going to release him

> until the Shiprock prosecutor informed the court that Yazzie had a federal hold
> regarding this matter.  At the time, Yazzie had not been indicted by a federal
> grand jury for these charges.  Yazzie remained in custody until he was
> interrogated by the FBI on these charges approximately two or three days after the
> Shiprock court announced his federal hold.

Second Supplement at 3 n.3.  Yazzie contends that he was "arrested" when a federal hold was

placed on him and that his confession must be suppressed due to unreasonable delay.  Second

Supplement at 3 n.3.  Further, Yazzie contends that Mr. Loonam stressed the damaging

connection between Yazzie's medical records, which revealed he had been treated for an STD

years earlier, and that Jane Doe 2 allegedly had an STD, but that Mr. Loonam did not discuss

suppressing Yazzie's medical records, "which were received in violation of [the Health

Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936

("HIPAA")] . . . [and] obtained without Yazzie's consent or waiver of his privacy interests and in

violation of his Constitutional rights to privacy," although the law provides remedies to suppress

medical records that were obtained by compelled disclosure.  Second Supplement at 3.  Yazzie

argues that "confidential medical information is entitled to constitutional privacy protection,"

and that "[t]he HIPPA [sic] laws further forbid disclosure of a patient's medical records or

discussion of those records unless that privileged care is waived by the patient."  Second

Supplement at 3-4 n.3 (citations omitted).  Yazzie asserts that he took the plea "based on his lack

of knowledge of 18 U.S.C. § 3501(c) and the fact Mr. Loonam felt Yazzie's medical records

containing a reference to an STD would result in a conviction"; it was only after the plea that Mr.

Loonam discussed and researched 18 U.S.C. § 3501(c) for Yazzie, but "Yazzie had no

knowledge to this day of his rights under HIPPA [sic] and that matter was never discussed." Second Supplement at 4.

Ms. Middlebrooks explains that she communicated with Mr. Loonam via electronic mail on August 14, 2013, and that Mr. Loonam said he discussed suppression issues with Yazzie before the plea, although he did not specifically discuss 18 U.S.C. § 3501(c) with Yazzie until after the plea; Mr. Loonam said that his and a colleague's assessment was that "there was no viable suppression of Yazzie's statement," but he would have argued for suppression had Yazzie chosen trial.  Second Suppression at 4.  Yazzie argues that, although he does not have evidence that "Loonam intentionally withheld law from him," the Court should allow him to withdraw his guilty plea, because "he did not know the law of 18 U.S.C. § 3501(c) prior to his plea and because he erroneously believed he would be faced with his medical records containing reference to an STD," and thus, "he was 'forced' to take a plea."  Second Supplement at 4.

9. **<u>Hearing on the Motion to Reconsider.</u>**

The Court held a hearing on September 13, 2013; Ms. Middlebrooks, on behalf of Yazzie, began by explaining that the Motion to Reconsider raises issues that Yazzie believes were not adequately before the Court at the February 4, 2012 hearing; although he concedes that the Court considered his argument that he was not informed of his options regarding suppressing his statements, he argues that his plea was not knowingly and voluntarily made, and that the Court focused its analysis on whether he understood the plea and its consequences rather than whether he understood his alternative courses of action before he entered the plea.  <u>See</u> Transcript of Hearing at 5:23-7:1 (Middlebrooks), taken September 13, 2013 ("Sept. 13 Tr.").  Ms. Middlebrooks stated that she takes responsibility for the confusion, because she argued at

the original hearing that Yazzie made a knowing and voluntary plea based on Dr. Foote's

competence finding:

> I recall very well my direct statement to the Court was, this was a knowing and
> voluntary plea on the basis that Dr. Foote had done a psychological evaluation of
> Mr. Yazzie and determined that not only was he competent to understand what
> was happening in the proceedings, but he was competent to understand what
> happened in the plea agreement, and that there was no force or coercion based on
> the questions that Dr. Foote had asked Mr. Yazzie.

Sept. 13 Tr. at 7:4-11 (Middlebrooks).   She explained that she did not realize that Yazzie's

argument was opposite of what she had argued at the initial hearing until she spoke with Yazzie

in preparation for sentencing.   See Sept. 13 Tr. at 7:15-25 (Middlebrooks).   Ms. Middlebrooks

said that Yazzie has waived his attorney-client privilege related to the conversations he had with

Mr. Loonam before he entered his plea, and that Yazzie has been "very candid" with her

regarding his discussions with Mr. Loonam; Yazzie concedes that Mr. Loonam discussed

suppressing forced and coerced statements, and that Mr. Loonam's colleague reviewed the issue

and came to the same conclusion that they could not suppress the statements, but Yazzie says

Mr. Loonam did not discuss suppressing statements under 18 U.S.C. § 3501.   Sept. 13 Tr. at 8:7-

25 (Middlebrooks).   Ms. Middlebrooks explained that 18 U.S.C. § 3501 permits a court to

suppress a statement that, although made voluntarily, was made more than six hours after the

time of arrest when the time between the arrest and arraignment is unreasonable.   See Sept. 13

Tr. at 9:1-7 (Middlebrooks).   Ms. Middlebrooks said that Mr. Loonam did not discuss this

provision with Yazzie until after the plea hearing, when Yazzie raised the issue with

Mr. Loonam; Yazzie did not initially have library access at the Torrance County detention

center, but when he gained access, he made a "conscious effort to . . . try to understand what was

going on with his case legally."   Sept. 13 Tr. at 9:10-24 (Middlebrooks).   After Yazzie raised the

issue with Mr. Loonam, Mr. Loonam concluded that "there was a reasonable delay in this case"

and that, therefore, 18 U.S.C. § 3501 would not apply to suppress Yazzie's statements.  Sept. 13 Tr. at 9:22-24 (Middlebrooks).

Ms. Middlebrooks admitted that she has "looked into the issue very peripherally," but that the evidence she has seen is unclear regarding when Yazzie was arrested: he was initially arrested on a DWI, and while the DWI proceedings were pending in the tribal court, there were also pending proceedings regarding custody of the children and whether they would be taken out of the home and placed elsewhere.  Sept. 13 Tr. at 9:25-11:9 (Middlebrooks).  She said that she believes Yazzie was arrested on May 4 or 5, 2010, went to tribal court on either May 4 or 5, 2010, and was supposed to be released, but "it was announced that there was a fee hold on him for these charges," and so he was held in custody and the FBI interviewed him.  Sept. 13 Tr. at 10:10-17 (Middlebrooks).  Ms. Middlebrooks stated that she did not know if it was a "true hold," but that charges were filed on May 10 or 11, 2010.   Sept. 13 Tr. at 10:18-25 (Court, Middlebrooks).  Ms. Middlebrooks said that the documents which she has reviewed "are very confusing to read," because they are dated 2006 and 2007, but refer to events in 2010, and that she would need to see the documentation from tribal court "and then probably speak to someone in the tribal court to understand why their documents read that way, what was happening, when was the actual arrest . . . was there a federal hold and things of that nature."  Sept. 13 Tr. at 11:7-23 (Middlebrooks).  The Court noted that there would not be a federal hold unless Yazzie was charged; Ms. Middlebrooks said she believed that statement is true, but that the Criminal Complaint was not filed until May 10 or 11, 2010.  See Sept. 13 Tr. at 11:24-12:16 (Court, Middlebrooks).  Ms. Middlebrooks explained that Yazzie believes he was technically in federal custody "when it was announced in the tribal court that he was on a federal hold," and that his "six hours would have started to tick at that point"; after Ms. Middlebrooks conferred with

- 45 -

Yazzie, she said that Yazzie was detained on the federal hold on May 7.  Sept. 13 Tr. at 13:2-18 (Court, Middlebrooks, Yazzie).  Yazzie made his confession on May 10.  See Sept. 13 Tr. at 13:19-25 (Court, Yazzie, Middlebrooks).  As Ms. Middlebrooks understood the situation, Mr. Loonam concluded that Yazzie was not arrested on federal charges until May 10 or 11, that reasonable delay could include transporting Yazzie from Shiprock to Albuquerque, New Mexico for initial proceedings or events taking place over a weekend, that there was a reasonable delay between arrest and when Yazzie confessed, and therefore, 18 U.S.C. § 3501 would not apply to suppress Yazzie's statements.  See Sept. 13 Tr. at 14:2-11 (Middlebrooks).  Ms. Middlebrooks explained that, if Yazzie was arrested or on a federal hold prior to May 10 or 11, 2010, when the charges were filed, then "there would be some merit to this argument" that his confession should be suppressed under 18 U.S.C. § 3501.  Sept. 13 Tr. at 14:12-15:3 (Middlebrooks).  After conferring with Yazzie, Ms. Middlebrooks clarified that Yazzie was arrested in tribal court on May 7, 2010, he went to court on May 8, 2010, at which point it was announced that there was a federal hold, he made his confession and was transferred into federal custody on May 10, 2010, and the Criminal Complaint and initial appearance came on May 11, 2010.  See Sept. 13 Tr. at 30:13-31:5 (Middlebrooks, Court).

Ms. Middlebrooks explained that the other issue Yazzie wishes the Court to consider relates to the connection between his medical records, revealing that he had an STD, and that Jane Doe 2 allegedly had an STD, and that Mr. Loonam never discussed with Yazzie the possibility of suppressing his medical records.  See Sept. 13 Tr. at 15:15-16:6 (Middlebrooks).  Ms. Middlebrooks said that the United States subpoenaed the medical records and obtained them in violation of HIPAA, and that Yazzie never waived his privilege regarding those records.  See Sept. 13 Tr. at 16:7-17 (Court, Middlebrooks).  Ms. Middlebrooks asserted that HIPAA provides

- 46 -

six specific exceptions for law enforcement to obtain medical records, but none of those exceptions would apply in Yazzie's case; further, there may have been other arguments that the way the United States obtained Yazzie's medical records violated his constitutional rights and rights to medical privacy.  See Sept. 13 Tr. at 16:17-17:9 (Middlebrooks).  Ms. Middlebrooks explained that, while she was uncertain whether Yazzie's statement could have been suppressed under 18 U.S.C. § 3501, she is more confident that the medical records could have been suppressed.  See Sept. 13 Tr. at 17:10-17 (Middlebrooks).  Ms. Middlebrooks conceded that, even if the Court had suppressed the medical records, there would have been "other factors and other issues in the discovery that [Yazzie] would have to overcome at trial"; she explained that Yazzie's concern is that he did not have an understanding of 18 U.S.C. § 3501(c) or his HIPAA rights until after he pled guilty, and that, because he did not understand his alternatives and possible defenses, the plea was not knowing and voluntary.  See Sept. 13 Tr. at 17:18-18:10 (Middlebrooks).  Although Yazzie initially seemed to argue that Mr. Loonam intentionally withheld law, Ms. Middlebrooks said that Yazzie does not have evidence of that action and that, thus, Yazzie's argument is that Mr. Loonam did not sufficiently explore these issues with Yazzie to enable Yazzie to make an informed decision.  See Sept. 13 Tr. at 18:11-23 (Middlebrooks).

The Court asked the parties about the Sentencing Guidelines range for Yazzie; Ms. Middlebrooks said the latest addendum to the PSR -- the Fifth Addendum -- set the offense level at 40, criminal history category I, resulting in a sentencing guidelines range of 292 to 365 months.  See Sept. 13 Tr. at 19:12-20:2 (Court, Middlebrooks).  Ms. Middlebrooks said that the Plea Agreement has a proposed range of 15 to 19 years, and that the United States is asking for 19 years, but Yazzie is asking for 15 years.  See Sept. 13 Tr. at 20:3-10 (Middlebrooks).  Ms. Middlebrooks explained that the 15 to 19 year range is favorable if he were convicted on the

statute to which he pled guilty, but that Yazzie is arguing that the most appropriate offense is abusive sexual contact, because, although he is not asserting outright innocence, he says that he never penetrated Jane Doe 1 with his finger.  See Sept. 13 Tr. at 20:11-21:4 (Middlebrooks).  Ms. Middlebrooks asserted that Yazzie understands his situation that, if he were to go to trial, he could be convicted and sentenced to a substantial amount of time, but he also believes he could be convicted of a lesser statute that carries a penalty of ten years or less.  See Sept. 13 Tr. at 21:7-19 (Middlebrooks).  Ms. Middlebrooks said that, if the Court were to sustain all of Yazzie's objections to the PSR and addendums, the sentence would be 15 years, consistent with the low end of the 11(c)(1)(C) agreement.  See Sept. 13 Tr. at 21:20-23:8 (Court, Middlebrooks).[13]  The United States agreed with Yazzie's initial calculation of an offense level at 40, criminal history category at I, placing the Sentencing Guidelines range between 292 to 365 months.  See Sept. 13 Tr. at 23:23-24:6 (Wishard).  Yazzie objected to the PSR, stating that the conduct that the USPO described did not meet the definition of a sexual act; according to Yazzie, this error led the USPO to mistakenly apply a 4-level enhancement under U.S.S.G. § 2A3.1(b)(1), and, if sustained, would lower the range to 188 to 235 months.  See Sept. 13 Tr. at 24:20-25:18 (Court, Middlebrooks); Sentencing Memo. at 3.  Further, Yazzie objects to the 5-level upward adjustment under U.S.S.G. § 4B1.5(b)(1); if sustained, Yazzie said that would lower the level to 29.[14]  See Sept. 13 Tr. at 26:17-25 (Middlebrooks); Sentencing Memo. Addendum at 1.  Yazzie explained that the USPO already dropped his criminal history category to 1.  See Sept. 13 Tr. at 27:6-10 (Middlebrooks).

---

[13] Ms. Middlebrooks appears to contradict this statement later in the hearing.

[14] The Court believes Ms. Middlebrooks miscalculated the total offense level if the Court sustains all of Yazzie's objections; according to the Court's calculations, the total offense level would be 31, not 29, resulting in a range of 108 to 135 months.

Ms. Middlebrooks said this case has been a difficult one for her to present from a sentencing standpoint, because on one hand, Yazzie pled guilty to the facts stated in the Plea Agreement, but on the other hand, Yazzie denies the factual basis, saying that penetration never occurred and that he, at most, committed sexual contact, not a sexual act.  See Sept. 13 Tr. at 27:22-28:4 (Middlebrooks).

> I understand how complicated and messy this could be, because the arguments that I felt I had to raise are based on what my client has told me, which [are] extremely different than the plea agreement.  And I've advised the client the consequences that he could face in terms of arguing against the plea agreement . . . .

Sept. 13 Tr. at 28:20-25 (Middlebrooks).  Ms. Middlebrooks stated that she is concerned that the United States Attorney's Office could withdraw the Plea Agreement, and although Yazzie would prefer that action, she is concerned about the amount of time Yazzie could serve if he were to be convicted at trial; he was originally indicted under 18 U.S.C. § 2241(c) for a sexual act involving minors, which carries a mandatory minimum of thirty years to life in prison, but he pled to 18 U.S.C. § 2241(a), which does not have a mandatory minimum but can carry a life sentence.  See Sept. 13 Tr. at 29:1-15 (Middlebrooks).  Yazzie contends that he should have pled to 18 U.S.C. § 2244, abusive sexual contact, and that the penalty for that crime is up to ten years.  See Sept. 13 Tr. at 29:16-23 (Middlebrooks).  "[H]e understands if he were to go to trial he could be convicted and face a mandatory minimum of 30 years, but he also believes it's possible a jury could convict him of a lesser statute, in which case he may be looking at less time . . . ."  Sept. 13 Tr. at 29:19-23 (Middlebrooks).  Ms. Middlebrooks acknowledged that the Court said in its MOO that it did not want to play a guessing game and that it has no way to determine what would happen at trial.  See Sept. 13 Tr. at 29:24-31:4 (Middlebrooks).

- 49 -

The Court noted that, if it sustains the objections to the PSR, then it will be working with a Sentencing Guidelines range that is roughly equal to the plea deal, and that, when it denied the request to withdraw the plea, it was considering a much higher range of 360 months to life; the Court said it would likely need to resolve the objections to the PSR to determine what the applicable Sentencing Guidelines range would be.  See Sept. 13 Tr. at 31:12-25 (Court).  The Court asked whether the United States could prove the United States Probation Office's enhancements by the preponderance of the evidence; based on the relaxed rules of evidence and relaxed standard, the United States asserted it could prove the enhancements by a preponderance of the evidence, placing Yazzie at an offense level of 40.  See Sept. 13 Tr. at 32:4-14 (Court, Wishard).  The United States said that, if Yazzie objected, the Court could ascribe whatever weight it felt Yazzie's current testimony deserves versus what he said in the past, and could also consider what the victims said shortly after the alleged incidents.  See Sept. 13 Tr. at 32:15-33:4 (Court, Wishard).  The United States said that it probably would not include the victims' testimony at trial, and that the change in the victims' testimony weighs against allowing Yazzie to withdraw, because the United States would have difficulty proving its case now that time has elapsed.  See Sept. 13 Tr. at 33:2-16 (Wishard, Court).  The United States argued that, at the appellate level, the Motion to Reconsider would have been filed as an Anders brief,[15]  and stated that "it really feels as though we're replowing ground here . . . alleging ineffective assistance of Mr. Loonam in negotiating and executing the plea agreement"; further, the United States

---

[15] An Anders brief derives its name from Anders v. California, 386 U.S. 738 (1976), in which a court-appointed attorney filed a motion to withdraw from the criminal appeal, because he believed that the appeal was frivolous.  See 386 U.S. at 739.  The Supreme Court ruled that any such motion must be accompanied by a brief, outlining the case and any potential grounds for appeal -- even if frivolous, that the appellate court should independently review the case, and that a defendant must be allowed the right to appeal either pro se or by other counsel.  See 386 U.S. at 744-45.

contended that if the Court were to sustain all the objections, the Sentencing Guidelines range would still be in line with the range in the 11(c)(1)(C) agreement.  Sept. 13 Tr. at 33:17-34:7 (Wishard).  "[A] big factor in the Court's reasoning was you didn't want to preside over another train wreck, and this trial would be a slow and painful process if the Court were to allow him to withdraw the plea."  Sept. 13 Tr. at 34:8-11 (Wishard).

The United States asked the Court to find that the PSR is correctly calculated or, if the Court sustains Yazzie's objections, to sentence Yazzie within the guideline range, to grant Ms. Middlebrooks' Motion to Withdraw after sentencing, and to "allow the appellate attorney to start to tease some of these issues out in a way that we can litigate in a linear and rational form."  Sept. 13 Tr. at 34:22-35:3 (Wishard).  The Court noted that it would be best to calculate the sentencing range, but that is difficult because it is such a large range, and, if Yazzie were to go to trial, the United States might recharge him or seek other counts rather than those to which he pled.  See Sept. 13 Tr. at 35:10-36:3 (Court).  The Court asked, if it were to hold a hearing on the factual statements in the PSR, what Yazzie would do to put the statements in issue.  See Sept. 13 Tr. at 36:8-12 (Court).  Ms. Middlebrooks said that, in the discovery, the victims "have never made any admission whatsoever of the penetration of the finger.  That statement came from Mr. Yazzie in his interview with the FBI, which, of course, Mr. Yazzie's position is that he was forced and coerced to say these things . . . ."  Sept. 13 Tr. at 36:13-17 (Middlebrooks).  She said that, during the interview, Yazzie repeatedly denied penetration, and after some length of time, the FBI asked something to the effect of "'well, don't you think you may have penetrated her slightly?' or something along those lines and he said basic[al]ly 'if you say so,' which at this point he's made an admission that he penetrated her with his finger."  Sept. 13 Tr. at 36:20-37:1 (Middlebrooks).  Ms. Middlebrooks asserted that Yazzie would testify at an evidentiary hearing,

stating his version of the events, and that she does not know to what the victims would testify; they have not heretofore said that he penetrated them with his finger, and they sent vague letters denying some of their previous allegations.   See Sept. 13 Tr. at 37:5-9 (Middlebrooks). Ms. Middlebrooks said Jones, Yazzie's counsel before her, hired investigators to contact the victims and find out what allegations they deny, but they did not respond; Ms. Middlebrooks said that she assumes that, if they came to court, they would not say that there was any penetration. See Sept. 13 Tr. at 37:10-18 (Middlebrooks).  In Ms. Middlebrooks' view, she is not making an Anders motion, because she believes the arguments she presented have merit.  See Sept. 13 Tr. at 37:19-38:2 (Court, Middlebrooks).   She said she shares the Court's concern that, if Yazzie withdraws his plea, he could be hit with the mandatory minimum of thirty years.  See Sept. 13 Tr. at 38:3-12.  Although "it may go the other way" and Yazzie may get convicted under a different statute with a ten-year sentence, she said that she is not sure, if she were making the call, that she would risk the possible thirty years when the difference between the Plea Agreement and the lesser conviction is five years.  See Sept. 13 Tr. at 38:3-17 (Middlebrooks). Ms. Middlebrooks noted that the Plea Agreement would likely come into evidence at trial and it would take a lot of explanation why Yazzie admitted these facts and now denies them.  See Sept. 13 Tr. at 38:18-23 (Middlebrooks).  On the other hand, although he made additional admissions in the letters to the Court, stating that he knew what he did was wrong, he did not admit any penetration.  See Sept. 13 Tr. at 38:23-39:3 (Middlebrooks)(not stating which letters, but probably referring to the May 2, 2011 Letter, in which Yazzie says: "Yes I did wrong with JD1 but we did that with no madness or force and she the one that like me but I should of not did what I did with her"; and the May 15, 2011 Letter at 1, in which Yazzie says: "Because of my wrong confession that is why I'm saying that I did not use force and penetration.  I should have

been under sexual contact for my charge.  Also [Jane Doe 1's] statement say[s] that there was no penetration.  I'm sorry for what I have done and forgive me.").  Ms. Middlebrooks said those letters would likely come into evidence, but would not hurt Yazzie's position that he is guilty of sexual contact rather than of a sexual act; the problem, in Ms. Middlebrooks' view, is that Yazzie would be in the difficult position of trying to explain too much to the jury, when he should be focusing on creating reasonable doubt.  See Sept. 13 Tr. at 39:3-23 (Middlebrooks).  The Court asked what Yazzie would do if it held a hearing "to deal with the objection to the factual statements in the PSR" and to determine what to do on the 1st Motion and 2nd Motion; the Court specifically questioned whether Ms. Middlebrooks wanted to be in the position of putting Yazzie on the stand to testify under oath.  Sept. 13 Tr. at 40:18-41:7 (Court, Middlebrooks).  Ms. Middlebrooks said that she had no reason to doubt Yazzie and that the statement he made to the FBI was not under oath.  See Sept. 13 Tr. at 41:3-15 (Middlebrooks).

## 10.    **Additional Filings.**

Apparently without the assistance of counsel, Yazzie handwrote the Addendum to the Motion for Reconsideration of Withdrawl [sic] of Plea, filed October 29, 2013 (Doc. 121)("Addendum"), and argues that the affidavit for his arrest warrant lacks probable cause and renders "official belief in its existence entirely unreasonable."  Addendum at 1 (citing United States v. Leon, 468 U.S. 897, 923 (1984)).  He argues that the first paragraph in the affidavit does not "state the names of the FBI and CI for the Navajo Nation Police Department and the location of the crime and the Police Department"; that the second paragraph does not

> state any existence of the Navajo Tribal Police Department in Shiprock that they were notified by Navajo Nation Social Services that two females where [sic] molested by Willis Yazzie.  There is also no evidence that ties me to the incidents of the location.  There is also no evidence that the case was referred to the FBI.  There is no evidence of the Navajo Police Department and Social Services that is attached to the affidavit for evidence.

- 53 -

Addendum at 1.  Yazzie argues that paragraphs three through thirteen do not "have attachment for evidence that we all get interview [sic] and by who."  Addendum at 1.  For paragraphs fifteen and sixteen, Yazzie argues that the FBI did not state that it had "belief or knowledge of the offense" or that they had probable cause for the search or arrest.  Addendum at 1-2.  Yazzie contends that there was no probable cause for the search or his arrest.  See Addendum at 2.

Yazzie, through his counsel Ms. Middlebrooks, clarifies that he is not asking the Court "to issue an advisory opinion on his Addendum," but that he submitted the Addendum "for the Court to consider as a possible issue he could have raised pre-plea."  Supplement to Defendant's Pro Se Addendum to Motion for Reconsideration of Withdrawal of Plea ¶ 2, at 1, filed November 15, 2013 (Doc. 122)("Addendum Supplement").  Ms. Middlebrooks notes that, "on its face, the Affidavit in support of the Criminal Complaint contains probable cause for the issuance of the Criminal Complaint and to bind the matter over to the District Court," and further, that the case Yazzie cites -- United States v. Leon -- "does not appear to be on point."  Addendum Supplement ¶ 3, at 1.  Ms. Middlebrooks explains that Yazzie "erroneously" argues that there was not probable cause in the Criminal Complaint Affidavit, but "in reality, his issue is centered on wrongful arrest/questioning."  Addendum Supplement ¶ 4, at 2.  Ms. Middlebrooks describes that the discovery she has received and reviewed lend credence to Yazzie's arguments regarding the timing of his arrest:

> Special Agent Dustin Grant states that he, along with Navajo Nation Public Safety Criminal Investigator, Louis St. Germaine, conducted a probable cause arrest of Yazzie after he was released from Tribal Jail.  Yazzie was taken into custody without incident and transported to San Juan County Detention in Farmington where he submitted to questioning.  According to discovery, this occurred on or about May 10, 2010.  However, the discovery also contains a document from the Shiprock Police that indicates Yazzie was in fact arrested on May 7, 2010, on incident No. 02-10-012403, entitled, "paper service," and which is totally separate from 02-08-039054, the alleged underlying DWI matter.  It therefore appears that

consistent with Yazzie's argument to this Court at the hearing on his motion to reconsider the Court's denial of his withdrawal of guilty plea, that Yazzie may have been arrested on this matter as early as May 7, 2010.  Any probable cause arrest of Yazzie either on May 7, 2010 or May 10, 2010, should be supported by probable cause.

Addendum Supplement ¶ 4, at 2.  Ms. Middlebrooks further explains that on May 5, 2010, Margaret Harjo, Jane Doe 1's and Jane Doe 2's mother and Yazzie's wife, told Shiprock Police that "Yazzie admitted to her allegations of sexual abuse."  Addendum Supplement ¶ 4, at 2.  On April 30, 2010, the Navajo Nation Medical Center interviewed the alleged victims regarding the sexual assault allegations, but Germaine did not request this information until May 10, 2010.  See Addendum Supplement at ¶ 4, at 2-3.

> It is not clear from the discovery whether the FBI or Mr. Germaine had the medical records information at the time the probable cause arrest occurred on or about May 10, 2010.  If in fact Yazzie was arrested on May 7, 2010, as appears may be the case, it is more than certain that the FBI and tribal authorities did not have the medical records and interview of the alleged victims on which to base probable cause.   Whether Margaret Harjo's statement of May 5, 2010, is sufficient to establish probable cause for the arrest would have been a matter for the Court to decide.

Addendum Supplement ¶ 4, at 3.  Ms. Middlebrooks notes that, "even if Yazzie is successful in challenging these issues at some later date, it is not clear to what extent these possible victories would advance his case toward an acquittal or lesser sentence."  Addendum Supplement ¶ 6, at 3.  Ms. Middlebrooks states that "Yazzie has already inundated this Court with multiple admissions via letter format," and that the letters and the plea "would more than likely be proper evidence before the jury," in which case Yazzie would "be in the difficult position of trying to explain too much instead of trying to establish reasonable doubt."   Addendum Supplement ¶ 6, at 3.  Ms. Middlebrooks asserts that Mr. Loonam could have raised these issues to the Court before the plea, and that Mr. Loonam could have questioned the basis of probable cause to arrest Yazzie

and take his statement, but instead, Mr. Loonam waived the preliminary hearing.   Addendum Supplement ¶ 6, at 3-4.

Ms. Middlebrooks submitted the Second Motion to Withdraw, filed November 21, 2013 (Doc. 125), stating that she initially asked to withdraw as Yazzie's counsel at the conclusion of his sentencing, which was scheduled to be in August, 2013, but that Yazzie has since renewed motions with the Court to withdraw his guilty plea.   Second Motion to Withdraw at 1.   "This matter is far from resolution given Yazzie's continuing practice of filing motions.   Additionally, if this Court allows Yazzie to withdraw his plea of guilty, Yazzie will proceed with a lengthy series of suppression motions and then trial."   Second Motion to Withdraw at 1. Ms. Middlebrooks explains that she retired in July, 2013, and only remained on this case because she believed the Court would sentence Yazzie in August, 2013; thus, she requests to withdraw as counsel and asks the Court to appoint new CJA counsel on Yazzie's behalf.   Second Motion to Withdraw at 1-2.   Yazzie opposes Ms. Middlebrooks' Second Motion to Withdraw.   See Supplement to Second Motion to Withdraw, filed December 3, 2013 (Doc. 128).

## LAW REGARDING WITHDRAWAL OF GUILTY PLEAS

Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure governs a motion to withdraw a guilty plea before the imposition of a sentence, and provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B).   Defendants do not have an absolute right to withdraw a guilty plea.   See United States v. Siedlik, 231 F.3d 744, 748 (10th Cir. 2000).   District courts, however, have broad discretion in determining whether to grant motions to withdraw pleas.   See United

States v. Wright, 392 F. App'x 623, 627 (10th Cir. 2010)(unpublished)[16]("We review the district

court's denial of a motion to withdraw a guilty plea for an abuse of discretion."); United States v.

Garcia, 577 F.3d 1271, 1274 (10th Cir. 2009)("Although a motion to withdraw a plea prior to

sentencing should be freely allowed, we will not reverse unless the defendant can show that the

court acted unjustly or unfairly.").  The Tenth Circuit has repeatedly held that, when a defendant

moves to withdraw a guilty plea before sentencing, the court must assess whether there is a fair

and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal
> would prejudice the government; (3) whether the defendant delayed in filing his
> motion, and, if so, the reason for the delay; (4) whether withdrawal would
> substantially inconvenience the court; (5) whether close assistance of counsel was
> available to the defendant; (6) whether the plea was knowing and voluntary; and
> (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d 1139, 1142 (10th Cir. 2005).  While treated sometimes as an

eighth factor, a district court may properly consider "the likelihood of conviction" when

---

[16] United States v. Wright, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Wright, United States v. Griffin, 191 F. App'x 699 (10th Cir. 2006)(unpublished), United States v. Sandoval, 427 F. App'x 621, 623 (10th Cir. 2011)(unpublished), United States v. Lee, 535 F. App'x 677, 680 (10th Cir. 2013)(unpublished), United States v. Wright, 392 F. App'x 623, 628 (10th Cir. 2010)(unpublished), United States v. Burciaga, 66 F. App'x 812, 814 n.2 (10th Cir. 2003)(unpublished), and United States v. Alvarado-Benjume, 251 F. App'x 586, at 589 (10th Cir. 2007)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

assessing whether to permit withdrawal of a guilty plea.  United States v. Carr, 80 F.3d 413, 421 n.5 (10th Cir. 1996)(recognizing that the Tenth Circuit has "suggested an additional factor to consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th Cir. 1990)).  Accord United States v. Begaye, 2012 WL 119602, at *10 ("The Court believes the consideration of likelihood of conviction is relevant here, either in the context of the two factors of whether withdrawal would substantially inconvenience the Court or waste judicial resources, or as an additional factor.").

The defendant bears the burden of demonstrating a "fair and just reason" for withdrawal of the plea.  United States v. Griffin, 191 F. App'x 699, 701 (10th Cir. 2006)(unpublished).  In assessing a motion to withdraw a guilty plea, courts should give particular weight to knowing and voluntary statements that the defendant made under oath at the plea hearing.  See United States v. Messino, 55 F.3d 1241, 1248 (7th Cir. 1995).  In reaching their decisions, courts should also remember that "[t]he plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom."  United States v. Morrison, 967 F.2d 264, 268 (8th Cir. 1992).  While the right to withdraw a guilty plea before sentencing, therefore, is not absolute, the court should allow relief when the defendant can show a fair and just reason for withdrawal.  See United States v. Jim, 2011 WL 6013093, at *6-7.

In United States v. Harmon, 871 F. Supp. 2d 1125 (D.N.M. 2012)(Browning, J.), the Court determined that a defendant had not shown a fair and just reason for withdrawing his guilty plea.  The defendant did not assert his innocence, but, rather, asserted that the Court should suppress the evidence against him.  The defendant requested that the Court reconsider its previous decision to not suppress evidence against him.  The Court denied the request for reconsideration, and determined, therefore, that the defendant had not presented a fair and just

reason for withdrawing his guilty plea, as the United States possessed the same evidence to convict him as it did when the defendant pleaded guilty.  See 871 F. Supp. 2d at 1171-75.  In United States v. Begaye, the Court applied the seven factors in United States v. Yazzie, and determined that the defendant failed to present a fair and just reason for withdrawing his guilty plea.  See United States v. Begaye, 2012 WL 119602, at **8-12.  The defendant asserted that he may have a self-defense defense, but the Court found that he had not made a credible claim of innocence, and determined that a slim possibility of acquittal was not a fair and just reason for allowing the defendant to withdraw his plea.  See 2012 WL 119602, at *8-9, 11-12.  In United States v. Jim, the Court permitted a defendant to withdraw his plea of guilty, because the defendant expressed that he did not understand that he waived his right to proceed to trial by entering into a plea agreement, and the judge taking the plea did not use the word "trial" during the plea colloquy.  United States v. Jim, 2011 WL 6013093, at *13.  The Court allowed Jim to withdraw his plea, even though the plea agreement included a waiver of Jim's right "to have a trial by jury."  Plea Agreement ¶¶ 2(c), 3, at 1-2, filed in Case No. CR 10-2653 JB on February 28, 2011 (Doc. 25).

## LAW REGARDING RULE 410 WAIVERS

The general rule is that evidence of a guilty plea or statements made in plea negotiations are inadmissible evidence.  See Fed. R. Evid. 410.  Accord United States v. Mitchell, 633 F.3d 997, 1002 (10th Cir. 2011)("As a general matter, evidence of a guilty plea or statements made in plea negotiations are inadmissible.").  Rule 410 provides:

**Pleas, Plea Discussions, and Related Statements**

**(a) Prohibited Uses.**  In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:

> (**1**) a guilty plea that was later withdrawn;
>
> (**2**) a nolo contendere plea;
>
> (**3**) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or
>
> (**4**) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

Fed. R. Evid. 410.

The Supreme Court of the United States, in United States v. Mezzanatto, 513 U.S. 196 (1995), addressed a challenge to a waiver that allowed the United States to use the defendant's statements during plea negotiations to impeach any contradictory testimony that could arise if the case proceeded to trial.  See 513 U.S. at 198.  The Supreme Court held that, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable."   513 U.S. at 210.  The Supreme Court stated that, while there "may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably 'discrediting the federal courts[,]' . . . enforcement of agreements like respondent's plainly will not have that effect."  United States v. Mezzanatto, 513 U.S. at 204 (internal brackets omitted).  Instead, the Supreme Court noted that admitting the plea statements for impeachment purposes enhanced the truth-seeking function of trials and would result in more accurate verdicts.  See United States v. Mezzanatto, 513 U.S. at 204 (Thomas, J.)("The admission of plea statements for impeachment purposes enhances the truth-seeking function of trials and will result in more accurate verdicts." (emphasis in original)).  In so holding, the Supreme Court rejected the following arguments that rule 410 should be unwaivable: (i) that rule 410 must be enforced to guarantee a fair procedure; (ii) that waivability

would undermine the goal of voluntary settlement; and (iii) that waivability would invite prosecutorial reaching and abuse.  See United States v. Mezzanatto, 513 U.S. at 204-10.  A three-justice concurrence advocated that courts should narrowly construe the holding's scope and emphasized that the case dealt only with an impeachment waiver.  See United States v. Mezzanatto, 513 U.S. at 211 (Ginsburg, J., concurring).

In United States v. Mitchell, however, the Tenth Circuit extended the Supreme Court's reasoning in United States v. Mezzanatto to case-in-chief waivers.  There the Tenth Circuit upheld the following provision, in which the defendant agreed:

> [I]f I withdraw my plea of guilty, I shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the defendant's statements pursuant to this agreement, or any leads derived therefrom, should be suppressed or are inadmissible at any trial, hearing, or other proceeding.

United States v. Mitchell, 633 F.3d at 999.  The Tenth Circuit commented: "We see no analytical distinction between Rule 410's application to impeachment waivers and case-in-chief waivers. The same reasoning for the former compels the latter."  United States v. Mitchell, 633 F.3d at 1004.  It further explained its decision and stated: "Even if the district court determines a guilty plea should be withdrawn, a waiver of Rule 410 only means a trial will contain more evidence -- both the evidence of the original guilty plea and evidence the plea was withdrawn."  United States v. Mitchell, 633 F.3d at 1005 (emphasis added).  The Tenth Circuit noted that its conclusion was in line with the other circuits who have considered expanding the rationale of United States v. Mezzanatto.  See 633 F.3d at 1006 (citing United States v. Sylvester, 583 F.3d 285, 289 (5th Cir. 2009); United States v. Young, 223 F.3d 905, 910-11 (8th Cir. 2000); United States v. Burch, 156 F.3d 1315, 1321 (D.C. Cir. 1998)).  The Tenth Circuit also stated that the facts of United States v. Mezzanatto supported its decision, because the defendant in that case

received only an opportunity to discuss cooperation with the United States, while the United States made promises to Mitchell in the plea agreement.  See United States v. Mitchell, 633 F.3d at 1006.  Before reaching the rule 410 question, the Tenth Circuit determined that the defendant's guilty plea was knowing and voluntary.  See United States v. Mitchell, 633 F.3d at 1001.  Although the district court noted that the defendant's counsel may have exerted undue influence, the Tenth Circuit concluded that his counsel's influence did not render the plea involuntary.  See United States v. Mitchell, 633 F.3d at 1002.

The Tenth Circuit's analysis in United States v. Mitchell began with its determination that the plea agreement was enforceable.  See 633 F.3d at 1002.  Although the Tenth Circuit stated at the outset that it was considering whether the rule 410 waiver was knowing and voluntary, it analyzed the plea as a whole.  See United States v. Mitchell, 633 F.3d at 1002 ("Based on a careful review of the record, we agree with the district court that Mitchell's plea was knowing and voluntary.").  The United States Court of Appeals for the District of Columbia Circuit similarly analyzed the validity of the rule 410 waiver in the context of the validity of the plea as whole.  See United States v. Burch, 156 F.3d at 1322.  The D.C. Circuit commented:

> Appellant's specific contention that he involuntarily waived the protections of Rules 11(e)(6) and 410 derives from his broader claim that he did not enter into the plea agreement voluntarily.  He makes no attempt to deconstruct the plea agreement into individual components, nor to claim that acceded to a particular provision involuntarily, independent of his intention with his respect to the entire plea.  Therefore, we can only review whether his waiver was knowing and voluntary through examining, as the trial court did, the nature of the plea agreement that subsumes it.

United States v. Burch, 156 F.3d at 1322 n.5.

In United States v. Jim, 839 F. Supp. 2d 1157 (D.N.M. 2012)(Browning, J.), the Court, after allowing the defendant to withdraw his guilty plea, denied the defendant's motion to exclude statements he made in the plea agreement and during the plea colloquy, because the

defendant waived his rights under rule 410 when he entered the plea agreement.  839 F. Supp. 2d

at 1158.  The plea agreement stated:

> Except under certain circumstances where the Court, acting on its own, fails to
> accept this plea agreement, the Defendant agrees that, upon the Defendant's
> signing of this plea agreement, the facts that the Defendant has admitted under
> this plea agreement as set forth above, as well as any facts to which the Defendant
> admits in open court at the Defendant's plea hearing, shall be admissible against
> the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent
> proceeding, including a criminal trial, and the Defendant expressly waives the
> Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal
> Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction
> with this plea agreement.

839 F. Supp. 2d at 1172.  The defendant argued that the waiver of his rights under rule 410 was

unconstitutional, but the Court disagreed, noting the similarity of the defendant's waiver with the

waiver that the Tenth Circuit upheld in United States v. Mitchell.  See 839 F. Supp. 2d at 1172.

The defendant then argued that, because his attorney at the time he pled guilty was missing half

of the photographs taken at the scene, he did not have all the evidence and pled guilty

involuntarily; although he raised the issue in terms of voluntariness, the Court explained that

voluntariness "ordinarily deals with claims that the plea was coerced," which the defendant did

not allege.  839 F. Supp. 2d at 1178.  The Court instead analyzed the defendant's argument in

terms of whether he knowingly pled guilty; the Court noted that the defendant did not argue that

the lack of evidence affected his understanding of "'what the plea connotes and of its

consequence,' the understanding necessary to enter a knowing plea."  839 F. Supp. 2d at 1179

(quoting Boykin v. Alabama, 395 U.S. at 244).  The Court reviewed its reasons for previously

allowing the defendant to withdraw his guilty plea, including a defect in the plea colloquy in

which the magistrate judge "never mentioned the word 'trial,'" and the defendant said he did not

know he was waiving his right to proceed to trial; this defect cast doubts on whether the

defendant knowingly and voluntarily pled guilty and led the Court to find a "fair and just reason"

to permit the defendant to withdraw his guilty plea.  839 F. Supp. 2d at 1180.  The Court concluded, however, that "the evidence in favor of a knowing and voluntary plea outweighs considerably the evidence of an unknowing plea, and is more weighty and more credible.  In other words, [the defendant] has not met his burden of presenting an 'affirmative indication' that the plea was not knowing and voluntary."  839 F. Supp. 2d at 1181.  Further, the defendant did not raise these arguments in his motion to exclude statements from the plea agreement and plea colloquy: "In the absence of argument on this issue and with the burden resting on [the defendant], the Court will not invalidate the rule 410 waiver and exclude [the defendant's] statements on this ground."  839 F. Supp. 2d at 1185.  As to the waiver's scope, the Court determined that, because the waiver to which the defendant stipulated permitted the United States to "use his statements in a subsequent 'criminal trial,'" the United States could use the defendant's statements in any phase of the trial.  839 F. Supp. 2d at 1186 (quoting the plea agreement).

### LAW REGARDING KNOWING-AND-VOLUNTARY STANDARD
### FOR GUILTY PLEAS

A defendant's guilty plea must be knowing and voluntary.  See United States v. Libretti, 38 F.3d 523, 529 (10th Cir. 1994).  To enter a plea that is knowing and voluntary, a defendant must have "a full understanding of what the plea connotes and of its consequence."  Boykin v. Alabama, 395 U.S. 238, 244 (1969).  A defendant must only understand the "direct consequences" of his plea, United States v. Hurlich, 293 F.3d 1223, 1230 (10th Cir. 2002), and whether the plea carries a risk of deportation, see Padilla v. Kentucky, 559 U.S. 356, 374 (2010).  If a guilty plea is not knowing and voluntary, it is void, and any additional waivers in the plea agreement generally are unenforceable.  See United States v. Mitchell, 633 F.3d at 1001 (citing United States v. Gigley, 213 F.3d 509, 516 (10th Cir. 2000)).  The Tenth Circuit has had more

frequent opportunities to analyze the knowing and voluntary nature of a waiver of rights in the context of a waiver of appellate rights.  See United States v. Sandoval, 427 F. App'x 621, 623 (10th Cir. 2011)(unpublished); United States v. Vidal, 561 F.3d 1113, 1118 (10th Cir. 2009); United States v. Wilken, 498 F.3d 1160, 1167 (10th Cir. 2007).

The defendant in United States v. Mitchell argued that the district court's statements that his counsel may have exerted "undue influence" over him rendered his plea involuntary.  633 F.3d at 1001.  The Tenth Circuit held that the fact that his counsel used "colorful language" -- telling the defendant "'you would be a fool not to take this plea offer!'" -- did not approach a constitutionally suspect level of coercion.  633 F.3d at 1002.  The Tenth Circuit stated that, even when pressure from counsel may be "palpable," and a defendant alleged he was "hounded, browbeaten, and yelled at," such pressures do not "vitiate the voluntariness of his plea."  633 F.3d at 1002 (citing United States v. Carr, 80 F.3d 413, 417 (10th Cir. 1996)(analyzing voluntariness where counsel called the defendant "stupid" and "a f***ing idiot").  The defendant in United States v. Mitchell also pointed to the breakdown in communication between himself and his attorney to establish that his plea was not knowing and involuntary.  See 633 F.3d at 1001.  The Tenth Circuit found this argument similarly unavailing, and held that the guilty plea and accompanying plea agreement were knowing and voluntary.  See  633 F.3d at 1002.

In the United States District Court for the District of New Mexico, if a defendant consents to plead guilty before a United States Magistrate Judge, then the Magistrate Judge will conduct the plea colloquy and accept the plea.  See United States v. Ciapponi, 77 F.3d 1247, 1349-50 (10th Cir. 1996)).  "With a defendant's express consent, the broad residuary 'additional duties' clause of the Magistrate Act authorizes a magistrate judge to conduct a Rule 11 felony plea proceeding, and such does not violate the defendant's constitutional rights."  United States

v. Ciapponi, 77 F.3d at 1251.  In other words, the Magistrate Judge routinely accepts the guilty

plea, because he or she is the one who can visually and audibly determine whether the plea is

voluntary, but the Magistrate Judge does not accept the plea agreement, if any.  See United

States v. Salas-Garcia, 698 F.3d 1242, 1253 (10th Cir. 2012)(stating that "Magistrate judges have

the authority to conduct plea hearings and accept guilty pleas," and that, "even if the magistrate

judge had deferred acceptance of the plea agreement itself, the magistrate judge accepted [the

defendant's] plea for the purposes of Rule 11").  Under the local rules, the "Court will defer a

decision on the acceptance or rejection of the plea agreement until the Court has reviewed the

presentence report, even in instances where the Court has accepted the guilty plea."  D.N.M.LR-

Cr. 11.2.  A District Judge will sentence the defendant, and, at that time, will accept or reject any

plea agreement.

## RELEVANT LAW REGARDING MOTIONS TO RECONSIDER

Although the Federal Rules of Criminal Procedure do not specifically provide for

motions to reconsider, such motions are proper in criminal cases.  See United States v. Christy,

739 F.3d 534, 539 (10th Cir. 2014).  See United States v. Christy, 810 F. Supp. 2d 1219, 1249

(D.N.M. 2011)(Browning, J.)(stating that in the criminal context, "courts ordinarily apply the

same standards as those used in civil cases" for motions to reconsider), aff'd, 739 F.3d 534 (10th

Cir. 2014).

> A motion to reconsider may be granted when the court has misapprehended the
> facts, a party's position, or the law.  Specific grounds include: "(1) an intervening
> change in the controlling law, (2) new evidence previously unavailable, and (3)
> the need to correct clear error or prevent manifest injustice."  A motion to
> reconsider should not be used to revisit issues already addressed or advance
> arguments that could have been raised earlier.

United States v. Christy, 739 F.3d at 539 (quoting Servants of Paraclete v. Does, 204 F.3d 1005,

1012 (10th Cir. 2000)).  It is within a court's discretion to grant or to deny a motion to

reconsider.  See United States v. Christy, 739 F.3d at 539 ("A district court should have the opportunity to correct alleged errors in its dispositions."); United States v. Wiseman, 172 F.3d 1196, 1207-08 (10th Cir. 1999); Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).  A motion to reconsider is not an opportunity to rehash arguments previously addressed or to advance new arguments that could have been raised in prior briefing.  See United States v. Christy, 739 F.3d at 534 ("A motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier.").

Notably, neither rule 59 nor rule 60 of the Federal Rules of Civil Procedure apply to interlocutory orders a district court reconsiders before entry of final judgment.  Rule 59(e) states: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e) (emphasis added).  Accord Van Skiver v. United States, 952 F.2d at 1243 ("In this case, plaintiffs' motion to reconsider was not served within ten days of the district court's judgment."); 12 J. Moore, Moore's Federal Practice § 59.11[1][a], at 59-26 (3d ed. 2013)("A motion for a new trial must be filed no later than 28 days after the entry of judgment, regardless of when or whether the parties received notice of the entry of the judgment." (citations omitted)).  As the note to the 1946 amendment to rule 60 emphasizes in a discussion of the choice to add the word "final" within rule 60(b):

> The addition of the qualifying word "final" emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.

Fed. R. Civ. P. 60 note to 1946 amendment.  Accord 12 J. Moore, supra, § 60.23, at 60-82 ("Rule 60(b) does not govern relief from interlocutory orders, that is to say any orders in which there is something left for the court to decide after issuing the order."); 11 C. Wright, A. Miller & M.

Kane, Federal Practice and Procedure § 2852, at 292 (3d ed. 2012)("[T]he power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b)." (footnotes omitted)).  The Tenth Circuit has recognized that a district court has broad discretion to reconsider its interlocutory rulings before the entry of judgment.  See Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011)("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders.").  That discretion extends to rulings on partial summary judgment motions.  See Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1223-24 n.2 (10th Cir. 2008)("The District Court's partial summary judgment ruling was not a final judgment.  Thus, Ms. Fye's motion for reconsideration is considered an 'interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'").

In United States v. Christy, the Court initially granted the defendant's motion to suppress, see 785 F. Supp. 2d at 1054; the United States filed a motion to reconsider, arguing that the evidence was admissible under the inevitable-discovery doctrine, see 810 F. Supp. 2d at 1222-23.  The Court reconsidered its prior ruling, agreed with the United States, and denied the defendant's motion to suppress.  See 810 F. Supp. 2d at 1282.  On appeal, the Tenth Circuit affirmed the Court's decision to reconsider its prior ruling; although the United States had raised inevitable-discovery theories briefly and without much emphasis during the initial suppression briefings and hearings, the Court had not ruled on the inevitable-discovery issue when it first granted the suppression motion, and, thus, "the district court acted well within its discretion in granting the motion to reconsider (at least as to inevitable discovery) in order to rule on an issue it mistakenly overlooked."  739 F.3d at 539.  The Tenth Circuit then addressed the merits of the United States' argument regarding inevitable discovery and affirmed the Court's conclusion that

the evidence "would have been discovered legally, had the illegal search not discovered it first."

739 F.3d at 543-44.

### LAW REGARDING SUPPRESSING CONFESSIONS UNDER RULE 5 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Under the common law, an arresting officer was required to "bring his prisoner before a magistrate as soon as he reasonably could.  This 'presentment' requirement tended to prevent secret detention and served to inform a suspect of the charges against him . . . ."  Corley v. United States, 556 U.S. 303, 306 (2009).  In McNabb v. United States, 318 U.S. 332 (1943), superseded by statute, Act of June 19, 1968, Pub. L. 90-351, 82 Stat. 210 (codified at 18 U.S.C. § 3501), as recognized in Corley v. United States, 556 U.S. 303 (2009), the Supreme Court addressed the proper remedy under federal statutes codifying the presentment rule; in that case, the defendants' murder convictions rested primarily on confessions the defendants made after they were arrested and subjected to several days of questioning, but before they appeared before a United States Commissioner[17] or judge, as the presentment statutes then required.  See 318 U.S. at 334-338.[18]  The Supreme Court found it "unnecessary to reach the Constitutional issue" -- whether the confessions were coerced or involuntary -- and instead invoked its "supervisory authority over the administration of criminal justice in the federal courts."  318 U.S. at 341.  The Supreme Court excluded the confessions, because the "arresting officers assumed functions

---

[17] Magistrate Judges were once called commissioners.  See 1 Charles Alan Wright & Andrew Leipold, Federal Practice and Procedure § 70, at 149 (4th ed. 2008).

[18] Although this case turned on the lack of presentment, "[t]he Supreme Court's understanding on this point turned out to be incorrect.  At a second trial it appeared that the defendants had been taken before a commissioner prior to the time they confessed, and on this showing the convictions were affirmed."  1 Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure § 72, at 161 n.2 (4th ed. 2008)(citing McNabb v. United States, 142 F.2d 904 (6th Cir. 1944)).

which Congress has explicitly denied them."  318 U.S. at 341-42.  See 1 Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure § 72, at 161 (4th ed. 2008)(explaining that "the Court held that confessions were inadmissible, apparently because of the failure to take the defendants promptly before a judicial officer, although the opinion is not entirely clear on the rationale").

After the Supreme Court decided McNabb v. United States, "the Judicial Conference of the United States and Congress produced Federal Rule of Criminal Procedure 5(a), which pulled the several statutory presentment provisions together in one place."  Corley v. United States, 556 U.S. at 307.  Rule 5(a) as enacted in 1946 was very similar to the current rule 5(a); the current rule provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . ."  Fed. R. Crim. P. 5(a)(1)(A).  See Corley v. United States, 556 U.S. at 308 (analyzing rule 5(a) from 1946 and stating that "[t]he rule remains much the same today").  A preliminary draft of rule 5 codified McNabb v. United States' exclusionary rule, providing that "[n]o statement made by a defendant in response to interrogation by an officer or agent of the government shall be admissible in evidence against him if the interrogation occurs while the defendant is held in custody in violation of this rule." 1 Wright & Leipold, supra, § 72, at 161 n.3.  The final version omitted this controversial exclusionary rule, 1 Wright & Leipold, supra, § 72, at 161-162.

The Supreme Court in two subsequent cases explained the interaction between McNabb v. United States and rule 5(a): in Upshaw v. United States, 335 U.S. 410 (1948), the Supreme Court "emphasized that even voluntary confessions are inadmissible if given after an unreasonable delay in presentment."  Corley v. United States, 556 U.S. at 308 (citing Upshaw v. United States, 335 U.S. at 413).  In Mallory v. United States, 354 U.S. 449 (1957), superseded by

statute, Act of June 19, 1968, Pub. L. 90-351, 82 Stat. 210 (codified at 18 U.S.C. § 3501), as recognized in Corley v. United States, 556 U.S. 303 (2009), the Supreme Court excluded a confession made seven hours after arrest, because the police questioned the suspect for hours "within the vicinity of numerous committing magistrates." Corley v. United States, 556 U.S. at 308 (quoting Mallory v. United States, 354 U.S. at 455). "Thus, the rule known simply as McNabb-Mallory 'generally renders inadmissible confessions made during periods of detention that violate the prompt presentment requirement of Rule 5(a).'" Corley v. United States, 556 U.S. at 309 (internal brackets omitted)(quoting United States v. Alvarez-Sanchez, 511 U.S. 350 (1994)).

In 1968, Congress enacted 18 U.S.C. § 3501; it enacted sections (a) and (b) in an attempt to eliminate Miranda v. Arizona, 384 U.S. 436 (1966), which attempt the Supreme Court rejected in Dickerson v. United States, 530 U.S. 428 (2000), and it enacted section (c) in response to "the application of McNabb-Mallory in some federal courts." Corley v. United States, 556 U.S. at 309.

> Subsection (a) provides that "[i]n any criminal prosecution brought by the United States . . . , a confession . . . shall be admissible in evidence if it is voluntarily given," while subsection (b) lists several considerations for courts to address in assessing voluntariness. Subsection (c), which focused on McNabb-Mallory, provides that in any federal prosecution, "a confession made . . . by . . . a defendant therein, while such person was under arrest . . . , shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily . . . and if such confession was made . . . within six hours [of arrest]"; the 6-hour time limit is extended when further delay is "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]."

Corley v. United States, 556 U.S. at 309-10 (alteration in original)(footnote omitted)(citation omitted).[19]

--------

[19] 18 U.S.C. § 3501 provides in full:

**(a)** In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given.  Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness.  If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

**(b)** The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

**(c)** In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge

In <u>Corley v. United States</u>, the Supreme Court addressed the issue "whether Congress intended § 3501(a) to sweep <u>McNabb-Mallory</u>'s exclusionary rule aside entirely, or merely meant § 3501(c) to provide immunization to voluntary confessions given within six hours of a suspect's arrest."  556 U.S. at 311.  In <u>Corley v. United States</u>, federal agents suspected the defendant of robbing a bank and arrested him in the morning; during the day, the agents questioned the defendant and took him to the hospital to treat a minor cut on his hand, but did not bring him before a magistrate judge for the initial appearance.  <u>See</u> 556 U.S. at 311.  The defendant signed a form waiving his <u>Miranda v. Arizona</u> rights, and about nine and a half hours after he was arrested, began orally confessing to the bank robbery.  <u>See</u> 556 U.S. at 311.  The following morning, he signed a written confession and was presented to a magistrate judge that afternoon, "29.5 hours after his arrest."  556 U.S. at 311-12.  The district court denied the defendant's motion to suppress his oral and written confessions under rule 5(a) and <u>McNabb-Mallory</u>, because the district court determined that, by excluding the time the defendant received medical care, he confessed within 18 U.S.C. § 3501(c)'s six-hour window.  <u>See</u> 556 U.S. at 312.  The Court of Appeals for the Third Circuit affirmed, but based its decision on Third Circuit

---

or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

**(d)** Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

**(e)** As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

18 U.S.C. § 3501 (emphasis in original).

precedent "that § 3501 entirely abrogated the McNabb-Mallory rule and replaced it with a pure voluntariness test."   556 U.S. at 312.   To the Supreme Court, the United States argued that § 3501(a) -- providing that any voluntary confession shall be admissible in evidence -- entirely eliminated the McNabb-Mallory bar on voluntary confessions given after an unreasonable delay in presentment; the defendant argued that § 3501(c) "leaves McNabb-Mallory inapplicable to confessions given within the six hours, but when a confession comes even later, the exclusionary rule applies and courts have to see whether the delay was unnecessary or unreasonable."   556 U.S. at 313-14.   The Supreme Court, in a five-four decision authored by the Honorable David Souter, former Associate Justice for the Supreme Court, agreed with the defendant and held that § 3501(c) modified the McNabb-Mallory rule, but did not supplant it:

> Under the rule as revised by § 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]").   If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and . . . the weight to be given [it] is left to the jury."   If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed.

556 U.S. at 322 (alteration in original)(citation omitted).   The Supreme Court remanded the case for the Third Circuit to consider, as the district court had, whether the defendant's confession should be treated as having been made within six hours of arrest.   See 556 U.S. at 323.

While Miranda v. Arizona is a "more robust doctrine for regulating confessions" than the presentment rule from rule 5(a), "[m]otions to suppress based on Rule 5(a) prompt appearance requirement are still made from time to time," although most courts "have interpreted the rule in a manner that gives it little independent force."   1 Wright & Leipold, supra, § 72, at 166-167. For example, if a defendant confesses before there is a delay, or if there is no interrogation, the

defendant may not be able to suppress the confession under rule 5(a).  See 1 Wright & Leipold, supra, § 72, at 168.  Further, the time limitations in 18 U.S.C. § 3501 do not apply until the defendant is arrested for a federal offense.  See 1 Wright & Leipold, supra, § 72, at 171.

In United States v. Smith, 606 F.3d 1270 (10th Cir. 2010), the defendant was arrested on Navajo tribal code charges, taken to a local jail, "advised of his rights and questioned by law enforcement officials, including a member of the FBI."  606 F.3d at 1274.  He confessed to sexually assaulting a victim at a party approximately five hours after he was arrested, and after additional investigation, officials obtained a federal arrest warrant and transferred the defendant into federal custody.  See 606 F.3d at 1275.  The defendant sought to suppress the confession, because he was not presented to a federal magistrate within six hours of his arrest.  See 606 F.3d at 1277.  The district court ruled that the defendant's motion failed as a matter of law, and the Tenth Circuit agreed; the defendant's confession fell within 18 U.S.C. § 3501(c)'s six-hour safe harbor requirements, and further, because the defendant was not arrested for a federal offense when he confessed, the prompt-presentment rule did not apply.  See 606 F.3d at 1278.  "Where a person is under arrest on solely non-federal charges, neither the prompt-presentment rule nor the safe-harbor period are relevant even when the arresting officers believe the person also may have violated federal law or the person makes an inculpatory statement to federal agents."  606 F.3d at 1278 (citing United States v. Alvarez–Sanchez, 511 U.S. 350, 358, (1994)).

## LAW REGARDING SEARCH AND SEIZURE OF MEDICAL RECORDS

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fourth Amendment generally requires a warrant for there to be a valid search and seizure.  See Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1198 (D.N.M. 2012)(Browning, J.).  A warrantless search is per se unreasonable unless it falls within one of the exceptions to the warrant requirement.  See United States v. Aquino, 836 F.2d 1268, 1270 n.3 (1988)("Police violate the Fourth Amendment when they engage in a warrantless search and no exception to the warrant requirement applies."); United States v. Bute, 43 F.3d 531, 534-535 (10th Cir. 1994)("The precedent of the Supreme Court and [the Tenth Circuit] is quite clear that a warrantless search is reasonable only when it falls within one of the clearly defined exceptions to the warrant requirement.").

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 132 S. Ct. 945, 952 (2012)(Scalia, J.)("[T]he Katz[20] reasonable-expectation-of-

---

[20] In Kyllo v. United States, 533 U.S. 27 (2001), the Supreme Court described the Katz v. United States rule:

> Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches.  We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) --  which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that

privacy test has been added to, not substituted for, the common-law trespassory test." (emphasis

omitted)). "When 'the Government obtains information by physically intruding' on persons,

houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has

'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013)(quoting United

States v. Jones, 132 S. Ct. at 950 n.3)). "[A]n actual trespass," however, "is neither necessary

nor sufficient to establish a constitutional violation." United States v. Jones, 132 S. Ct. at 951

n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)). In

determining whether a search has occurred, "[t]respass alone does not qualify, but there must be

conjoined with that . . . an attempt to find something or to obtain information." United States v.

Jones, 132 S. Ct. at 951 n.5. The Supreme Court has also noted that "[p]hysically invasive

inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529

U.S. 334, 337 (2000). Moreover, the Supreme Court's majority opinion in Florida v. Jardines

suggested that the trespass-based analysis applies only when the trespass occurs in one of the

four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things
> encompassed by its protections": persons, houses, papers, and effects. The Fourth
> Amendment does not, therefore, prevent all investigations conducted on private
> property; for example, an officer may (subject to Katz [v. United States, 389 U.S.
> 347 (1967)]) gather information in what we have called "open fields" -- even if
> those fields are privately owned -- because such fields are not enumerated in the
> Amendment's text. . . . But when it comes to the Fourth Amendment, the home is
> first among equals.

Florida v. Jardines, 133 S. Ct. at 1414 (2013).

---

expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in
original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law."   United States v. Alabi, 943 F. Supp. 2d 1201 (D.N..M. 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).   Although the Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach," 2013 WL 1876791, at *35, these two Supreme Court decisions may also raise the question whether a search's reasonableness still hinges on balancing the government's interest in the search against the subject's reasonable privacy expectations.   In June, 2013, however, after having written the majority opinion in Florida v. Jardines, and United States v. Jones, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"  Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home
> "are weighty enough that the search may require a warrant, notwithstanding the

> diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the <u>body</u> is at stake? (The Fourth Amendment lists "persons" <u>first</u> among the entities protected against unreasonable searches and seizures.)

<u>Maryland v. King</u>, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original). Justice Scalia also suggested that the Founders would have shared these privacy related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 133 S. Ct. at 1989 (Scalia J., dissenting). The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

In <u>Ferguson v. City of Charleston</u>, 532 U.S. 67 (2001), the Supreme Court considered whether the special-needs exception[21] to the Fourth Amendment permitted a hospital policy designed to obtain evidence of drug use through urine tests that would be turned over to the police. The Supreme Court found the special-needs exception did not apply and remanded the case. In its opinion, the Supreme Court stated: "'[T]he gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue

---

[21] "The 'special needs' doctrine, which has been used to uphold certain suspicionless searches performed for reasons unrelated to law enforcement, is an exception to the general rule that a search must be based on individualized suspicion of wrongdoing." <u>Ferguson v. City of Charleston</u>, 532 U.S. at 79 n.15 (quoting <u>Indianapolis v. Edmond</u>, 531 U.S. 32, 54 (2000)(Rehnquist, C.J., dissenting)). <u>See</u> <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987)(concluding that, in limited circumstances, a search unsupported by either warrant or probable cause can be constitutional when "special needs" other than the normal need for law enforcement provide sufficient justification).

a given purpose.'   The Fourth Amendment's general prohibition against nonconsensual, warrantless, and suspicionless searches necessarily applies to such a policy."   532 U.S. at 86 (quoting Indianapolis v. Edmond, 531 U.S. at 32, 42-43 (2000)).

Regarding the warrantless seizure of medical records, the Tenth Circuit has stated that a Fourth Amendment violation might occur when a government employer seizes an employee's medical records without a warrant.  See Lankford v. City of Hobart, 27 F.3d 477, 480 n.2 (10th Cir. 1994).  The Tenth Circuit in Lankford v. City of Hobart seemed to suggest that such a finding is possible without deciding the issue.  See 27 F.3d at 480 n.2 ("It is possible that a Fourth Amendment violation occurred when . . . [the defendant] 'seized' [the plaintiff's] medical files without a warrant. . . .   [The plaintiff] has failed adequately to address the Fourth Amendment implications of [the defendant's] actions on appeal. Therefore, we do not address this issue.").  Instead of resting on Fourth-Amendment grounds, the Lankford v. City of Hobart holding is rooted in the right to privacy.   In Lankford v. City of Hobart, female former-dispatchers brought an action against a police chief under 42 U.S.C. § 1983.  See 27 F.3d at 478. Among other things, the plaintiffs alleged that the police chief sexually harassed them and used his authority as police chief to obtain the private medical records of one of the plaintiffs to prove that she was a lesbian.  See 27 F.3d at 478.  The Tenth Circuit held that, if true, the police chief's actions amounted to a clear privacy violation.  See 27 F.3d at 479.

In Jaffee v. Redmond, 518 U.S. 1 (1996), the Supreme Court held "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."  518 U.S. at 15.  While announcing the privilege in the context of that § 1983 action, the Supreme Court found it "neither necessary nor feasible to delineate its full contours in a way

that would 'govern all conceivable future questions in this area.'"   518 U.S. at 18 (quoting

Upjohn Co. v. United States, 449 U.S. 383, 386 (1981)).  In United States v. Glass, 133 F.3d

1356 (10th Cir. 1998), the Tenth Circuit upheld the psychotherapist privilege in criminal cases to

protect the defendant's statements from compelled disclosure.  See 133 F.3d at 1360.

In Chavez v. Martinez, No. CIV 07-1250 JB/LFG, 2008 WL 6045509 (D.N.M. Oct. 20,

2008)(Browning, J.), the Court considered whether the defendant, an officer, violated the

plaintiff's Fourth and Fourteenth Amendment rights when the defendant went to the plaintiff's

doctor's office to verify the dates on the plaintiff's doctor's note.  See 2008 WL 6045509, at *1-

2.  In that case, the defendant suspected that the plaintiff had altered his doctor's note, so the

defendant followed up with the doctor's office.  See 2008 WL 6045509, at *1.  The defendant

did not request or receive the plaintiff's medical records; he received only oral information from

the receptionist.  See 2008 WL 6045509, at *2.  The United States Department of Health and

Human Services also performed an investigation, and found that the disclosure of the plaintiff's

medical information to the defendant "could reflect a violation of the general uses and

disclosures provision at 45 C.F.R. § 164.502(a)."  2008 WL 6045509, at *3.  In  Chavez v.

Martinez,  the Court stated:

> The Court does not believe that a police officer asking a third-party questions and
> receiving voluntary answers is a search under the Fourth Amendment.  To hold
> otherwise would make almost all routine police work and investigation subject to
> the Fourth Amendment's limitations.  The Court does not believe that police
> questioning and voluntary responses constitute a search to which the Fourth
> Amendment applies.
>
> [The defendant's] questions and receipt of answers in this specific context do not
> constitute a search.  To constitute a search, [the defendant's] actions must have at
> least invaded upon [the plaintiff's] reasonable expectations of privacy.  See
> United States v. Jacobsen, 466 U.S.[ 109,] 113[ (1984)].  The information that
> [the defendant] sought and obtained was information that [the plaintiff] purported
> to supply in his request for sick leave.  Specifically, [the plaintiff] provided a

doctor's note containing the information that [the defendant] attempted to verify
at [the doctor's] office.  Thus, [the plaintiff] cannot, on good ground, argue that he
had a reasonable expectation of privacy in the fact that he was undergoing a
medical procedure and in the dates upon which he was taking days off work to
visit the doctor.

2008 WL 6045509, at *11.

In Kerns v. Board of Comm'rs, 707 F. Supp. 2d 1190 (D.N.M. 2010)(Browning, J.),
rev'd in part, vacated in part sub nom. Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the
plaintiff alleged that the sheriff violated his Fourth and Fourteenth Amendment rights when the
sheriff requested the plaintiff's private medical records from the Veterans Hospital.  See 707 F.
Supp. 2d at 1253.  The sheriff argued that he was entitled to qualified immunity -- he did not
violate the plaintiff's constitutional rights and, even if he did, the constitutional right was not
clearly established at the time.  See 707 F. Supp. 2d at 1254.  Looking to the plaintiff's Fourth
Amendment right to be free from unreasonable searches and seizures, the Court noted that the
sheriff did not seek a warrant or a subpoena for the medical records, nor did he seek the
plaintiff's consent.  See 707 F. Supp. 2d at 1262.  The Court concluded that, because the plaintiff
had a reasonable expectation of privacy in his medical records, the sheriff unreasonably infringed
that right and "crossed the line from proper police investigation into constitutional violation."
707 F. Supp. 2d at 1263.  The defendants argued that there was no clearly established law that
requesting medical records violated the Fourth Amendment, and the Court did not locate a case
affirmatively holding that requesting private medical records without consent had Fourth
Amendment consequences; the Court nonetheless concluded that the right was clearly
established.  See 707 F. Supp. 2d at 1263-64.  The Court relied on Lankford v. City of Hobart --
in which the Tenth Circuit stated "'it is possible that a Fourth Amendment violation occurred
where, as [the plaintiff] alleges, [the defendant] 'seized' her protected medical files without a

warrant'" -- noting that "the Tenth Circuit's statement provides notice to officers taking medical records that, not only will it subject him or her to liability for a constitutional privacy violation, but possibly to liability for violating the Fourth Amendment."  707 F. Supp. 2d at 1264 (quoting Lankford v. City of Hobart, 27 F.3d at 480 n.2).  The Court went on to explain that "[w]hat has to be clearly established [for qualified immunity] is that what the defendant is doing is wrong," even if all the law related to the cause of action is not clearly established.  707 F. Supp. 2d at 1264.  The Court concluded that the plaintiff satisfied both prongs necessary to defeat qualified immunity.  See 707 F. Supp. 2d at 1268.

The Tenth Circuit reversed the Court in part and vacated the Court in part in Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011).  The Tenth Circuit did not agree with the Court that the plaintiff's Fourth and Fourteenth Amendment rights were clearly established, and so reversed the Court without analyzing whether the sheriff had violated the plaintiff's constitutional rights:

> On appeal, the Sheriff disputes whether he violated Mr. Kerns's constitutional rights by asking a hospital to share its records voluntarily -- and, if he did, whether those rights were clearly established at the time.  Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit majority explained that the "scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.

On the Fourth Amendment claim, the Tenth Circuit majority framed the issue as

> whether Mr. Kerns can show that Sheriff White's request to a third party (the hospital) for records that it may own but in which Mr. Kerns claims a privacy

- 83 -

interest (an interest which we accept exists for our purposes at step two) violated clearly established Fourth Amendment law as of 2005.

663 F.3d at 1184.  The Tenth Circuit majority rejected the Court's and the plaintiff's reliance on Lankford v. City of Hobart, because "its language hardly announced 'clearly established law.' At best, Lankford's equivocation *declined to foreclose* the possibility of a Fourth Amendment violation."  663 F.3d at 1185 n.2 (emphasis in original).  The Tenth Circuit majority concluded that there was no clearly established law for the plaintiff's Fourth Amendment claim.  See 663 F.3d at 1185.  The Tenth Circuit ordered the Court to enter summary judgment in favor of the sheriff, "only because [the plaintiff] has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005."  663 F.3d at 1187.

The Honorable William J. Holloway, Senior United States Circuit Judge for the Tenth Circuit, dissented; he found it "unwise" for the majority to avoid the first question of qualified immunity -- whether the plaintiff's constitutional rights were violated.  663 F.3d at 1195 (Holloway, J., dissenting).  Judge Holloway said the majority's approach made it seem that the sheriff's conduct may have been lawful, when, in Judge Holloway's view, the "case is crystal clear."  663 F.3d at 1196 (Holloway, J., dissenting).

> We should not hesitate to declare the obvious: Courts have for decades recognized a constitutionally protected right of privacy in the highly personal information contained in medical records, and law enforcement therefore must have something more than merely a legitimate investigatory interest in the protected information to justify invading that privacy.

663 F.3d at 1197 (Holloway, J., dissenting).  On the question whether the law was clearly established, Judge Holloway said it was; although there were no cases directly on point, Judge Holloway said "the precedents that do exist are easily close enough on point that any reasonable law enforcement officer would have known that constitutionally protected medical records cannot be obtained simply because a possibility exists that the information would be helpful."

663 F.3d at 1198 (Holloway, J., dissenting).   Judge Holloway explained that the plaintiff "enjoyed a due process right to the non-disclosure of his personal medical information" and that "the infringement of that right implicates the Fourth Amendment."  663 F.3d at 1200 (Holloway, J., dissenting).

## LAW REGARDING THE RIGHT TO PRIVACY IN MEDICAL RECORDS

The Due Process Clause of the Fourteenth Amendment protects the right of privacy. See Flanagan v. Munger, 890 F.2d 1557, 1570 n.15 (10th Cir. 1989); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986).  The Tenth Circuit has recognized that the right to privacy protects government employees from their employers improperly attempting to obtain the private medical history or records.  See Lankford v. City of Hobart, 27 F.3d at 479.  Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss the manner in which a court should determine generally when a violation of the privacy right occurs.  See 27 F.3d at 479-80.   Flanagan v. Munger provides some instruction on this point.  In Flanagan v. Munger, the Tenth Circuit employed a balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy.  See Flanagan v. Munger, 890 F.2d at 1570.  Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling state interest; and (3) if disclosure can be made in the least intrusive manner."  890 F.2d at 1570.  The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personal information is protected."  890 F.2d at 1570.  See  Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material . . . .").  In Ortlieb v. Howery, 74

Fed. App'x 853, 854 (10th Cir. 2003), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her X-ray.  See 74 Fed. App'x at 857.  In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery noted that the plaintiff's broken leg was not confidential information, because the plaintiff had contacted her employer seeking extended medical leave given the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs."  74 Fed. App'x at 857.  The Tenth Circuit also observed that, because the plaintiff had "supported her request for an indefinite extension of medical benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview."  74 Fed. App'x at 857.  Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits."  74 Fed. App'x at 857.

In Kerns v. Board of Comm'rs, the Court used the Tenth Circuit's balancing test from Flanagan v. Munger to determine whether a sheriff who obtained the plaintiff's medical records violated the plaintiff's privacy right under the Fourteenth Amendment, finding that (i) the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records, because he believed that the medical and mental health records were confidential and private; (ii) the sheriff's department had a compelling state interest in the records, because of its interest in enforcing 18 U.S.C. § 922(g)(4), which makes it unlawful for a person who has been "adjudicated as a mental defective" or who has been "committed to a mental institution" to possess firearms, and ensuring that the plaintiff did not fit that category; and (iii) the state could

have achieved its objectives in a less intrusive manner by making a more particularized request

for records, rather than requesting to "review all records."   707 F. Supp. 2d at 1256-57.

Balancing these factors, the Court concluded that the plaintiff met its burden on summary

judgment to demonstrate that the sheriff violated his constitutionally protected right to privacy.

See 707 F. Supp. 2d at 1257.  The Court noted that the sheriff had not relied on HIPAA when he

requested the records; the law-enforcement exception in HIPAA allows HIPAA-covered entities

to disclose protected healthcare information in six circumstances:

> (i) as required by law-court orders, subpoenas, warrants; (ii) to identify or locate a
> suspect, fugitive, material witness, or missing person; (iii) in response to a law-
> enforcement official's request for information about a victim or suspected victim
> of a crime; (iv) to alert law enforcement of a person's death, if the covered entity
> suspects that criminal activity caused the death; (v) when a covered entity
> believes that protected health information is evidence of a crime that occurred on
> its premises; and (vi) by a covered health-care provider in a medical emergency
> not occurring on its premises, when necessary to inform law enforcement about
> the commission and nature of a crime, the location of the crime or crime victims,
> and the perpetrator of the crime.

707 F. Supp. 2d at 1259 (citing 45 C.F.R. § 164.512).  The Court said that "HIPAA restrains the

'health plan, health care clearinghouse, or healthcare provider' from disclosing protected medical

information, and does not restrain law-enforcement directly."  707 F. Supp. 2d at 1259 (quoting

45 C.F.R. § 164.104).  The Court also concluded that the plaintiff established that his right to

privacy in his medical records was clearly established at the time, precluding the sheriff from

qualified immunity.  See 707 F. Supp. 2d at 1259-61.

The majority in the Tenth Circuit did not agree with the Court that the plaintiff's

Fourteenth Amendment rights were clearly established and reversed the Court without analyzing

whether the sheriff had violated the plaintiff's constitutional rights.  See Kerns v. Bader, 663

F.3d at 1183-84.  Although the plaintiff cited several cases in which the Tenth Circuit "held that

government officials violated plaintiffs' substantive due process privacy rights by accessing their

records without public disclosure," the Tenth Circuit explained that those cases "involved another element not present here: the government officials involved accessed the plaintiffs' confidential information as part of an unlawful campaign of sexual harassment." 663 F.3d at 1186. The Tenth Circuit ordered the Court to enter summary judgment in favor of the sheriff, "only because [the plaintiff] has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005." 663 F.3d at 1187. Judge Holloway dissented, agreeing instead with the Court that the officer violated the plaintiff's "clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime *might* have occurred." 663 F.3d at 1197-98 (Holloway, J., dissenting)(emphasis in original).

## ANALYSIS

The Court will grant the Motion to Reconsider in part and to the extent that the Court may have misapprehended Yazzie's position in the 1st Motion and 2nd Motion. See United States v. Christy, 739 F.3d at 539 (stating that "[a] motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law"). "A district court should have the opportunity to correct alleged errors in its disposition." United States v. Christy, 739 F.3d 539. See Rimbert v. Eli Lilly & Co., 647 F.3d at 1251 (stating that district courts are generally free to reconsider earlier interlocutory orders). By granting the Motion to Reconsider in part, the Court will revisit its analysis of Yazzie's 1st Motion and 2nd Motion in light of the arguments he has made subsequent to the MOO, namely, that he was "forced" to plead guilty through his lack of knowledge of the law, and that, had he been adequately informed of his

options to suppress the statement he made to the FBI and the medical records showing his history of an STD, he would not have pled guilty.

After carefully reconsidering its prior decision, however, the Court will deny the Motion to Reconsider to the extent it asks the Court to grant the 1st Motion and 2nd Motion.  Although the Court's analysis has slightly changed, so that at least one factor weighs in favor of allowing Yazzie to withdraw his guilty plea, the overall weight of the factors prompts the Court to continue to deny the 1st Motion and 2nd Motion.  Rule 11(d)(2)(B) provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  Defendants do not have an absolute right to withdraw a guilty plea.  See United States v. Siedlik, 231 F.3d at 748.  District courts, however, have broad discretion in determining whether to grant motions to withdraw pleas.  See United States v. Wright, 392 F. App'x. at 627.  The Tenth Circuit has repeatedly held that, when a defendant moves to withdraw a guilty plea before sentencing, a court must assess whether there is a fair and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and, if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d at 1142.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  United States v. Carr, 80 F.3d at 421 n. 5.  The Tenth Circuit has explained that the "primary considerations for determining whether a fair and just reason exists are whether the defendant (1) knowingly and voluntarily pled guilty, (2) had assistance of counsel relating to the decision to plead guilty, and (3) has asserted his innocence."  United

States v. Lee, 535 F. App'x 677, 680 (10th Cir. 2013)(unpublished).  These are the factors that

"'speak to . . . the defendant's reason for withdrawal.'"  United States v. Lee, 535 F. App'x at

680 (alteration in original)(quoting United States v. Hamilton, 510 F.3d at 1217).  "If the

defendant demonstrates a fair and just reason for withdrawing his guilty plea, the court may also

consider systemic burdens" -- the other four United States v. Yazzie factors, including "prejudice

to the government, timing of the motion, inconvenience to the court, and waste of judicial

resources."  United States v. Lee, 535 F. App'x at 680 & n.3 (citing United States v. Hamilton,

510 F.3d at 1214).

## I.     YAZZIE KNOWINGLY AND VOLUNTARILY PLED GUILTY.

In the MOO, the Court concluded that the first primary consideration -- whether Yazzie

knowingly and voluntarily pled guilty -- weighed against allowing Yazzie to withdraw his plea,

because he "demonstrated through his letters to the Court that he understands the consequences

of pleading guilty to the specific offence charged in the Information."  MOO at 35.  The Court

characterized Yazzie's assertion that his plea was not knowingly and voluntarily given as

"conclusory," noting that Yazzie's main concern at the hearing was that he thought he deserved a

lesser sentence and thought his wife would receive custody of their children.  MOO at 33.  The

Court also addressed Judge Puglisi's reference to a "more probable than not standard," ultimately

concluding that Judge Puglisi did not misstate the United States' burden of proof and that

"Yazzie affirmed that he was pleading guilty because he is 'in fact guilty.'"  MOO at 34.

Yazzie contends that the Court did not adequately understand his argument, and that he

did not knowingly and voluntarily plead guilty, "[be]cause [Mr. Loonam] ha[d] knowledge of the

law and I did not."  Motion to Reconsider at 1.  Yazzie explains that, if he had known of the

possibility to suppress his medical records and the statement he made to the FBI, he would not

have pled guilty, and that, because he was not fully aware of those options, Mr. Loonam essentially forced him to plead guilty.   As Ms. Middlebrooks notes, however, a plea is not involuntary simply because the attorney strongly urges the defendant to accept a guilty plea -- counsel must inform the client that he has no choice but to plead guilty to render a guilty plea involuntary.   See Supplement at 5 (citing Fields v. Gibson, 277 F.3d at 1213).   In Fields v. Gibson, the Tenth Circuit said a plea may be involuntary "when an attorney materially misinforms the defendant of the consequences of the plea, e.g., by falsely alleging that promises or guarantees exist," or if "counsel informs the defendant that he has no choice, he must plead guilty."   277 F.3d at 1213 (internal quotation marks and citations omitted).   Counsel may, however, offer advice and even vigorously urge the defendant to plead guilty: "Indeed, one central component of a lawyer's job is to assimilate and synthesize information from numerous sources and then advise clients about what is perceived to be in their best interests.   Advice -- even strong urging by counsel does not invalidate a guilty plea."   277 F.3d at 1213 (internal quotation marks and citations omitted).   Yazzie has not contended that Mr. Loonam demanded that he plead guilty or gave him no choice, and Yazzie's own statements at the plea hearing indicate that he understood that the choice to plead was ultimately his decision: when Judge Puglisi asked him whether anyone attempted to force him to plead guilty, he said "no."   Plea Tr. at 6:1-3 (Judge Puglisi, Yazzie).   Mr. Loonam's strong urging, if that is what happened, does not transform Yazzie's voluntary plea into an involuntary one.

Yazzie argues that he did not knowingly and voluntarily plead guilty, because he was not fully aware of the potential to suppress his confession and his medical records.   Ms. Middlebrooks asserts that, while she is unsure about the merit of Yazzie's argument to suppress the statements he made to the FBI, there is merit to the argument that the Court should suppress

his medical records.  Although Mr. Loonam addressed some aspects of suppressing Yazzie's statements to the FBI, Mr. Loonam did not address the 18 U.S.C. § 3501(c) arguments until after Yazzie pled guilty; further, Mr. Loonam did not ever address suppressing the medical records. Even if correct, however, these arguments misapprehend the relevant inquiry regarding a knowing and voluntary plea: the Court must consider whether Yazzie understood the consequences of his plea, and whether he understood the proceedings -- and it is clear from the record that Yazzie understood the consequences of pleading guilty.  "To enter a plea that is knowing and voluntary, the defendant must have 'a full understanding of what the plea connotes and of its consequence.'"  United States v. Hurlich, 293 F.3d at 1230 (quoting Boykin v. Alabama, 395 U.S. 238, 244 (1969)).  "The defendant need not understand every collateral consequence of the plea, but need only understand its direct consequences," United States v. Hurlich, 293 F.3d at 1230-31 (quoting Wall v. United States, 500 F.2d 38, 39 (10th Cir. 1974)(per curiam)), and whether the plea carries a risk of deportation, see Padilla v. Kentucky, 559 U.S. at 374.  "Consequences of a guilty plea unrelated to the length and nature of the federal sentence are not direct consequences."  United States v. Hurlich, 293 F.3d at 1231 (citations omitted).  "[T]he 'knowing and voluntary' inquiry focuses on whether [a defendant] in fact did understand the proceedings."  Allen v. Mullin, 368 F.3d 1220, 1240 (10th Cir. 2004).  Yazzie's statements at the hearing indicate that he understood the proceedings, understood that he was giving up the right to a trial, and understood that he was accepting a sentence between 15 and 19 years; he has not since contested that he misunderstood what took place at the plea hearing.

Some circuit courts have held that, to be knowing and voluntary, a defendant should be made aware of his possible defenses and understand that he is giving up those possible defenses by pleading guilty.  See, e.g., United States v. Ranum, 96 F.3d 1020, 1024 (7th Cir. 1996)("The

defendant must also understand 'that his or her conduct actually falls within the charge[,] . . . and should be made aware of possible defenses, at least where the defendant makes known facts that might form the basis of such defenses.'" (alteration in original)(quoting United States v. Frye, 738 F.2d 196, 199 (7th Cir. 1984))); Sober v. Crist, 644 F.2d 807, 810 n.3 (9th Cir. 1981)("The accused should be made aware of possible defenses, at least where the attorney or court is made aware of facts that would constitute such a defense.").   The Tenth Circuit has said that, when a defendant is made aware of his defenses, he has knowingly pled guilty, see United States v. Wright, 392 F. App'x 623, 628 (10th Cir. 2010)(unpublished)(listing the ways in which the defendant understood his guilty plea, including that he "had discussed the charges, lesser-included offenses, and possible defenses with his appointed counsel"), but the Tenth Circuit has not held that a failure to ensure that the defendant understands that he is giving up potential defenses is fatal to the knowing and voluntary nature of the plea.   Rather, it seems that the Tenth Circuit focuses on whether the court taking the defendant's plea has complied with rule 11 of the Federal Rules of Criminal Procedure, see United States v. Hickok, 907 F.2d 983, 985 (10th Cir. 1990)(noting that by pleading guilty, the defendant waives all nonjurisdictional defenses, and that, before accepting a guilty plea, a court must determine that the defendant understands that he is waiving the right to trial under rule 11(c)(4)).   Rule 11 lists a number of items that a court should ensure the defendant understands before accepting the plea, including the right to a jury trial, the right to confront and cross-examine witnesses, and the defendant's waiver of those trial rights if the court accepts a guilty plea.   See Fed. R. Crim. P. 11(b)(1).   Rule 11 does not specifically require the court to ensure that the defendant understands his defenses or that he is waiving his defenses by pleading guilty.   See Fed. R. Crim. P. 11.   While the focus seems to be on whether rule 11's mandates were met, the Tenth Circuit has also recognized that a court's

failure to address one of the rule 11 provisions may be error, but not necessarily reversible error, because the failure may not affect the defendant's substantial rights.  See United States v. Alvarado-Benjume, 251 F. App'x 586, at 589 (10th Cir. 2007)(unpublished)(holding that, although the district court did not explain to the defendant that he was waiving his right to appeal, the record evidence on plain error review did not dispute that the defendant knowingly and voluntarily pled guilty and waived his right to appeal).  Even when defendants misjudge their defenses, the Tenth Circuit has said that fact does not render their guilty pleas involuntary or unknowing.  See United States v. Burciaga, 66 F. App'x 812, 814 n.2 (10th Cir. 2003)(unpublished)("Some of the defendants argue, however, their guilty pleas were involuntary or unknowing because they did not know the wiretap statute had expired.  We reject this argument.  Although the defendants may have misjudged the admissibility of the wiretap evidence, this alone does not render their guilty pleas involuntary or unknowing.").

In this case, it appears that, in accordance with rule 11, Yazzie understood his right to a jury trial and that he was waiving this right by pleading guilty.  The Plea Agreement lists Yazzie's rights -- "to plead not guilty" and "to have a trial by jury," and, at trial, "to confront and cross-examine adverse witnesses," "to be protected from compelled self-incrimination," "to testify and present evidence on [his] own behalf," and "to compel the attendance of witnesses for the defense" -- and that he agrees to waive those rights and plead guilty.  Plea Agreement ¶¶2-3, at 1-2.[22]  Although neither the Plea Agreement nor the plea colloquy clearly indicate that Yazzie

---

[22]  At the Plea Hearing, Judge Puglisi did not ask Yazzie whether he understood everything listed in rule 11, including his right to a jury trial, his right at trial to confront and cross-examine adverse witnesses, and that he would be waiving his trial rights by pleading guilty.  See Fed. R. Crim. P. 11(b).  Instead, Judge Puglisi asked Mr. Loonam if he discussed the Plea Agreement with Yazzie and if Mr. Loonam was "convinced that [Yazzie] understands the rights that he gives up by admitting guilt to this crime as well as the likely sentence he will receive under Rule 11(c)(1)(C)[.]"  Plea. Tr. at 4:20-23 (Judge Puglisi).  Mr. Loonam said that he

understood that he was giving up his potential defenses, this omission is not fatal to his knowing and voluntary plea.  Pleading guilty "frequently involves the making of difficult judgments," and "[w]aiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts."  McMann v. Richardson, 397 U.S. 759, 769 (1970).  The Court cannot fully weigh the likelihood of success without coming close to deciding the two suppression issues, but if it is not necessary to decide all motions to suppress before a defendant enters a plea agreement, it does not make sense for the Court to have to decide motions to suppress before deciding a motion to withdraw.  Deciding a motion to suppress before deciding a motion to withdraw a guilty plea would be putting the cart before the horse.  The Court need decide only whether Yazzie knowingly and voluntarily pled guilty, not whether he knew all possible defenses and their chances of success; similarly, the Court will not decide any potential motions to suppress before deciding the Motion to Reconsider.  The Court concludes that Yazzie knowingly and voluntarily pled guilty; thus, this factor weighs against Yazzie withdrawing his guilty plea.

## II.     YAZZIE HAD CLOSE ASSISTANCE OF COUNSEL.

Regarding whether Yazzie had close assistance of counsel before and during the plea hearing, the Court previously concluded that, "[a]lthough Yazzie's relationship with Mr. Loonam

---

had "reviewed [the Plea Agreement] thoroughly over quite some time."  Plea Tr. at 4:24-25 (Loonam).  Although Judge Puglisi did not discuss all of the information in rule 11 or in the Plea Agreement,

> a Rule 11 error is not prejudicial when the defendant was simply deprived of a mandated procedure as opposed to the substantive material information contemplated by the rule.  Thus, a defendant who receives the information omitted by the district court from other sources generally cannot demonstrate that he would not have pleaded guilty had the court also so informed him.

United States v. Ferrel, 603 F.3d 758, 763 (10th Cir. 2010)(citations omitted).

broke down after the plea hearing, that subsequent break down does not appear to have affected the Plea Agreement or plea negotiations." MOO at 31. The Court noted that, although Yazzie later asserted that he did not penetrate Jane Doe 1, he did not raise the issue at the plea hearing, and "he ultimately admitted that the United States could prove its charges against him." MOO at 31. Yazzie also represented at the plea hearing that "he had been satisfied with Mr. Loonam 'in all respects' in his representation." MOO at 32. The Court said that Mr. Loonam secured a favorable Plea Agreement for Yazzie, and although Yazzie expressed discontentment with the charge, the Court concluded that the factor "may be neutral . . . or weigh against withdrawal. Mr. Loonam might have focused his professional attention on the bottom line -- the length of Yazzie's sentence -- rather than focusing on getting a different charge." MOO at 32.

The Tenth Circuit has recognized that the question whether the defendant had assistance of counsel may require the same analysis as ineffective assistance-of-counsel claims. See United States v. Lee, 535 F. App'x at 680 n.2 ("[D]espite the differences between the two issues, we have analyzed challenges to the assistance of counsel made in th[e] context [of motions to withdraw guilty pleas] under the cause-and-prejudice standard applicable to Sixth Amendment ineffective-assistance-of-counsel claims."); United States v. Hamilton, 510 F.3d at 1216. "To demonstrate ineffectiveness, [Yazzie] 'must show both (1) that counsel's performance was deficient and (2) that his deficiency prejudiced his defense.'" United States v. Lee, 535 F. App'x at 681 (emphasis in original)(quoting United States v. Hamilton, 510 F.3d at 1216). "Counsel's performance is deficient when it falls 'outside the wide range of competence demanded of attorneys in criminal cases.'" United States v. Lee, 535 F. App'x at 681 (quoting United States v. Hamilton, 510 F.3d at 1216). "In particular, counsel's performance is deficient if he 'materially misinform[s] the defendant of the consequences of the plea.'" United States v. Lee,

535 F. App'x at 681 (emphasis in original)(quoting United States v. Carr, 80 F.3d 413 (10th Cir. 1996)).   "To demonstrate prejudice, [Yazzie] must show a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" United States v. Lee, at *3 (emphasis in original)(quoting United States v. Hamilton, 510 F.3d at 1216).   "[T]he proper standard for attorney performance is that of reasonably effective assistance"; Yazzie must show that Mr. Loonam's conduct fell below an objective standard of reasonableness.   Strickland v. Washington, 466 U.S. 668 at 687-88 (1984).   "Judicial scrutiny of counsel's performance must be highly deferential."   Strickland v. Washington, 466 U.S. at 689.

Yazzie takes issue with Mr. Loonam's assistance in three ways: (i) negotiating a charge for sexual abuse rather than sexual contact; (ii) not informing Yazzie of the potential to suppress his statements to the FBI under 18 U.S.C. § 3501(c); and (iii) not informing Yazzie of the potential to suppress his medical records.

### A.   MR. LOONAM OBTAINED A FAVORABLE PLEA AGREEMENT.

As of the Fifth Addendum to the PSR, the USPO calculates that Yazzie's total offense level is 40.   See Fifth Addendum at 1.   This calculation is based on: (i) a base offense level of 30; (ii) a 4-level enhancement under U.S.S.G. § 2A3.1(b)(1) based on conduct that violates 18 U.S.C. § 2241(a); (iii) a 2-level enhancement under U.S.S.G. § 2A3.1(b)(2)(B), because the victim was between twelve and sixteen years old; (iv) a 2-level enhancement under U.S.S.G. § 2A3.1(b)(3), because the victim was in Yazzie's custody, care, or supervisory control; (v) a 4-level enhancement under U.S.S.G. § 4B1.5(b)(1) as a repeat and dangerous sex offender against minors; (vi) a 2-level reduction under U.S.S.G. § 3E1.1 for accepting responsibility; and (vii) a 1-level reduction based on an expected motion from the United States based on Yazzie's acceptance of responsibility.   See PSR ¶¶ 31-40, at 10-11; Fifth Addendum at 1.   This calculation

results in a sentencing guidelines range of 292 to 365 months, which is well above the 180 to 228 months to which the parties agreed in the Plea Agreement. See Plea Agreement ¶ 10(a), at 4.

Yazzie objects to the USPO's enhancements under U.S.S.G. §§ 2A3.1(b)(1) and 4B1.5(b)(1). If the Court sustains both of these objections, the total offense level would be 31, resulting in a guidelines range of 108 to 135 months, which is lower than Yazzie's Plea Agreement range. This reduction would change the Court's view whether the Plea Agreement was a good deal for Yazzie under 18 U.S.C. § 2241(a), the statute to which he pled guilty. Although the Court does not intend to rule definitively on the objections without giving the parties an opportunity to present their arguments to the Court at a sentencing hearing, the Court concludes that it is necessary to consider to some extent the merit of Yazzie's objections so that it can correctly estimate what the sentencing guidelines range would be for Yazzie without the Plea Agreement.

Looking first to Yazzie's objection to the 4-level enhancement under U.S.S.G. § 2A3.1(b)(1), Yazzie argues that the conduct described in the PSR for this enhancement does not constitute a sexual act as required by 18 U.S.C. § 2241(a) and (b).

> The defendant was charged with Aggravated Sexual Abuse by force or threat. [Jane Doe 1] described being alone with Yazzie on numerous occasions when he would force her onto the bed then sit on her abdomen so she was unable to move. He would then kiss her, forcing her to kick, and hit him until he let her go. [Jane Doe 1] also reported that the defendant threatened to hurt their mother if she or her sister disclosed the abuse.

PSR ¶ 31, at 10. 18 U.S.C. § 2246 provides four alternative definitions for "sexual act":

> **(A)** contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, slight;
>
> **(B)** contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

**(C)** the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

**(D)** the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]

18 U.S.C. § 2246(2). Yazzie is correct that the additional conduct that the PSR describes does not constitute a sexual act as defined in 18 U.S.C. § 2246, but he cannot avoid the 4-level enhancement, because the crime to which he pled guilty is 18 U.S.C. § 2241(a), meaning that "the offense involved conduct described in 18 U.S.C. § 2241(a)." U.S.S.G. § 2A3.1(b)(1). Ms. Middlebrooks explained at the Sept. 13, 2013 hearing that, although Yazzie pled guilty to the facts in the Plea Agreement, he now denies the factual basis, asserting instead that at most, he committed sexual contact and not a sexual act. At this point, with the Plea Agreement still standing, Yazzie is subject to the 4-level enhancement under U.S.S.G. § 2A3.1(b)(1); if the Court permits him to withdraw his guilty plea and he is convicted at trial for the same offense, he would likewise be subject to the 4-level enhancement.

Yazzie also objects to the 5-level enhancement under U.S.S.G. § 4B1.5(b)(1), which applies when the "defendant engaged in a pattern of activity involving prohibited sexual conduct." U.S.S.G. § 4B1.5(b). He argues that the prohibited sexual conduct refers to a prior sex offense conviction, and, because he does not have any prior sex offense convictions, he contends the 5-level enhancement should not apply. The Court agrees with the USPO's response to this argument in the Fourth Addendum -- the application notes to U.S.S.G. § 4B1.5(b)(1) explain that "[a]n occasion of prohibited sexual conduct may be considered for purposes of subsection (b) without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion."

U.S.S.G. § 4B1.5 application note 4(b)(ii).   The Federal Sentencing Guidelines Handbook confirms that U.S.S.G. § 4B1.5(b) does not require prior convictions and thus "the 'pattern of activity' can include uncharged sexual assaults."  Roger W. Haines, Jr., Frank O. Bowman, III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook 2009-2010 Edition §4B1.5 Authors' Discussion, at 1402.  The Court tentatively concludes that the 5-level increase under U.S.S.G. § 4B1.5(b)(1) applies.  Because the Court does not believe, or does not have enough information to predict with any precision, that Yazzie's objections will be sustained, Yazzie will, on the present record, remain -- if he continues in his plea or is convicted at trial on the charge to which he pled -- at an offense level of 40 and a criminal history category I, resulting in a range of 292 to 365 months.  On that premise, the Plea Agreement results in a more favorable sentencing range than to what Yazzie would be subject for the same offense without the Plea Agreement. Even if the Court applies the 4-level enhancement under U.S.S.G. § 2A3.1(b)(1), but not the 5-level enhancement under U.S.S.G. § 4B1.5(b)(1), the offense level would be 35 and criminal history category I, resulting in a guideline range of 168 to 210 months, not radically different than the Plea Agreement's range of 180 months to 228 months.  Although Yazzie argues that he should be convicted for sexual contact and not a sexual act, the Court is concerned that, if it permits him to withdraw his guilty plea and Yazzie proceeds to trial, he may be convicted for the same offense to which he pled, 18 U.S.C. § 2241(a), because the United States would likely be able to use the statements Yazzie made in the Plea Agreement and at the plea colloquy.  See United States v. Jim, 839 F. Supp. 2d at 1158 (denying the defendant's motion in limine to exclude statements the defendant made in his plea agreement and during the plea colloquy).

Yazzie's problem with Mr. Loonam is not only that Mr. Loonam secured an unfavorable plea agreement based on the offense to which he pled guilty, but that he should not have pled

guilty to that offense at all.  Yazzie argues now that he is guilty of sexual contact and not of a sexual act, and that Mr. Loonam should have obtained a plea deal under 18 U.S.C. § 2244(a)(1), which would have capped his sentence at 10 years.  Although Yazzie asserts that he committed sexual contact, because he disputes that he penetrated Jane Doe 1 and that he touched her under her clothes, Yazzie did not dispute that he committed a sexual act at the plea hearing when he discussed the facts to which he was pleading guilty.  He rather contested that he used force and so demonstrated that he was not afraid to correct the record; yet he remained silent regarding the allegation that he penetrated Jane Doe 1.  Further, the United States initially charged Yazzie under 18 U.S.C. § 2241(c), which carries a mandatory minimum sentence of 30 years in prison.  See 18 U.S.C. § 2241(c).  The Court cannot say that Mr. Loonam's performance in representing Yazzie was deficient when he helped Yazzie avoid a much harsher sentence than what the United States initially charged, especially when Yazzie did not make clear until after he pled guilty that he disputes committing a sexual act.

As to the first complaint of Mr. Loonam's assistance, even if Yazzie is correct that he should not have pled guilty to sexual abuse, he knowingly and voluntarily pled to that offense, and he had the opportunity to challenge the facts of the charge at the plea hearing.  At the plea hearing, he challenged the characterization that he used force; he was also free to challenge whether he penetrated Jane Doe 1, yet he did not challenge that fact at the plea colloquy.  He waited until the May 15, 2011 Letter to assert that he did not penetrate Jane Doe 1.  Yazzie cannot show that, even if Mr. Loonam were somehow ineffective in obtaining the plea deal, that such ineffectiveness prejudiced Yazzie, because he was aware of the charge and pled to it anyway.

**B.    IT IS NOT CLEAR WHETHER YAZZIE COULD SUPPRESS HIS CONFESSION TO THE FBI.**

Yazzie argues that Mr. Loonam should have informed him of the possibility of suppressing his confession to the FBI under 18 U.S.C. § 3501(c).  This section does not provide the remedy Yazzie is seeking, but 18 U.S.C. § 3501 in conjunction with rule 5(a) of the Federal Rules of Criminal Procedure and the McNabb-Mallory rule may: rule 5(a) mandates that "a person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge," Fed. R. Crim. P. 5(a)(1)(A), and if the time between arrest and presentment is more than the six-hour safe harbor in 18 U.S.C. § 3501(c), then a court must determine whether the delay is reasonable, see 18 U.S.C. § 3501(c).  If the delay is unreasonable, the McNabb-Mallory rule describes the proper remedy under rule 5(a), which is to exclude from evidence the confession, even if the confession was voluntary.  Although the issue is not before the Court in a motion to suppress, the Court will consider to some extent the merit of Yazzie's argument, because it impacts the Court's analysis of Mr. Loonam's assistance of counsel.

The important facts and dates include (i) when Yazzie was arrested on the federal charge; (ii) when Yazzie confessed; and (iii) when Yazzie appeared before a Magistrate Judge for initial presentment.  The Court does not have independent access to the discovery in this case, and so must rely on the information the parties and the USPO have provided, which does not result in clear answers for when these events took place.

The PSR explains that, "[o]n May 11, 2010, FBI agents made a probable cause arrest of Willis Yazzie for the instant offense, Aggravated Sexual Abuse.  On that day he had been released from tribal jail for unrelated charges and was transferred to San Juan County Detention Center in Farmington, New Mexico."  PSR ¶ 8, at 4.  The PSR also states that, on "May 10,

2010, the Navajo Tribal Police Department interviewed Willis Yazzie concerning the allegations

made by both victims" and that Yazzie confessed that day.  PSR ¶ 15, at 6.

Yazzie provides a number of different dates and arguments for when he was arrested for

a federal offense and when he confessed.  For example, in the May 15, 2011 Letter, Yazzie said

he was

> serve[d] with a federal offense on May 5, 2010 at 9:15 am at the Shiprock P.D.
> and arrested at 9:30 am for a tribal warrant and I went to court o[n] Friday of May
> 7, for my warrant and the judge told me I was also on hold for the F.B.I. and
> sometime the next morning of May 8th I was interview[ed] by the F.B.I. and he
> badgered me to make a statement that is not true at the time I did not know what I
> was getting myself into.  Now I want to suppress my confession cause it occurred
> before the defendants presentment to a federal magistrate judge and beyond six
> hours, however, the court must decide whether delaying that long was
> unreasonable or unnecessary, and if it was, the confession is to be suppressed.

May 15, 2011 Letter at 1.  In the Motion to Dismiss with Prejudice on Constitutional Grounds,

filed May 25, 2011 (Doc. 47)("Motion to Dismiss"),[23] which Yazzie handwrote, he provided the

following statement of facts:

> Mr. Yazzie was arrested on tribal charges on May 5, 2010 at approximately at
> [sic] 9:30 am.  On May 8, 2010 sometime in the morning Mr. Yazzie was
> interview [sic] by a F.B.I. agent before obtaining a federal arrest warrant.  Navajo
> authorities released Yazzie into federal custody on May 10, 2010.  Mr. Yazzie
> was brought to magistrate court on May 11, 2010.

Motion to Dismiss at 1.  Ms. Middlebrooks explained at the September 13, 2013, hearing that she

is unsure about the actual dates: after conferring with Yazzie, she stated that Yazzie was initially

arrested for a DWI on May 7, 2010, he went to tribal court on May 8, 2010, remained in custody

based on a federal hold, confessed and was transferred into federal custody on May 10, 2010,

and was charged and made the initial appearance on May 11, 2010.  See Sept. 13 Tr. at 30:13-

---

[23] Yazzie later withdrew this motion.  See Defendant Willis Yazzie's Notice of
Withdrawal of Certain Motions, filed August 17, 2012 (Doc. 77).

31:5 (Middlebrooks, Court).  After the hearing, Ms. Middlebrooks further explained some of the

confusion about dates:

> According to the discovery in this case received to date by undersigned counsel,
> Special Agent Dustin Grant states that he, along with Navajo Nation Public Safety
> Criminal Investigator, Louis St. Germaine, conducted a probable cause arrest of
> Yazzie after he was released from Tribal Jail.  Yazzie was taken into custody
> without incident and transported to San Juan County Detention in Farmington
> where he submitted to questioning.  According to discovery, this occurred on or
> about May 10, 2010.  However, the discovery also contains a document from the
> Shiprock Police that indicates Yazzie was in fact arrested on May 7, 2010, on
> incident No. 02-10-012403, entitled, "paper service," and which is totally separate
> from 02-08-039054, the alleged underlying DWI matter.  It therefore appears that
> consistent with Yazzie's argument to this Court at the hearing on his motion to
> reconsider the Court's denial of his withdrawal of guilty plea, that Yazzie may
> have been arrested on this matter as early as May 7, 2010.

Addendum Supplement ¶ 4, at 2.  The conflicting dates show that Yazzie may have been arrested

for a federal offense as early as May 7, 2010 or as late as May 11, 2010.  It is unclear whether he

confessed on May 8, 2010, or May 10, 2010.  It appears that Yazzie's initial appearance was

May 12, 2010, at 9:53 a.m. in Albuquerque.  See Clerk's Minutes of Hearing before US

Magistrate Judge W. Daniel Schneider, Initial Presentment, filed May 12, 2010 (Doc. 6).

> Yazzie also argues that he was "arrested" as soon as a federal hold was placed on him:

> Yazzie was arrested by Shiprock police on a bench warrant for an unrelated
> matter.  According to Yazzie, when he attended court in Shiprock, the court was
> going to release Yazzie until the Shiprock prosecutor informed the court that
> Yazzie had a federal hold regarding this matter. At the time, Yazzie had not been
> indicted by a federal grand jury for these charges.  Yazzie remained in custody
> until he was interrogated by the FBI on these charges approximately two or three
> days after the Shiprock court announced his federal hold. Yazzie contends that he
> was "arrested" when a federal hold was placed on him and that his confession
> must be suppressed due to unreasonable delay.

Second Supplement at 3 n.2.

Ms. Middlebrooks explained that, based on her conversations with Mr. Loonam, Mr.

Loonam believed there was reasonable delay between Yazzie's arrest and his initial presentment;

he believed Yazzie was not arrested for federal charges until May 10 or 11, and that the time needed to transport Yazzie from Shiprock to Albuquerque explained the delay between the arrest and initial presentment.  See Sept. 13 Tr. at 14:2-11 (Middlebrooks).

If the facts that the USPO presented in the PSR are accurate, then the Tenth Circuit's analysis in United States v. Smith resolves the dispute; as the Tenth Circuit explained, the prompt-presentment rule does not apply until a defendant is arrested for a federal offense.  See 606 F.3d at 1278.  If Yazzie was arrested for a federal offense before he confessed, then Yazzie may have a stronger argument, and the Court would need to determine if the delay between the arrest and presentment was reasonable.  If, for example, Yazzie confessed before there was unreasonable delay, the presentment rule may not require its exclusion.  See 1 Wright & Leipold, supra, § 72, at 168 ("Exclusion of a confession is not required if the confession came before there had been delay; a confession given promptly upon arrest is admissible even though thereafter there is improper delay in taking the defendant before a magistrate judge.").  Without more definite information, the Court cannot say whether Yazzie's argument for suppressing his confession has any merit.

Even if Yazzie's suppression argument has merit, however, the prospect of a potential suppression motion is not enough to show that Mr. Loonam's performance was deficient -- Yazzie must show that Mr. Loonam's performance fell below an objective standard of reasonableness and that the deficient performance resulted in prejudice.  See United States v. Gordon, 4 F.3d at 1570.  The Supreme Court has addressed a similar situation in McMann v. Richardson, 397 U.S. 759 (1970), when it dealt with

> situations involving the counseled defendant who allegedly would put the State to
> its proof if there was a substantial enough chance of acquittal, who would do so
> except for a prior confession that might be offered against him, and who because

of the confession decides to plead guilty to save himself the expense and agony of
a trial and perhaps also to minimize the penalty that might be imposed.

397 U.S. at 767-68.  The Supreme Court discussed the situation where a defendant decided to

plead guilty based on his belief that the law would allow his confession to be used against him,

later learns that he may have been able to suppress his confession, and then petitions the court for

collateral relief, arguing that "his plea was an unintelligent and voidable act."  397 U.S. at 769.

The Supreme Court rejected this attack:

> As we said in Brady v. United States, 397 U.S., at 756-757, . . . the decision to
> plead guilty before the evidence is in frequently involves the making of difficult
> judgments.  All the pertinent facts normally cannot be known unless witnesses are
> examined and cross-examined in court.  Even then the truth will often be in
> dispute.  In the face of unavoidable uncertainty, the defendant and his counsel
> must make their best judgment as to the weight of the State's case.  Counsel must
> predict how the facts, as he understands them, would be viewed by a court.  If
> proved, would those facts convince a judge or jury of the defendant's guilt?  On
> those facts would evidence seized without a warrant be admissible?  Would the
> trier of fact on those facts find a confession voluntary and admissible?  Questions
> like these cannot be answered with certitude; yet a decision to plead guilty must
> necessarily rest upon counsel's answers, uncertain as they may be.  Waiving trial
> entails the inherent risk that the good-faith evaluations of a reasonably competent
> attorney will turn out to be mistaken either as to the facts or as to what a court's
> judgment might be on given facts.
>
> That a guilty plea must be intelligently made is not a requirement that all
> advice offered by the defendant's lawyer withstand retrospective examination in a
> post-conviction hearing.  Courts continue to have serious differences among
> themselves on the admissibility of evidence, both with respect to the proper
> standard by which the facts are to be judged and with respect to the application of
> that standard to particular facts.  That this Court might hold a defendant's
> confession inadmissible in evidence, possibly by a divided vote, hardly justifies a
> conclusion that the defendant's attorney was incompetent or ineffective when he
> thought the admissibility of the confession sufficiently probable to advise a plea
> of guilty.

397 U.S. at 769-70.  The Supreme Court went on to explain that, when a defendant attacks

whether his plea was knowing and voluntary based on the advice his counsel offered, a court

should not simply consider whether the counsel's advice was right or wrong, but whether the

advice was "within the range of competence demanded of attorneys in criminal cases."  397 U.S. at 770-71.

The Court concludes that Yazzie has not shown that Mr. Loonam's performance fell below an objective standard of reasonableness; even though Yazzie may have been able to suppress his confession under rule 5 and the McNabb-Mallory rule, that is not entirely clear, and, at most, it appears that Mr. Loonam may have misjudged the admissibility of the evidence. Misjudgment is not enough to show that Mr. Loonam's advice was outside the range of competence demanded of attorneys in criminal cases.  Mr. Loonam shared with Yazzie his impression that they could not suppress the statements Yazzie made to the FBI based on the FBI forcing or coercing Yazzie to make the statements; although Mr. Loonam did not discuss or address 18 U.S.C. § 3501(c) until after Yazzie pled guilty, his conclusion regarding the admissibility of the statements remained the same.  Ms. Middlebrooks has candidly informed the Court that she is uncertain as to the merit of Yazzie's suppression argument under 18 U.S.C. § 3501(c).  The Court does not have enough information to analyze the strength of this argument; more importantly, the Court does not need to decide this issue to determine whether Yazzie had close assistance of counsel or whether he knowingly pled guilty.  Yazzie has not met his burden to show that Mr. Loonam's advice fell outside the range of acceptable performance, and, thus, Yazzie's contentions that he would have not pled guilty had he known about the possibility of suppressing his confession to the FBI is irrelevant.

### C.    IT IS NOT CLEAR WHETHER YAZZIE COULD SUPPRESS HIS MEDICAL RECORDS, BUT HIS MEDICAL RECORDS DO NOT PERTAIN TO THE CRIME TO WHICH HE PLED GUILTY.

Yazzie asserts that part of the reason he pled guilty was because Mr. Loonam advised him that evidence from his medical records that the FBI obtained showed that Yazzie had an

STD and that Jane Doe 2 also had an STD, and that this evidence, with his statement to the FBI, would result in a conviction.  See Second Supplement at 2.  Yazzie says that Mr. Loonam did not talk to him about suppressing those records, and Ms. Middlebrooks explains that Yazzie was not aware of this possibility until she raised the issue with him.  See Second Supplement at 4. Yazzie argues that the Court should allow him to withdraw his guilty plea, because he "erroneously believed he would be faced with his medical records containing reference to an STD."  Second Supplement at 4.

Because the medical records pertain to Jane Doe 2 and Yazzie pled guilty to the charge against him regarding Jane Doe 1, the Court is unsure how the medical records influenced him to plead guilty, and he has not explained this problem except to say that Mr. Loonam advised that the medical records, with the confession, would likely lead to a conviction.  Perhaps the United States would have charged Yazzie for offenses relating to both Jane Doe 1 and Jane Doe 2 if Yazzie proceeded to trial, whereas it was willing to drop the charges against Yazzie for Jane Doe 2 if he pled guilty for Jane Doe 1.  The Court does not understand why the medical records made such an impact on Yazzie pleading guilty to the charges against him for Jane Doe 1, but the Court will consider whether Mr. Loonam should have raised the possibility of suppressing the records with Yazzie, and more importantly, whether failing to do so fell outside the range of competence demanded of attorneys in criminal cases.

Ms. Middlebrooks indicated that the FBI subpoenaed Yazzie's medical records and obtained them in violation of HIPAA, and that Yazzie never waived his privilege regarding those records.  See Sept. 13 Tr. at 16:7-17 (Court, Middlebrooks).  Ms. Middlebrooks seems to be arguing that, under HIPAA, Yazzie may have been able to suppress the medical records, because she contends that none of the HIPAA law enforcement exceptions apply.  She also mentioned

that the FBI subpoenaed the records, but she did not indicate whether the exception, pursuant to

45 C.F.R. § 164.512(e), for judicial and administrative proceedings would apply.  That exception

permits disclosure in the course of a judicial or administrative proceeding "in response to a

subpoena" if the "covered entity receives satisfactory assurance . . . from the party seeking the

information that reasonable efforts have been made by such party" that either the subject of the

protected health information has been given notice, or that the party seeking the information has

made reasonable efforts to secure a qualified protective order.  45 C.F.R. § 164.512(e)(1)(ii).

The qualified protective order would "[p]rohibit[] the parties from using or disclosing the

protected health information for any purpose other than the litigation or proceeding for which

such information was requested," and "[r]equire[] the return to the covered entity or destruction

of the protected health information (including all copies made) at the end of the litigation or

proceeding."  45 C.F.R. § 164.512(e)(1)(v).  The Court does not know the circumstances in

which the FBI obtained the medical records or whether the FBI provided the covered medical

entity with the adequate assurances required under HIPAA; assuming, however, that the covered

medical entity provided the records in violation of HIPAA, without an applicable exception

covering its conduct, the Court does not believe that suppressing the records would be the proper

remedy.

HIPAA prohibits a "covered entity" from using or disclosing protected health

information.  45 C.F.R. § 164.502(a).  Covered entities include a "health plan," a "health care

clearinghouse," and a "health care provider who transmits any health information in electronic

form in connection with a transaction" that HIPAA covers.  45 C.F.R. § 164.104(a).  The FBI is

not a covered entity under HIPAA.  See Kerns v. Bd. of Comm'rs, 707 F. Supp. 2d at 1259

(stating that "HIPAA restrains the 'health plan, health care clearinghouse, or health care

provider' from disclosing protected medical information, and does not restrain law-enforcement directly."  (quoting 45 C.F.R. § 164.104)); United States v. Mathis, 377 F. Supp. 2d 640, 645 (M.D. Tenn. 2005)("HIPAA applies to 'a health plan,' 'a healthcare clearinghouse,' or 'a healthcare provider who transmits any health information in an electronic form in connection with a transaction referred to in Section 1320d-2(a)(1) of this title.'  The FBI does not fit within any of these categories."); United States v. Elliott, 676 F. Supp. 2d 431, 440 (D. Md. 2009)("Law enforcement agencies, including the office of the prosecuting attorney, are not covered entities under HIP[A]A.").  Although Yazzie argues that the FBI violated HIPAA by obtaining his medical records, it seems that Yazzie's HIPAA argument would be better directed toward the covered entity -- likely the healthcare provider that released his records to the FBI.  HIPAA "provides for criminal and civil penalties against entities that fail to comply with its provisions," United States v. Elliott, 676 F. Supp. 2d at 440 (citing 42 U.S.C. §§ 1320d-5, 1320d-6), but suppressing medical records does not appear to be an appropriate remedy for a HIPAA violation, see United States v. Elliott, 676 F. Supp. 2d at 440-41 (stating that HIPAA "was passed to ensure an individual's right to privacy over medical records, it was not intended to be a means for evading prosecution in criminal proceedings," and finding "that the Government's interest in obtaining the requested records outweighs the defendant's right to withhold them and the records will not be excluded from trial on this ground"); Elder-Evins v. Casey, C 09-05775 SBA LB, 2012 WL 2577589 (N.D. Cal. July 3, 2012)("As other courts have noted, HIPAA does not have a suppression remedy.  And where this is the case, it is inappropriate for the court to exclude evidence on this basis." (citation and footnote omitted)); United States v. Streich, 560 F.3d 926, 935 (9th Cir. 2009)(Kleinfeld, J., concurring)("HIPAA does not provide any private right of action, much less a suppression remedy.").

Ms. Middlebrooks has not explained how the FBI obtained the medical records, other than to say that the FBI subpoenaed the records.  The Court is not aware that the FBI has any subpoena powers,[24] so, if there was a subpoena, the FBI most likely went to the United States Attorney and then the federal court for a subpoena.  If there were a subpoena, the suppression remedy might not be available, even if there were a constitutional violation, under the good-faith exception to the exclusionary rule, see United States v. Leon, 468 U.S. 897, 922 (1984), or under absolute judicial immunity for obeying a court order, see Valdez v. City & Cnty. of Denver, 878 F.2d 1285, 1287-88 (10th Cir. 1989).[25]  Also, the medical records might have been inevitably discovered, even if not secured constitutionally.  See United States v. Christy, 739 F.3d at 540 (stating that, under the inevitable discovery doctrine, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means'" (quoting Nix v. Williams, 467 U.S. 431, 444 (1984))).  Without more information, such as evidence about the means by which the FBI obtained the subpoena, whether the United States had a compelling interest in the records, and whether the United States could have achieved its objectives in a less intrusive manner, it is not clear to the Court whether Yazzie may have meritorious arguments regarding his constitutional right to privacy under the Fourteenth Amendment, or his right to be free from unreasonable searches and seizures under the Fourth Amendment, the latter being the

---

[24] The parties did not discuss whether the FBI has authority to issue subpoenas; although the Court has identified one case stating that "the FBI issued a subpoena" as a part of its investigation, United States v. Vazquez-Rivera, 665 F.3d 351, 354 (1st Cir. 2011), it is not clear from that case whether the FBI, independent of a court, has authority to issue a subpoena.

[25] The Court does not have enough information to state precisely what it would do if faced with a motion to suppress; it does not know, for example, if the FBI requested the subpoena pursuant to an ongoing investigation or if it carried out a subpoena that a grand jury issued.

most likely source for Yazzie's desired exclusionary remedy. [26]  Yazzie has not demonstrated to

the Court that Mr. Loonam's failure to advise Yazzie about his rights related to his medical

records fell below an objective standard of reasonableness.  It does not appear that the Court

should delve into these issues any further; the Tenth Circuit's opinions do not state that the Court

should find that the defendant has a meritorious defense or good suppression motions.  That the

[26] The Court's decision in Kerns v. Board of Commissioners is not inconsistent with the Court's analysis of Yazzie's potential suppression motion.  In Kerns v. Board of Commissioners, the plaintiff brought an action under § 1983 against a law enforcement officer who had obtained the plaintiff's medical records without the plaintiff's consent, warrant, or subpoena.  See 707 F. Supp. at 1254.  The Court concluded that the officer violated the plaintiff's Fourteenth Amendment right to privacy, because the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records and, while the disclosure of the information served a compelling state interest -- determining whether the plaintiff had violated a law prohibiting a person who had been adjudicated a mental defect or committed to a mental institution from possessing a firearm -- the state could have achieved its objectives in a less obtrusive manner.  See 707 F. Supp. at 1254-1257.  The Court then concluded that the law was clearly established and denied the defendant's qualified immunity defense.  See 707 F. Supp. at 1261.  The Court also found that the officer violated the plaintiff's Fourth Amendment right to be free from an unreasonable search and seizure; the Court noted that the plaintiff had an expectation of privacy in his medical records, and that the officer "neither sought consent, nor used proper legal means -- a warrant or subpoena -- to request his medical records."  707 F. Supp. at 1262.  This right, the Court also concluded, was clearly established, and thus denied the officer's qualified immunity defense.  See 707 F. Supp. at 1268.  The Tenth Circuit reversed the Court, holding that the law was not clearly established on either the Fourteenth or the Fourth Amendment rights, but the majority did not comment on the first prong of the qualified immunity analysis -- whether the defendant violated the plaintiff's constitutional rights.  See Kerns v. Bader, 663 F.3d at 1187.  Judge Holloway dissented, agreeing instead with the Court that the officer violated the plaintiff's "clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime *might* have occurred."  663 F.3d at 1197-98 (Holloway, J., dissenting)(emphasis in original).  Judge Holloway also agreed with the Court that the plaintiff "enjoyed a due process right to the non-disclosure of his personal medical information" and that "the infringement of that right implicates the Fourth Amendment."  663 F.3d at 1200 (Holloway, J., dissenting).  While the Court found a Fourth Amendment violation in Kerns v. Board of Commissioners, and Judge Holloway agreed in Kerns v. Bader, an important difference is that the officer in that case requested and received the medical information without a warrant or subpoena.  In this case, Ms. Middlebrooks indicated that the FBI obtained Yazzie's medical records pursuant to a subpoena, leading the Court to believe that it could, depending on the facts not yet known, reach a different conclusion on the Fourth Amendment issue than what it reached in Kerns v. Board of Commissioners.

defendant gave up good arguments does not mean that the plea was involuntary; defendants often give up arguments -- good ones -- to secure plea agreements. The Court should not have to decide every motion to suppress before a defendant pleas, and Yazzie has not demonstrated that, in failing to raise this issue, Mr. Loonam's advice was deficient.

The factor analyzing whether Yazzie had close assistance of counsel weighs against allowing Yazzie to withdraw his plea; although Mr. Loonam may not have provided Yazzie with every potential argument, and the Court has reservations regarding Mr. Loonam's communication, Yazzie has not shown that Mr. Loonam's advice fell below an objective standard of reasonableness. The Court has considered whether Yazzie's potential suppression motions have merit, but cannot say definitively that either would succeed.

## III.    YAZZIE IS ASSERTING HIS INNOCENCE.

The final factor that can show a fair and just reason to allow a defendant to withdraw his guilty plea is if the defendant asserts his innocence. In the MOO, the Court concluded that this factor "is either neutral, as Yazzie asserts he is guilty of a lesser offense than the Information charges, or weighs against allowing him to withdraw his plea, because he has repeatedly admitted that he did wrong." MOO at 28. The Court noted that Yazzie contested "some of the factual basis underlying his statement in the Plea Agreement," including whether he used force and whether he touched Jane Doe 1 under her clothing; further, he included affidavits from Jane Doe 1 and Jane Doe 2 in which they vacillate from their prior positions. MOO at 27. The Court stated, however, that Yazzie did not contest at the plea hearing that a jury would find him guilty of sexual abuse under 18 U.S.C. § 2241(a) and observed that he has continued to admit that he has done wrong. See MOO at 27.

This factor requires the defendant to assert either legal or factual innocence, but a defendant "must offer evidence to support conclusory statements of innocence." United States v. Coates, 483 F. App'x 488, 493 (10th Cir. 2012). The Court previously noted that Yazzie "has not clearly asserted that he is innocent of the charged offense," MOO at 26, and that "Yazzie continues to admit that he committed a sexual act with a minor," MOO at 27. After further consideration, and with Yazzie's subsequent arguments, the Court believes that Yazzie is asserting actual innocence from 18 U.S.C. § 2241(a), the offense to which he pled guilty, because he says he did not commit a sexual act under the definitions of 18 U.S.C. § 2246(2). Instead, he argues that he has committed "sexual contact," because he did not touch Jane Doe 1 or Jane Doe 2 under their clothing, and did not penetrate Jane Doe 1 with his finger. The Information to which Yazzie pled guilty cites 18 U.S.C. § 2246(2)(C) to define "sexual act" as "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]" 18 U.S.C. § 2246(2)(C). 18 U.S.C. § 2246(2) provides four definitions of "sexual act":

> **(A)** contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, slight;
>
> **(B)** contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
>
> **(C)** the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
>
> **(D)** the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person . . . .

18 U.S.C. § 2246(2).  Because Yazzie argues that he did not touch either Jane Doe 1 or Jane Doe 2 under their clothing, as required by 18 U.S.C. § 2246(2)(D), and did not penetrate Jane Doe 1, as required by 18 U.S.C. § 2246(2)(C), he is asserting his innocence from 18 U.S.C. § 2241(a), which requires a sexual act.  Instead, Yazzie argues that he committed a sexual contact, under 18 U.S.C. § 2244, and that "sexual contact" means "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]"  18 U.S.C. § 2246(3).  Yazzie is not asserting that he is wholly innocent from any wrongdoing, but he is asserting that he is innocent of the crime to which he pled.  This factor weighs in favor of allowing Yazzie to withdraw his guilty plea.

After reanalyzing the three factors that could justify allowing Yazzie to withdraw his guilty plea, the Court finds that only one weighs in his favor -- that Yazzie asserts his innocence. The Court's analysis became slightly more favorable to Yazzie regarding the close assistance of counsel, but that factor still weighs slightly against allowing withdrawal.  The Court has not changed its position that Yazzie knowingly and voluntarily pled guilty, weighing against allowing Yazzie to withdraw his plea.  The Court will next review the systemic burdens: "prejudice to the government, timing of the motion, inconvenience to the court, and waste of judicial resources."  United States v. Lee, 2013 WL 4750787 at *2 n.3.

## IV.   THE UNITED STATES WOULD SUFFER PREJUDICE IF THE COURT ALLOWS YAZZIE TO WITHDRAW HIS GUILTY PLEA.

The analysis for the prejudice to the United States remains the same as in the Court's MOO and weighs against allowing Yazzie to withdraw his guilty plea.  In fact, the prejudice has gotten worse and more severe, because the victims now state a desire to change their previous statements alleging that Yazzie sexually abused them.  See Affidavit of Jane Doe 1 ("I think it

was very hard for me to accept a new parent in my life.  Well all I could say is that most of those reports were not true and he did not do all of those things to me, and my family."); Affidavit of Jane Doe 2 ("I . . . have a different point of view since now that I'm older.").  On one hand, perhaps a victim recanting prior testimony is not prejudice to the government in the same way that the death of witness would be, because it may be an improvement on the quality of evidence if the witness was not telling the truth at first.  On the other hand, the victims have not clearly recanted, declared Yazzie's innocence, or explained which of their previous statements were true and which were false -- rather, they seem to be more concerned about losing a member of their household and are rethinking their desire to testify against Yazzie.  As the Court noted in its MOO, the United States' evidence has diminished with the passage of time, and recollections have faded and changed.  See Feb. 4 Tr. at 23:3-4 (Wishard)(expressing that the United States case is "substantially more weak today than it was when [Yazzie] entered into the plea").  The United States has expressed that, if it proceeds to trial, it would not have the victims' testimony.  See Feb. 4 Tr. at 23:5-9 (Wishard)("None of the complaining witnesses or the person to whom Mr. Yazzie confessed other than the FBI agent has testified under oath, so were this matter to proceed to trial the United States would have Mr. Yazzie's inculpatory statements and confession but would not have a good corroborating witness."); Sept. 13. Tr. at 33:12-16 (Court, Wishard)("Court: But realistically [a trial is] probably not going to include the victims' testimony?  Wishard: That's correct.  And that was one of the factors we argued against allowing him to withdraw his plea.").

The Tenth Circuit has recognized that requiring the United States to try a case it would not otherwise have to try, particularly when preparation for the trial will be difficult, results in prejudice to the United States.  See United States v. Jones, 168 F.3d 1217, 1220 (10th Cir.

1999)(finding that allowing the defendant to withdraw his plea "could also prejudice the government," because the "government will face the presumably difficult task of locating confidential informants").  Although the United States maintains that it can prosecute this case, the Court finds that this factor weighs in favor of not permitting Yazzie to withdraw his guilty plea.

## V.   THE TIMING OF THE MOTIONS WEIGH SLIGHTLY AGAINST PERMITTING YAZZIE TO WITHDRAW HIS GUILTY PLEA.

The analysis regarding the timing of the motions also remains the same; although the Court notes that Yazzie promptly filed the Motion to Reconsider after the Court filed its MOO, Yazzie did not file his 1st Motion until approximately nine months after the plea hearing, which is a significant portion of time.  The delay is somewhat excusable, because of Yazzie's difficulties with counsel, but Yazzie wrote to the Court on multiple occasions without the assistance of counsel, and he could have done the same to request to withdraw his guilty plea. See United States v. Kramer, 168 F.3d 1196, 1202 (10th Cir. 1999)(recognizing that an eight-month delay and a motion to withdraw a guilty plea filed on "the eve of sentencing" constituted delay).  This factor, thus, weighs slightly against permitting Yazzie to withdraw his plea.

## VI.   ALLOWING YAZZIE TO WITHDRAW HIS GUILTY PLEA WOULD INCONVENIENCE THE COURT AND WASTE JUDICIAL RESOURCES.

The Court previously noted that the other two systemic factors -- whether the withdrawal will substantially inconvenience the Court or waste judicial resources -- weigh against withdrawal.  The Court stated that there will almost always be some inconvenience to the Court, and in this case, allowing Yazzie to withdraw his plea will mean suppression hearings and proceeding to trial, which would create a lot of judicial work in this busy district.  As the Court stated, however, it is "in the justice business, not trying to avoid work.  If justice requires a trial,

so be it."  MOO at 29.  The Motion to Reconsider suggests that there may be even more work --
two suppression hearings.  The Court's thoughts remain the same, however.  The Court wants to
do right by Yazzie and not just get out of work.  If allowing withdrawal requires a lot of work to
do justice to Yazzie, that work will be done.  It is unclear, however, whether doing more work on
this case will be justice.  The Court was persuaded that this factor weighs against Yazzie,
because it believed the United States would probably be able to prove its case using Yazzie's
multiple admissions, and that Yazzie would not likely receive a more favorable sentence after
trial than what he has in the Plea Agreement.  The Court also included in its analysis the
"likelihood of conviction," and concluded that Yazzie would likely be convicted, and that a trial
"would be a waste of time and get us to the same point that Yazzie is in today -- convicted."
MOO at 31.

These factors still weigh against allowing Yazzie to withdraw his guilty plea, and the
analysis remains largely unaffected by Yazzie's current arguments, but the Court notes that, if
Yazzie is convicted of the same statute to which he pled, and if the Court sustains Yazzie's
objections to the PSR, Yazzie's sentence will likely be lower than to what agreed in the Plea
Agreement.  The Court cannot know precisely what will happen at trial and at a sentencing
hearing, but notes that Yazzie will likely still be convicted, although he may be in a better
sentencing position after a trial than to what he agreed in the Plea Agreement.  The Court notes,
however, that Yazzie would also be exposed to a potential life sentence with a conviction under
18 U.S.C. § 2241(a), and that the United States may be able to pursue the original charge under
18 U.S.C. § 2241(c), which carries a mandatory minimum sentence of 30 years.  The Court
concludes that these factors weigh against allowing Yazzie to withdraw his plea.

The Court concluded in the MOO that Yazzie did not give the Court a just and fair reason to allow withdrawal.  See MOO at 36.  After reconsidering the 1st Motion, 2nd Motion, and Yazzie's current arguments, the Court has slightly changed its position, finding that Yazzie has asserted his innocence to the specific charge to which he pled, which weighs in favor of allowing Yazzie to withdraw his guilty plea.  The Court has also expressed reservations about the assistance-of-counsel factor, although still concluding that it weighs against withdrawal, if only slightly.  The other factors, however, weigh against allowing Yazzie to withdraw his guilty plea, including that he entered the plea knowingly and voluntarily.  "The plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom."  United States v. Morrison, 967 F.2d at 268.  The Court, thus, will not permit Yazzie to withdraw his guilty plea.

**IT IS ORDERED** that the Letter from Willis J. Yazzie, Sr. to Judge James O. Browning, sent June 7, 2013, filed June 10, 2013 (Doc. 113), is granted in part and denied in part.  The Court has reconsidered its Memorandum Opinion and Order, filed June 4, 2013 (Doc. 100), but will continue to deny the Defendant's Motion to Withdraw Plea of Guilty, filed November 29, 2011 (Doc. 59), and the Defendant's Motion to Withdraw Plea of Guilty, filed April 4, 2012 (Doc. 64).

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
   United States Attorney
Jacob Wishard
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Kimberly A. Middlebrooks
Albuquerque, New Mexico

*Attorney for the Defendant*