IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                    No. CR 10-1761 JB

WILLIS YAZZIE,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on: (i) the Letter from Defendant Willis J. Yazzie to the Honorable James O. Browning, dated March 11, 2014, filed March 13, 2014 (Doc. 134)("March 11, 2014 Letter"); and (ii) the Letter from Yazzie to Judge Browning, dated March 12, 2014, filed March 14, 2014 (Doc. 133)("March 12, 2014 Letter").   The Court held a sentencing hearing on March 21, 2014.  The primary issues are: (i) whether Yazzie has given the Court a fair and just reason to allow him to withdraw his guilty plea; (ii) whether the Honorable Richard L. Puglisi, former Chief United States Magistrate Judge for the District of New Mexico,[1] violated rule 11 of the Federal Rules of Criminal Procedure during Defendant Willis Yazzie's plea colloquy; (iii) whether Yazzie has presented any new arguments or evidence to change the Court's analysis regarding his medical records and the allegations against him involving Jane Doe 2; and (iv) whether Yazzie's argument that he did not understand that he was waiving, at his plea colloquy, the protections of rule 410 of the Federal Rules of Evidence and pleading guilty to an information rather than an indictment affect the knowing and voluntary nature of his guilty plea.  The Court will deny Yazzie's requests to withdraw his guilty plea, because Yazzie's

---

[1] Judge Puglisi is currently a United States Magistrate Judge for the District of Hawaii.

arguments and evidence do not change the Court's previous analysis that the seven factors that the United States Court of Appeals for the Tenth Circuit requires the Court to consider weigh as a whole against permitting Yazzie to withdraw his plea.  Judge Puglisi was not involved in the plea negotiations between Plaintiff United States of America and Yazzie, and thus, did not violate rule 11.  The Court previously considered Yazzie's argument that his medical records should have been suppressed, and again concludes that whether Yazzie gave up a meritorious suppression argument when he pled guilty does not affect the knowing and voluntary nature of his plea.  Although Yazzie asserts that he did not know at the time of his plea that he was waiving the protections of rule 410 or that he was pleading guilty to an information rather than an indictment, these arguments do not render his guilty plea unknowing and involuntary.

## FACTUAL BACKGROUND

Yazzie lived in an "eight-foot-by-eight-foot shack" in Two Grey Hills, New Mexico, with his wife and their four children, two of whom were Jane Doe 1 and Jane Doe 2, Yazzie's step-daughters.  United States' Response to Defendant's Motion Withdraw [sic] His Plea of Guilty at 1, filed December 30, 2011 (Doc. 62)("Response")(citation omitted).  The Navajo Tribal Police Department learned that Yazzie was allegedly abusing Jane Doe 1, who was thirteen years old at the time, and Jane Doe 2, who was then ten years old, on May 3, 2010.  Response at 1.  On May 10, 2010, the Navajo Police interviewed Yazzie regarding the allegations.  See Response at 4. Before the interview, Yazzie orally and in writing waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966).[2]  See Response at 4.  Yazzie admitted that he had an intimate relationship

---

[2] Miranda v. Arizona "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

with Jane Doe 1, which involved him kissing Jane Doe 1, holding hands with her, putting his penis on her cheek and telling her to suck it, which she would not, and touching her vagina, both over her clothes and under clothes, including penetration with his finger.  See Response at 4. Yazzie denies ever having intercourse with Jane Doe 1.  See Response at 1-2.  Yazzie admitted that he touched Jane Doe 2's vagina one night, but contends that he thought it was his wife's, and not Jane Doe 2's, that he was touching.  See Response at 5.  He denies having intercourse with Jane Doe 2.  See Response at 5.

## PROCEDURAL BACKGROUND

The Court has previously described the procedural history in this case, including the charges against Yazzie, his guilty plea pursuant to a plea agreement, and his subsequent attempts to withdraw his guilty plea.  See Memorandum Opinion and Order, filed June 4, 2013 (Doc. 100)("June 4, 2013 MOO"); Memorandum Opinion and Order, filed February 6, 2014 (Doc. 130)("Feb. 6, 2014 MOO").

In the Criminal Complaint, filed May 12, 2010 (Doc. 1), the United States charged Yazzie with committing "multiple acts of aggravated sexual abuse to two minor children under the ages of twelve and sixteen years in violation of" 18 U.S.C. §§ 2241(c) and 2246(2)(C)(D). Criminal Complaint at 1.  A person convicted under 18 U.S.C. § 2241(c) "shall be fined under

_____

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

this title and imprisoned for not less than 30 years or for life." 18 U.S.C. § 2241(c). A Grand

Jury indicted Yazzie on two counts of aggravated sexual abuse: as to Jane Doe 1, the Grand Jury

indicted Yazzie for violating 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(C), and as to Jane Doe 2,

the Grand Jury indicted him for violating 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(D). <u>See</u>

Indictment at 1-2, filed June 10, 2010 (Doc. 12). Yazzie pled not guilty to the two counts in the

Indictment. <u>See</u> Clerk's Minutes of Arraignment at 1, filed June 16, 201 (Doc. 14).

       1.    <u>**The Plea Agreement and Plea Hearing**</u>.

As part of a Plea Agreement, filed February 9, 2011 (Doc. 38), Yazzie pled guilty to an

Information, filed February 9, 2011 (Doc. 35), in which the United States charged Yazzie with

Aggravated Sexual Abuse of Jane Doe 1, in violation of 18 U.S.C. §§ 1153, 2241(a), and

2246(2)(C). <u>See</u> Information at 1; Plea Agreement ¶ 3, at 2. A person convicted under 18

U.S.C. § 2241(a) "shall be fined under this title, imprisoned for any term of years or life, or

both." 18 U.S.C. § 2241(a). The United States and Yazzie agreed to a specific sentence

"between 15 years (180 months) and 19 years (228 months) imprisonment," pursuant to rule

11(c)(1)(c) of the Federal Rules of Criminal Procedure. Plea Agreement ¶ 10(a), at 4. In the

Plea Agreement, in the section titled "Defendant's Admission of Facts," the statement from

Yazzie reads, in part:

> Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of
> entering this plea, the United States could prove facts sufficient to establish my
> guilt of the offense to which I am pleading guilty beyond a reasonable doubt. I
> specifically admit the following facts related to the charges against me, and
> declare under penalty of perjury that all of these facts are true and correct:
>
> . . . .
>
>     <u>**During March of 2010, I, Willis Yazzie, inserted my finger into
> the vaginal opening of my stepdaughter, A.N., a/k/a Jane Doe.
> A.N. was 13 years old at the time. In doing so, I used force
> against A.N.**</u>

Plea Agreement ¶ 8, at 3 (emphasis in original).  Yazzie also stipulated:

> [T]he Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

Plea Agreement ¶ 10(c), at 5.

At the plea hearing, Yazzie swore that the testimony he gave was the "truth, the whole truth, and nothing but the truth."  For The Record at 12:05:45-05:58 (Sanchez, Yazzie)("FTR"); Transcript of Plea Hearing at 2:13, taken February 9, 2011, filed January 17, 2012 (Doc. 63)("Plea Tr.")(stating that the Defendant was sworn).   Judge Puglisi asked Yazzie whether he had been recently treated for any mental illness or addiction to narcotic drugs, and whether Yazzie was under the influence of alcohol or drugs of any kind; Yazzie answered "no" to both questions.  Plea Tr. at 2:24-3:7 (Judge Puglisi, Yazzie).  Yazzie responded "yes" to Judge Puglisi's question whether Yazzie was satisfied "in all respects with his attorney Mr. Loonam." Plea Tr. at 3:8-11 (Judge Puglisi, Yazzie).   Yazzie affirmed that he had read the Consent to Proceed Before United States Magistrate Judge in a Felony Case, filed February 9, 2011 (Doc. 37), the Waiver of Indictment, filed February 9, 2011 (Doc. 36), and the Plea Agreement, and Yazzie stated that he had also reviewed the documents with his counsel.  See Plea Tr. at 3:12-21 (Judge Puglisi, Yazzie).  Yazzie stated that he did not have any questions about those documents.  See Plea Tr. at 3:22-24 (Judge Puglisi, Yazzie).  Yazzie stated that he understood the information in those documents.  See Plea Tr. at 3:25-4:2 (Judge Puglisi, Yazzie).  Yazzie affirmed that he had signed the documents.  See Plea Tr. at 4:3-6 (Judge Puglisi, Yazzie).

Yazzie affirmed that he understood that, by signing the Consent to Proceed Before United States Magistrate Judge in a Felony Case, he had given up his right to have the District Judge receive his plea.  See Plea Tr. at 4:7-10 (Judge Puglisi, Yazzie).  Yazzie also stated that he understood that, by signing the Waiver of Indictment, he had given up his right to have a grand jury indict him before he pled.  See Plea Tr. at 4:11-16 (Judge Puglisi, Yazzie).  On the basis of Yazzie's statements, Judge Puglisi approved the Consent to Proceed Before United States Magistrate Judge in a Felony Case and the Waiver of Indictment, finding that Yazzie had "full knowledge" of their meaning and effect.  Plea Tr. at 4:17-19 (Judge Puglisi).

Assistant Federal Public Defender James C. Loonam, Yazzie's counsel at the time, stated that he was convinced that Yazzie understood the rights he gives up by pleading guilty and his likely sentence under rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  See Plea Tr. at 4:20-25 (Judge Puglisi, Loonam).  When Judge Puglisi asked Yazzie whether the Plea Agreement is his only agreement with the United States, Yazzie stated that he wants "another agreement."  Plea Tr. at 5:2-5 (Judge Puglisi, Yazzie).  Mr. Loonam informed Judge Puglisi that, while Yazzie was detained pretrial, his wife gave birth to Yazzie's child, and Yazzie wants an agreement that will allow him to see his baby in person, in the presence of United States Marshals.  See Plea Tr. at 5:7-19 (Loonam).  Judge Puglisi asked Yazzie whether he understood that the only agreement that was binding at the time of the plea hearing was the Plea Agreement, and Yazzie responded: "Yes."  Plea Tr. at 5:21-25 (Judge Puglisi, Yazzie).  Yazzie responded "no" to Judge Puglisi's question whether anybody had attempted to force him to plead guilty, in any way, and Yazzie responded "yes" to Judge Puglisi's question whether he was pleading guilty because he is "in fact guilty."  Plea Tr. at 6:1-6 (Judge Puglisi, Yazzie).

Judge Puglisi stated that he would not read through the Plea Agreement word-for-word at the plea hearing with Yazzie, because Yazzie indicated that he understood the Plea Agreement. Plea Tr. at 6:7-10 (Judge Puglisi).   Judge Puglisi stated that he would, rather, ask Yazzie questions on particular parts of the Plea Agreement to assure that Yazzie understood it.   See Plea Tr. at 6:10-11 (Judge Puglisi).   Judge Puglisi asked Yazzie whether he could affirm that his statement in the Plea Agreement is true.   See Plea Tr. at 6:12-17 (Judge Puglisi)(citing Plea Agreement at 3-4).   Yazzie stated that his statement in the Plea Agreement is "not all true" and that he had tried everything he could to change it, but could not change the statement, and, therefore, he would "have to say it's true." Plea Tr. at 6:18-20 (Yazzie).   Judge Puglisi informed Yazzie that he did not have to say that his statement is true.   See Plea Tr. at 6:21 (Judge Puglisi). Judge Puglisi asked Yazzie which portion of his statement in the Plea Agreement is not true.   See Plea Tr. at 6:22-23 (Judge Puglisi).   Yazzie responded that the statement inaccurately indicates that he used "force" on Jane Doe 1.  Plea Tr. at 6:24 (Yazzie).   Judge Puglisi asked Yazzie why it is not true that Yazzie used "force," and Yazzie stated that he did not use force and that, rather, Jane Doe 1 kept "coming to" him.   Plea Tr. at 6:24-7:2 (Judge Puglisi, Yazzie).   Judge Puglisi asked whether everything in his statement, besides the allegation of force, is true, and Yazzie responded: "Yes."   Plea Tr. at 7:3-5 (Judge Puglisi, Yazzie).   Judge Puglisi noted that both the Information and the Plea Agreement state that Yazzie used "force," but also noted that a child of Jane Doe 1's age at the time -- thirteen -- cannot consent to sexual contact, so Judge Puglisi expressed that he was not certain whether Yazzie must admit to using force.   Plea Tr. at 7:6-18 (Judge Puglisi).   Judge Puglisi asked the United States whether Yazzie is required to admit that he used force to be found guilty of aggravated sexual abuse of a minor.   See Plea Tr. at 7:19-21 (Judge Puglisi).   The United States responded that the second element of the charge against

Yazzie is that he used force and that, therefore, Yazzie must admit to using force to plead guilty

to the Information.  See Plea Tr. at 7:22-24 (Henderson).

Judge Puglisi then asked Yazzie whether, in light of the United States' evidence against

him, Yazzie believed it was "more probable than not" that a jury would find that he used force to

commit a sexual act with Jane Doe 1, regardless whether Yazzie believed that Jane Doe 1

consented to the act:

> Well let me ask you this, Mr. Yazzie: You feel that you didn't use force.  You
> said that the minor in this information charging you with the crime of aggravated
> sexual abuse kept coming to you.  But do you, after considering all of the
> evidence that the United States has marshaled against you, do you feel that it is
> more probable than not that a jury would find that you did use force?  In other
> words, that they would believe the evidence in this case, aside from what you
> have to say?

Plea Tr. at 7:25-8:8 (Judge Puglisi).  Yazzie conferred with Mr. Loonam and stated that, based

on his conversation with Mr. Loonam, he understood that a jury would find he had used force on

Jane Doe 1, because "of the age of the victim."  Plea Tr. at 8:10-15 (Yazzie, Judge Puglisi).

Judge Puglisi asked Yazzie: "And so even though you feel that there wasn't force used, after you

have looked at all the evidence in the case is it your belief that a jury would not believe you and

find that you did use force?"  Plea Tr. at 8:16-19 (Judge Puglisi).  Yazzie responded: "Yes."

Plea Tr. at 8:20 (Yazzie).  Judge Puglisi then announced that, after reviewing Yazzie's statement

in the Plea Agreement, he found the facts provided an adequate foundation to the Information

charging Yazzie with aggravated sexual abuse.  See Plea Tr. at 8:21-24 (Judge Puglisi).  The

United States did not request that Judge Puglisi question Yazzie further regarding the crime.  See

Plea Tr. at 8:25-9:2 (Judge Puglisi, Henderson).

Judge Puglisi then asked Yazzie whether he understood that he had agreed to a sentence

"between 15 years and 19 years or 180 months and 220 months," and that, if Judge Puglisi

accepts his plea, Yazzie will receive a sentence of imprisonment in that range.  Plea Tr. at 9:3-9 (Judge Puglisi).  Yazzie responded: "[Y]es."  Plea Tr. at 9:10 (Yazzie).  Judge Puglisi asked Yazzie whether he understood that he could withdraw from the Plea Agreement if the Court rejects the Plea Agreement, and Yazzie responded that he did.  See Plea Tr. at 9:11-15 (Judge Puglisi, Yazzie).  Judge Puglisi asked Yazzie: "Are you sure you want to agree to a sentence that is in the range that I just mentioned to you?"  Plea Tr. at 9:16-17 (Judge Puglisi).  Yazzie stated that the sentence is "too much for me" and that he "tried everything to get it something lower," but could not, and, therefore, "yes," he accepted the agreed sentencing range.  Plea Tr. at 9:18-20 (Yazzie).  Judge Puglisi asked Yazzie whether he "still want[ed] to proceed with this plea?"  Plea Tr. at 9:21-22 (Judge Puglisi).  Yazzie replied: "Yes."  Plea Tr. at 9:23 (Yazzie).  Judge Puglisi asked Yazzie whether he understood that, if Judge Puglisi accepts the plea, Yazzie will be required to register as a sex offender, and Yazzie replied: "Yes."  Plea Tr. at 9:24-10:1 (Judge Puglisi, Yazzie).   Yazzie affirmed that he had discussed with Mr. Loonam, in detail, the requirement for registration as a sex offender.  See Plea Tr. at 10:2-5 (Judge Puglisi, Yazzie).

Judge Puglisi asked Yazzie whether he understood that, in the Plea Agreement, he has waived the right to appeal any sentence up to the maximum allowed by law, which Judge Puglisi notes the Plea Agreement states is a sentence of up to life imprisonment.  See Plea Tr. at 10:6-11 (Judge Puglisi).  Yazzie responded: "Yes."  Plea Tr. at 10:12 (Yazzie).  Judge Puglisi asked whether Yazzie understood that, if the Court rejects the Plea Agreement, Yazzie may be subject to the maximum statutory penalty and not to the agreed sentencing range in the Plea Agreement, and Yazzie replied: "Yes."  Plea Tr. at 10:13-16 (Judge Puglisi); FTR at 12:19:00-19:17 (Judge

Puglisi, Yazzie).[3]  Judge Puglisi asked Yazzie whether he understood that, if the Court sentences him in accordance with the Plea Agreement, he has waived his right to appeal, and Yazzie responded: "Yes."  Plea Tr. at 10:17-20 (Judge Puglisi, Yazzie).

Judge Puglisi then asked Yazzie how he wanted to plead to the Information.  See Plea Tr. at 10:24-11:2 (Judge Puglisi).  Yazzie stated: "Guilty."  Plea Tr. at 11:3 (Yazzie).  Judge Puglisi then announced that he found Yazzie competent and capable of entering a plea, and that his plea was knowing and voluntary; accordingly, Judge Puglisi accepted Yazzie's plea of guilty and found him guilty of the offense.  See Plea Tr. at 11:4-12 (Judge Puglisi).  Judge Puglisi explained that the Court may accept or reject the Plea Agreement up to the date of Yazzie's sentencing hearing.  See Plea Tr. at 11:13-17 (Judge Puglisi).

On May 2, 2011, Yazzie wrote the Court stating his concern with the Plea Agreement and his counsel.  See Letter to the Court from Willis Yazzie, dated May 2, 2011, filed May 2, 2011 (Doc. 43)("May 2, 2011 Letter").  The Court concluded that communications had broken down between Yazzie and his counsel, Mr. Loonam.  See Memorandum Opinion and Order at 1-2, filed October 6, 2011 (Doc. 54).  On October 7, 2011, the Court appointed P. Jeffrey Jones to replace Mr. Loonam.  See CJA 20 Appointment of and Authority to Pay Court Appointed Counsel, filed October 7, 2011 (Doc. 55).  Yazzie later asked the Court to dismiss Mr. Jones as counsel, see Motion for Dismissal of Counsel, filed July 6, 2012 (Doc. 73), and the Court appointed Kimberly A. Middlebrooks to represent Yazzie, see CJA 20 Appointment of and Authority to Pay Court Appointed Counsel, filed August 8, 2012 (Doc. 74).

---

[3] Although the Plea Tr. states that Yazzie did not give an audible response, see Plea Tr. at 10:16, the Court listened to the FTR several times and heard Yazzie respond, "Yes," albeit faintly, see FTR at 12:19:13-19:17.

2.      Yazzie's Previous Attempts to Withdraw His Guilty Plea.

Yazzie filed two motions to withdraw his guilty plea.  See Defendant's Motion to Withdraw Plea of Guilty, filed November 29, 2011 (Doc. 59)("1st Motion"); Defendant's Motion to Withdraw Plea of Guilty, filed April 4, 2012 (Doc. 64)("2nd Motion").  The Court denied Yazzie's 1st Motion and 2nd Motion in the June 4, 2013 MOO.  After weighing the Tenth Circuit's seven factors from United States v. Yazzie, 407 F.3d 1139 (10th Cir. 2005),[4] and the likelihood of conviction, the Court concluded that Yazzie did not give "the Court a fair and just reason for permitting him to withdraw his plea."  June 4, 2013 MOO at 1, 26.

After the June 4, 2013 MOO, Yazzie asked the Court to reconsider his motions to withdraw the guilty plea.  See Letter from Willis J. Yazzie, Sr. to Judge James O. Browning at 1, sent June 7, 2013, filed June 10, 2013 (Doc. 113)("Motion to Reconsider").  Through the Motion to Reconsider and subsequent letters and motions before the Court, see Motion to Reconsider; Supplement to Motion for Reconsideration of Motion to Withdraw Plea of Guilty, filed August 13, 2013 (Doc. 114); Second Supplement to Motion for Reconsideration of Motion to Withdraw Plea of Guilty, filed August 19, 2013 (Doc. 117); Addendum to the Motion for Reconsideration of Withdrawl [sic] of Plea, filed October 29, 2013 (Doc. 121); Supplement to Defendant's Pro Se Addendum to Motion for Reconsideration of Withdrawal of Plea, filed November 15, 2013 (Doc. 122), Yazzie asked the Court to permit him to withdraw his guilty plea.  The Court reconsidered its June 4, 2013 MOO, but denied the 1st Motion and 2nd Motion and did not permit Yazzie to withdraw his guilty plea.  See Feb. 6, 2014 MOO at 1, 119.

---

[4] Although bearing the same name as the current case, United States v. Yazzie involves a different defendant: Gerald Yazzie.  It is a Tenth Circuit case that explains the standard for withdrawing a guilty plea, but is not otherwise connected to this case.

3.      **Yazzie's Recent Requests to Withdraw His Guilty Plea**.

After the Court issued the Feb. 6, 2014 MOO, Yazzie sent two additional letters to the Court.  In the March 11, 2014 Letter, Yazzie explains that he received the Feb. 6, 2014 MOO, and that, after he read the section regarding the plea hearing, he asked Ms. Middlebrooks for a copy of the transcript from the plea hearing, but that "she told me that it costs money to print it out."  March 11, 2014 Letter at 1.  Yazzie points to the exchange he had with Judge Puglisi:

> "But do you, after considering all of the evidence that the U.S. has marshaled against you, do you feel that it is more probable than not that a jury would find that you did use force?  In order words, that they would believe the evidence in this case, aside from what you have to say?"

March 11, 2014 Letter at 1 (quoting Plea Tr. at 7:25-8:8 (Judge Puglisi)).  Yazzie argues that, "[i]f I would ha[ve] seen [the transcript] I would [have] know[n] that there was a Rule 11 violation where the judge got involve[d] in [the] plea."  March 11, 2014 Letter at 1.  Yazzie contends that he would not have pled guilty had Judge Puglisi not made these statements, that he has caselaw on the subject, but sent it home to his wife, and that the "plea should be withdraw[n] for Rule 11 violation."  March 11, 2014 Letter at 1.

In the March 12, 2014 Letter, Yazzie asserts that the "medical information is without probable cause and it is the fruit of the poisonous tree," and lists two numbered paragraphs. March 12, 2014 Letter at 1.  In the first paragraph, he references Jane Doe 2's diary entry, without explaining how it affects his request to withdraw his guilty plea:

> (1) On May 10, 2010 when I was getting interviewed I denie[d] ever touching Jane Doe 2 . . . and they told me that she had STD and that I had it to[o] [be]c[a]use they had my medical records and that when I said put it the way you want it.  See attachment of Jane Doe 2 Letter from her diary that her mom got when she was picking up her stuff from her aunt house in Arizona.  The mom (Margaret) showed it to the Navajo Police and they just took it from her and just gave her a copy of this page and the diary itself has her name on it.  The aunt name is Lenora and her sister Cassie is married to the C.I. Louis St. Germanie that did the investigation with S. A. Dustin Grant.  With the knowledge I got from

studying case law is that Rachel do[es] not say what happen, but she said she was scared and it was stupid. She do[es] not say because she never had knowledge of it and was ashamed to wright down what happen, Now my wife Margaret says that Lemora is so nice to her and before she was not and when Margaret ask Lenora for some money she give it to her. Margaret ask me why are they so nice to me now. I have a suspicion that Lenora know about the diary, that is why she is so nice to Margaret.

March 12, 2014 Letter at 1. The diary entry that Yazzie attached states:

So I was like taking a shower or something. So we went to the store to bread, corn flake cieral, [sic] chicken. So we went home I came in side driping weat [sic] so I went up stairs to change my clothes in the closet because there was somebody in there so I tuck [sic] off my clothes and this is were the alfull [sic] part is. So I dryed [sic] off myself then stared [sic] to put my panties on then my bra but it got tangle up so I had to try to put my bra on then that when I heard someone coming. I grab my towel and Chuck opened the door and saw me so I was going to say get out before I hit you in the face but I did not so I just scared and he got out it was so stupid. So after that it was dinner time I went down stairs but they were still cooking so I went back up stairs laid on the bed put my face down in my pillow. Then I hear someone come in and I already know it was him so he went over were [sic] I was he tickled my feet and I almost kicked him but then he went to my face and moved my hair.

March 12, 2014 Letter at 4.

In the second numbered paragraph, Yazzie argues that he did not penetrate Jane Doe 1 or use force, and that he did not do anything to Jane Doe 2, but that Mr. Loonam "said they will use my statement and Jane Doe 2['s] S.T.D. plus the medical record." March 12, 2014 Letter at 1. Yazzie says that he asked Mr. Loonam to "reinvestigate the girls, but he said they can't, but they can put it in the plea." March 12, 2014 Letter at 1-2. According to Yazzie, "[w]ith the STD and my statement my attorney [Mr. Loonam] told me the jury will fin[d] me guilty of the crime if I go to trial so I had to take the plea." March 12, 2014 Letter at 1. He explains that, at the plea hearing, he contested that he used force "because I did not say I use[d] force in my statement," but he did not contest that he penetrated Jane Doe 1, because "my attorney said I could not avoid

- 13 -

it." March 12, 2014 Letter at 1.  Yazzie argues several other points related to his medical records

and his arrest:

> My medical record was seized without probable cause in violation of my
> Fourth Amendment.  It did the damage for me to say put it the way you want it at
> my interview on May 10, 2010.  It also did a damage for me to take the plea
> [be]cause my attorney said they will use it at trial.  If my medical record was not
> involved or if I know that a 10 year old girl cannot carry STD over 2 years, I
> would of not took the plea.  Can the U.S. Attorney prove that the F.B.I. got the
> subpoena from federal court?  No he can't [be]cause he did not have probable
> cause.

> Now on my statement it can be suppress [be]cause the officer had no
> probable cause to seiz[e] and search me for verble [sic] evidence.  In U.S. v.
> Henry, 261 U.S. 98 at 103, the arrest took place when the federal agents stopped
> the car.  The arrest took place when the federal agent got me from Navajo Trib[al]
> Police and took me to the Navajo Nation Police which is the B.I.A.

> [drawing of a map]

> There was no facts [sic] or belief for a finding of probable cause.  See
> Giordenello v. U.S., 357 U.S. 484-487.

> Under Miranda v. Arizona, 384 U.S. 436 at 451, it says the method should
> be used only when the guilt of the subject appears highly probable.  In Boyd v.
> U.S. 116 U.S. 616[,] 633 [(1886)], compelling a man to give evidence against
> himself within the meaning of the Fourth Amendment.

> There is more I could say but I just have to save it for the court of appeal.

March 12, 2014 Letter at 1-3.

The Court held a sentencing hearing on March 21, 2014.  See Transcript of Hearing,

taken March 21, 2014 ("Tr.").[5]  Regarding the March 11, 2014 Letter, the Court noted that it had

previously analyzed the Plea Colloquy in the June 4, 2013 MOO and the Feb. 6, 2014 MOO.

See Tr. at 5:2-4 (Court).  It said that the "Court can't set in a room and negotiate a [plea] between

the United States and the defendant," but that "the plea had already been entered into by the time

---

[5] The Court's citations to the transcript of the hearing refer to the court reporter's
original, unedited version.  Any final transcript may contain slightly different page and/or line
numbers.

Judge Puglisi got there, and not only would I expect[ ] Judge Puglisi to have discussed the plea with Mr. Yazzie," but "I would have been disappointed and troubled if he had not." Tr. at 5:7-14 (Court). The Court said that it did not "see anything that suggested that [Judge Puglisi] was trying to renegotiate or to change the plea in any way. He was simply trying to explain it and make sure Mr. Yazzie understood it." Tr. at 5:19-23 (Court). The Court explained that it did not "see any basis" for a rule 11 violation. Tr. at 5:23-24 (Court). Ms. Middlebrooks agreed with the Court and said that she explained to Yazzie that Judge Puglisi's comments at the plea hearing were "entirely appropriate under [rule] 11. It's a violation i[f] the judge were to help negotiate the actual plea but that's not what happened here and we don't have any evidence of that." Tr. at 6:4-12 (Middlebrooks). Ms. Middlebrooks asserted that Yazzie's argument that Judge Puglisi violated rule 11 "has no legal basis." Tr. at 6:13-14 (Middlebrooks). When the Court asked Yazzie if he had anything further he wanted to say on that letter, Yazzie said, "No." Tr. at 6:23-7:1 (Court, Yazzie). The United States also agreed with the Court's analysis that Judge Puglisi did not violate rule 11. See Tr. at 7:4-6 (Wishard). The Court denied Yazzie's request to withdraw his guilty plea based on the alleged rule 11 violation, because it concluded that Judge Puglisi did not violate rule 11. See Tr. at 7:15-18 (Court).

Regarding the March 12, 2014 Letter, the Court said that it did not see any new arguments that it had not previously addressed in its prior opinions. See Tr. at 7:22-8:1 (Court). It said that the first paragraph seemed to be "speculation based upon some information acquired from a diary," but that it did not think that the diary entry would affect its decision to deny Yazzie's request to withdraw his guilty plea. Tr. at 8:5-8 (Court). The Court said that Judge Puglisi "repeatedly gave Mr. Yazzie a chance to say he was forced to enter into a plea agreement," that the second paragraph in Yazzie's March 12, 2014 Letter asserts "that

Mr. Loonam forced [Yazzie] to plead guilty," but that the Plea Colloquy does not support that argument.  Tr. at 8:9-15 (Court).  The Court explained that it had already analyzed Yazzie's concern about the medical records, and that it did not "see anything here that was new to suggest that that analysis needed to be reconsidered."  Tr. at 8:16-19 (Court).  The Court said it was inclined to deny Yazzie's request in the March 12, 2014 Letter to withdraw his guilty plea.  See Tr. at 8:19-21 (Court).  Ms. Middlebrooks said she agreed with the Court's assessment and that the Court had already addressed the arguments that Yazzie raised in the March 12, 2014 Letter. See Tr. at 9:3-12 (Middlebrooks).

The Court asked Yazzie to identify any issues it had missed or other issues he wanted to raise.  See Tr. at 9:19-22 (Court).  Yazzie explained that, regarding his allegation that Judge Puglisi violated rule 11,

> the judge made it sound that I was already guilty when he told me with all the evidence mar[shaled] against me, he told me that they will find me guilty of all the evidence.  And that was like a coercion right there for me to take the plea and he asked me at the end of that how do you plea so I told him guilty.

Tr. at 9:23-10:5 (Yazzie).  The Court explained that Judge Puglisi was "asking you questions to see if you thought that they could prove beyond a reasonable doubt the elements" and that those questions are "asked every time somebody pleads guilty."  Tr. at 10:7-14 (Court).  The Court said that Judge Puglisi's questions did not "shift[] him into a position of where he was trying to broker some sort of the plea agreement."  Tr. at 10:21-24 (Court).  The Court asked if Yazzie had anything else, and Yazzie said, "No."  Tr. at 11:4-5 (Court, Yazzie).  The United States said that it did not have any arguments regarding the March 12, 2014 Letter.  See Tr. at 11:11-13 (Wishard).  The Court said that it would deny Yazzie's requests to withdraw from the plea agreement that he made in the March 11, 2014 Letter and in the March 12, 2014 Letter.  See Tr. at 12:14-20 (Court).

- 16 -

Ms. Middlebrooks raised two additional issues that Yazzie had discussed with her before the hearing.  First, she said that Yazzie contends that he did not know, when he pled guilty pursuant to the plea agreement, that he was waiving his protections in rule 410.  See Tr. at 20:19-22 (Middlebrooks).  Ms. Middlebrooks said that the rule 410 waiver was in the Plea Agreement, and while Judge Puglisi did not directly address it in the plea colloquy, he asked whether Yazzie had read or had all of the documents explained to him, and Yazzie said that he had.  See Tr. at 21:3-12 (Middlebrooks).  Second, she said that Yazzie contends that he did not know that he was pleading guilty to an information and that he did not know what an information was.  See Tr. at 21:13-16 (Middlebrooks).  Ms. Middlebrooks explained that, at the plea hearing, Judge Puglisi asked Yazzie "specifically on the waiver of indictment and if he understood that he was giving up the right to have the charges"; while Judge Puglisi did not say the word "information," he asked if Yazzie understood that he "was giving up the right to have the charges considered by a grand jury," and Yazzie had said that he understood.  Tr. at 21:17-22:3 (Middlebrooks).  The Court said that it did not "know of any requirement that every provision" in the plea agreement must be covered with the defendant during the plea colloquy, and that it did not think "the 410 provision is something there is any case law on as to whether it has to be covered at the plea colloquy," but that it did not think that failing to discuss the 410 waiver "makes a plea colloquy deficient."  Tr. at 22:7-17 (Court).  Regarding Yazzie's second point, the Court noted Yazzie signed a waiver giving up his right to an indictment, that he pled to the information, that Judge Puglisi covered Yazzie's waiver at the plea colloquy, and that Yazzie's argument was not a basis for allowing him to withdraw his guilty plea.  See Tr. at 22:17-23:2 (Court, Middlebrooks).  The United States said that it did not have anything to add, and the Court denied Yazzie's requests to withdraw from the plea and plea agreement.  See Tr. at 23:4-15 (Court, Wishard).

## LAW REGARDING WITHDRAWAL OF GUILTY PLEAS

Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure governs a motion to withdraw a guilty plea before the imposition of a sentence, and provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). Defendants do not have an absolute right to withdraw a guilty plea. See United States v. Siedlik, 231 F.3d 744, 748 (10th Cir. 2000). District courts have broad discretion in determining whether to grant motions to withdraw pleas. See United States v. Wright, 392 F. App'x 623, 627 (10th Cir. 2010)(unpublished)[6]("We review the district court's denial of a motion to withdraw a guilty plea for an abuse of discretion."); United States v. Garcia, 577 F.3d 1271, 1274 (10th Cir. 2009)("Although a motion to withdraw a plea prior to sentencing should be freely allowed, we will not reverse unless the defendant can show that the court acted unjustly or unfairly."). The Tenth Circuit has repeatedly held that, when a defendant

---

[6] United States v. Wright, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Wright, United States v. Griffin, 191 F. App'x 699 (10th Cir. 2006)(unpublished), United States v. Sandoval, 427 F. App'x 621 (10th Cir. 2011)(unpublished), Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), United States v. Burciaga, 66 F. App'x 812 (10th Cir. 2003)(unpublished), United States v. Alvarado-Benjume, 251 F. App'x 586 (10th Cir. 2007)(unpublished), and United States v. Lee, 535 F. App'x 677 (10th Cir. 2013)(unpublished)m have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

moves to withdraw a guilty plea before sentencing, the court must assess whether there is a fair

and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal
> would prejudice the government; (3) whether the defendant delayed in filing his
> motion, and, if so, the reason for the delay; (4) whether withdrawal would
> substantially inconvenience the court; (5) whether close assistance of counsel was
> available to the defendant; (6) whether the plea was knowing and voluntary; and
> (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d 1139, 1142 (10th Cir. 2005). While treated sometimes as an

eighth factor, a district court may properly consider "the likelihood of conviction" when

assessing whether to permit withdrawal of a guilty plea. United States v. Carr, 80 F.3d 413, 421

n.5 (10th Cir. 1996)(recognizing that the Tenth Circuit has "suggested an additional factor to

consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th

Cir. 1990)). Accord United States v. Begaye, 2012 WL 119602, at *10 ("The Court believes the

consideration of likelihood of conviction is relevant here, either in the context of the two factors

of whether withdrawal would substantially inconvenience the Court or waste judicial resources,

or as an additional factor.").

The defendant bears the burden of demonstrating a "fair and just reason" for withdrawal

of the plea. United States v. Griffin, 191 F. App'x 699, 701 (10th Cir. 2006)(unpublished). In

assessing a motion to withdraw a guilty plea, courts should give particular weight to knowing

and voluntary statements that the defendant made under oath at the plea hearing. See United

States v. Messino, 55 F.3d 1241, 1248 (7th Cir. 1995). In reaching their decisions, courts should

also remember that "[t]he plea of guilty is a solemn act not to be disregarded because of belated

misgivings about [its] wisdom." United States v. Morrison, 967 F.2d 264, 268 (8th Cir. 1992).

While the right to withdraw a guilty plea before sentencing, therefore, is not absolute, the Court

should allow relief when the defendant can show a fair and just reason for withdrawal.  See United States v. Jim, 2011 WL 6013093, at *6-7.

In United States v. Harmon, 871 F. Supp. 2d 1125 (D.N.M. 2012)(Browning, J.), the Court determined that a defendant had not shown a fair and just reason for withdrawing his guilty plea.  The defendant did not assert his innocence, but, rather, asserted that the Court should suppress the evidence against him.  The defendant requested that the Court reconsider its previous decision to not suppress evidence against him.  The Court denied the request for reconsideration, and determined, therefore, that the defendant had not presented a fair and just reason for withdrawing his guilty plea, as the United States possessed the same evidence to convict him as it did when the defendant pled guilty.  See 871 F. Supp. 2d at 1171-75.  In United States v. Begaye, the Court applied the seven factors in United States v. Yazzie, and determined that the defendant failed to present a fair and just reason for withdrawing his guilty plea.  See United States v. Begaye, 2012 WL 119602, at *8-*12.  The defendant asserted that he may have a self-defense defense, but the Court found that he had not made a credible claim of innocence, and determined that a slim possibility of acquittal was not a fair and just reason for allowing the defendant to withdraw his plea.  See 2012 WL 119602, at *8-*9, *11-*12.  In United States v. Jim, the Court permitted a defendant to withdraw his plea of guilty, because the defendant expressed that he did not understand that he waived his right to proceed to trial by entering into a plea agreement, and the judge taking the plea did not use the word "trial" during the plea colloquy.  United States v. Jim, 2011 WL 6013093, at *13.  The Court allowed Jim to withdraw his plea, even though the plea agreement included a waiver of Jim's right "to have a trial by jury."  Plea Agreement ¶¶ 2(c), 3, at 1-2, filed in Case No. CR 10-2653 JB on February 28, 2011 (Doc. 25).

## LAW REGARDING THE KNOWING-AND-VOLUNTARY STANDARD
## FOR GUILTY PLEAS

A defendant's guilty plea must be knowing and voluntary.  See United States v. Libretti, 38 F.3d 523, 529 (10th Cir. 1994).  To enter a plea that is knowing and voluntary, a defendant must have "a full understanding of what the plea connotes and of its consequence." Boykin v. Alabama, 395 U.S. 238, 244 (1969).  A defendant must only understand the "direct consequences" of his plea, United States v. Hurlich, 293 F.3d 1223, 1230 (10th Cir. 2002), and whether the plea carries a risk of deportation, see Padilla v. Kentucky, 559 U.S. 356, 374 (2010).  If a guilty plea is not knowing and voluntary, it is void, and any additional waivers in the plea agreement generally are unenforceable.  See United States v. Mitchell, 633 F.3d at 1001 (citing United States v. Gigley, 213 F.3d 509, 516 (10th Cir. 2000)).  The Tenth Circuit has analyzed the knowing and voluntary nature of a waiver of rights in the context of a waiver of appellate rights, explaining that "[a] waiver of appellate rights will be enforced if: (1) the disputed appeal falls within the scope of the waiver of appellate rights; (2) the defendant knowingly and voluntarily waived his appellate rights; and (3) enforcing the waiver would not results in a miscarriage of justice."  United States v. Vidal, 561 F.3d 1113, 1118 (10th Cir. 2009)(alteration omitted)(internal quotation marks omitted).  See United States v. Sandoval, 427 F. App'x 621, 623 (10th Cir. 2011)(unpublished); United States v. Wilken, 498 F.3d 1160, 1167 (10th Cir. 2007).

The defendant in United States v. Mitchell argued that the district court's statements that his counsel may have exerted "undue influence" over him rendered his plea involuntary.  633 F.3d at 1001.  The Tenth Circuit held that the fact that his counsel used "colorful language" -- telling the defendant "'you would be a fool not to take this plea offer!'" -- did not approach a constitutionally suspect level of coercion.  633 F.3d at 1002.  The Tenth Circuit stated that, even

when pressure from counsel may be "palpable," and a defendant alleged he was "hounded, browbeaten, and yelled at," such pressures do not "vitiate the voluntariness of his plea."   633 F.3d at 1002 (citing United States v. Carr, 80 F.3d 413, 417 (10th Cir. 1996)(analyzing voluntariness where counsel called the defendant "stupid" and "a f***ing idiot").   The defendant in United States v. Mitchell also pointed to the breakdown in communication between himself and his attorney to establish that his plea was not knowing and involuntary.   See 633 F.3d at 1001.   The Tenth Circuit found this argument similarly unavailing, and held that the guilty plea and accompanying plea agreement were knowing and voluntary.   See 633 F.3d at 1002.

In the United States District Court for the District of New Mexico, if a defendant consents to plead guilty before a United States Magistrate Judge, then the Magistrate Judge will conduct the plea colloquy and accept the plea.   See United States v. Ciapponi, 77 F.3d 1247, 1349-50 (10th Cir. 1996)).   "With a defendant's express consent, the broad residuary 'additional duties' clause of the Magistrate Act authorizes a magistrate judge to conduct a Rule 11 felony plea proceeding, and such does not violate the defendant's constitutional rights."   United States v. Ciapponi, 77 F.3d at 1251.   In other words, the Magistrate Judge routinely accepts the guilty plea, because he or she is the one who can visually and audibly determine whether the plea is voluntary, but the Magistrate Judge does not accept the plea agreement, if any.   See United States v. Salas-Garcia, 698 F.3d 1242, 1253 (10th Cir. 2012)(stating that "Magistrate judges have the authority to conduct plea hearings and accept guilty pleas," and that, "even if the magistrate judge had deferred acceptance of the plea agreement itself, the magistrate judge accepted [the defendant's] plea for the purposes of Rule 11").   Under the local rules, the "Court will defer a decision on the acceptance or rejection of the plea agreement until the Court has reviewed the presentence report, even in instances where the Court has accepted the guilty plea."   D.N.M.LR-

Cr. 11.2.  A District Judge will sentence the defendant, and, at that time, will accept or reject any

plea agreement.

### LAW REGARDING THE COURT'S INVOLVEMENT IN PLEA NEGOTIATIONS UNDER RULE 11(c)(1)

Rule 11(c)(1) states that "[a]n attorney for the government and the defendant's attorney,

or the defendant when proceeding pro se, may discuss and reach a plea agreement," but

specifically states that "[t]he court must not participate in these discussions."  Fed. R. Crim. P.

11(c)(1).  "'[T]he unambiguous mandate of Rule 11 prohibits the participation of the judge in

plea negotiations under *any* circumstances: it is a rule that . . . admits of no exceptions."  United

States v. Cano-Varela, 497 F.3d 1122, 1132  (10th Cir. 2007)(ellipses in original)(emphasis in

original)(quoting United States v. Bruce, 976 F.2d 552, 558 (9th Cir. 1992)).

> Rule 11 is designed to totally eliminate judicial pressure from the plea bargaining
> process.  Excluding the judge from the plea discussions serves three purposes: it
> minimizes the risk that the defendant will be judicially coerced into pleading
> guilty, it preserves the impartiality of the court, and it avoids any appearance of
> impropriety.

United States v. Cano-Varela, 497 F.3d at 1132 (citations omitted)(internal quotation marks

omitted).  While courts are not allowed to participate in plea negotiations, "[n]ot all judicial

comments relating to plea agreements violate the rule."  United States v. Cano-Varela, 497 F.3d

at 1132.  The Tenth Circuit has explained the difference between a court's comments that do not

violate rule 11 compared to other comments that affect the fairness of the proceedings:

> Rule 11's "stringent prohibitions . . . do not apply once the parties have concluded
> their agreement, and the prosecutor has laid it out in open court, even if the
> agreement is not formal and binding."  United States v. Carver, 160 F.3d 1266,
> 1269 (10th Cir. 1998) (internal quotation marks and brackets omitted).  "In other
> words, once the parties have 'hammered out' the details of their agreement, Rule
> 11[(c)] does not prevent the sentencing judge from questioning the defendant
> regarding the terms, consequences, and acceptance of the plea agreement or from
> providing the defendant with information relating to these matters."  Id.  This
> position appears to be uniform among the Courts of Appeals.  See, e.g., [United

States v.] Cannady, 283 F.3d [641,] 641 [(4th Cir. 2002)]; United States v. Telemaque, 244 F.3d 1247, 1249 (11th Cir. 2001)(per curiam); [United States v.] Kraus, 137 F.3d [447,] 453-54 [(7th Cir. 1998)]; United States v. Crowell, 60 F.3d 199, 204 (5th Cir. 1996).

Similarly, Rule 11(c)(1) is not violated by a judge's comments made while implementing or planning docket or case-management decisions.  One obvious example of this type of comment is a judge's refusal to extend a plea cut-off deadline.  There is nothing inherently coercive about requiring a defendant "to make a decision -- either plead guilty or go to trial," Cannady, 283 F.3d at 645 -- so refusing to give a defendant more time to mull his options simply does not fall within the purview of the rule.  And a judge does not violate the rule merely by inquiring into the status of plea negotiations, such as asking whether an agreement will be reached by the plea deadline.

Nor does the rule "establish a series of traps for imperfectly articulated oral remarks."  United States v. Frank, 36 F.3d 898, 903 (9th Cir. 1994).  In the course of managing trials, district judges must make snap judgments and occasionally may misspeak.  Id. at 899-900.  Rule 11 "protects the parties against implicit or explicit pressure to settle criminal cases on terms favored by the judge," id. at 903, and comments by the district judge must be evaluated in that light.  See also Carver, 160 F.3d at 1269 ("[R]ule 11[(c)] prevents a judge from shaping the terms of a plea bargain or pressuring a criminal defendant to settle his case . . . .").

On the other hand, the Courts of Appeals all appear to hold that any "discussion of the penal consequences of a guilty plea as compared to going to trial is inherently coercive, no matter how well-intentioned."  United States v. Johnson, 89 F.3d 778, 783 (11th Cir. 1996)[, abrogated on other grounds as stated in United States v. Davila, --- F.3d ---, 2014 WL 1428018, at *7 n.8 (11th Cir. April 15, 2014)]; see also Bruce, 976 F.2d at 558 ("No matter how benign the court's intent, its awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not, and a defendant needs no reminder that if he rejects the proposal, stands upon his right to trial and is convicted, he faces a significantly longer sentence." (internal quotation marks and alteration omitted)).  Likewise, after rejecting a proposed plea, a court may not offer guidance regarding what terms in a subsequent plea agreement it would find acceptable.  Kraus, 137 F.3d at 454.  We agree with the Fourth and Fifth Circuits that errors such as these "almost inevitably seriously affect the fairness and integrity of judicial proceedings" and affect substantial rights as required to prove plain error.  United States v. Bradley, 455 F.3d 453, 463 (4th Cir. 2006)(citing United States v. Miles, 10 F.3d 1135, 1141 (5th Cir. 1993)).

United States v. Cano-Varela, 497 F.3d at 1132-33.

In United States v. Cano-Varela, the Tenth Circuit reviewed the district court's comments to the defendant before the defendant pled guilty pursuant to a plea agreement, and held that some, but not all, of the district court's comments violated rule 11.  The district court did not violate rule 11 when it told the defendant that it would require the defendant to go to trial if he wanted a new lawyer, because rule 11 "does not require district courts to repeatedly push back plea deadlines."  497 F.3d at 1133.  The Tenth Circuit held that the district court "crossed into territory clearly forbidden by Rule 11" when it told the defendant "that he would 'be doing at least ten years in a federal penitentiary' if he did not plead and was found guilty at trial, and that a post-trial 'sentence will . . . be a harsh one.'"  497 F.3d at 1133 (quoting the record).  Although the district court "repeatedly reminded" the defendant "that he had the choice to plead guilty or to go to trial, and that his trial would be fair if that was the route he chose," the Tenth Circuit explained that "the court's comparison of a post-trial sentence to a post-plea sentence was inherently coercive."  497 F.3d at 1134.  On plain error review, the Tenth Circuit determined that "the court's comments may have coerced the defendant into entering the plea when he otherwise would not have[, which] obviously affected his substantial rights."  497 F.3d at 1134.  The Tenth Circuit held that the district court violated rule 11(c)(1) and that the defendant "must be allowed to withdraw his plea."  497 F.3d at 1134.

## LAW REGARDING WAIVERS OF A DEFENDANT'S RIGHTS
## UNDER RULE 410 OF THE FEDERAL RULES OF EVIDENCE

The general rule is that evidence of a guilty plea or statements made in plea negotiations are inadmissible evidence.  See Fed. R. Evid. 410.  Accord United States v. Mitchell, 633 F.3d 997, 1002 (10th Cir. 2011)("As a general matter, evidence of a guilty plea or statements made in plea negotiations are inadmissible.").  Rule 410 provides:

**Pleas, Plea Discussions, and Related Statements**

(a) **Prohibited Uses.**  In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:

> (1) a guilty plea that was later withdrawn;
>
> (2) a nolo contendere plea;
>
> (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or
>
> (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

Fed. R. Evid. 410.

The Supreme Court of the United States, in <u>United States v. Mezzanatto</u>, 513 U.S. 196 (1995)(Thomas, J.), addressed a challenge to a waiver that allowed the United States to use the defendant's statements during plea negotiations to impeach any contradictory testimony that could arise if the case proceeded to trial.  <u>See</u> 513 U.S. at 198.  The Supreme Court held that, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable."  513 U.S. at 210.  The Supreme Court stated that, while there "may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably discrediting the federal courts," "enforcement of agreements like respondent's plainly will not have that effect."  513 U.S. at 204 (internal brackets omitted)(internal quotation marks omitted).  Instead, the Supreme Court noted that admitting the plea statements for impeachment purposes enhanced the truth-seeking function of trials and would result in more accurate verdicts.  <u>See</u> 513 U.S. at 204 ("The admission of plea statements for impeachment purposes <u>enhances</u> the truth-seeking function of trials and will result

in more accurate verdicts." (emphasis in original)).  In so holding, the Supreme Court rejected

the following arguments that rule 410 should be unwaivable: (i) that rule 410 must be enforced to

guarantee a fair procedure; (ii) that waivability would undermine the goal of voluntary

settlement; and (iii) that waivability would invite prosecutorial reaching and abuse.  See 513 U.S.

at 204-10.   A three-justice concurrence advocated that courts should narrowly construe the

holding's scope and emphasized that the case dealt only with an impeachment waiver.  See 513

U.S. at 211 (Ginsburg, J., concurring).

        In United States v. Mitchell, however, the Tenth Circuit extended the Supreme Court's

reasoning in United States v. Mezzanatto to case-in-chief waivers.   There the Tenth Circuit

upheld the following provision, in which the defendant agreed:

        [I]f I withdraw my plea of guilty, I shall assert no claim under the United States
        Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of
        the Federal Rules of Criminal Procedure, or any other federal rule, that the
        defendant's statements pursuant to this agreement, or any leads derived therefrom,
        should be suppressed or are inadmissible at any trial, hearing, or other proceeding.

United States v. Mitchell, 633 F.3d at 999.  The Tenth Circuit commented: "We see no analytical

distinction between Rule 410's application to impeachment waivers and case-in-chief waivers.

The same reasoning for the former compels the latter."  633 F.3d at 1004.  It further explained its

decision and stated: "Even if the district court determines a guilty plea should be withdrawn, a

waiver of Rule 410 only means a trial will contain more evidence -- both the evidence of the

original guilty plea and evidence the plea was withdrawn."  United States v. Mitchell, 633 F.3d

at 1005 (emphasis added).  The Tenth Circuit noted that its conclusion was in line with the other

circuits who have considered expanding the rationale of United States v. Mezzanatto.  See 633

F.3d at 1006 (citing United States v. Sylvester, 583 F.3d 285, 289 (5th Cir. 2009); United States

v. Young, 223 F.3d 905, 910-11 (8th Cir. 2000); United States v. Burch, 156 F.3d 1315, 1321

(D.C. Cir. 1998)).  The Tenth Circuit also stated that the facts of United States v. Mezzanatto supported its decision, because the defendant in that case received only an opportunity to discuss cooperation with the United States, while the United States made promises to Mitchell in the plea agreement.  See United States v. Mitchell, 633 F.3d at 1006.  Before reaching the rule 410 question, the Tenth Circuit determined that the defendant's guilty plea was knowing and voluntary.  See 633 F.3d at 1001.  Although the district court noted that the defendant's counsel may have exerted undue influence, the Tenth Circuit concluded that his counsel's influence did not render the plea involuntary.  See 633 F.3d at 1002.

The Tenth Circuit's analysis in United States v. Mitchell began with its determination that the plea agreement was enforceable.  See 633 F.3d at 1002.  Although the Tenth Circuit stated at the outset that it was considering whether the rule 410 waiver was knowing and voluntary, it analyzed the plea as a whole.  See United States v. Mitchell, 633 F.3d at 1002 ("Based on a careful review of the record, we agree with the district court that Mitchell's plea was knowing and voluntary.").  The United States Court of Appeals for the District of Columbia Circuit similarly analyzed the validity of the rule 410 waiver in the context of the validity of the plea as whole.  See United States v. Burch, 156 F.3d at 1322.  The D.C. Circuit commented:

> Appellant's specific contention that he involuntarily waived the protections of Rules 11(e)(6) and 410 derives from his broader claim that he did not enter into the plea agreement voluntarily.  He makes no attempt to deconstruct the plea agreement into individual components, nor to claim that he acceded to a particular provision involuntarily, independent of his intention with his respect to the entire plea.  Therefore, we can only review whether his waiver was knowing and voluntary through examining, as the trial court did, the nature of the plea agreement that subsumes it.

156 F.3d at 1322 n.5.

In United States v. Jim, 839 F. Supp. 2d 1157 (D.N.M. 2012)(Browning, J.), the Court, after allowing the defendant to withdraw his guilty plea, denied the defendant's motion to

exclude statements he made in the plea agreement and during the plea colloquy, because the defendant waived his rights under rule 410 when he entered the plea agreement.  839 F. Supp. 2d at 1158.  The plea agreement stated:

> Except under certain circumstances where the Court, acting on its own, fails to accept this plea agreement, the Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

839 F. Supp. 2d at 1172.  The defendant argued that the waiver of his rights under rule 410 was unconstitutional, but the Court disagreed, noting the similarity of the defendant's waiver with the waiver that the Tenth Circuit upheld in United States v. Mitchell.  See 839 F. Supp. 2d at 1172. The defendant then argued that, because his attorney at the time he pled guilty was missing half of the photographs taken at the scene, he did not have all the evidence and pled guilty involuntarily; although he raised the issue in terms of voluntariness, the Court explained that voluntariness "ordinarily deals with claims that the plea was coerced," which the defendant did not allege.  839 F. Supp. 2d at 1178.  The Court instead analyzed the defendant's argument in terms of whether he knowingly pled guilty; the Court noted that the defendant did not argue that the lack of evidence affected his understanding of "'what the plea connotes and of its consequence,' the understanding necessary to enter a knowing plea."  839 F. Supp. 2d at 1179 (quoting Boykin v. Alabama, 395 U.S. at 244).  The Court reviewed its reasons for previously allowing the defendant to withdraw his guilty plea, including a defect in the plea colloquy in which the magistrate judge "never mentioned the word 'trial,'" and the defendant said he did not know he was waiving his right to proceed to trial; this defect cast doubts on whether the

defendant knowingly and voluntarily pled guilty and led the Court to find a "fair and just reason" to permit the defendant to withdraw his guilty plea.  839 F. Supp. 2d at 1180.  The Court concluded, however, that "the evidence in favor of a knowing and voluntary plea outweighs considerably the evidence of an unknowing plea, and is more weighty and more credible.  In other words, [the defendant] has not met his burden of presenting an 'affirmative indication' that the plea was not knowing and voluntary."  839 F. Supp. 2d at 1181.  Further, the defendant did not raise these arguments in his motion to exclude statements from the plea agreement and plea colloquy: "In the absence of argument on this issue and with the burden resting on [the defendant], the Court will not invalidate the rule 410 waiver and exclude [the defendant's] statements on this ground."  839 F. Supp. 2d at 1185.  As to the waiver's scope, the Court determined that, because the waiver to which the defendant stipulated permitted the United States to "use his statements in a subsequent 'criminal trial,'" the United States could use the defendant's statements in any phase of the trial.  839 F. Supp. 2d at 1186 (quoting the plea agreement).

## LAW REGARDING MOTIONS TO RECONSIDER

Although the Federal Rules of Criminal Procedure do not specifically provide for motions to reconsider, such motions are proper in criminal cases.  See United States v. Christy, 739 F.3d 534, 539 (10th Cir. 2014).  See United States v. Christy, 810 F. Supp. 2d 1219, 1249 (D.N.M. 2011)(Browning, J.)(stating that, in the criminal context, "courts ordinarily apply the same standards as those used in civil cases" for motions to reconsider), aff'd, 739 F.3d 534 (10th Cir. 2014).

A motion to reconsider may be granted when the court has misapprehended the facts, a party's position, or the law.  Specific grounds include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  A motion to

reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier.

United States v. Christy, 739 F.3d at 539 (quoting Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)).   It is within a court's discretion to grant or to deny a motion to reconsider.   See United States v. Christy, 739 F.3d at 539 ("A district court should have the opportunity to correct alleged errors in its dispositions."); United States v. Wiseman, 172 F.3d 1196, 1207-08 (10th Cir. 1999), abrogated on other grounds by Rosemond v. United States, 134 S. Ct. 1240 (2014); Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).   A motion to reconsider is not an opportunity to rehash arguments previously addressed or to advance new arguments that could have been raised in prior briefing.   See United States v. Christy, 739 F.3d at 534 ("A motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier.").

Notably, neither rule 59 nor rule 60 of the Federal Rules of Civil Procedure applies to interlocutory orders a district court reconsiders before entry of final judgment. Rule 59(e) states: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."   Fed. R. Civ. P. 59(e) (emphasis added).   Accord Van Skiver v. United States, 952 F.2d at 1243 ("In this case, plaintiffs' motion to reconsider was not served within ten days of the district court's judgment."); 12 J. Moore, Moore's Federal Practice § 59.11[1][a], at 59-26 (3d ed. 2013)("A motion for a new trial must be filed no later than 28 days after the entry of judgment, regardless of when or whether the parties received notice of the entry of the judgment." (citations omitted)).   As the note to the 1946 amendment to rule 60 emphasizes in a discussion of the choice to add the word "final" within rule 60(b):

> The addition of the qualifying word "final" emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but

> rather they are left subject to the complete power of the court rendering them to
> afford such relief from them as justice requires.

Fed. R. Civ. P. 60 note to 1946 amendment.  Accord 12 J. Moore, supra, § 60.23, at 60-82 ("Rule 60(b) does not govern relief from interlocutory orders, that is to say any orders in which there is something left for the court to decide after issuing the order."); 11 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2852, at 292 (3d ed. 2012)("[T]he power of a court to modify an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not limited by the provisions of Rule 60(b)." (footnotes omitted)).  The Tenth Circuit has recognized that a district court has broad discretion to reconsider its interlocutory rulings before the entry of judgment.  See Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011)("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders.").  That discretion extends to rulings on partial summary judgment motions.  See Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1223-24 n.2 (10th Cir. 2008)("The District Court's partial summary judgment ruling was not a final judgment.  Thus, Ms. Fye's motion for reconsideration is considered an 'interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'").

In United States v. Christy, the Court initially granted the defendant's motion to suppress, see 785 F. Supp. 2d at 1054; the United States filed a motion to reconsider, arguing that the evidence was admissible under the inevitable-discovery doctrine, see 810 F. Supp. 2d at 1222-23.  The Court reconsidered its prior ruling, agreed with the United States, and denied the defendant's motion to suppress.  See 810 F. Supp. 2d at 1282.  On appeal, the Tenth Circuit affirmed the Court's decision to reconsider its prior ruling; although the United States had raised inevitable-discovery theories briefly and without much emphasis during the initial suppression briefings and hearings, the Court had not ruled on the inevitable-discovery issue when it first

granted the suppression motion, and, thus, "the district court acted well within its discretion in granting the motion to reconsider (at least as to inevitable discovery) in order to rule on an issue it mistakenly overlooked."  739 F.3d at 539.  The Tenth Circuit then addressed the merits of the United States' argument regarding inevitable discovery and affirmed the Court's conclusion that the evidence "would have been discovered legally, had the illegal search not discovered it first." 739 F.3d at 543-44.

### LAW REGARDING SEARCH AND SEIZURE OF MEDICAL RECORDS

The Fourth Amendment to the Constitution of the United States of America states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fourth Amendment generally requires a warrant for there to be a valid search and seizure.  See Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1198 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  A warrantless search is per se unreasonable unless it falls within one of the exceptions to the warrant requirement.  See United States v. Aquino, 836 F.2d 1268, 1270 n.3 (1988)("Police violate the Fourth Amendment when they engage in a warrantless search and no exception to the warrant requirement applies."); United States v. Bute, 43 F.3d 531, 534-535 (10th Cir. 1994)("The precedent of the Supreme Court and [the Tenth Circuit] is quite clear that a warrantless search is reasonable only when it falls within one of the clearly defined exceptions to the warrant requirement.").

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 132 S. Ct. 945, 952 (2012)(Scalia, J.)("[T]he Katz[7] reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." (emphasis omitted)).  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013)(quoting United States v. Jones, 132 S. Ct. at 950 n.3)).  "[A]n actual trespass," however, "is neither necessary

---

[7] In Kyllo v. United States, 533 U.S. 27 (2001), the Supreme Court described the Katz v. United States rule:

> Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches.  We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") -- which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"  Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

nor sufficient to establish a constitutional violation." United States v. Jones, 132 S. Ct. at 951 n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).   In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.   The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court's majority opinion in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects.  The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz [v. United States, 389 U.S. 347 (1967)]) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 133 S. Ct. at 1414 (2013).

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law." United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Although the Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to

application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach," 2013 WL 1876791, at *35, these two Supreme Court decisions may also raise the question whether a search's reasonableness still hinges on balancing the government's interest in the search against the subject's reasonable privacy expectations.  In June, 2013, however, after having written the majority opinion in Florida v. Jardines, and United States v. Jones, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"  Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia, J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.

But I doubt that the proud men who wrote the charter of our liberties would have
been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia, J., dissenting).  The Court therefore concludes that

Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when

determining whether a search is reasonable for Fourth Amendment purposes, although Justice

Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

In Ferguson v. City of Charleston, 532 U.S. 67 (2001), the Supreme Court considered

whether the special-needs exception[8] to the Fourth Amendment permitted a hospital policy

designed to obtain evidence of drug use through urine tests that would be turned over to the

police.  The Supreme Court found the special-needs exception did not apply and remanded the

case.  In its opinion, the Supreme Court stated: "'[T]he gravity of the threat alone cannot be

dispositive of questions concerning what means law enforcement officers may employ to pursue

a given purpose.'   The Fourth Amendment's general prohibition against nonconsensual,

warrantless, and suspicionless searches necessarily applies to such a policy."  532 U.S. at 86

(quoting Indianapolis v. Edmond, 531 U.S. at 32, 42-43 (2000)).

Regarding the warrantless seizure of medical records, the Tenth Circuit has stated that a

Fourth Amendment violation might occur when a government employer seizes an employee's

medical records without a warrant.  See Lankford v. City of Hobart, 27 F.3d 477, 480 n.2 (10th

Cir. 1994).  The Tenth Circuit in Lankford v. City of Hobart seemed to suggest that such a

_____

[8] "The 'special needs' doctrine, which has been used to uphold certain suspicionless
searches performed for reasons unrelated to law enforcement, is an exception to the general rule
that a search must be based on individualized suspicion of wrongdoing."  Ferguson v. City of
Charleston, 532 U.S. at 79 n.15 (quoting Indianapolis v. Edmond, 531 U.S. 32, 54
(2000)(Rehnquist, C.J., dissenting)).   See Griffin v. Wisconsin, 483 U.S. 868, 873
(1987)(concluding that, in limited circumstances, a search unsupported by either a warrant or
probable cause can be constitutional when "special needs" other than the normal need for law
enforcement provide sufficient justification).

finding is possible without deciding the issue.  See 27 F.3d at 480 n.2 ("It is possible that a Fourth Amendment violation occurred when . . . [the defendant] 'seized' [the plaintiff's] medical files without a warrant. . . .   [The plaintiff] has failed adequately to address the Fourth Amendment implications of [the defendant's] actions on appeal. Therefore, we do not address this issue.").  Instead of resting on Fourth-Amendment grounds, the Lankford v. City of Hobart holding is rooted in the right to privacy.   In Lankford v. City of Hobart, female former-dispatchers brought an action against a police chief under 42 U.S.C. § 1983.  See 27 F.3d at 478. Among other things, the plaintiffs alleged that the police chief sexually harassed them and used his authority as police chief to obtain the private medical records of one of the plaintiffs to prove that she was a lesbian.  See 27 F.3d at 478.  The Tenth Circuit held that, if true, the police chief's actions amounted to a clear privacy violation.  See 27 F.3d at 479.

In Jaffee v. Redmond, 518 U.S. 1 (1996), the Supreme Court held "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." 518 U.S. at 15.  While announcing the privilege in the context of that § 1983 action, the Supreme Court found it "neither necessary nor feasible to delineate its full contours in a way that would 'govern all conceivable future questions in this area.'"   518 U.S. at 18 (quoting Upjohn Co. v. United States, 449 U.S. 383, 386 (1981)).  In United States v. Glass, 133 F.3d 1356 (10th Cir. 1998), the Tenth Circuit upheld the psychotherapist privilege in criminal cases to protect the defendant's statements from compelled disclosure.  See 133 F.3d at 1360.

In Chavez v. Martinez, No. CIV 07-1250 JB/LFG, 2008 WL 6045509 (D.N.M. Oct. 20, 2008)(Browning, J.), the Court considered whether the defendant, an officer, violated the plaintiff's Fourth and Fourteenth Amendment rights when the defendant went to the plaintiff's

doctor's office to verify the dates on the plaintiff's doctor's note.  See 2008 WL 6045509, at *1-2.  In that case, the defendant suspected that the plaintiff had altered his doctor's note, so the defendant followed up with the doctor's office.  See 2008 WL 6045509, at *1.  The defendant did not request or receive the plaintiff's medical records; he received only oral information from the receptionist.  See 2008 WL 6045509, at *2.  The United States Department of Health and Human Services also performed an investigation, and found that the disclosure of the plaintiff's medical information to the defendant "could reflect a violation of the general uses and disclosures provision at 45 C.F.R. § 164.502(a)."  2008 WL 6045509, at *3.  In  Chavez v. Martinez,  the Court stated:

> The Court does not believe that a police officer asking a third-party questions and receiving voluntary answers is a search under the Fourth Amendment.  To hold otherwise would make almost all routine police work and investigation subject to the Fourth Amendment's limitations.  The Court does not believe that police questioning and voluntary responses constitute a search to which the Fourth Amendment applies.
>
> [The defendant's] questions and receipt of answers in this specific context do not constitute a search.  To constitute a search, [the defendant's] actions must have at least invaded upon [the plaintiff's] reasonable expectations of privacy.  See United States v. Jacobsen, 466 U.S.[ 109,] 113[ (1984)].  The information that [the defendant] sought and obtained was information that [the plaintiff] purported to supply in his request for sick leave.  Specifically, [the plaintiff] provided a doctor's note containing the information that [the defendant] attempted to verify at [the doctor's] office.  Thus, [the plaintiff] cannot, on good ground, argue that he had a reasonable expectation of privacy in the fact that he was undergoing a medical procedure and in the dates upon which he was taking days off work to visit the doctor.

2008 WL 6045509, at *11.

In Kerns v. Board of Comm'rs, 707 F. Supp. 2d 1190 (D.N.M. 2010)(Browning, J.), rev'd in part, vacated in part sub nom. Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the plaintiff alleged that the sheriff violated his Fourth and Fourteenth Amendment rights when the

sheriff requested the plaintiff's private medical records from the Veterans Hospital.  See 707 F. Supp. 2d at 1253.  The sheriff argued that he was entitled to qualified immunity -- he did not violate the plaintiff's constitutional rights and, even if he did, the constitutional right was not clearly established at the time.  See 707 F. Supp. 2d at 1254.  Looking to the plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures, the Court noted that the sheriff did not seek a warrant or a subpoena for the medical records, nor did he seek the plaintiff's consent.  See 707 F. Supp. 2d at 1262.  The Court concluded that, because the plaintiff had a reasonable expectation of privacy in his medical records, the sheriff unreasonably infringed that right and "crossed the line from proper police investigation into constitutional violation." 707 F. Supp. 2d at 1263.  The defendants argued that there was no clearly established law that requesting medical records violated the Fourth Amendment, and the Court did not locate a case affirmatively holding that requesting private medical records without consent had Fourth Amendment consequences; the Court nonetheless concluded that the right was clearly established.  See 707 F. Supp. 2d at 1263-64.  The Court relied on Lankford v. City of Hobart -- in which the Tenth Circuit stated "'it is possible that a Fourth Amendment violation occurred where, as [the plaintiff] alleges, [the defendant] 'seized' her protected medical files without a warrant'" -- noting that "the Tenth Circuit's statement provides notice to officers taking medical records that, not only will it subject him or her to liability for a constitutional privacy violation, but possibly to liability for violating the Fourth Amendment." Kerns v. Board of Comm'rs, 707 F. Supp. 2d at 1264 (quoting Lankford v. City of Hobart, 27 F.3d at 480 n.2).  The Court went on to explain that "[w]hat has to be clearly established [for qualified immunity] is that what the defendant is doing is wrong," even if all the law related to the cause of action is not clearly

established.   707 F. Supp. 2d at 1264.   The Court concluded that the plaintiff satisfied both

prongs necessary to defeat qualified immunity.  See 707 F. Supp. 2d at 1268.

    The Tenth Circuit reversed the Court in part and vacated the Court in part in Kerns v.

Bader, 663 F.3d 1173 (10th Cir. 2011).  The Tenth Circuit did not agree with the Court that the

plaintiff's Fourth and Fourteenth Amendment rights were clearly established, and so reversed the

Court without analyzing whether the sheriff had violated the plaintiff's constitutional rights:

> On appeal, the Sheriff disputes whether he violated Mr. Kerns's constitutional
> rights by asking a hospital to share its records voluntarily -- and, if he did,
> whether those rights were clearly established at the time.  Because we agree with
> Sheriff White on the latter (clearly established law) question, we reverse without
> addressing the former (constitutional violation) question.   And we pursue this
> course because doing so allows us to avoid rendering a decision on important and
> contentious questions of constitutional law with the attendant needless (entirely
> avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit majority explained that the "scope of the Constitution's

protection for a patient's hospital records can be adequately decided in future cases where the

qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized

records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.

    On the Fourth Amendment claim, the Tenth Circuit majority framed the issue as

> whether Mr. Kerns can show that Sheriff White's request to a third party (the
> hospital) for records that it may own but in which Mr. Kerns claims a privacy
> interest (an interest which we accept exists for our purposes at step two) violated
> clearly established Fourth Amendment law as of 2005.

663 F.3d at 1184.  The Tenth Circuit majority rejected the Court's and the plaintiff's reliance on

Lankford v. City of Hobart, because "its language hardly announced 'clearly established law.'

At best, Lankford's equivocation declined to foreclose the possibility of a Fourth Amendment

violation."  663 F.3d at 1185 n.2 (emphasis in original).  The Tenth Circuit majority concluded

that there was no clearly established law for the plaintiff's Fourth Amendment claim.  See 663

- 41 -

F.3d at 1185.  The Tenth Circuit ordered the Court to enter summary judgment in favor of the sheriff, "only because [the plaintiff] has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005."  663 F.3d at 1187.

The Honorable William J. Holloway, Senior United States Circuit Judge for the Tenth Circuit, dissented; he found it "unwise" for the majority to avoid the first question of qualified immunity -- whether the plaintiff's constitutional rights were violated.  663 F.3d at 1195 (Holloway, J., dissenting).  Judge Holloway said the majority's approach made it seem that the sheriff's conduct may have been lawful, when, in Judge Holloway's view, the "case is crystal clear."  663 F.3d at 1196 (Holloway, J., dissenting).

> We should not hesitate to declare the obvious: Courts have for decades recognized a constitutionally protected right of privacy in the highly personal information contained in medical records, and law enforcement therefore must have something more than merely a legitimate investigatory interest in the protected information to justify invading that privacy.

663 F.3d at 1197 (Holloway, J., dissenting).  On the question whether the law was clearly established, Judge Holloway said it was; although there were no cases directly on point, Judge Holloway said "the precedents that do exist are easily close enough on point that any reasonable law enforcement officer would have known that constitutionally protected medical records cannot be obtained simply because a possibility exists that the information would be helpful."  663 F.3d at 1198 (Holloway, J., dissenting).  Judge Holloway explained that the plaintiff "enjoyed a due process right to the non-disclosure of his personal medical information" and that "the infringement of that right implicates the Fourth Amendment."  663 F.3d at 1200 (Holloway, J., dissenting).

**LAW REGARDING THE RIGHT TO PRIVACY IN MEDICAL RECORDS**

The Due Process Clause of the Fourteenth Amendment protects the right of privacy. See Flanagan v. Munger, 890 F.2d 1557, 1570 n.15 (10th Cir. 1989); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986). The Tenth Circuit has recognized that the right to privacy protects government employees from their employers improperly attempting to obtain the private medical history or records. See Lankford v. City of Hobart, 27 F.3d at 479. Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss the manner in which a court should determine generally when a violation of the privacy right occurs. See 27 F.3d at 479-80. Flanagan v. Munger provides some instruction on this point. In Flanagan v. Munger, the Tenth Circuit employed a balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy. See 890 F.2d at 1570. Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling state interest; and (3) if disclosure can be made in the least intrusive manner." Flanagan v. Munger, 890 F.2d at 1570. The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personal information is protected." Flanagan v. Munger, 890 F.2d at 1570. See  Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material . . . ."). In Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her X-ray. See 74 F. App'x at 857. In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery noted that the plaintiff's broken

leg was not confidential information, because the plaintiff had contacted her employer seeking extended medical leave given the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs."  74 F. App'x at 857.  The Tenth Circuit also observed that, because the plaintiff had "supported her request for an indefinite extension of medical benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview."  74 F. App'x at 857. Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits." 74 F. App'x at 857.

In Kerns v. Board of Commissioners, 707 F. Supp. 2d 1190 (D.N.M. 2010)(Browning, J.), rev'd in part, vacated in part sub nom. Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Court used the Tenth Circuit's balancing test from Flanagan v. Munger to determine whether a sheriff who obtained the plaintiff's medical records violated the plaintiff's privacy right under the Fourteenth Amendment, finding that (i) the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records, because he believed that the medical and mental health records were confidential and private; (ii) the sheriff's department had a compelling state interest in the records, because of its interest in enforcing 18 U.S.C. § 922(g)(4), which makes it unlawful for a person who has been "adjudicated as a mental defective" or who has been "committed to a mental institution" to possess firearms, and ensuring that the plaintiff did not fit that category; and (iii) the state could have achieved its objectives in a less intrusive manner by making a more particularized request for records, rather than requesting

to "review all records." 707 F. Supp. 2d at 1256-57. Balancing these factors, the Court concluded that the plaintiff met its burden on summary judgment to demonstrate that the sheriff violated his constitutionally protected right to privacy. See 707 F. Supp. 2d at 1257. The Court noted that the sheriff had not relied on the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936 ("HIPAA") when he requested the records; the law-enforcement exception in HIPAA allows HIPAA-covered entities to disclose protected healthcare information in six circumstances:

> (i) as required by law-court orders, subpoenas, warrants; (ii) to identify or locate a suspect, fugitive, material witness, or missing person; (iii) in response to a law-enforcement official's request for information about a victim or suspected victim of a crime; (iv) to alert law enforcement of a person's death, if the covered entity suspects that criminal activity caused the death; (v) when a covered entity believes that protected health information is evidence of a crime that occurred on its premises; and (vi) by a covered health-care provider in a medical emergency not occurring on its premises, when necessary to inform law enforcement about the commission and nature of a crime, the location of the crime or crime victims, and the perpetrator of the crime.

707 F. Supp. 2d at 1259 (citing 45 C.F.R. § 164.512). The Court said that "HIPAA restrains the 'health plan, health care clearinghouse, or healthcare provider' from disclosing protected medical information, and does not restrain law-enforcement directly." 707 F. Supp. 2d at 1259 (quoting 45 C.F.R. § 164.104). The Court also concluded that the plaintiff established that his right to privacy in his medical records was clearly established at the time, precluding the sheriff from qualified immunity. See 707 F. Supp. 2d at 1259-61.

The majority of the panel in the Tenth Circuit did not agree with the Court that the plaintiff's Fourteenth Amendment rights were clearly established and reversed the Court without analyzing whether the sheriff had violated the plaintiff's constitutional rights. See Kerns v. Bader, 663 F.3d at 1183-84. Although the plaintiff cited several cases in which the Tenth Circuit "held that government officials violated plaintiffs' substantive due process privacy rights by

accessing their records without public disclosure," the Tenth Circuit explained that those cases "involved another element not present here: the government officials involved accessed the plaintiffs' confidential information as part of an unlawful campaign of sexual harassment." 663 F.3d at 1186. The Tenth Circuit ordered the Court to enter summary judgment in favor of the sheriff, "only because [the plaintiff] has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005." 663 F.3d at 1187. Judge Holloway dissented, agreeing instead with the Court that the officer violated the plaintiff's "clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime *might* have occurred." 663 F.3d at 1197-98 (Holloway, J., dissenting)(emphasis in original).

## ANALYSIS

Through the May 11, 2014 Letter, the May 12, 2014 Letter, and the arguments that Ms. Middlebrooks made on Yazzie's behalf at the hearing, Yazzie requests that the Court allow him to withdraw his guilty plea. He has previously made similar requests, which the Court has denied. To the extent that Yazzie is requesting that the Court reconsider its previous rulings or renewing his requests to withdraw his guilty plea, the Court will deny his requests; the Court has previously addressed many of the arguments Yazzie has made, and the remaining arguments do not affect its conclusion that Yazzie has not presented a fair and just reason that the Court should permit Yazzie to withdraw his guilty plea.

## I.   JUDGE PUGLISI DID NOT VIOLATE RULE 11; THUS, YAZZIE MAY NOT WITHDRAW HIS GUILTY PLEA BASED ON A RULE 11 VIOLATION.

Yazzie argues that Judge Puglisi violated rule 11 during the plea colloquy, and points to the following questions that Judge Puglisi asked:

"But do you, after considering all of the evidence that the U.S. has marshaled against you, do you feel that it is more probable than not that a jury would find that you did use force?  In order words, that they would believe the evidence in this case, aside from what you have to say?"

March 11, 2014 Letter at 1 (quoting Plea Tr. at 7:25-8:8 (Judge Puglisi)).  Yazzie contends that he would not have pled guilty had Judge Puglisi not made these statements.  See March 11, 2014 Letter at 1.

A court must not participate in plea negotiations, see Fed. R. Crim. P. 11(c)(1), but not all comments that a judge makes regarding plea agreements violate rule 11, see United States v. Cano-Varela, 497 F.3d at 1132.  "[O]nce the parties have 'hammered out' the details of their agreement, Rule 11[(c)] does not prevent the sentencing judge from questioning the defendant regarding the terms, consequences, and acceptance of the plea agreement or from providing the defendant with information relating to these matters."  United States v. Cano-Varela, 497 F.3d at 1132 (quoting United States v. Carver, 160 F.3d at 1269).  On the other hand, discussions of the "penal consequences of a guilty plea as compared to going to trial" are "inherently coercive, no matter how well-intentioned."  United States v. Cano-Varela, 497 F.3d at 1133 (internal quotation marks omitted).

Judge Puglisi directed his comments at Yazzie to determine whether he understood the consequences of pleading guilty pursuant to the Plea Agreement; they did not impermissibly cross the line into pressuring Yazzie to plead guilty by commenting on the penal consequences of the guilty plea as compared to going to trial.  Rule 11 requires a court to "address the defendant personally in open court" before accepting a guilty plea, to ensure that the defendant understands, among other things, the right to plead not guilty, the right to a jury trial, the right to confront and cross-examine adverse witnesses, that he or she is waiving these trial rights if the court accepts the guilty plea, the nature of the charges, and the possible maximum and minimum

- 47 -

penalties.  Fed. R. Crim. P. 11(b)(1).  A court must also "determine that there is a factual basis for the plea."  Fed. R. Crim. P. 11(b)(3).  The questions that Judge Puglisi asked Yazzie were part of carrying out his duties under rule 11 to ensure that there was a factual basis for Yazzie's guilty plea; the questions were not indicating that Judge Puglisi thought Yazzie should plead guilty based on the evidence.

The Court has previously expressed concern over Judge Puglisi's reference to a "more probable than not" standard, but after reviewing the transcript of the plea hearing, concluded that the term did not create a constitutional problem:

A concern to the Court with the plea colloquy was Judge Puglisi's reference to a "more probable than not" standard.  [Plea Tr. at 7:25-8:8] (Judge Puglisi).  After careful review of the transcript of the plea hearing, however, the Court concludes that using this term does not create a constitutional problem with Yazzie's plea colloquy.  Judge Puglisi did not inform Yazzie that the United States need prove his guilt by only a "more probable than not" standard; rather, Judge Puglisi's reference to this standard was in a discussion of the likelihood that a jury would find Yazzie guilty.  Judge Puglisi's question to Yazzie was:

You feel that you didn't use force, you said that the minor in this Information charging you with the crime of aggravated sexual abuse kept coming to you, but do you, after considering all of the evidence that the United States has marshaled against you, do you feel that it is more probable than not that a jury would find that you did use force?  In other words, that they would believe the evidence in this case aside from what you have to say?

[Plea Tr. at 7:25-8:8] (Judge Puglisi).  Judge Puglisi did not, therefore, misstate the United States' burden of proof.  Yazzie affirmed that he was pleading guilty because he is "in fact guilty."  [Plea Tr. at 6:1-6] (Judge Puglisi, Yazzie).  Further, the Plea Agreement, which Yazzie signed, includes an admission under penalty of perjury in which Yazzie states that, if he "chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense to which I am pleading guilty beyond a reasonable doubt."  Plea Agreement ¶ 8, at 3.  Yazzie affirmed at the plea hearing that he had reviewed the Plea Agreement with his attorney, that he understood the Plea Agreement, and that he had no questions about the information in the Plea Agreement.  See [Plea Tr. at 3:12-21] (Judge Puglisi, Yazzie).  Yazzie further admitted that, notwithstanding his contention that he did not use force, he believed a jury would find he used force, and that the rest of his statement in the Plea Agreement is true.

See [Plea Tr. at 7:3-5] (Judge Puglisi, Yazzie); [Plea Tr. at 8:16-20] (Judge Puglisi, Yazzie).  Yazzie affirmed that he had not been forced to enter a guilty plea, and that he was not under the influence of a mental illness, alcohol, or addition to drugs at the plea hearing.  See [Plea Tr. at 2:24-3:7] (Judge Puglisi, Yazzie); [Plea Tr. at 6:1-6 (Judge Puglisi, Yazzie)].  Additionally, any question regarding Yazzie's competency has been resolved, and the Court finds that Yazzie has been competent throughout these proceedings.  See Order Finding Defendant Competent ¶ 2, at 1 ("In a written opinion dated November 29, 2012, Dr. Foote finds that Willis Yazzie is competent in these proceedings.").  The Court concludes, therefore, that Judge Puglisi's reference to Yazzie's belief in the probability of his conviction is not an error that caused Yazzie to not understand the consequences of his plea.  Rather, Yazzie has demonstrated through his letters to the Court that he understands the consequences of pleading guilty to the specific offense charged in the Information.  See May 15[, 2011] Letter at 3 (distinguishing between a conviction under 18 U.S.C. § 2246(2)(D) and 18 U.S.C. § 2246(2)(C)).  The Court determines, therefore, that this factor counsels against allowing Yazzie to withdraw his guilty plea.

June 4, 2013 MOO at 34-35.  The Court concludes that Judge Puglisi did not participate in the plea negotiations with Yazzie, but was asking Yazzie, as part of the rule 11 obligations, whether there was a factual basis for Yazzie's guilty plea.  Because Judge Puglisi did not participate in the plea negotiations, he did not violate rule 11.  Yazzie may not withdraw his guilty plea based on the alleged rule 11 violation.

## II.  THE COURT HAS PREVIOUSLY ANALYZED AND REJECTED YAZZIE'S ARGUMENTS REGARDING THE ALLEGATIONS INVOLVING JANE DOE 2 AND YAZZIE'S MEDICAL RECORDS, AND YAZZIE'S CURRENT ARGUMENTS DO NOT AFFECT THE COURT'S PREVIOUS ANALYSIS.

Yazzie makes several arguments in the March 12, 2014 Letter regarding the use of his medical records.  He asserts that he did not touch Jane Doe 2, but that he pled guilty in part because she had an STD and his medical records showed that he also had an STD.  In the first paragraph of the March 12, 2014 Letter, Yazzie points to a diary entry from Jane Doe 2; Yazzie does not explain how he thinks the diary entry supports his request to withdraw his guilty plea, but the Court thinks Yazzie is using it to deny that he touched Jane Doe 2.  Yazzie argues in the second paragraph in the March 12, 2014 Letter that his medical records were seized without

probable cause, and that he would not have pled guilty if Mr. Loonam had not told him that the United States would use his medical records against him at trial.

The Court previously considered Yazzie's arguments that he did not touch Jane Doe 2, and that he would not have pled guilty had he known about the potential to suppress his medical records; the Court addressed these arguments in its analysis of whether Yazzie knowingly and voluntarily pled guilty and whether he had close assistance of counsel.  See Feb. 6, 2014 MOO at 90-95, 107-113.  It noted that Yazzie pled guilty for his conduct with Jane Doe 1, not Jane Doe 2, and that, even if he may have been able to suppress his medical records and proceed to trial, the fact that he gave up potentially meritorious defenses when he pled guilty does not change the fact that he knowingly and voluntarily pled guilty.

> Yazzie explains that, if he had known of the possibility to suppress his medical records and the statement he made to the FBI, he would not have pled guilty, and that, because he was not fully aware of those options, Mr. Loonam essentially forced him to plead guilty.  As Ms. Middlebrooks notes, however, a plea is not involuntary simply because the attorney strongly urges the defendant to accept a guilty plea -- counsel must inform the client that he has no choice but to plead guilty to render a guilty plea involuntary.  See Supplement at 5 (citing Fields v. Gibson, 277 F.3d at 1213).  In Fields v. Gibson, the Tenth Circuit said a plea may be involuntary "when an attorney materially misinforms the defendant of the consequences of the plea, e.g., by falsely alleging that promises or guarantees exist," or if "counsel informs the defendant that he has no choice, he must plead guilty."  277 F.3d at 1213 (internal quotation marks and citations omitted).  Counsel may, however, offer advice and even vigorously urge the defendant to plead guilty: "Indeed, one central component of a lawyer's job is to assimilate and synthesize information from numerous sources and then advise clients about what is perceived to be in their best interests.  Advice -- even strong urging by counsel does not invalidate a guilty plea."  277 F.3d at 1213 (internal quotation marks and citations omitted).  Yazzie has not contended that Mr. Loonam demanded that he plead guilty or gave him no choice, and Yazzie's own statements at the plea hearing indicate that he understood that the choice to plead was ultimately his decision: when Judge Puglisi asked him whether anyone attempted to force him to plead guilty, he said "no."    Plea Tr. at 6:1-3 (Judge Puglisi, Yazzie).  Mr. Loonam's strong urging, if that is what happened, does not transform Yazzie's voluntary plea into an involuntary one.

Yazzie argues that he did not knowingly and voluntarily plead guilty, because he was not fully aware of the potential to suppress his confession and his medical records.  Ms. Middlebrooks asserts that, while she is unsure about the merit of Yazzie's argument to suppress the statements he made to the FBI, there is merit to the argument that the Court should suppress his medical records.  Although Mr. Loonam addressed some aspects of suppressing Yazzie's statements to the FBI, Mr. Loonam did not address the 18 U.S.C. § 3501(c) arguments until after Yazzie pled guilty; further, Mr. Loonam did not ever address suppressing the medical records.  Even if correct, however, these arguments misapprehend the relevant inquiry regarding a knowing and voluntary plea: the Court must consider whether Yazzie understood the consequences of his plea, and whether he understood the proceedings -- and it is clear from the record that Yazzie understood the consequences of pleading guilty.  "To enter a plea that is knowing and voluntary, the defendant must have 'a full understanding of what the plea connotes and of its consequence.'"  United States v. Hurlich, 293 F.3d at 1230 (quoting Boykin v. Alabama, 395 U.S. 238, 244 (1969)).  "The defendant need not understand every collateral consequence of the plea, but need only understand its direct consequences," United States v. Hurlich, 293 F.3d at 1230-31 (quoting Wall v. United States, 500 F.2d 38, 39 (10th Cir. 1974)(per curiam)), and whether the plea carries a risk of deportation, see Padilla v. Kentucky, 559 U.S. at 374.  "Consequences of a guilty plea unrelated to the length and nature of the federal sentence are not direct consequences."  United States v. Hurlich, 293 F.3d at 1231 (citations omitted).  "[T]he 'knowing and voluntary' inquiry focuses on whether [a defendant] in fact did understand the proceedings."  Allen v. Mullin, 368 F.3d 1220, 1240 (10th Cir. 2004).  Yazzie's statements at the hearing indicate that he understood the proceedings, understood that he was giving up the right to a trial, and understood that he was accepting a sentence between 15 and 19 years; he has not since contested that he misunderstood what took place at the plea hearing.

Some circuit courts have held that, to be knowing and voluntary, a defendant should be made aware of his possible defenses and understand that he is giving up those possible defenses by pleading guilty.  See, e.g., United States v. Ranum, 96 F.3d 1020, 1024 (7th Cir. 1996)("The defendant must also understand 'that his or her conduct actually falls within the charge[,] . . . and should be made aware of possible defenses, at least where the defendant makes known facts that might form the basis of such defenses.'" (alteration in original)(quoting United States v. Frye, 738 F.2d 196, 199 (7th Cir. 1984))); Sober v. Crist, 644 F.2d 807, 810 n.3 (9th Cir. 1981)("The accused should be made aware of possible defenses, at least where the attorney or court is made aware of facts that would constitute such a defense.").  The Tenth Circuit has said that, when a defendant is made aware of his defenses, he has knowingly pled guilty, see United States v. Wright, 392 F. App'x 623, 628 (10th Cir. 2010)(unpublished)(listing the ways in which the defendant understood his guilty plea, including that he "had discussed the charges, lesser-included offenses, and possible defenses with his appointed counsel"), but the Tenth Circuit has not held that a failure to ensure that the

defendant understands that he is giving up potential defenses is fatal to the knowing and voluntary nature of the plea. Rather, it seems that the Tenth Circuit focuses on whether the court taking the defendant's plea has complied with rule 11 of the Federal Rules of Criminal Procedure, see United States v. Hickok, 907 F.2d 983, 985 (10th Cir. 1990)(noting that by pleading guilty, the defendant waives all nonjurisdictional defenses, and that, before accepting a guilty plea, a court must determine that the defendant understands that he is waiving the right to trial under rule 11(c)(4)). Rule 11 lists a number of items that a court should ensure the defendant understands before accepting the plea, including the right to a jury trial, the right to confront and cross-examine witnesses, and the defendant's waiver of those trial rights if the court accepts a guilty plea. See Fed. R. Crim. P. 11(b)(1). Rule 11 does not specifically require the court to ensure that the defendant understands his defenses or that he is waiving his defenses by pleading guilty. See Fed. R. Crim. P. 11. While the focus seems to be on whether rule 11's mandates were met, the Tenth Circuit has also recognized that a court's failure to address one of the rule 11 provisions may be error, but not necessarily reversible error, because the failure may not affect the defendant's substantial rights. See United States v. Alvarado-Benjume, 251 F. App'x 586, at 589 (10th Cir. 2007)(unpublished)(holding that, although the district court did not explain to the defendant that he was waiving his right to appeal, the record evidence on plain error review did not dispute that the defendant knowingly and voluntarily pled guilty and waived his right to appeal). Even when defendants misjudge their defenses, the Tenth Circuit has said that fact does not render their guilty pleas involuntary or unknowing. See United States v. Burciaga, 66 F. App'x 812, 814 n.2 (10th Cir. 2003)(unpublished)("Some of the defendants argue, however, their guilty pleas were involuntary or unknowing because they did not know the wiretap statute had expired. We reject this argument. Although the defendants may have misjudged the admissibility of the wiretap evidence, this alone does not render their guilty pleas involuntary or unknowing.").

In this case, it appears that, in accordance with rule 11, Yazzie understood his right to a jury trial and that he was waiving this right by pleading guilty. The Plea Agreement lists Yazzie's rights -- "to plead not guilty" and "to have a trial by jury," and, at trial, "to confront and cross-examine adverse witnesses," "to be protected from compelled self-incrimination," "to testify and present evidence on [his] own behalf," and "to compel the attendance of witnesses for the defense" -- and that he agrees to waive those rights and plead guilty. Plea Agreement ¶¶ 2-3, at 1-2.[9] Although neither the Plea Agreement nor the plea colloquy clearly

---

[9] At the plea hearing, Judge Puglisi did not ask Yazzie whether he understood everything listed in rule 11, including his right to a jury trial, his right at trial to confront and cross-examine adverse witnesses, and that he would be waiving his trial rights by pleading guilty. See Fed. R. Crim. P. 11(b). Instead, Judge Puglisi asked Mr. Loonam if he discussed the Plea Agreement with Yazzie and if Mr. Loonam was "convinced that [Yazzie] understands the rights that he

indicates that Yazzie understood that he was giving up his potential defenses, this omission is not fatal to his knowing and voluntary plea. Pleading guilty "frequently involves the making of difficult judgments," and "[w]aiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts." McMann v. Richardson, 397 U.S. 759, 769 (1970). The Court cannot fully weigh the likelihood of success without coming close to deciding the two suppression issues, but if it is not necessary to decide all motions to suppress before a defendant enters a plea agreement, it does not make sense for the Court to have to decide motions to suppress before deciding a motion to withdraw. Deciding a motion to suppress before deciding a motion to withdraw a guilty plea would be putting the cart before the horse. The Court need decide only whether Yazzie knowingly and voluntarily pled guilty, not whether he knew all possible defenses and their chances of success; similarly, the Court will not decide any potential motions to suppress before deciding the Motion to Reconsider. The Court concludes that Yazzie knowingly and voluntarily pled guilty; thus, this factor weighs against Yazzie withdrawing his guilty plea.

Feb. 6, 2014 MOO at 90-95. Further, the Court addressed the potential to suppress Yazzie's

medical records in the section analyzing whether he had close assistance of counsel:

> Yazzie asserts that part of the reason he pled guilty was because Mr. Loonam advised him that evidence from his medical records that the FBI obtained showed that Yazzie had an STD and that Jane Doe 2 also had an STD, and that this evidence, with his statement to the FBI, would result in a conviction. See Second Supplement at 2. Yazzie says that Mr. Loonam did not talk to him about suppressing those records, and Ms. Middlebrooks explains that Yazzie was not aware of this possibility until she raised the issue with him. See Second Supplement at 4. Yazzie argues that the Court should allow him to withdraw his

---

gives up by admitting guilt to this crime as well as the likely sentence he will receive under Rule 11(c)(1)(C)[.]" Plea. Tr. at 4:20-23 (Judge Puglisi). Mr. Loonam said that he had "reviewed [the Plea Agreement] thoroughly over quite some time." Plea Tr. at 4:24-25 (Loonam). Although Judge Puglisi did not discuss all of the information in rule 11 or in the Plea Agreement,

> a Rule 11 error is not prejudicial when the defendant was simply deprived of a mandated procedure as opposed to the substantive material information contemplated by the rule. Thus, a defendant who receives the information omitted by the district court from other sources generally cannot demonstrate that he would not have pleaded guilty had the court also so informed him.

United States v. Ferrel, 603 F.3d 758, 763 (10th Cir. 2010)(citations omitted).

guilty plea, because he "erroneously believed he would be faced with his medical records containing reference to an STD."  Second Supplement at 4.

Because the medical records pertain to Jane Doe 2 and Yazzie pled guilty to the charge against him regarding Jane Doe 1, the Court is unsure how the medical records influenced him to plead guilty, and he has not explained this problem except to say that Mr. Loonam advised that the medical records, with the confession, would likely lead to a conviction.  Perhaps the United States would have charged Yazzie for offenses relating to both Jane Doe 1 and Jane Doe 2 if Yazzie proceeded to trial, whereas it was willing to drop the charges against Yazzie for Jane Doe 2 if he pled guilty for Jane Doe 1.  The Court does not understand why the medical records made such an impact on Yazzie pleading guilty to the charges against him for Jane Doe 1, but the Court will consider whether Mr. Loonam should have raised the possibility of suppressing the records with Yazzie, and more importantly, whether failing to do so fell outside the range of competence demanded of attorneys in criminal cases.

Ms. Middlebrooks indicated that the FBI subpoenaed Yazzie's medical records and obtained them in violation of HIPAA, and that Yazzie never waived his privilege regarding those records.  See Sept. 13 Tr. at 16:7-17 (Court, Middlebrooks).  Ms. Middlebrooks seems to be arguing that, under HIPAA, Yazzie may have been able to suppress the medical records, because she contends that none of the HIPAA law enforcement exceptions apply.  She also mentioned that the FBI subpoenaed the records, but she did not indicate whether the exception, pursuant to 45 C.F.R. § 164.512(e), for judicial and administrative proceedings would apply.  That exception permits disclosure in the course of a judicial or administrative proceeding "in response to a subpoena" if the "covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party" that either the subject of the protected health information has been given notice, or that the party seeking the information has made reasonable efforts to secure a qualified protective order. 45 C.F.R. § 164.512(e)(1)(ii).  The qualified protective order would "[p]rohibit[] the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested," and "[r]equire[] the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding."   45 C.F.R. § 164.512(e)(1)(v).  The Court does not know the circumstances in which the FBI obtained the medical records or whether the FBI provided the covered medical entity with the adequate assurances required under HIPAA; assuming, however, that the covered medical entity provided the records in violation of HIPAA, without an applicable exception covering its conduct, the Court does not believe that suppressing the records would be the proper remedy.

HIPAA prohibits a "covered entity" from using or disclosing protected health information.  45 C.F.R. § 164.502(a).  Covered entities include a "health

- 54 -

plan," a "health care clearinghouse," and a "health care provider who transmits any health information in electronic form in connection with a transaction" that HIPAA covers. 45 C.F.R. § 164.104(a). The FBI is not a covered entity under HIPAA. See Kerns v. Bd. of Comm'rs, 707 F. Supp. 2d at 1259 (stating that "HIPAA restrains the 'health plan, health care clearinghouse, or health care provider' from disclosing protected medical information, and does not restrain law-enforcement directly." (quoting 45 C.F.R. § 164.104)); United States v. Mathis, 377 F. Supp. 2d 640, 645 (M.D. Tenn. 2005)("HIPAA applies to 'a health plan,' 'a healthcare clearinghouse,' or 'a healthcare provider who transmits any health information in an electronic form in connection with a transaction referred to in Section 1320d-2(a)(1) of this title.' The FBI does not fit within any of these categories."); United States v. Elliott, 676 F. Supp. 2d 431, 440 (D. Md. 2009)("Law enforcement agencies, including the office of the prosecuting attorney, are not covered entities under HIP[A]A."). Although Yazzie argues that the FBI violated HIPAA by obtaining his medical records, it seems that Yazzie's HIPAA argument would be better directed toward the covered entity -- likely the healthcare provider that released his records to the FBI. HIPAA "provides for criminal and civil penalties against entities that fail to comply with its provisions," United States v. Elliott, 676 F. Supp. 2d at 440 (citing 42 U.S.C. §§ 1320d-5, 1320d-6), but suppressing medical records does not appear to be an appropriate remedy for a HIPAA violation, see United States v. Elliott, 676 F. Supp. 2d at 440-41 (stating that HIPAA "was passed to ensure an individual's right to privacy over medical records, it was not intended to be a means for evading prosecution in criminal proceedings," and finding "that the Government's interest in obtaining the requested records outweighs the defendant's right to withhold them and the records will not be excluded from trial on this ground"); Elder-Evins v. Casey, C 09-05775 SBA LB, 2012 WL 2577589 (N.D. Cal. July 3, 2012)("As other courts have noted, HIPAA does not have a suppression remedy. And where this is the case, it is inappropriate for the court to exclude evidence on this basis." (citation and footnote omitted)); United States v. Streich, 560 F.3d 926, 935 (9th Cir. 2009)(Kleinfeld, J., concurring)("HIPAA does not provide any private right of action, much less a suppression remedy.").

Ms. Middlebrooks has not explained how the FBI obtained the medical records, other than to say that the FBI subpoenaed the records. The Court is not aware that the FBI has any subpoena powers,[10] so, if there was a subpoena, the FBI most likely went to the United States Attorney and then the federal court for a subpoena. If there were a subpoena, the suppression remedy might not be available, even if there were a constitutional violation, under the good-faith exception to the exclusionary rule, see United States v. Leon, 468 U.S. 897, 922

---

[10] The parties did not discuss whether the FBI has authority to issue subpoenas; although the Court has identified one case stating that "the FBI issued a subpoena" as a part of its investigation, United States v. Vazquez-Rivera, 665 F.3d 351, 354 (1st Cir. 2011), it is not clear from that case whether the FBI, independent of a court, has authority to issue a subpoena.

(1984), or under absolute judicial immunity for obeying a court order, see Valdez v. City & Cnty. of Denver, 878 F.2d 1285, 1287-88 (10th Cir. 1989).[11]  Also, the medical records might have been inevitably discovered, even if not secured constitutionally.  See United States v. Christy, 739 F.3d at 540 (stating that, under the inevitable discovery doctrine, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means'" (quoting Nix v. Williams, 467 U.S. 431, 444 (1984))).  Without more information, such as evidence about the means by which the FBI obtained the subpoena, whether the United States had a compelling interest in the records, and whether the United States could have achieved its objectives in a less intrusive manner, it is not clear to the Court whether Yazzie may have meritorious arguments regarding his constitutional right to privacy under the Fourteenth Amendment, or his right to be free from unreasonable searches and seizures under the Fourth Amendment, the latter being the most likely source for Yazzie's desired exclusionary remedy.[12]    Yazzie has not demonstrated to the Court that

_____

[11]  The Court does not have enough information to state precisely what it would do if faced with a motion to suppress; it does not know, for example, if the FBI requested the subpoena pursuant to an ongoing investigation or if it carried out a subpoena that a grand jury issued.

[12]  The Court's decision in Kerns v. Board of Commissioners is not inconsistent with the Court's analysis of Yazzie's potential suppression motion.  In Kerns v. Board of Commissioners, the plaintiff brought an action under § 1983 against a law enforcement officer who had obtained the plaintiff's medical records without the plaintiff's consent, warrant, or subpoena.  See 707 F. Supp. [2d] at 1254.  The Court concluded that the officer violated the plaintiff's Fourteenth Amendment right to privacy, because the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records and, while the disclosure of the information served a compelling state interest -- determining whether the plaintiff had violated a law prohibiting a person who had been adjudicated a mental defect or committed to a mental institution from possessing a firearm  -- the state could have achieved its objectives in a less obtrusive manner.  See 707 F. Supp. [2d] at 1254-1257.  The Court then concluded that the law was clearly established and denied the defendant's qualified immunity defense.  See 707 F. Supp. [2d] at 1261.  The Court also found that the officer violated the plaintiff's Fourth Amendment right to be free from an unreasonable search and seizure; the Court noted that the plaintiff had an expectation of privacy in his medical records, and that the officer "neither sought consent, nor used proper legal means -- a warrant or subpoena -- to request his medical records."  707 F. Supp. [2d] at 1262.  This right, the Court also concluded, was clearly established, and thus denied the officer's qualified immunity defense.  See 707 F. Supp. [2d] at 1268.  The Tenth Circuit reversed the Court, holding that the law was not clearly established on either the Fourteenth or the Fourth Amendment rights, but the majority did not comment on the first prong of the qualified immunity analysis -- whether the defendant violated the plaintiff's constitutional rights.  See

Mr. Loonam's failure to advise Yazzie about his rights related to his medical records fell below an objective standard of reasonableness.  It does not appear that the Court should delve into these issues any further; the Tenth Circuit's opinions do not state that the Court should find that the defendant has a meritorious defense or good suppression motions.  That the defendant gave up good arguments does not mean that the plea was involuntary; defendants often give up arguments -- good ones -- to secure plea agreements.  The Court should not have to decide every motion to suppress before a defendant pleas, and Yazzie has not demonstrated that, in failing to raise this issue, Mr. Loonam's advice was deficient.

The factor analyzing whether Yazzie had close assistance of counsel weighs against allowing Yazzie to withdraw his plea; although Mr. Loonam may not have provided Yazzie with every potential argument, and the Court has reservations regarding Mr. Loonam's communication, Yazzie has not shown that Mr. Loonam's advice fell below an objective standard of reasonableness.  The Court has considered whether Yazzie's potential suppression motions have merit, but cannot say definitively that either would succeed.

Feb. 6, 2014 MOO at 107-13.

The Court's previous analysis addresses most of the arguments that Yazzie raised in the May 12, 2014 Letter, including that Yazzie did not plead guilty to any conduct against Jane Doe 2, and that whether he could have suppressed the medical records did not affect his knowing and voluntary guilty plea or his close assistance of counsel.  The Court does not see how the new

---

Kerns v. Bader, 663 F.3d at 1187.  Judge Holloway dissented, agreeing instead with the Court that the officer violated the plaintiff's "clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime *might* have occurred."   663 F.3d at 1197-98 (Holloway, J., dissenting)(emphasis in original).  Judge Holloway also agreed with the Court that the plaintiff "enjoyed a due process right to the non-disclosure of his personal medical information" and that "the infringement of that right implicates the Fourth Amendment."  663 F.3d at 1200 (Holloway, J., dissenting). While the Court found a Fourth Amendment violation in Kerns v. Board of Commissioners, and Judge Holloway agreed in Kerns v. Bader, an important difference is that the officer in that case requested and received the medical information without a warrant or subpoena.  In this case, Ms. Middlebrooks indicated that the FBI obtained Yazzie's medical records pursuant to a subpoena, leading the Court to believe that it could, depending on the facts not yet known, reach a different conclusion on the Fourth Amendment issue than what it reached in Kerns v. Board of Commissioners.

evidence presented from Jane Doe 2's diary changes the analysis, and thus, will deny Yazzie's

request to withdraw his guilty plea that he made in the March 12, 2014 Letter.

### III.   ALTHOUGH YAZZIE ASSERTS THAT HE DID NOT KNOW HE WAS WAIVING THE PROTECTIONS IN RULE 410 WHEN HE PLED GUILTY PURSUANT TO THE PLEA AGREEMENT, AND THAT HE DID NOT UNDERSTAND THAT HE WAS PLEADING GUILTY TO AN INFORMATION, HE KNOWINGLY AND VOLUNTARILY PLED GUILTY.

Yazzie argues that he was not aware that he was waiving the protections in rule 410 when

he pled guilty pursuant to the Plea Agreement.   Although Judge Puglisi did not specifically

review this portion of the Plea Agreement, the Plea Agreement states:

> Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing, shall be admissible against the Defendant under Federal Rule of Evidence 80l(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

Plea Agreement at 5.   At the plea hearing, Yazzie said that he had read the Plea Agreement,

reviewed it with Mr. Loonam, understood the information, did not have any questions, and

affirmed that he had signed it.  See Plea Tr. at 3:12-4:6 (Judge Puglisi, Yazzie).

"To enter a plea that is knowing and voluntary, the defendant must have 'a full

understanding of what the plea connotes and of its consequence.'"  United States v. Hurlich, 293

F.3d at 1230 (quoting Boykin v. Alabama, 395 U.S. 238, 244 (1969)).  "The defendant need not

understand every collateral consequence of the plea, but need only understand its direct

consequences," United States v. Hurlich, 293 F.3d at 1230-31 (quoting Wall v. United States,

500 F.2d 38, 39 (10th Cir. 1974)(per curiam)), and whether the plea carries a risk of deportation,

see Padilla v. Kentucky, 559 U.S. at 374.  "Consequences of a guilty plea unrelated to the length

and nature of the federal sentence are not direct consequences." United States v. Hurlich, 293 F.3d at 1231 (citations omitted).  "[T]he 'knowing and voluntary' inquiry focuses on whether [a defendant] in fact did understand the proceedings." Allen v. Mullin, 368 F.3d 1220, 1240 (10th Cir. 2004).  Yazzie's statements at the hearing indicate that he understood the proceedings, understood that he was giving up the right to a trial, and understood that he was accepting a sentence between fifteen and nineteen years; he has not since contested that he misunderstood what took place at the plea hearing.  Although Judge Puglisi did not specifically ask Yazzie if he understood that he was waiving the protections in rule 410 through the Plea Agreement, he asked Yazzie if he had reviewed and understood the Plea Agreement, and Yazzie said that he had.  The Court does not see any argument that changes its position, and it again concludes that Yazzie knowingly and voluntarily pled guilty, weighing against allowing him to withdraw his guilty plea.

Yazzie's final argument is that he did not understand the difference between an indictment and an information, and that he did not realize that he was pleading guilty to an information rather than an indictment.  The Court does not see any basis for this argument, because, at the plea hearing, Judge Puglisi asked Yazzie if he had read the Waiver of Indictment, and Yazzie asserted that he had read it, reviewed it with Mr. Loonam, understood it, and had signed it. See Plea Tr. at 3:12-4:6 (Judge Puglisi, Yazzie).  Yazzie stated that he understood that, by signing the Waiver of Indictment, he had given up his right to have a grand jury indict him before he pled. See Plea Tr. at 4:11-16 (Judge Puglisi, Yazzie).  Yazzie's statements at the plea hearing demonstrate that he understood that a grand jury did not indict him on the charges to which he pled guilty.  Further, Yazzie's understanding of an indictment versus an information does not affect the knowing and voluntary nature of the plea; he knowingly and voluntarily pled

guilty to the offense and demonstrated that he understood the direct consequences of that plea, including a sentence between 180 and 228 months imprisonment.

The Court concludes that Yazzie's arguments from the May 11, 2014 Letter, the May 12, 2014 Letter, and the hearing do not alter its previous conclusion that Yazzie has not presented a fair and just reason to withdraw his guilty plea. Defendants do not have an absolute right to withdraw a guilty plea. See United States v. Siedlik, 231 F.3d at 748. District courts, however, have broad discretion in determining whether to grant motions to withdraw pleas. See United States v. Wright, 392 F. App'x. at 627. The Tenth Circuit has repeatedly held that, when a defendant moves to withdraw a guilty plea before sentencing, a court must assess whether there is a fair and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and, if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d at 1142. While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea. United States v. Carr, 80 F.3d at 421 n.5. The Tenth Circuit has explained that the "primary considerations for determining whether a fair and just reason exists are whether the defendant (1) knowingly and voluntarily pled guilty, (2) had assistance of counsel relating to the decision to plead guilty, and (3) has asserted his innocence." United States v. Lee, 535 F. App'x 677, 680 (10th Cir. 2013)(unpublished). These factors "'speak to . . . the defendant's reason for withdrawal.'" United States v. Lee, 535 F. App'x at 680 (alteration in original)(quoting United States v. Hamilton, 510 F.3d at 1217). "If the defendant demonstrates a fair and just reason for withdrawing his guilty plea, the court may also consider systemic

- 60 -

burdens" -- the other four <u>United States v. Yazzie</u> factors, including "prejudice to the government, timing of the motion, inconvenience to the court, and waste of judicial resources." <u>United States v. Lee</u>, 535 F. App'x at 680 & n.3 (citing <u>United States v. Hamilton</u>, 510 F.3d at 1214).  Yazzie's arguments do not change the Court's conclusion that Yazzie has not presented a fair and just reason to withdraw his guilty plea.

**IT IS ORDERED** that the requests that Defendant Willis J. Yazzie made in (i) the Letter from Defendant Willis J. Yazzie to the Honorable James O. Browning, dated March 11, 2014, filed March 13, 2014 (Doc. 134), (ii) the Letter from Yazzie to Judge Browning, dated March 12, 2014, filed March 14, 2014 (Doc. 133), and (iii) the Hearing, held on March 21, 2014, are denied.  The Court will not permit Yazzie to withdraw his guilty plea.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
   United States Attorney
Jacob Wishard
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Kimberly A. Middlebrooks
Albuquerque, New Mexico

   *Attorney for the Defendant*