# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                              No. CR 10-1761 JB

WILLIS YAZZIE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Third Petition for Revocation of Supervised Release, filed June 25, 2025 (Doc. 336)("Petition for Revocation"). The Court holds an evidentiary hearing on August 13, 2025. See Clerk's Minutes at 1, filed August 13, 2025 (Doc. 359)("Clerk's Minutes"); Draft Hearing Transcript of Proceedings at 1 (taken August 13, 2025)(Court)("2025 Tr.").[1] The primary issues are: (i) whether Defendant Willis W. Yazzie's revocation proceeding satisfies procedural due process; (ii) whether W. Yazzie violates his modified conditions of supervised release, where W. Yazzie does not reside in a Residential Reentry Center ("RRC") for a term of six months, because he does not follow the RRC's rules and regulations to find employment within twenty-one days of his arrival at the RRC; (iii) if there is a violation, whether W. Yazzie violates the terms of his supervised release willfully; (iv) whether the Supreme Court of the United States' holding in Bearden v. Georgia, 461 U.S. 660 (1983)("Bearden"), applies to revocation hearings, where the alleged violation is not failure to pay a fine; and (v) if Bearden does apply, whether W. Yazzie makes a bona fide effort to comply with the RRC's rules and regulations to find employment, where he makes three documented attempts

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

at seeking employment, within three weeks, after being placed on a zero-tolerance contract to find employment within two weeks.  The Court concludes that: (i) W. Yazzie's revocation proceeding satisfies procedural due process; (ii) W. Yazzie violates the terms of his supervised release, because the United States of America shows, by a preponderance of evidence, that W. Yazzie does not reside in a RRC for a term of six months and he does not comply with the RRC's requirement of finding employment within twenty-one days of arriving; (iii) the United States proves, by a preponderance of the evidence, that W. Yazzie's commits these violations willfully; (iv) the Supreme Court's holding in <u>Bearden</u> does not apply to revocation hearings, where the alleged violation is not failure to pay a fine, because the Supreme Court expressly limits the holding to revocations strictly based on an indigent defendant's ability to pay; (v) even if <u>Bearden</u> is applicable, W. Yazzie fails to make a bona fide efforts to comply with Diersen Charities' rules and regulations ("Rules") to find employment, because W. Yazzie does not demonstrate he makes bona fide efforts to comply with his supervised release terms or the Rules, and the United States shows, by a preponderance of evidence, that W. Yazzie's three documented attempts at seeking employment are far less than the number of attempts that similar RRC residents make, and this lack of effort reflects W. Yazzie's pattern of noncompliance with his supervised release terms; (vi) W. Yazzie commits a Grade C violation pursuant to the Guidelines policy statement § 7B1.1(a)(1),(2), and (3); (vii) W. Yazzie's criminal history category is I; and (viii) W. Yazzie's grade C violation and criminal history category of I, under § 7B1.1 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") establishes a revocation imprisonment range of 3 to 9 months.  Pursuant to 18 U.S.C. § 3583(e)(3), the maximum term of imprisonment upon revocation of supervised release is 60 months.

## FACTUAL BACKGROUND

The Court begins the Factual Background with its findings of fact, and then describes W. Yazzie's original crime and the judgment. The Court adopts facts in the: (i) Presentence Report, disclosed on April 27, 2011 ("PSR"), as findings of fact. See Federal R. Crim. P. 32(i)(3)(A) ("[The court] may accept any undisputed portion of the presentence report as a finding of fact.").

Based on the evidentiary hearing, the Court makes the following findings of fact related to the issues present in this case. Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes. In making these findings, the Court does not consider any evidence or testimony from the hearing that violates the balancing test that the United States Court of Appeals for the Tenth Circuit adopts in United States v. Jones, 818 F.3d 1091, 1098 (10th Cir. 2016)("Jones"). See United States v. Hernandez, 428 F. Supp. 3d 775, 788 (D.N.M. 2019)(Browning, J.)("When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness.")(citing Jones, 818 F.3d at 1098). At the hearing, both parties conduct direct and cross-examination of the witnesses Assistant Director of Diersen Charities Albuquerque Jose Rodriguez, United States Probation Office ("USPO") Officer Loya-Hobbs, and W. Yazzie. See Clerks Minutes at 2. The Court makes the following findings of fact from the hearing.

### 1.    W. Yazzie's Special Conditions.

1.      The Court begins supervising W. Yazzie in 2023.  See 2025 Tr. at 29:8-29:9 (Loya-Hobbs).  See also Request for Modifying the Conditions or Terms of Supervision at 1, filed on March 13, 2023 (Doc. 261)("Petition for Modification").

2.      W. Yazzie's Special Conditions or Term of Supervision states that he "must reside in a residential reentry center for a term of six months."  Petition for Revocation at 2.  See 2025 Tr. at 31:17-32:4 (Loya-Hobbs, Probasco).

3.      W. Yazzie's Special Conditions or Term of Supervision state that he "must follow the rules and regulations of the center."  Petition for Revocation at 2.  See 2025 Tr. at 32:5-32:7 (Probasco, Loya-Hobbs).

4.      W. Yazzie is aware of the RRC requirement, and that he must follow Diersen Charitites' rules and regulations.  See 2025 Tr. at 32:5-32:7 (Probasco, Loya-Hobbs).

5.      Diersen Charities terminates W. Yazzie's residency during his first term of supervised release, for failing to follow the Rules, and the Court revokes W. Yazzie's supervised release.  See 2025 Tr. at 29:8-29:15 (Loya-Hobbs).

    **2.      Diersen Charities Terminates W. Yazzie's Residency.**

6.      W. Yazzie arrives at Diersen Charities on February 27, 2024.  See 2025 Tr. at 20:3-20:4 (Rodriguez).

7.      Diersen Charities requires residents to find employment within twenty-one calendar days of arriving.  See 2025 Tr. at 9:19-10:3 (Probasco, Rodriguez).

8.      Diersen Charities' Prohibited Act Code 16 states: "Residents are required to secure full-time (40 hour) employment within 21 calendar days after arrival.  A resident must actively seek a job and must keep the EPS informed of any changes in employment status.  A legal notice must be conduced before the resident can begin work."  Termination Report at 1.  See 2025 Tr. at

10:23-10:24 (Rodriguez)(stating that Diersen Charities requires residents "to be actively looking"

for a job).

9.      W. Yazzie is aware of this requirement.  See 2025 Tr. at 9:9-18 (Probasco,

Rodriguez).

10.     On June 3, 2025, Driesen Charities places W. Yazzie on a zero-tolerance contract

after giving W. Yazzie over three months to find full-time employment.  See 2025 Tr. at 20:3-20:7

(Rodriguez).

11.     Diersen Charities describes the terminating incident as:

> On June 3, 2025, Resident Willis Yazzie was placed on a zero tolerance
> contract because he had failed to program.  Resident Yazzie had until 6/17/2025 to
> find full-time employment to be compliant with his programming.  As of this
> writing (6/24/2025) Resident Yazzie has yet to find full-time employment.  Due to
> Yazzie's violation of the zero tolerance contract, he is terminated from the program
> effective immediately.

Termination Report at 1.

12.     The zero-tolerance contract requires W. Yazzie to find full-time employment by

June 17, 2024.  See Termination Report 1.

13.     Driesen gives W. Yazzie an additional week to look for employment after placing

him on his two-week-zero-tolerance contract.  See 2025 Tr. at 10:10-10:18 (Rodriguez).

14.     Rodriguez has experience helping Diersen Charities residents find work.  See

2025 Tr. at 21:19 (Rodriguez)

15.     Jose Rodriguez, Assistant Director of Diersen Charities Albuquerque, reviews

W. Yazzie's Exhibit A ("Timecard") for compliance with the zero-tolerance contract or indications

W. Yazzie is putting in effort to find work.  See 2025 Tr. at 10:17-10:18 (Rodriguez).

16.     The time entries show that W. Yazzie attends counseling on June 3, 2025 (1:34

p.m. to 3:46 p.m.).  See Timecard at 1.

17.     The time entries show that W. Yazzie attends counseling on June 4, 2025 (12:02 p.m. to 2:27 p.m.).  <u>See</u> Timecard at 2.

18.     The time entries show that W. Yazzie attends counseling on June 5, 2025 (9:01 a.m. to 11:18 a.m.).  <u>See</u> Timecard at 2.

19.     The time entries show that W. Yazzie attends counseling on June 12, 2025 (9:00 a.m. to 12:28 p.m.).  <u>See</u> Timecard at 4.

20.     The time entries show that W. Yazzie attends counseling on June 18, 2025 (12:01 p.m. to 2:32 p.m.).  <u>See</u> Timecard at 7.

21.     The time entries show that W. Yazzie attends counseling on June 19, 2025 (9:00 a.m. to 11:35 a.m.).  <u>See</u> Timecard at 7.

22.     The time spent attending counseling totals approximately fifteen and a half hours. <u>See</u> Timecard at 1-9.

23.     In addition, W. Yazzie signs out once on June 11, 2025, "to take care of business with Bernalillo County," from 10:01 a.m. to 11:52 a.m., a period of approximately one hour and fifty-three minutes.  Timecard at 3.

24.     The time entries show that W. Yazzie signs out for health-related concerns on June 12, 2025 (1:43 p.m. to 2:54 p.m.).  <u>See</u> Timecard at 4;

25.     The time entries show that W. Yazzie signs out for health-related concerns on June 17, 2025 (7:53 a.m. to 10:42 a.m.).  <u>See</u> Timecard at 6.

26.     The time entries show that W. Yazzie signs out for health-related concerns on June 20, 2025 (9:02 a.m. to 10:55 a.m. for prescription pickup, and 10:55 a.m. to 12:07 p.m. for additional health-related matters).  <u>See</u> Timecard at 8.

- 6 -

27.     The time entries show that W. Yazzie signs out for health-related concerns on June 24, 2025 (7:16 a.m. to 10:17 a.m., and again from 12:01 p.m. to 1:25 p.m.).  See Timecard at 9.

28.     The time spent away from Diersen Charities for health-related concerns totals approximately eleven and a half hours.  See Timecard at 1-9.

29.     During the three weeks while on his zero-tolerance contract, W. Yazzie makes three documented attempts at finding employment.  See 2025 Tr. at 10:17-10:18 (Rodriguez).

30.     The time entries show that W. Yazzie signs out to look for employment on June 10, 2025 (7:39 a.m. to 7:49 a.m.).  See Timecard at 3.

31.     The time entries show that W. Yazzie signs out to look for employment on June 13, 2025 (8:32 a.m. to 12:02 p.m., and 1:26 p.m. to 4:03 p.m.).  See Timecard at 5.

32.     The time entries show that W. Yazzie signs out to attend a job interview with Walmart on June 16, 2025 (9:01 a.m. to 10:20 a.m.).  See Timecard at 6.

33.     Diersen Charities does not have evidence W. Yazzie attends his interview.[2]

34.     The time spent away form Diersen Charities for employment reasons amounts to approximately eight hours and thirty-six minutes.  See Timecard at 1-9.

35.     W. Yazzie's June, 2025, timecard shows roughly fifteen and a half hours spent in counseling, eight and a half hours spent looking for employment, nearly two hours on personal business, and eleven and a half hours addressing medical needs.  See Timecard at 1-9.

36.     Three attempts are less than what other residents at Diersen Charities make in the same period of time.  See 2025 Tr. at 12:22-13:3 (Probasco, Rodriguez).

_____

[2] Rodriguez testifies that when he reviews Diersen Charities' W. Yazzie's files he does not find the corresponding "job search form" he expects to find from an interview.  2025 Tr. at 59:7-59:15 (Probasco, Rodriguez).

37.    W. Yazzie's characteristics are similar to other Diersen Charities residents who find work within the time period required.  See 2025 Tr. at 26:2-26:7 (Court, Rodriguez).

38.    Sex offenders in similar circumstances commonly comply with Diersen Charities' work requirement.  See 2025 Tr. at 32:12-32:16 (Probasco, Loya-Hobbs).

39.    Diersen Charities terminates W. Yazzie's residency before he completes his six-month requirement.  See 2025 Tr. at 31:17-31:21 (Loya-Hobbs).  See also 2025 Tr. at 42:16-42:23 (Probasco, W. Yazzie).

**3.    Barriers to W. Yazzie Finding Employment.**

40.    Employers post job applications online.  See 2025 Tr. at 37:9-37:11 (W. Yazzie).

41.    W. Yazzie does not have access to his telephone during the zero-tolerance period.  See 2025 Tr. at 34:2-34:21 (Marjon, Loya-Hobbs).

42.    When Diersen Charities' reviews W. Yazzie's telephone activity during the ninety-day period before it places him on a zero-tolerance contract, the review does not show job searches.  See 2025 Tr. at 17:8-17:12 (Marjon, Rodriguez).[3]

43.    W. Yazzie's employment experience is limited.    See 2025 Tr. at 37:16-38:5(Marjon, W. Yazzie)

44.    He works as a mechanic and at times in manual labor.  See 2025 Tr. at 37:16-38:2 (Marjon, W. Yazzie).

45.    W. Yazzie does not have a contact whom employers can contact.  See 2025 Tr. at 38:3-38:5 (Marjon, W. Yazzie).

---

[3] Notably, W. Yazzie does not contest Rodriguez' testimony about his telephone use prior to the confiscation.

46.    W. Yazzie seeks medical attention during the period he is on the zero-tolerance-contract.  See 2025 Tr. at 36:11-36:18 (W. Yazzie).

47.    W. Yazzie's concern for his finger impacts his job search; however, he can still write.  See 2025 Tr. at 41:13-41:20 (Probasco, W. Yazzie).  See Government's Exhibit 1 ("Writing Sample"); see 2025 Tr. at 41:25-42:1 (Court).

48.    W. Yazzie uses his bicycle to seek attend counseling, seek medical care, and apply for jobs.  See Timecard at 1-9.

49.    W. Yazzie's pinkie dysfunction does not affect significantly his job search efforts.[4]

50.    W. Yazzie does not want to live at Diersen Charities, and he makes this desire known to staff.  See 2025 Tr. at 32:17-32:25 (Probasco, Loya-Hobbs).  See also 2025 Tr. at 12:9-12:11 (Rodriguez).

51.    W. Yazzie does not seek employment actively during the three weeks he is under the zero-tolerance contract with Diersen Charities.[5]

---

[4] The Court discusses the reasons for its conclusion that W. Yazzie's pinkie does not affect significantly his job search efforts, below.  Here, the Court notes that during the hearing W. Yazzie demonstrates he can write, see Writing Sample, and the Timecard gives the Court reason to conclude W. Yazzie's pinkie dysfunction during this period is not severe enough to hinder his job searching activities, see Timecard 1-9.

[5] Applying the Rules' plain language, the Court finds W. Yazzie was not "actively seeking a job" during the three weeks that he is on a zero-tolerance contract.  The Rules state a resident "must actively seek a job."  Termination Report at 1.  The verb "seek" means "to go in search or quest of; to try to find, look for (either a particular object -- person, thing, or place -- whose whereabouts are unknown, or an indefinite object suitable for a particular purpose)."  Seek, Oxford English Dictionary (1989), https://www.oed.com/oedv2/00218352 (last visited Nov. 10, 2025).  This definition suggests that W. Yazzie complies with the Diersen Charities' requirements, because W. Yazzie leaves the RRC on three occasions to search for full-time employment, as the Rules and his zero-tolerance contract require.  The verb "seek" alone, however, does not capture fully the requisite standard at issue.  In the Rules, the adverb "actively" modifies the term "seek," which requires further scrutiny.

According to the Oxford English Dictionary, the adverb "actively" means "[i]n an active manner; hence 1. In action, as opposed to contemplation; practically, in practical life. Opposed to contemplative or speculative: Given to outward action rather than inward contemplation or speculation; practical; esp[ecially] 'life'." Actively, Oxford English Dictionary (1989), https://www.oed.com/oedv2/00002216 (last visited Nov. 10, 2025). The Merriam-Webster Dictionary defines "actively" as the adverb of "active" meaning "characterized or accomplished by action or effort." Active, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/active. (last visited on Nov. 10, 2025). In light of these definitions, the Court understands the Diersen Charities' expectation is that residents' job search efforts must involve more than passive contemplation. The search must be expressed through visible, outward action, which Diersen Charities can observe. The search must not be passive, meaning the resident cannot merely wait for a job to come to them. Rather, the resident must exert effort on his or her own accord, reaching out to potential employers without prompting. Diersen Charities requiring visible outward efforts that it can track makes sense, because the RRC is flexible with residents who cannot find employment within twenty-one days, giving them additional opportunities to comply. Without accountability, Diersen Charities is not able to afford residents the flexibility that W. Yazzie receives here.

In this case, W. Yazzie's actions do not amount to what the Court considers to be "actively seeking." Termination Report at 1. The Court's analysis focuses on the three weeks W. Yazzie is under a zero-tolerance contract, notably, an amount of time equivalent to the RRC's usual expectation for residents to secure employment upon arrival. Rodriguez provides W. Yazzie's timecard for this period, which details all the times he left the RRC and why. The Court admits the timecard as Defense Exhibit A ("Timecard").

W. Yazzie's timecard for June reflects a limited number of sign-outs from Diersen Charities, primarily for counseling, job searches, and health-related matters. See Timecard at 1-9. The time entries show that W. Yazzie attends counseling on six occasions: (i) June 3, 2025 (1:34 p.m. to 3:46 p.m.); (ii) June 4, 2025 (12:02 p.m. to 2:27 p.m.); (iii) June 5, 2025 (9:01 a.m. to 11:18 a.m.); (iv) June 12, 2025 (9:00 a.m. to 12:28 p.m.); (v) June 18, 2025 (12:01 p.m. to 2:32 p.m.); and (vi) June 19, 2025 (9:00 a.m. to 11:35 a.m.), totaling approximately fifteen and a half hours. Timecard at 1-9.

The timecard further reflects four instances in which the W. Yazzie signs out to look for employment. See Timecard at 3, 5, 6. On June 10, 2025, he leaves at 7:39 a.m. and returns ten minutes later at 7:49 a.m. See Timecard at 3. On June 13, 2025, he signs out twice for job searches -- first from 8:32 a.m. to 12:02 p.m., and again from 1:26 p.m. to 4:03 p.m., see Timecard at 5, and on June 16, 2025, from 9:01 a.m. to 10:20 a.m, see Timecard at 6. In total, these four outings amount to approximately eight hours and thirty-six minutes dedicated to job-seeking activities. In addition, W. Yazzie signs out once on June 11, 2025, "to take care of business with Bernalillo County," from 10:01 a.m. to 11:52 a.m., a period of approximately one hour and fifty-three minutes. Timecard at 3.

The timecard also documents several occasions on which W. Yazzie signs out for health-related reasons. See Timecard at 4, 6, 8, 9. These include: (i) June 12, 2025 (1:43 p.m. to 2:54 p.m.), see Timecard at 4; (ii) June 17, 2025 (7:53 a.m. to 10:42 a.m.), see Timecard at 6; (iii) June 20, 2025 (9:02 a.m. to 10:55 a.m. for prescription pickup, and 10:55 a.m. to 12:07 p.m. for additional health-related matters), see Timecard at 8; and (iv) June 24, 2025 (7:16 a.m. to 10:17

a.m., and again from 12:01 p.m. to 1:25 p.m.), see Timecard at 9. Collectively, these health-related outings total approximately eleven and a half hours.

Taken together, W. Yazzie's June, 2025, timecard shows roughly fifteen and a half hours spent in counseling, eight and a half hours spent looking for employment, nearly two hours on personal business, and eleven and a half hours addressing medical needs. See Timecard at 1-9. The Court observes that W. Yazzie makes only three job-seeking attempts over a twenty-one-day period, each of which is cut short. See Timecard at 3, 5, 6. Moreover, the Court notes the absence of job-seeking activity is not isolated to the timecard. See 2025 Tr. at 17:8-17:12 (Marjon, Rodriguez). In regards to the June 16, 2025, attempt, W. Yazzie documents on the timecard that he attends an interview with Walmart. See Timecard at 7. Rodriguez testifies, however, that W. Yazzie's file at Diersen Charities does not have the corresponding "job search form" he would expect to find from an interview. 2025 Tr. at 59:7-59:15 (Probasco, Rodriguez). Diersen Charities' files do not have evidence that W. Yazzie interviews at any of the businesses the timecard documents. See 2025 Tr. at 58:4-58:16 (Court, Rodriguez). W. Yazzie offers, as an explanation for the notable absence of job activity, that he "was dealing with other things," such as health issues, including concerns with his pinkie and determining if he was healthy enough to work. See 2025 Tr. at 36:11-36:18. W. Yazzie sought medical care only, however, on four out of the twenty-one days during this period, and two of those days involve only half-day appointments that provide time for job searching before or after the appointments. See Timecard at 4, 6, 8, 9.

The Court is mindful that health issues can impact the visible efforts a resident makes towards finding employment; however, the record does not support that health issues are the problem in W. Yazzie's the case. During the hearing, W. Yazzie mentions only two health concerns -- joint aches and a pinkie injury -- with the latter being the focal point. See 2025 Tr. At 36:14-18. The Court first addresses why it finds that the pinkie injury does not limit significantly the visible efforts W. Yazzie makes in seeking employment, before briefly turning to the issue of joint aches. First, W. Yazzie testifies that he injuries his pinkie during the zero-tolerance period while riding his bike and that he is seeking care to remedy its dysfunction. See 2025 Tr. at 36:11-36:18. On cross-examination, however, Mr. Probasco shows that W. Yazzie is able to write sufficient enough to fill out an application or take an order at a restaurant. See 2025 Tr. at 36:11-36:18. Moreover, the timecard records from Diersen Charitites shows that, when W. Yazzie leaves the RRC, he lists "bicycle" as his mode of transportation. Timecard at 1-9. This fact signals to the Court that W. Yazzie's pinkie dysfunction, during the period he is on a zero-tolerance contract, is not so severe that he cannot ride his bicycle. Logic suggests that finger dysfunction severe enough to impact filling out an employment application is severe enough to limit one's ability to bike ride throughout Albuquerque. This reason along with the demonstration before the Court gives the Court solid basis to find that W. Yazzie's health concerns does not affect significantly his job search efforts. As for the joint aches, Rodriguez testifies that, during this period, W. Yazzie does not appear to be suffering from a disability, nor does he complain about aching joints. See 2025 Tr. at 54:13-54:20 (Probasco, Rodriguez). Moreover, the timecard does not support W. Yazzie's statement about joint point, because the reasons he lists for leaving the RRC are his pinkie and "I sleep a lot." Timecard at 4. There is no mention of joint pain outside the hearing.

Accordingly, the Court finds that the W. Yazzie's timecard reflects significant free periods of time, nine days, to be precise, during which there is no record of commitments outside the RRC. See Timecard 1-9. Moreover, that number increases to fourteen days where W. Yazzie has no

requirements outside the RRC besides his required counseling. <u>See</u> Timecard 1-9. The Court finds it not sound to accept that, during a time period of twenty-one days, when forty to sixty percent of the documented time shows no job-seeking activity, W. Yazzie's efforts are "active" in searching for a job. His time during this period can more properly be categorized as seeking medical care actively to avoid the RRC's employment requirement.

In addition to the timecard records, the Court finds the testimony of Rodriguez and Loya-Hobbs persuasive. Specifically, the Court notes that many other residents of Diersen Charities comply with the rule requiring them to find full-time employment within twenty-one days. <u>See</u> 2025 Tr. at 32:12-32:16 (Probasco, Loya-Hobbs). Loya-Hobbs' testimony supports this statement; Loya-Hobbs says that many of her supervisees are able to comply with the RRC's rules. <u>See</u> 2025 Tr. at 32:12-32:16 (Probasco, Loya-Hobbs). The Court notes, moreover, that, by the time Diersen Charitites places W. Yazzie on the zero-tolerance contract, the RRC affords him over ninety days to find a job, yet he does not secure employment. Rodriguez testifies that he expects residents to treat the job search process as a full-time job. <u>See</u> 2025 Tr. at 61:11-61:15 (Probasco, Rodriguez). If W. Yazzie is searching actively for employment, his timecards should reflect roughly eighteen attempts. <u>See</u> 2025 Tr. at 12:22-13:3 (Probasco, Rodriguez). The timecard shows only three attempts. <u>See</u> Timecard at 1-9. In the Court's view, three attempts demonstrate a resistance to the RRC's requirements. Loyal-Hobbs' testimony confirms the Court's view. She testifies that W. Yazzie "has been pretty noncompliant, pretty resistant to almost everything," which is the same tone and concern that Diersen Charities staff express to her. 2025 Tr. at 32:17-32:25 (Probasco, Loya-Hobbs).

Regarding the W. Yazzie's telephone, he suggests that his efforts are more "active" if his telephone had not been taken during the period in question. While the Court credits the W. Yazzie's testimony that his telephone was taken, limiting his ability to apply for jobs online, the Court finds Rodriguez' testimony equally credible. <u>See</u> 2025 Tr. at 36:3-36:7 (W. Yazzie). Rodriguez testifies that, when W. Yazzie's telephone is searched during the ninety-day period before Diersen Charities places W. Yazzie on a zero-tolerance contract, the activity does not reflect an "active" job search. <u>See</u> 2025 Tr. at 17:8-17:12 (Marjon, Rodriguez). Diersen Charities does not seek to terminate residents for failing to find employment; rather, it aims to work with residents. <u>See</u> 2025 Tr. at 55:24-56:1 (Probasco, Rodriguez). Accordingly, the Court finds Diersen Charities places W. Yazzie on the zero-tolerance contract, because his records, including the telephone search, does not demonstrate active efforts to seek employment.

The Court recognizes that being without his telephone impacts W. Yazzie's ability to seek actively employment during this period. W. Yazzie's testimony is consistent with Rodriguez's testimony that many jobs' applications are online. <u>See</u> 2025 Tr. at 38:8-38:11 (W. Yazzie); <u>id.</u> at 62:10-62:11 (Rodriguez). This fact, however, does not relieve W. Yazzie entirely of the requirement to seek employment actively. Even without his telephone, W. Yazzie makes only one attempt at using the Diersen Charities' resources for job searching, like Workforce Connections or Goodwill. <u>See</u> 2025 Tr. at 11:10-11:12 (Rodriguez). As for the available employment specialist, Rodriguez testifies that even he is unable to "gain compliance" from W. Yazzie. Tr. at 2025 11:12-12:1 (Probasco, Rodriguez). Although being without a telephone is not inconsequential, the Court sees no efforts by W. Yazzie to compensate, nor does the Court believe his telephone use during the three weeks differ meaningfully from the previous ninety days where it fail to demonstrate active job searching.

4.       **Personal Background**.

W. Yazzie's personal background is remarkable for several reasons, including: (i) his social support; (ii) his education; and (iii) his employment history.  W. Yazzie describes his childhood as difficult, with his parents often absent, because they are alcoholics.  See PSR ¶ 56, at 16.  As a result, W. Yazzie's brother, James Yazzie, raises him.  See PSR ¶ 56, at 16.  As an adult, W. Yazzie does not speak with his siblings on a regular basis, but he believes that he has a good relationship with them, see PSR ¶ 56, at 16, including J. Yazzie whom W. Yazzie had a physical altercation with over a girlfriend, see PSR ¶ 56, at 16.

W. Yazzie last attended Shiprock High School in Shiprock, New Mexico, where he completed ninth grade.  See PSR ¶ 64, at 17.  J. Yazzie describes his "brother [as]slow, but did not know if he had ever been diagnosed with a specific disability."  PSR ¶ 64, at 18.  W. Yazzie pursues his GED, taking classes at the Toadelena Boarding School, see PSR ¶ 65, at 18, with plans to take the Automotive Service Excellence examination to receive his mechanics certificate, see PSR ¶ 65, at 18.

From 2000 to 2007, W. Yazzie works "off and on for Valley Grand Universal Mechanics" in Farmington, New Mexico.  PSR ¶ 68, at 18.  During this time, W. Yazzie also works part time

---

Finally, the Court notes that W. Yazzie does not contend that his actions amounted to seeking employment "actively" within the meaning of Diersen Charities' requirements.  Rather, his argument centers on the assertion that he makes good-faith or bona fide efforts to obtain employment.  At this stage of the Court's analysis, however, the question is not whether W. Yazzie's efforts are genuine or well-intentioned, but whether the Court properly can characterize those efforts as active within the standard that the Rules contemplates.  The Court concludes they cannot.

Having reviewed the W. Yazzie's timecards, as well as testimony from Diersen Charities' staff and the USPO, and taking into account the W. Yazzie's health concerns and his limited access to a telephone, the Court finds that W. Yazzie does not "actively look for a job" during the twenty-one days he was subject to the zero-tolerance contract requiring him to obtain full-time employment.

- 13 -

laying pipe and in the oil fields in Farmington.  See PSR ¶ 68, at 18.  From 2007 to 2008, W. Yazzie works for MTC Transport in Farmington.  See PSR ¶ 67, at 18.  W. Yazzie contends that he "never really saw a paycheck" and that his boss took his toolbox as payment for money W. Yazzie owed him.  PSR ¶ 67, at 18.  From 2008 to 2010, W. Yazzie is self-employed as a mechanic.  See PSR ¶ 66, at 18.  During this time, he also hauls wood to make extra money.  See PSR ¶ 66, at 18. W. Yazzie denies having received any specialized training in any particular field, but he learns mechanics from his father.  See PSR ¶ 68, at 18.

     5.    **Prior Convictions.**

    W. Yazzie's criminal history is limited.  First, in June, 2003, W. Yazzie receives ninety days in custody for reckless driving.  See PSR ¶ 42, at 11.  Later, in December, 2003, W. Yazzie receives 113 days in custody for Aggravated DWI, Roadways Laned for Traffic, and Immediate Notice of Accident as well as fines for Possession of Drug Paraphernalia and Open Container.  See PSR ¶ 43, at 12.  In 2004, W. Yazzie pays fines for "Under the Influence of Liquor or Drug."  PSR ¶ 44, at 12.  W. Yazzie pays multiple other fines for different charges including: (i) in March, 2006, W. Yazzie pays fines for "Under Influence of Liquor or Drugs," PSR ¶ 46, at 13; (ii) in December, 2006, he pays fines for the "Possession of Liquor," PSR ¶ 45, at 13; (iii) in February, 2008, he pays fines for "No Insurance" and "No registration," PSR ¶ 47, at 13; and (iv) in April, 2008, he pays fines for "Speeding," PSR  ¶ 48, at 13.

     6.    **The Crime.**

    On May 3, 2010, the Navajo Nation Social Services notify the Navajo Tribal Police Department in Shiprock, New Mexico, that two minor females report that W. Yazzie has molested them.  See PSR ¶ 9, at 4.  On May 10, 2010, W. Yazzie admits to abusing sexually one of the minors since 2009.  See PSR ¶ 15, at 6.  The United States charges W. Yazzie with Crime in Indian

Country, Sexual Abuse, 18 U.S.C. § 1153, 18 U.S.C. §§ 2241(a) and 2246(2)(C), and U.S.S.G. §

2A3.1.  See PSR ¶ 29, at 9.  On February 9, 2011, W. Yazzie signs a plea agreement, pleading

guilty to committing a Crime in Indian County, Aggravated Sexual Abuse, 18 U.SC. §§ 1153,

2241(a), and 2246(2)(C).  See PSR ¶ 2, at 3.

## PROCEDURAL BACKGROUND

In this section, the Court describes W. Yazzie's Judgment and sentence.  Next, the Court

describes the Request for Modifying the Conditions or Terms of Supervision, filed on March 13,

2023 (Doc. 261)("Petition for Modification").  Then, the Court describes the events leading to his

first and second revocation of supervised release.  The Court then describes the events leading to

the current petition for his third revocation of supervised release.

### 1.    The Judgment.

On February 9, 2011, as part of the Plea Agreement, filed February 9, 2011 (Doc. 38)("Plea

Agreement"), W. Yazzie pleads guilty to Aggravated Sexual Abuse, Crime in Indian Country, 18

U.S.C. §§ 1153, 2241(a), and 2246(2)(C).  Information at 1, filed February 9, 2011 (Doc. 35).  See

Plea Agreement ¶ 3, at 2.  The Court grants the United States' motion, pursuant to U.S.S.G. §

3E1.1(b), for a downward adjustment in sentencing and decreases the offense level downward by

1 additional level for timely acceptance of responsibility.  See Order ¶ 1, at 1, filed on March 21,

2014 (Doc. 136).  On December 14, 2021, the Court sentences W. Yazzie to a term of 188 months

incarceration and eight years of supervised release.  See Memorandum Opinion and Order at 2,

filed May 7, 2014 (Doc. 152).

### 2.    The Petition for Modification of Supervision.

On March 13, 2023, the United States Probation Office ("USPO") files the Petition for

Modification.  Petition for Modification at 1.  The USPO requests that the Court add several

conditions to W. Yazzie's Conditions or Term of Supervision, including that W. Yazzie "must reside in a residential reentry center for a term of six months. [W. Yazzie] must follow the rules and regulations of the center." Petition for Modification at 1. The USPO justifies the proposed modification based on an inspection by W. Yazzie's probation officer. See Petition for Modification at 2. The probation officer inspects W. Yazzie's residence in Two Grey Hills Trading Post in Newcomb, New Mexico, noting that the residence places W. Yazzie in close sleeping quarters with a child, the dogs on the property will not allow for safe inspection, and the location makes W. Yazzie's lack of transportation problematic for attending required meeting and treatments. See Petition for Modification at 2. Based on the USPO's justifications, the Court approves the Petition for Modification on March 16, 2023. See Order, text-only entry, filed on March 16, 2023 (Doc. 262).

3.    **The First Revocation of Supervised Release.**

On September 15, 2023, W. Yazzie commences his term of supervised release in the District of New Mexico. On January 17, 2024, the USPO files an initial Petition for Revocation of Supervised Release after the RRC terminates W. Yazzie from the facility. See Petition for Revocation at 1, filed January 17, 2024 (Doc. 266)("First Petition for Revocation"). See also Violation Report at 1, filed January 17, 2024 (Doc. 269)("First Violation Report"). As justification for the First Petition for Revocation, the USPO notes: "The defendant's adjustment to supervision has been poor. He consistently stated he should not be at the RRC." First Violation Report at 1. W. Yazzie "has missed multiple treatment sessions . . . . Failed to obtain employment . . . . [And possessed] illegal substances on the premises." First Violation Report at 1. On March 13, 2024, the Court revokes supervised release and sentences W. Yazzie to 3 months in custody and 5 years

of supervised release.  See Violation of Supervision Proceedings Minute Sheet at 1, filed March 13, 2024 (Doc. 285).

    **4.**       **The Second Revocation of Supervised Release.**

On April 17, 2024, W. Yazzie commences his second term of supervised.  See Amended Violation Report at 1, filed January 7, 2025 (Doc. 318)("Second Violation Report").  As justification for the Second Petition, the USPO notes W. Yazzie reports "several instances of noncompliance."  See Second Violation Report at 1.  Examples of the noncompliance include: (i) not reporting contact with law enforcement; (ii) viewing sexually explicit content on his telephone; (iii) staying overnight at unapproved locations; (iv) staying in a residence with minor children; and (v) intentionally trying to manipulate his polygraph examinations.  See Second Violation Report at 1-2.  On January 21, 2025, the Court revokes supervised release and sentences W. Yazzie to 4 months in custody and 5 years of supervised release.  See Violation of Supervision Proceedings Minute Sheet at 1, filed January 21, 2025 (Doc. 328).

    **5.**       **The Third (Current) Revocation of Supervised Release.**

On February 27, 2025, W. Yazzie commences his third term of supervised.  See Violation Report at 1, filed June 25, 2025 (Doc. 337)("Third Violation Report").  The USPO files the Third Petition for Revocation, filed June 25, 2025 (Doc. 336)("Third Petition for Revocation"), and as justification for the Third Petition, the USPO notes two instances of noncompliance.  See Third Violation Report at 1.  The first instance occurs on April 21, 2025, when a USPO officer "observed a number of images depicting sexual intercourse and sexually explicit conduct" on W. Yazzie's telephone.  Third Violation Report at 1.  W. Yazzie's telephone is taken way for 30 days, because of the violation.  See Third Violation Report at 1.  The second instance of noncompliance occurs on June 24, 2025, when the RRC terminate W. Yazzie's residency for "failing to comply with the

program rules" of obtaining employment.  Third Violation Report at 1.  Specifically, Diersen

Charities' rules state: "Residents are required to secure full-time (40 hour) employment within 21

calendar days after arrival.  A resident must actively seek a job . . . ."  Diersen Charities

Albuquerque USPO Termination Report at 1, filed June 25, 20205 (Doc. 337-1)("Termination

Report").  Furthermore, the Termination Report describes W. Yazzie's zero-tolerance contract as

requiring him "to find full-time employment [by June 17, 2025] to be compliant with his

programming."  Termination Report at 1.

###### 6.    The Evidentiary Hearing.

The Court holds an evidentiary hearing on August 13, 2025.  See Clerk's Minutes at 1;

Draft Transcript of Proceedings (taken August 13, 2025)("August 2025 Tr.").[6]  At the hearing, the

United States calls two witnesses: Jose Rodriguez, Assistant Director of Diersen Charities

Albuquerque, and USPO Officer Rachel Loya-Hobbs.  See 2025 Tr. at 4-5: 20-8 (Probasco).

Rodriguez testifies to Diersen Charities' residency requirements, his experience at Diersen

Charities working with residents to find employment, and his experience with W. Yazzie's efforts

to find employment.  See generally 2025 Tr. at 7:7-28:10; id. at 53:1-62:25.  Loya-Hobbs testifies

about being W. Yazzie's probation officer, his prior history on supervised release, and W. Yazzie's

attitude towards compliance with his Conditions and Term of Supervision.  See generally 2025 Tr.

at 28:5-35:7.  In response to the United States' witnesses, W. Yazzie testifies.  See 2025 Tr. at

35:9-13 (Court, Marjon).  W. Yazzie testifies about the efforts he made in finding employment

and his physical health during the time-period in question.  See generally 2025 Tr. at 36:19-51:3.

###### a.    Jose Rodriguez's Testimony.

---

[6] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Rodriguez' testimony begins by describing his position at Diersen Charities, and his familiarity with W. Yazzie's stay at Diersen Charities. See 2025 Tr. at 7:8-8:16 (Probasco, Rodriguez). W. Yazzie arrives at Diersen Charities on February 27, 2024. See 2025 Tr. at 20:3-20:4 (Rodriguez). Rodriguez explains that W. Yazzie's residency at Diersen Charities lasts "approximately four months." 2025 Tr. at 8:15 (Rodriguez). Rodriguez testifies that Diersen Charities terminates W. Yazzie's residency for a "few issues, but the main issue for him . . . was him not finding employment or in my opinion attempting to find employment." 2025 Tr. at 8:23-8:25 (Rodriguez). Diersen Charities requires that residents find full-time employment within twenty-one days after arrival. See 2025 Tr. at 9:22-9:25 (Probasco, Rodriguez). Diersen Charities informs W. Yazzie of this requirement at arrival and "throughout his stay," including meetings with his "case manager every two weeks." 2025 Tr. at 9:9-9:18 (Probasco, Rodriguez). After trying to assist W. Yazzie in finding employment with employment specialists and case management, in June, 2025, Diersen Charities places W. Yazzie "on a zero tolerance" notice that he needs to find employment within two weeks. 2025 Tr. at 10: 14-15 (Rodriguez). Diersen Charities gives W. Yazzie an additional week to find employment, but terminates W. Yazzie's residence, because he does not find employment. See 2025 Tr. at 10:16-10:18 (Rodriguez). During those three weeks, W. Yazzie looks for employment only three times. See 2025 Tr. at 10:17-10:18 (Rodriguez). The three attempts are consistent with staff's observations that W. Yazzie "just literally would show no effort in finding employment." 2025 Tr. at 12:9-12:11 (Rodriguez). Rodriguez testifies that he expects to see around eighteen attempts during that three-week period. See 2025 Tr. at 12:22-13:3 (Probasco, Rodriguez). This estimate comes from Rodriguez's previous experience as "essentially the employment specialist" at Diersen Charities, 2025 Tr. at 21:19 (Rodriguez), and the hundreds of residents that transition through the RRC every

year, see 2025 Tr. at 21:4-21:7 (Rodriguez).  Finally, Rodriguez testifies that during this period
W. Yazzie does not appear to be suffering from a disability, nor does he complain about aching
joints.  See August Tr. at 2025 54:13-54:20 (Probasco, Rodriguez).

On cross-examination of Rodriguez, Mr. Marjon elicits testimony about potential job
searches W. Yazzie conducts that the record does not reflect.  See 2025 Tr. at 15:25-16:2 ("There
were some attempts to find employment that he had noted that you didn't count because you said
it was not sufficient time?")(Marjon).  Rodriguez explains that he did not count the day in question
because W. Yazzie signs out for seventeen minutes.  See 2025 Tr. at 16:3-16:7 (Rodriguez).
Rodriguez, furthermore, admits to the Court that he is not aware of "whether there are forms in
[W. Yazzie's] file indicating contact with employers or not".  2025 Tr. at 58:17-58:20 (Court,
Rodriguez).  On re-cross-examination, Rodriguez clarifies that Diersen Charities has a process for
documenting interviews with employers, and that W. Yazzie did not follow the process with
respect to the Walmart interview.  See 2025 Tr. at 59:16-60:18 (Probasco, Rodriguez).

The Court questions Rodriguez about the difficulty of finding employment for sex
offenders.  See 2025 Tr. at 24:19-24:20 (Court).  Rodriguez discusses some of the opportunities
available for sex offenders, see 2025 Tr. at 24:22-25:19 (Court, Rodriguez), explaining that there
is not "anything about Mr. W. Yazzie that differentiates him from other sex offenders that would
make it more difficult for him to get a job" compared with other Diersen Charities residents, see
2025 Tr. at 26:2-26:7 (Court, Rodriguez).

**b.      Rachel Loya-Hobbs' Testimony.**

Loya-Hobbs' is a W. Yazzie's probation officer.  See 2025 Tr. at 28:18-28:19 (Probasco,
Loya-Hobbs).  W. Yazzie is under her supervision since April 2024.  See 2025 Tr. at 28:19-28:20
(Loya-Hobbs).   Loya-Hobbs discusses  W. Yazzie's supervised-release history, and his prior

revocation proceedings. See 2025 Tr. at 30:1-31:10 (Probasco, Loya-Hobbs). The current revocation proceeding is initiated, because Loya-Hobbs "received a termination report from Diersen." 2025 Tr. at 31:17-31:21 (Loya-Hobbs). Loya-Hobbs testifies that W. Yazzie is aware of his condition of supervised release to remain at a RRC, see 2025 Tr. at 31:22-32:4 (Probasco, Loya-Hobbs), and that he is "required to follow the rules and regulations" of the RRC, see 2025 Tr. at 32:5-32:7 (Probasco, Loya-Hobbs). In her experience, residents commonly are able to comply with Diersen Charities' rules and are successful at RRCs. See 2025 Tr. at 32:12-32:16 (Probasco, Loya-Hobbs). Loya-Hobbs' experience with W. Yazzie is that his attitude "has been pretty noncompliant, pretty resistant to almost everything that we discuss . . . . I receive that same tone, concern from the counselors. And when I speak to Diersen Charities charity staff members he doesn't want to be there, he just wants to go home." 2025 Tr. at 32:17-32:25 (Probasco, Loya-Hobbs).

On cross-examination, Mr. Marjon, inquires about W. Yazzie's access to his cellphone. See 2025 Tr. at 34:11-34:16 (Marjon, Loya-Hobbs). Loya-Hobbs testifies that, after W. Yazzie's second revocation hearing, where he is found to be viewing pornography, the Court requires W. Yazzie's telephone be monitored, and W. Yazzie chooses to not have a telephone rather than be monitored. See 2025 Tr. at 34:2-34:21 (Marjon, Loya-Hobbs).

### c.    W. Yazzie's Testimony.

W. Yazzie testifies about his efforts to find employment and difficulties he faces with meeting Diersen Charities' requirements. See 2025 Tr. at 35:22-38:6 (Marjon, W. Yazzie). W. Yazzie applies to positions through LinkedIn and in person. See 2025 Tr. at 37:6-37:8 (Marjon, W. Yazzie). He finds applying for jobs in person "difficult because they say everything is online." 2025 Tr. at 37:9-37:11 (W. Yazzie). In addition to the difficulty with positions being

online, W. Yazzie's work experience is limited to mechanic positions, see 2025 Tr. at 37:16-38:2 (Marjon, W. Yazzie), and W. Yazzie does not have a contact prospective employers can call for a reference, see 2025 Tr. at 38:3-38:5 (Marjon, W. Yazzie).  Finally, W. Yazzie testifies to dealing with medical problems during the last three weeks at Diersen Charities.  See 2025 Tr. at 36:11-36:18 ("I was going to medical.  The reason why is because my joints ache they hurt a lot and I was trying to figure out if I was still able to work or not, and I also had a bicycle accident, and now my pinkie on my right hand don't function right.").

On cross-examination, W. Yazzie testifies that he can write and he does not find employment while at Diersen Charities, and explains the circumstances surrounding his efforts looking for work.  Mr. Probasco, hearing W. Yazzie's testimony about his pinkie, asks W. Yazzie to write on a napkin the words: "double cheeseburger" and "coke."   2025 Tr. at 41:13-41:20 (Probasco, W. Yazzie).  W. Yazzie writes the words on the napkin, and the Court admits the napkin into evidence as Government's Exhibit 1, the Writing Sample.  See 2025 Tr. at 41:25-42:1 (Court). W. Yazzie then testifies that he is given longer than twenty-one days to find employment, see 2025 Tr. at 42:6-42:8 (Probasco, W. Yazzie), and that he never obtains employment during that time, see 2025 Tr. at 42:16-42:23 (Probasco, W. Yazzie).  As an explanation, W. Yazzie states he does not have his telephone for "over a month," 2025 Tr. at 42:13-42:15 (W. Yazzie), and Diersen Charities does not "tell me to look for a job," 2025 Tr. at 42:20-42:21 (W. Yazzie).  When asked about Diersen Charities' resource specialist, W. Yazzie testifies that "it was hard to communicate with him, sometimes he wasn't there, and every time I put a call out for him for me to go look for job, he tells me that I need to find five individual places before" an order is put in.  2025 Tr. at 44:6-44:12 (W. Yazzie).  With respect to the five passes, on which W. Yazzie is granted a five-hour pass to search for employment, he returns on two of those occasions more than an hour and

a half early.  See 2025 Tr. at 48:9-48:17 (Probasco, W. Yazzie).  W. Yazzie testifies that he returns early, because the last job opportunity is too far, and he cannot make it back to Diersen Charities within the time he is permitted to be away from the RRC.   See 2025 Tr. at 48:18-48:19 (W. Yazzie).  He testifies that, on the June 20, 2025, W. Yazzie leaves for only seventeen minutes, he does not search for jobs, because "it was raining hard that day."   2025 Tr. at 49:2-49:6 (W. Yazzie).

## LAW REGARDING SUPERVISED RELEASE

A district court's decision-making with regard to violations of supervised release conditions comes in two phases.  First, at sentencing, the court must decide whether to impose a term of supervised release and, if so, how long a term to impose and what conditions to associate with it.  Second, while the defendant is on supervised release, if the United States accuses the defendant of violating a condition of supervised release, the court must determine whether the defendant has violated the conditions, whether to revoke supervised release, and, if the court revokes supervised release, what disposition to impose for the violation.

### 1.    Imposition of Supervised Release.

A court, "in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may [and sometimes must] include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment."  18 U.S.C. § 3583(a).  As part of a defendant's supervised release, he is legally bound to abide by certain conditions of his release. See 18 U.S.C. § 3583(d).  Section 3583 of Title 18 of the United States Code sets forth some of the standard and discretionary conditions that courts shall and may impose as part of supervised release:

> **Conditions of supervised release.** -- The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local

crime during the term of supervision and that the defendant not unlawfully possess a controlled substance.  The court shall order as an explicit condition of supervised release for a defendant convicted for the first time of a domestic violence crime as defined in section 3561(b) that the defendant attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is readily available within a 50-mile radius of the legal residence of the defendant.  The court shall order, as an explicit condition of supervised release for a person required to register under the Sex Offender Registration and Notification Act, that the person comply with the requirements of that Act.  The court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000.  The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance.  The condition stated in the preceding sentence may be ameliorated or suspended by the court as provided in section 3563(a)(4).   The results of a drug test administered in accordance with the preceding subsection shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test.  A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy.  The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.  The court may order, as a further condition of supervised release, to the extent that such condition --

(1)     is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2)     involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3)     is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);

any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate, provided, however that a

condition set forth in subsection 3563(b)(10) shall be imposed only for a violation of a condition of supervised release in accordance with section 3583(e)(2) and only when facilities are available.  If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.  The court may order, as an explicit condition of supervised release for a person who is a felon and required to register under the Sex Offender Registration and Notification Act, that the person submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

18 U.S.C. § 3583(d).

Thus, § 3583 specifies standard and discretionary conditions of supervised release, while elsewhere Congress provides for other conduct which, if a defendant commits on supervised release, can result in a revocation of supervised release.  Among others, § 3583 provides that the defendant must not commit another federal, State, or local crime during the term of supervision, that the defendant not possess any controlled substances, and that the defendant cooperate in the collection of a DNA sample.  See 18 U.S.C. § 3583(d).  Further, § 3583 permits a court to craft special conditions of supervised release that it deems appropriate.  See 18 U.S.C. § 3583(d).  Among those conditions not listed in § 3583 is that supervised release may be revoked if the defendant fails to pay a fine or restitution that the court has imposed.  See 18 U.S.C. § 3613A ("Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release . . . .").  In "determining whether to include a term of supervised release, and if a term of supervised release is to be included, in determining the length of the term and the conditions of supervised release,"

- 25 -

the court "shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)." 18 U.S.C. § 3583(c).[7]

    2.    **<u>Revocation of Supervised Release</u>.**

Subsection (e)(3) of § 3583 sets forth the process for revoking supervised release:

    **(e)**    **Modification of conditions or revocation.** -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --

. . . .

    (3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than three years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case . . . .

---

    [7]The Court will discuss these eight specific § 3553(a) factors in the next two sections, which focus on a district court's re-imprisonment of a defendant following revocation of a term of supervised release under § 3583(e). A district court must consider these same eight factors in both contexts. It should be noted that 18 U.S.C. § 3583(c) omits § 3553(a)(2)(A), which requires a district court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Judge Posner of the Seventh Circuit observes regarding this omission: "From the omission of subsection 3553(a)(2)(A), the court in <u>United States v. Murray</u>, 692 F.3d 273, 280 (3d Cir. 2012), inferred 'that the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment.'" <u>United States v. Thompson</u>, 2015 WL 151609, at * 2 (7th Cir. Jan. 13, 2015)(Posner, J.). The Court agrees with that general observation and goal.

18 U.S.C. § 3583(e).  Further, under § 3583(h), "[w]hen a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment."  18 U.S.C. § 3583(h).  See Johnson v. United States, 529 U.S. 694, 712-13 (2000)(holding that, even before the addition of Subsection (h) to the statute in 1994, a plain reading of Subsection (e)(3) authorizes district courts to order terms of supervised release following reimprisonment).  The court must find all violations of supervised release by a preponderance of the evidence, regardless whether the violative conduct itself constitutes criminal conduct.  See 18 U.S.C. § 3583(e).  This standard is different from the ones that apply to a defendant's violation of pretrial release conditions -- mere probable cause for criminal violations and the heightened clear-and-convincing standard for noncriminal violations.  See 18 U.S.C. § 3148(b)(1).

A defendant violates a supervised release condition when the defendant violates the supervised release condition's express terms.  For example, in United States v. Roy, 438 F.3d 140 (1st Cir. 2006), the defendant has two express supervised release conditions: (i) that he respond to the probation officer truthfully; and (ii) that he participate in a mental health treatment program.  See 438 F.3d at 143.  The United States Court of Appeals for the First Circuit concludes that the defendant violates both express conditions, because he lies to his probation officer about having a relationship with a woman, and because a treatment program terminates the defendant for having unapproved contact with children and being dishonest.  See 438 F.3d at 143.  At least one Court of Appeals concludes that, when a defendant does not participate in activities which the supervised release condition requires, the defendant violates supervised release conditions and faces revocation.  In United States v. Musso, 643 F.3d 566, 570 (7th Cir. 2011), the defendant's sex offender treatment contract requires the defendant, who has a conviction for possessing child

pornography, to "participate in group discussions, treatment activities, and written assignments," and states that "simply showing up for sessions is not enough to be considered cooperative with treatment." 643 F.3d at 570. The United States Court of Appeals for the Seventh Circuit affirms the district judge's conclusion that, because the defendant talks about superficial personal topics instead of the core issues that bring him to treatment, frequently denies, minimizes, or uses a victim stance to avoid accountability for his actions, and does not submit his homework assignments, the defendant does not "participate meaningfully" in sex offender treatment. 643 F.3d at 570. Furthermore, the defendant violates additional contract terms, including possessing prohibited sexual materials and engaging in prohibited contact with a minor. See 643 F.3d at 570-71. According to the Seventh Circuit, the district court, therefore, correctly revokes the defendant's supervised release and imposes new special conditions of supervised release. See 643 F.3d at 570. As long as the defendant follows the supervised release conditions' express terms, the court does not revoke supervised release, even if the defendant harbors negative feelings towards the conditions or does not make progress. See United States v. Hronich, No. CR 11-1789 JB, 2025 WL 1330467, at *1 (D.N.M. May 7, 2025)(Browning, J.)(denying petition to revoke supervised release, because the defendant attends and participates in sex offender treatment to the extent that supervised release special condition's language requires).

   3.    **Sentencing Following the Revocation of Supervised Release.**

   Consistent with § 3583(e)(2), the Tenth Circuit explains: "When a convicted defendant violates a condition of supervised release, the sentencing judge may revoke the term of supervised release and impose prison time." United States v. Patton, 506 F. App'x 729, 731 (10th Cir.

2012)(Brorby, J.)[8](quoting <u>United States v. Vigil</u>, 696 F.3d 997, 1002 (10th Cir. 2012)(O'Brien, J.)(citing 18 U.S.C. § 3584(e)).[9]  Considering the sentence, "[t]he judge must consider [certain] factors in 18 U.S.C. § 3553(a) and the policy statements in Chapter 7 of the Sentencing Guidelines." <u>United States v. Patton</u>, 506 F. App'x at 731 (brackets in original). <u>See</u> 18 U.S.C. § 3583(e).  The relevant portion of 18 U.S.C. § 3583(e) concerning revocation of supervised release provides that "[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release." 18 U.S.C. § 3583(e).  The relevant § 3553(a) factors are as follows:

---

[8] <u>United States v. Patton</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The United States Court of Appeals for the Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Patton</u>, 506 F. App'x 729 (10th Cir. 2012), <u>United States v. Miller</u>, 608 Fed. App'x 707 (10th Cir. 2015), <u>United States v. Chatburn</u>, 505 Fed. App'x 713 (10th Cir. 2012), <u>United States v. Carney</u>, 271 F. App'x 700 (10th Cir. 2008), and <u>United States v. Echols</u>, 33 F. App'x 376 (10th Cir. 2002) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[9]As described in the preceding section, under § 3583(h), "[w]hen a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment." 18 U.S.C. § 3583(h). <u>See</u> <u>Johnson v. United States</u>, 529 U.S. 694, 712-13 (2000)(holding that, even before the addition of Subsection (h) to the statute in 1994, a plain reading of Subsection (e)(3) authorizes district courts to order terms of supervised release following reimprisonment).  When a defendant violates conditions of his supervised release, therefore, the Court can sentence the defendant to imprisonment and further supervised release.

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed --

. . .

      (B)     to afford adequate deterrence to criminal conduct;

      (C)     to protect the public from further crimes of the defendant; and

      (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

. . .

(4)     the kinds of sentence and the sentencing range established for --

. . . .

      (B)     in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5)     any pertinent policy statement --

      (A)     issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

      (B)     that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced; or

. . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  See United States v. Patton, 506 F. App'x at 731 n.2 (explaining that 18

U.S.C. § 3583(e) lists the § 3553(a) factors that the Court must consider).[10]  The Tenth Circuit

_____

[10]"Section 3583(e) does not list Section 3553(a)(2)(A) among the factors district courts should consider in modifying or revoking supervised release."  United States v. Penn, 601 F.3d 1007, 1012 (10th Cir. 2010)(Baldock, J.).  The omitted section, § 3553(a)(2)(A), provides that, in determining the sentence to be imposed, the district court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

The Supreme Court has not addressed whether a district court's consideration of a § 3553(a)(2)(A) factor during revocation sentencing is error.  See United States v. Miller, 608 Fed. App'x 707, 709 (10th Cir. 2015)(Baldock, J.).  The Courts of Appeals are split on the question.  See United States v. Chatburn, 505 Fed. App'x 713, 717 (10th Cir. 2012)(Matheson, Jr., J.).  The United States Courts of Appeals for the First, Second, Third, Sixth, and Seventh Circuits conclude that it is not error to consider § 3553(a)(2)(A) factors during revocation sentencing.  See e.g., United States v. Clay, 752 F.3d 1106, 1108-09 (7th Cir. 2014)(Flaum, J.); United States v. Vargas-Davila, 649 F.3d 129, 131-32 (1st Cir. 2011)(Selya, J.); United States v. Young, 634 F.3d 233, 239 (3d Cir. 2011)(Vanaskie, J.); United States v. Lewis, 498 F.3d 393, 399-400 (6th Cir. 2007)(McKeague, J.); United States v. Williams, 443 F.3d 35, 47-48 (2d Cir. 2006)(Kearse, J.).  The United States Court of Appeals for the Fifth, Ninth, and Tenth Circuits, by contrast, conclude that it is error.  See United States v. Miller, 634 F.3d 841, 844 (5th Cir. 2011)(Garza, J.); United States v. Miqbel, 444 F.3d 1173, 1182 (9th Cir. 2006)(Reinhardt, J.); United States v. Booker, 63 F.4th 1254, 1259-60 (10th Cir. 2023).  The United States Courts of Appeals for the Fourth Circuit initially joins the Fifth and Ninth Circuits, holding that, "[a]ccording to § 3553(a)(2)(A), in devising a revocation sentence the district court is not authorized to consider whether the revocation sentence 'reflect[s] the seriousness of the offense, . . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense.'"  United States v. Crudup, 461 F.3d 433, 439 (4th Cir. 2006)(Shedd, J.).  Seven years later, the Fourth Circuit limits United States v. Crudup's holding in United States v. Webb, 738 F.3d 638 (4th Cir. 2013)(Floyd, J.):

> A district court's meaningful consideration of the enumerated § 3553(a) factors when imposing a revocation sentence typically will include analysis that furthers the purposes of post-revocation incarceration.  Given that the § 3553(a)(2)(A) factors are closely related to the factors district courts are instructed to consider under § 3583(e), we fail to see how a district court's reference to the § 3553(a)(2)(A) sentencing considerations, without more, would automatically render a sentence unreasonable.  Accordingly, although a district court may not impose a revocation sentence based predominantly on the seriousness of the releasee's violation or the need for the sentence to promote respect for the law and provide just punishment, we conclude that mere reference to such considerations does not render a revocation sentence procedurally unreasonable when those factors are relevant to, and considered in conjunction with, the enumerated § 3553(a) factors.

_____

United States v. Webb, 738 F.3d at 641-42.  The Ninth Circuit, likewise, later rules that its holding
in United States v. Miqbel, 444 F.3d at 1182, does not make reliance upon a § 3553(a)(2)(A) factor
improper per se, explaining:

> [W]e did not set forth a blanket proposition that a court in no circumstances may
> consider the seriousness of the criminal offense underlying the revocation.  The
> seriousness of the offense underlying the revocation, though not a focal point of the
> inquiry, may be considered to a lesser degree as part of the criminal history of the
> violator.
>
> . . . .
>
> To ignore the new violation underlying the revocation entirely
> would be to ignore a key predictor of a violator's potential for reintroduction
> into society without relapse.  See, e.g., United States v. Tadeo, 222 F.3d
> 623, 626 (9th Cir. 2000)(finding no abuse of discretion where the court
> found that the use of narcotics in violation of supervised release created a
> risk that the defendant would commit serious crimes because some of his
> past criminal activity occurred while under the influence).  The history of
> the violator, when combined with the violator's most recent criminal
> offenses, and particularly when similar to the past transgressions, is
> indicative of the violator's propensity for recidivism and inability to
> integrate peacefully into a community.  See id.; U.S.S.G.M. Ch.7, Pt. A(4)
> (2006) (determining "that the purpose of . . . supervised release should focus
> on the integration of the violator into the community, while providing the
> supervision designed to limit further criminal conduct"); see also 18 U.S.C.
> §§ 3553(a)(2)(B)(2003) (affording deterrence as one consideration) and
> 3553(a)(2)(C)(2003) (protecting the public from further crimes as another);
> 18 U.S.C. § 3583(e) (permitting the preceding factors for consideration in
> revocation sentences).  A history of, for example, drug-related offenses,
> combined with a drug-related offense underlying revocation, as is the case
> here, creates a greater likelihood that the violator will relapse into the same
> or similar criminal activity.  A violator who, after committing an offense
> and being placed on supervised release for that offense, again commits a
> similar offense is not only more likely to continue on that path, but also has
> demonstrated to the court that the violator has little respect for its command.
> Because the district court's trust in the violator's ability to coexist in society
> peacefully has been broken to a greater degree than if the violator had
> committed a minor offense of a dissimilar nature, greater sanctions may be
> required to deter future criminal activity.  Consequently, if the nature and
> the severity of the underlying offense were removed from the equation
> altogether, the court's ability to predict the violator's potential for
> recidivism and to punish the violator for the violator's full breach of trust

holds that, at revocation sentencing, consideration of any other factors beyond § 3553(a), as well as any § 3553(a) factors that §3583(e) does not enumerate explicitly -- such as the need for retribution -- is improper.  See United States v. Booker, 63 F.4th 1254, 1259-60 (10th Cir. 2023). In United States v. Booker, the Tenth Circuit applies to revocation sentencings its prior holding from United States v. Smart, 518 F.3d 800, 803-04 (10th Cir. 2008)("Smart"), that any consideration of sentencing factors not enumerated in § 3553(a) at sentencing is in procedural error.  See United States v. Booker, 63 F.4th at 1259.  The Tenth Circuit explains that its holding in Smart also applies to revocation sentencings, "because § 3583(e) also requires courts to consider certain § 3553(a) factors when sentencing after a supervised release violation."  United States v.

---

(and, ultimately, to deter the violator and to protect the public) would be impaired significantly.

United States v. Simtob, 485 F.3d 1058, 1062-63 (9th Cir. 2007)(Ezra, J.).

Before the Tenth Circuit's decision in United States v. Booker, the Court thought that, like the Fifth and Ninth Circuits, it is not error to consider the § 3553(a)(2)(A) factors during revocation sentencing, and still thinks that is probably the better rule.  The Court must apply, however, Tenth Circuit precedent.  Now, where there is a revocation, given United States v. Booker, the Court strives not to consider respect for the law, just punishment, and the seriousness of the offense.  The Court believes the solution and best practice is to always keep in mind what Judge Posner and the Third Circuit emphasize -- "that the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment."  United States v. Thompson, 2015 WL 151609, at *2 (quoting United States v. Murray, 692 F.3d 273, 280 (3d Cir. 2012)(Fuentes, J.)).  It is mindful that all it does should help the defendant ease back into society after a sometimes lengthy prison sentence, and it tries not to punish the defendant, although sometimes punishment -- incarceration -- is necessary, and expressly authorized to get the defendant to do what the Court and the USPO tell him or her to do.

The Court makes one other observation.  When Congress and the Court says the word "offense" at a violation hearing, the question is whether it is referring to the underlying offense or to the violation.  The Court can consider both, but again, in meeting the goals of supervised release, the emphasis should be on the violation, and not on the underlying offense.  For example, when it considers the "nature and circumstances of the offense," it may consider how the defendant arrived before the Court, but its focus and emphasis in coming up with a disposition should be on the nature and circumstances of the new violation.  If the Court is going to consider the seriousness of the offense, the seriousness of the underlying offense is largely irrelevant, unless the violation is just the same thing as the underlying offense.  In any case, the focus and emphasis, if seriousness is considered at all, should be on the seriousness of the new violation.

Booker, 63 F.4th at 1259 (citing United States v. McBride, 633 F.3d 1229, 1231 (10th Cir. 2011)).

Then, the Tenth Circuit explains: "Because we read § 3583(e) to set forth those sentencing factors

that courts must consider, the subsection 'implicitly forbids consideration' of any other § 3553(a)

factors when modifying or revoking a term of supervised release." United States v. Booker, 63

F.4th at 1260 (quoting Smart, 518 F.3d at 803-04). The Tenth Circuit concludes that "the omission

of § 3553(a)(2)(A) from the sentencing factors enumerated in § 3583(e) precludes a court from

considering the need for retribution when modifying or revoking a term of supervised release."

United States v. Booker, 63 F.4th at 1260. The district court, in United States v. Booker, thus,

errs, because it "directly quoted" from § 3553(a)(2)(A) when explaining the reasons for Booker's

sentence, and § 3553(a)(2)(A) is a factor the district court cannot consider when modifying or

revoking Booker's term of supervised release. 63 F.4th at 1262.[11]

        In particular, a district court must consider the policy statements in Chapter 7 of the

Guidelines before imposing a sentence for violations of the conditions of supervised release. See

United States v. Vigil, 696 F.3d at 1002; United States v. Kelley, 359 F.3d 1302, 1304-05 (10th

Cir. 2004)(Ebel, J.). The Guidelines' commentary is generally an authoritative interpretation of

the rules contained therein. See Stinson v. United States, 508 U.S. 36, 38 (1993). "[T]he Chapter

---

        [11]The Court notes that, in United States v. Booker, the Tenth Circuit concludes that the
district court's error in considering § 3553(a)(2)(A) does not affect the defendant's substantial
rights. See United States v. Booker, 63 F.4th at 1262. The Tenth Circuit explains:

        We concluded that a single reference to punishment did not affect the defendant's
        substantial rights. [United States v. Penn, 601 F.3d 1007, 1012 (10th Cir. 2010)].
        The court did not rely on the need for punishment in setting forth his initial reasons
        for the new sentence based upon violation of the terms of supervised release, and
        only raised it after defense counsel objected to his client receiving a high-end
        sentence.

United States v. Booker, 63 F.4th at 1263.

7 provisions dealing with violations of supervised release are not mandatory sentencing guidelines; rather, they merely constitute advisory 'policy' statements."  United States v. Contreras-Martinez, 409 F.3d 1236, 1240 (quoting United States v. Tsosie, 376 F.3d 1210, 1218 (10th Cir. 2004).  See United States v. Lee, 957 F.2d 770, 773-74 (10th Cir. 1992)("[T]he policy statements regarding revocation of supervised release contained in Chapter 7 of the U.S.S.G. are advisory rather than mandatory in nature," and "they must be considered by the trial court in its deliberations concerning punishment for violation of conditions of supervised release.").

"All discussions of applicable sentences before a district court following the revocation of supervised release 'should be grounded in the common understanding that the district court may impose any sentence within the statutory maximum.'"  United States v. Burdex, 100 F.3d 882, 885 (10th Cir. 1996)(Henry, J.)(quoting United States v. Hofierka, 83 F.3d 357, 362 (11th Cir. 1996)). While district courts are required to consider Chapter 7's policy statements in imposing sentences after revocation of supervised release, "'[m]agic words, however, are not required to demonstrate fulfillment of this requirement.'"  United States v. Vigil, 696 F.3d 997, 1002 (10th Cir. 2012)(quoting United States v. Tedford, 405 F.3d 1159, 1161 (10th Cir. 2005)).  "Rather, it is enough if the district court considers § 3553(a) en masse and states its reasons for imposing a given sentence." United States v. Penn, 601 F.3d at 1011.

## LAW REGARDING SUPERVISED RELEASE REVOCATION AND REVOCATION HEARINGS

Subsection (e)(3) of § 3583 permits courts to revoke supervised release on the conclusion, by a preponderance of the evidence, that the defendant violates a condition of probation.  See 18 U.S.C. § 3583(e).  Section 3583(e)(3) sets forth the process for revoking supervised release:

   **(e)    Modification of conditions or revocation.** -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --

- 35 -

. . . .

(3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than three years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case . . . .

18 U.S.C. § 3583(e)(bold in original).  "Preponderance of the evidence" is "evidence sufficient to persuade you that a fact is more likely present than not present."  10th Cir. Crim. Pattern Jury Instructions No. 1.05.1.  It is:

The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.

"Preponderance of the Evidence," Black's Law Dictionary 18c (12th ed. 2024).

Where, as here, revocation of supervised release is contested, courts must hold a revocation hearing.  See Fed. R. Crim. P. 32.1(b)(2).  Rule 32.1 of the Federal Rules of Criminal Procedure governs revocation hearings.  See Fed. R. Crim. P. 32.1.  Rule 32.1 provides in relevant part:

(2)    Revocation Hearing. Unless waived by the person, the court must hold the revocation hearing within a reasonable time in the district having jurisdiction. The person is entitled to:

(A)    written notice of the alleged violation;

- 36 -

> (B)     disclosure of the evidence against the person;
>
> (C)     an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear;
>
> (D)     notice of the person's right to retain counsel or to request that counsel be appointed if the person cannot obtain counsel; and
>
> (E)     an opportunity to make a statement and present any information in mitigation . . . .

Fed. R. Crim. P. 32.1(b).

Although rule 32.1(b)(2) provides for a revocation hearing, the hearing is "not a formal trial." Comment to Rule 32.1(a)(2). Instead, revocation hearings are to be more flexible and inclusive than criminal trials. See Morrissey v. Brewer, 408 U.S. 471, 489 (1972).[12] The parties may call witnesses and present evidence, but the process "should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." Morrissey v. Brewer, 408 U.S. at 489 (emphasis added). To that end, the Federal Rules of Evidence do not apply in revocation hearings. See Fed. R. Evid. 1101(d)(3) ("These rules -- except for those on privilege -- do not apply to . . . miscellaneous proceedings such as . . . granting or revoking probation or supervised release . . . ."); United States v. Diaz, 986 F.3d 202, 209 (2d Cir. 2021).

---

[12]Rule 32.1 was adopted in 1979. See Advisory Committee Notes on Fed. R. Crim. P. 32.1. It replaced the former "revocation of parole" system with a new "revocation of supervised release" system. See Advisory Committee Notes on Fed. R. Crim. P. 32.1. The Supreme Court decided Morrissey v. Brewer in 1972, before rule 32.1's adoption. Accordingly, the Supreme Court's analysis concerns revocation of parole, and not of revocation of supervised release. Nevertheless, the Tenth Circuit has interpreted Morrissey v. Brewer to apply to revocation of supervised release. See, Jones, 818 F.3d at 1098-99 (discussing Morrissey v. Brewer as part of the history and development of rule 32.1).

Also in service of flexibility and inclusivity, defendants have a lesser right to confrontation in revocation hearings.  See Jones, 818 F.3d at 1098.  "The Sixth Amendment [to the Constitution of the United States of America] is a trial right" and does not apply to revocation hearings.  United States v. Hernandez, 778 F. Supp. 2d 1211, 1225 (D.N.M. 2011)(Browning, J.).  Rule 32.1 of the Federal Rules of Criminal Procedure, however, gives the defendant at the revocation hearing "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."  Fed. R. Crim. P. 32.1(b)(2)(c).  Instead of running through a standard confrontation analysis like the one the Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004)("Crawford"), courts presiding over revocation hearings engage in a balancing test.  See Jones, 818 F.3d at 1099-100.  When the United States relies on a non-testifying declarant's out-of-court statement in a revocation hearing, the court "must determine whether the 'interest of justice does not require the witness to appear' by balancing (1) 'the person's interest in the constitutionally guaranteed right to confrontation' against (2) 'the government's good cause for denying it.'"  Jones, 818 F.3d at 1099-100 (quoting Advisory Committee Notes to the 2002 Amendment to Fed. R. Crim. P. 32.1).  See Rule 32.1 Advisory Committee's Note to the 2012 Amendment (instructing courts to apply a balancing test that weighs "the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it."); United States v. Hernandez, 428 F. Supp. 3d at 788 ("When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness" (citing Jones, 818 F.3d at 1098)).  The testimony's "reliability is a very important factor in determining the strength of a releasee's confrontation right.'"  Jones, 818 F.3d at 1100 (quoting Curtis v. Chester, 626 F.3d 540, 546 (10th Cir. 2010)(emphasis omitted in Jones, but in Curtis v.

Chester)).   The Tenth Circuit has adopted this balancing test "when determining a releasee's confrontation rights at a revocation hearing."  Jones, 818 F.3d at 1099.  See, e.g., United States v. Hykes, 653 F. Supp. 3d 913, 917 (D.N.M. 2022)(Browning, J.)(establishing findings of fact in a revocation of supervised release memorandum opinion and order based on evidence that survives the balancing test that the Tenth Circuit adopts in Jones, 818 F.3d at 1098); United States v. Calvert-Cata, 2022 U.S. Dist. LEXIS 194756, at *30-31 (D.N.M. October 26, 2022)(Browning, J.)(determining in the alternative that, even if it must apply the Jones, 818 F.3d at 1098, balancing test  to the victim's out-of-court statements, the statements are admissible, because the United States has good cause not to call on the witness to testify at the revocation hearing).

Although rule 32.1 and the Jones balancing test are geared toward decreasing procedural protections for defendants in revocation hearings and increasing the universe of evidence courts can consider in those hearings, in practice, rule 32.1 and Jones may limit evidence unnecessarily and unwisely.  In some instances, courts presiding over revocation hearings may be compelled to disregard out-of-court statements even though those same out-of-court statements would be admissible under the Federal Rules of Evidence and Crawford if they were offered at trial, regardless whether the declarant is available to testify at the trial.[13]  Those instances are troubling

---

[13]The Court confronts a similar issue in United States v. Hernandez, 428 F. Supp. 3d 775 (D.N.M. 2019)(Browning, J.).  There, an officer responds to a domestic disturbance in Rio Rancho, New Mexico.  See 428 F. Supp. 3d at 782.  When the officer arrives at the scene, the victim "appeared distressed," and tells the officer that the defendant assaulted her and attempted to set fire to a kitchen, among other things.  428 F. Supp. 3d at 782.  The defendant is on supervised release at the time, and the United States subsequently petitions to revoke his supervised release. See 428 F. Supp. 3d at 780.  At the hearing, the United States does not call the victim, yet it relies on her statements to the officer on the scene.  See 428 F. Supp. 3d at 781.  The Court applies the Jones balancing test and determines that it cannot consider the victim's out-of-court statements to the officer.  See 428 F. Supp. 3d at 788.  Those out-of-court statements, however, are admissible hearsay in a trial setting as either a present sense impression or excited utterance.  See Fed. R. Evid. 803(1), (2).  Given the Court's recent decisions in United States v. Chavez, No. CR 15-3557

for two reasons. First, defendants in those cases receive a greater right to confrontation in the revocation context than they do in the trial context. It is difficult -- if not impossible -- to square that outcome with the Tenth Circuit's guidance that defendants are supposed to have a more limited right to confrontation in the revocation setting than they do in the trial setting. See Jones, 818 F.3d at 1098. Second, courts in those cases must rely on smaller universes of evidence than they would be able to in the trial setting. Again, it is difficult -- if not impossible -- to reconcile that result with the Supreme Court's guidance in Morrissey v. Brewer that courts presiding over revocation hearings should be able to consider "material that would not be admissible in an adversary criminal trial." 408 U.S. at 489.

The Honorable Andrew S. Oldham, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, documents this paradox in his concurring opinion in United States v. Alvear, 959 F.3d 185, 191 (5th Cir. 2020)(Oldham, J., concurring). In his concurrence, Judge Oldham discusses "three oddities" in rule 32.1 caselaw. United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring).[14] First, he notes that "it's unclear what if anything the Due Process Clause adds to the protections of Rule 32.1(b)(2)(C)." United States v. Alvear, 959 F.3d at 193 (Oldham, J., concurring). Second, he observes that, "instead of applying Rule 32.1(b)(2)(C), many

---

JB, 2023 WL 5672594 (D.N.M. Sept. 1, 2023)(Browning, J.) or United States v. Green, No. CR 06-2605 JB, 2022 WL 1184650 (D.N.M. Apr. 21, 2022)(Browning, J.), aff'd, No. 22-2062, 2023 WL 4195884 (10th Cir. June 27, 2023), the Court would admit these out of court statements today.

[14]The Fifth Circuit does not use the Jones test. It uses, however, a balancing test analogous to Jones test, as does every other Court of Appeals that has handled a rule 32.1 issue. See United States v. Taveras, 380 F.3d 532, 536 (1st Cir. 2004); United States v. Chin, 224 F.3d 121, 124 (2d Cir. 2000); United States v. Lloyd, 566 F.3d 341, 344 (3d Cir. 2009); United States v. Doswell, 670 F.3d 526, 530 (4th Cir. 2012); Barnes v. Johnson, 184 F.3d 451, 454 (5th Cir. 1999); United States v. Jackson, 422 Fed. App'x 408, 410-11 (6th Cir. 2011)(unpublished); United States v. Jordan, 742 F.3d 276, 279 (7th Cir. 2014); United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986); United States v. Comito, 177 F.3d 1166, 1170 (9th Cir. 1999); United States v. Frazier, 26 F.3d 110, 114 (11th Cir. 1994); United States v. Stanfield, 360 F.3d 1346, 1360 (D.C. Cir. 2004).

of our decisions in this area contain nary a citation to it." United States v. Alvear, 959 F.3d at 193

(Oldham, J., concurring).  Finally, he describes, "oddest of all, sometimes confrontation rights in

a revocation hearing can be broader than the confrontation right at trial." United States v. Alvear,

959 F.3d at 193 (Oldham, J., concurring)(emphasis in original).

> The Supreme Court has told us that protections in a revocation hearing are (at most) the same as those at trial.  See United States v. Haymond, -- U.S. --, 139 S.Ct. 2369, 2378-79 . . . (2019) (plurality opinion); id. at 2385-86 (Breyer, J., concurring in the judgment).  That result creates its own difficulties. See id. at 2390-91 (Alito, J., dissenting).  But it's an altogether different problem to make the constitutional protections in the revocation hearing broader than at trial.  After all, one premise of our system is that post-conviction rights are generally narrower because "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." Herrera v. Collins, 506 U.S. 390, 399 . . . (1993).  But when we ask different questions under the Confrontation Clause at trial (is the statement "testimonial"?) and under the Due Process Clause at revocation (is there "good cause" to admit the statement?), we can get incongruous answers.
>
> Consider an example.  A boyfriend violently attacks his girlfriend who then immediately calls 911.  The Government wants to use her statements to the 911 operator against the boyfriend.  At trial, the defendant has no right to prevent the introduction of these statements under the Confrontation Clause because they're not "testimonial."  [Ohio v. ]Clark, [576 U.S. 237 (2015)] (citing Davis v. Washington, 547 U.S. 813, 820 . . . (2006)).  But this same 911 call is almost certainly hearsay.  So at the boyfriend's revocation hearing, he can object to the introduction of the statements under the Due Process Clause, unless there is "good cause" to admit them.  See, e.g., [United States v. ]Jimison, 825 F.3d [260,] 263 [(2016)].
>
> The oddities don't end there.  The Federal Rules of Evidence apply at trial.  And they provide for the admission of all sorts of hearsay: an excited utterance, a statement made for medical treatment, a present sense impression, a business record, a statement against interest.  See Fed. R. Evid. 803, 804.  But the hearsay rules in the Federal Rules of Evidence do not apply in revocation hearings.  Fed. R. Evid. 1101(d)(3) . . . .  So if the Government wants to use these same (otherwise-admissible) hearsay statements at a revocation hearing, the court has to apply the "good cause" analysis demanded by the Due Process Clause.  That's an additional hurdle that applies post-conviction that does not apply pre-conviction.  How odd.

United States v. Alvear, 959 F.3d at 194 (Oldham, J., concurring).

Although 18 U.S.C. § 3583(e) establishes the maximum terms of imprisonment upon the revocation of a defendant's supervised release, the U.S.S.G. establishes revocation imprisonment ranges based on the defendant's criminal history category and the violation grade. U.S.S.G. § 7B1.4(a). The Guidelines establish three violation categories:

 (1) GRADE A VIOLATIONS -- conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;

 (2) GRADE B VIOLATIONS -- conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year;

 (3) GRADE C VIOLATIONS -- conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision.

U.S.S.G. § 7B1.2(a) (capitalization in original). In determining the applicable revocation imprisonment range, the Guidelines instruct that courts should apply the criminal history category applicable at the time of the defendant's underlying sentencing. See U.S.S.G. § 7B1.4 cmt. n.1.

## ANALYSIS

The Court concludes that: (i) W. Yazzie's revocation proceeding satisfies procedural due process; (ii) W. Yazzie violates the terms of his supervised release, because the United States shows, by a preponderance of evidence, that W. Yazzie does not reside in a RRC for a term of six months and he does not comply with the RRC's requirement of finding employment within twenty-one days of arriving; (iii) the United States proves, by a preponderance of the evidence, that W. Yazzie's commits these violations willfully; (iv) the Supreme Court's holding in Bearden does not apply to revocation hearings, where the alleged violation is not failure to pay a fine, because the Supreme Court expressly limits the holding to revocations strictly based on an indigent

defendant's ability to pay; (v) even if <u>Bearden</u> is applicable, W. Yazzie fails to make a bona fide efforts to comply with Diersen Charities' requirement to find employment, because W. Yazzie does not demonstrate he makes bona fide efforts to comply with his supervised release terms or the Rules, and the United States shows, by a preponderance of evidence, that W. Yazzie's three documented attempts at seeking employment are far less than the number of attempts that similar RRC residents make, and this lack of effort reflects W. Yazzie's pattern of noncompliance with his supervised release terms; (vi) W. Yazzie commits a Grade C violation pursuant to the Guidelines policy statement § 7B1.1(a)(1),(2), and (3); (vii) W. Yazzie's criminal history category is I; and (viii) W. Yazzie's grade C violation and criminal history category of I, under § 7B1.1 of the Guidelines establishes a revocation imprisonment range of 3 to 9 months. Pursuant to 18 U.S.C. § 3583(e)(3), the maximum term of imprisonment upon revocation of supervised release is 60 months.

## I.    W. YAZZIE'S REVOCATION HEARING SATISFIES PROCEDURAL DUE PROCESS.

18 U.S.C. § 3583(e)(3) governs supervised release revocations. Under that statute, a district court may, after considering the relevant factors under § 3553(a), revoke a term of supervised release and impose a term of imprisonment if the court finds by a preponderance of the evidence that the defendant violates a condition of supervised release. <u>See</u> 18 U.S.C. § 3583(e). This standard, proof by a preponderance, requires only that the evidence demonstrate that a fact is more likely "present than not present." 10th Cir. Crim. Pattern Jury Instructions No. 1.05.1.

Rule 32.1(b)(2) sets forth the procedural requirement for revocation hearings. The rule entitles a defendant to written notice of the alleged violation, to disclosure of the government's evidence, to the opportunity to appear and present evidence, the right to question adverse witnesses unless the court finds good cause to excuse them, the right to counsel, and the right to present a

statement in mitigation.  Fed. R. Crim. P. 32.1(b).  The hearing "is not a formal trial."  Comment to Rule 32.1(a)(2).  The Supreme Court emphasizes that revocation hearings should be flexible enough to consider evidence and other material that would not be admissible in an adversary criminal trial.  See Morrissey v. Brewer, 408 U.S. at 489.  The Federal Rules of Evidence do not apply.  See Fed. R. Evid. 1101(d)(3).

The flexibility of revocation proceedings reflects their remedial character, helping individuals reintegrate into society as constructive individuals.  See Gagnon v. Scarpelli, 411 U.S. 778, 783, (1973)("Gagnon").  Revocation is about rehabilitation and public safety rather than the punishing new conduct.  See Gagnon, 411 U.S. at 783-84.  See Standlee v. Rhay, 557 F.2d 1303, 1306 (9th Cir. 1977)(citing Gagnon, 411 U.S. at 783-84; Morrissey v. Brewer, 408 U.S. at 477)("Revocation of parole is remedial rather than punitive, since it seeks to protect the welfare of parolees and the safety of society.").  Accordingly, the Court's inquiry is not whether W. Yazzie deserves new punishment, but whether his demonstrated conduct shows that continued supervised release under the same conditions serves its intended purpose.  See Gagnon, 411 U.S. at 785 (stating that revocation should be used "as a last resort when treatment has failed or is about to fail").  This remedial purpose informs the procedural framework governing revocation hearings.  Because revocation is not a new prosecution but a continuation of the original sentence, W. Yazzie is entitled to a more limited, though still meaningful, set of procedural safeguards that ensure fairness without converting the proceeding into a full criminal trial.  See United States v. Alvear, 959 F.3d 185, 191 (5th Cir. 2020)(Oldham, J., concurring)("After all, one premise of our system is that post-conviction rights are generally narrower because '[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears.'")(quoting Herrera v. Collins, 506 U.S. 390, 399 (1993)).  The Court therefore must

- 44 -

balance flexibility and due process -- protecting the defendant's conditional liberty interest -- while enabling the Court to assess whether the goals of supervision remain achievable.

W. Yazzie receives all the rule 32.1(b)(2) procedural protections, satisfying procedural due process. The United States provides written notice of the alleged violation; W. Yazzie has the assistance of counsel; the Court allows him to testify and to cross-examine the United States' witnesses; and the Court gives him the opportunity to present evidence and argument in mitigation. The Court holds the hearing within a reasonable time after the violation report, and the record establishes no procedural errors or unfairness. The Court, having found no procedural deficiencies, therefore turns to the alleged violation's substance.

## II.    W. YAZZIE DOES NOT DISPUTE THE VIOLATION'S FACTUAL BASIS.

W. Yazzie does not dispute "the facts of the violation." 2025 Tr. at 5:23-5:24 (Marjon). W. Yazzie concedes that he fails to complete six months of residence at the RRC, as his modified conditions of supervision require. See 2025 Tr. at 42:16-42:23 (Probasco, W. Yazzie). During the hearing, moreover, W. Yazzie does not argue that he complies with the Rules, and the Court makes a finding of fact that W. Yazzie does not "look actively" for employment. Instead, W. Yazzie argues that the Court should not revoke his supervision, because the violation results from circumstances beyond his control or, in the alternative, he makes bona fide efforts to comply with the Rules. See 2025 Tr. at 5:25-6:3 (Marjon)("My one objection is that the conduct that . . . violated probation was outside the control of my client and was not willful."). Accordingly, the Court concludes the United States proves by a preponderance of the evidence that W. Yazzie violates his modified conditions of supervised release and the Rules.

A.    **W. YAZZIE WILLFULLY VIOLATES DIERSEN CHARITIES' RULES.**

W. Yazzie willfully violates his modified conditions of supervised release and the Rules, because he acts with knowledge that both sets of rules proscribe his conduct while at Diersen Charities.   The Tenth Circuit states that, "to establish a 'willful' violation of a statute, 'the government must prove that the defendant acted with knowledge that his conduct was unlawful.'" United States v. Kaspereit, 994 F.3d 1202, 1208 (10th Cir. 2021)("Kaspereit")(quoting Bryan v. United States, 524 U.S. 184,  191-92 (1998)).   The Tenth Circuit does not define "willful" in the context of revocation proceedings.[15]   However, the Court determines Kaspereit's definition for "willful" in the context of interpreting a criminal statute is applicable to W. Yazzie's revocation proceeding.[16]   Here, the United States proves by a preponderance of the evidence that W. Yazzie

---

[15] In the Tenth Circuit Criminal Pattern Jury Instructions, the comment to No. 1.38 "Willfully -- To Act" states that the committee "does not recommend any general instruction defining the term 'willfully' because no single instruction can accurately encompass the different meanings this term has in federal criminal law." 10th Cir. Crim. Pattern Jury Instructions No. 1.38 at 54 (2025)("Pattern Jury Instructions").

[16] The Court applies the Kaspereit's definition of "willfully" when interpreting criminal statutes, recognizing its varied meanings in different legal contexts.  994 F.3d at 1208.  The Court concludes Kaspereit's definition is appropriate for two reasons: (i) the definition does not focus on W. Yazzie's specific intent, and (ii) the definition instead focuses on his conduct.  The Tenth Circuit Criminal Pattern Jury Instructions caution that courts do not always use the term "willfully" consistently and that the term can have different interpretations depending on the context.  Pattern Jury Instructions at 54.  Generally, "willfully" "may impose on the government the burden of proving that the defendant had knowledge of his conduct, or that his conduct was unlawful, or of the precise legal duty, the violation of which forms the substance of the charges against the defendant."  Pattern Jury Instructions at 54.

Kaspereit's definition does not focus on W. Yazzie's specific intent, which the Court does not believe is the relevant inquiry.  In criminal law, "willfully" often denotes deliberate action undertaken with a "bad purpose," distinguishing between deliberate and unwitting conduct.  Pattern Jury Instructions at 54.  However, the Pattern Jury Instruction's comment notes that for some courts "willfully" does not always require specific intent.  Pattern Jury Instructions at 54.  For example, in United States v. Jackson, 248 F.3d 1028 (10th Cir. 2001), the court states that "'the word "willfully" does not always require specific intent'".  Pattern Jury Instructions at 54 (quoting United States v. Jackson, 248 F.3d at 1031 n.2).  The Court determines that W. Yazzie's

acts with knowledge that his special conditions prohibit his conduct.  Specifically, he must follow

the Rules and stay at a RRC for six months.  See 2025 Tr. at 31:17-32:4 (Loya-Hobbs)(stating that

Loya-Hobbs reviews W. Yazzie's requirements that he reside at a RRC for six months and he is

"required to follow the rules and regulations of the center").  The record shows that W. Yazzie is

aware that he must find a job to continue staying at Diersen Charities, see 2025 Tr. at 9:9-18

(Probasco, Rodriguez)(stating that Diersen Charities' case manager reviews W. Yazzie's goals and

requirements "every two weeks," including the employment requirement), and if he does not find

a job, Diersen Charities will terminate his residency, see 2025 Tr. at 29:8-29:15 (Loya-

Hobbs)(discussing that Diersen Charities terminates W. Yazzie's first residency for not complying

with the Rules).  Finally, the record shows W. Yazzie, on June 3, 2025, is aware that his zero-

tolerance contract requires him to find a job by June 17, 2025.  See Termination Report at 1.  Taken

together, the Court concludes W. Yazzie willfully violates his modified conditions of supervised

---

objective conduct is more helpful for determining whether to revoke supervised release than
speculating on a "bad purpose" or specific intent to violate his supervised release conditions.
        Kaspereit's definition appropriately focuses on the intentionality of W. Yazzie's conduct.
The Pattern Jury Instructions cite United States v. Hilliard, 31 F.3d 1509 (10th Cir.
1994)("Hilliard"), where that court defines "willfulness" as a form or "intentional conduct."
Pattern Jury Instructions at 54 (citing 31 F.3d at 1517 n.5).  The Pattern Jury Instruction's comment
states, furthermore, "'willfully' is proved where the defendant 'knowingly performed an act,
deliberately and intentionally "on purpose" as contrasted with accidently, carelessly or
unintentionally.'"  Pattern Jury Instructions at 54 (quoting Hilliard, 31 F.3d at 1517 n.5).  Similarly,
the Pattern Jury Instruction's comment notes that the Supreme Court develops an understanding
that "willfulness" is "intentional conduct *that the actor knows to be a violation of the law*."  Pattern
Jury Instructions at 54 (emphasis in the original)(citing Cheek v. United States, 498 U.S. 192
(1991)).  Kaspereit's "willfulness" definition reflects both the Supreme Court's understanding of
"willfulness" and Hilliard's focus on the intentionality of the conduct.  The Court concludes,
Kaspereit's is appropriate, because establishing W. Yazzie acts with knowledge that the Rules and
his modified conditions proscribe his conduct allows the Court to make an objective finding of
whether his actions are more purposeful than careless.  The Court concludes W. Yazzie's conduct
falls within the spectrum of "willfully" that the Pattern Jury Instructions details, because
"willfully" does not require specific intent and W. Yazzie is aware that his modified conditions
and the Rules require he find a job to continue residing at Diersen Charities.

release and the Rules, because, with full knowledge of the requirements and potential consequences, he does not look actively for a job and, as a result, Diersen Charities' terminates W. Yazzie's residency, before he completes the six months his special conditions require, on June 24, 2025, seven days after the zero-tolerance contract mandates.  See Termination Report at 1. The Court now turns to Bearden and W. Yazzie's bona fide efforts arguments.

### III.    W. YAZZIE'S RELIANCE ON BEARDEN IS MISPLACED.

W. Yazzie contends that, because finding a job is "outside" his control, the Court should not revoke his supervised release.   2025 Tr. at 5:25-6:3 (Marjon).   He cites Bearden for the principle that due process requires a finding of willful noncompliance before the Court can revoke his supervision, or that revocation is in appropriate when he makes efforts to comply.  See 2025 Tr. at 5:25-6:3 (Marjon).  The Court explains its finding that W. Yazzie willfully violates his modified special conditions of release and the Rules, in the previous section.  In the alternative, the Court considers W. Yazzie's argument and whether Bearden prohibits the Court from revoking his supervised release if the Court concludes that W. Yazzie makes bona fide efforts to comply with his modified conditions of supervised release or the Rules.  The Court concludes that argument is unpersuasive, both as a matter of law and as applied to the facts.

W. Yazzie's argument that Bearden prohibits the Court from revoking his supervised release fails for three reasons: (i) W. Yazzie's condition is an exception the Supreme Court carves out in Bearden, because his condition relates to the community's welfare and safety, see 461 U.S. at 668 n.9; (ii) Bearden does not apply, because the Supreme Court limits its holding to the context of indigency and paying fines, see 461 U.S. at 665; and (iii) the Court complies with Bearded, because it considers alternatives to revoking supervised release, see 461 U.S. at 665.  Bearden address a specific and narrow question: "Whether a sentencing court can revoke a defendant's

probation for failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate." Bearden, 461 U.S. at 665. The Supreme Court holds:

> that in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for failure to pay . . . . If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternative measures of punishment other than imprisonment . . . . To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.

Bearden, 461 U.S. 672-63. With this holding in mind, the Court makes two observations. First, Bearden does not govern this case, because W. Yazzie' condition of release does not involve the payment of a fine. Second, the Court nevertheless satisfies Bearden's directive, because, as discussed below, the Court considers alternatives to imprisonment and concludes that none are appropriate. Before addressing these observations, the Court discusses an exception to Bearden that supplies context necessary to the Court's analysis.

### A. W. YAZZIE'S CONDITION IS AN EXCEPTION TO BEARDEN, BECAUSE IT PROMOTES SOCIETY'S WELFARE.

The Tenth Circuit has yet to address W. Yazzie's argument that Bearden applies in the context of revoking supervised release for defendants who are not indigent. 2025 Tr. at 5:25-6:3 (Marjon). This case falls, however, within the exception that the Supreme Court identifies in Bearden. See 461 U.S. at 668 n.9 ("In contrast to a condition like chronic drunken driving, however, the condition at issue here -- indigency -- is itself no threat to the safety or welfare of society."). See also United States v. Pinjuv, 218 F.3d 1125, 1129 (9th Cir. 2000)("Pinjuv")(stating that the conditions must contribute to rehabilitation "or to the safety of society"); see Powell v. State of Tex., 392 U.S. 514, 532 (1968)(stating that the Texas is not punishing "a mere status;" it

is punishing behavior which "may create substantial health and safety hazards," making the lack of fault indeterminate).

Here, W. Yazzie's special condition of supervision is not tied to his status, financial or other, but to the community's safety and welfare. The requirement that he reside in an RRC exists, because W. Yazzie lacks housing options that do not place him in close proximity with minors. See Petition for Modification at 2. The threat to the community's safety and welfare, moreover, is not theoretical; it transpires during his second term of supervised release. See Second Violation Report at 1-2. After his first stent in an RRC, when Diersen Charities terminates him for noncompliance with the Rules, the USPO permits W. Yazzie to reside with a family member. See Second Violation Report at 1-2. When Loya-Hobbs inspects that residence, however, she discovers that minors also live there. See Second Violation Report at 1-2. Allowing W. Yazzie, who has a history of sexually abusing minors, to continue residing in a home with children, including sleeping in the same room as them, presents a direct risk to public safety and welfare. See PSR ¶ 2, at 3. Heightening the risks of allowing W. Yazzie to stay with family and undermining the goals of supervised release, Loya-Hobbs learns that W. Yazzie frequently spends nights away from his approved residence. See Second Violation Report at 1-2.

Allowing W. Yazzie to remain in such an environment, despite his demonstrated inability to comply with conditions that the Court fashions to protect minors, is, as the Supreme Court cautions in Bearden, "reckless." 461 U.S. at 668 n.9. The Court imposes W. Yazzie's sentence, not for circumstances beyond his control, but "because he ha[s] committed a crime." Bearden, 461 U.S. at 668 n.9. Accordingly, even if substantive due process considerations extend to revocation proceedings beyond indigency cases, W. Yazzie's circumstances fall within the safety exception Bearden recognizes.

- 50 -

### B.    EVEN IF APPLICABLE, <u>BEARDEN</u>'S SCOPE IS NARROW, APPLYING ONLY TO INDIGENCY.

Notwithstanding the threat to society, W. Yazzie argues <u>Bearden</u> establishes a general rule for revocation proceedings.  <u>Bearden</u> does not establish a general rule that, to justify revocation, every violation must be willful or without bona fide efforts.  <u>See</u> 461 U.S. at 668 n9. ("We do not suggest that, in other contexts, the probationer's lack of fault in violating a term of probation would necessarily prevent a court from revoking probation.")  The Supreme Court later confirms that <u>Bearden</u>'s holding applies in only "certain circumstances," <u>Black v. Romano</u>, U.S. 471, 606, 614 (1985)("<u>Black</u>"), and that it "need not decide" whether fundamental fairness precludes the automatic revocation of probation in circumstances other than those found in <u>Bearden</u>, 471 U.S. at 615.  The Supreme Court limits the circumstances, where fundamental fairness requires an inquiry into willfulness or bona fide efforts, to the context of indigency.  <u>See</u> <u>Black</u>, 471 U.S. at 611 ("<u>Bearden v. Georgia</u> recognized substantive limits on the automatic revocation of probation where an indigent defendant is unable to pay a fine or restitution.").  Accordingly, the Court concludes that it must undertake <u>Bearden</u>'s willfulness or bona fide efforts inquiry only when it revokes supervised release based on a defendant's inability to pay a fine.  <u>See</u> <u>Jones v. Governor of Fla.</u>, 975 F.3d 1016, 1032 (11th Cir. 2020)(stating that the "Supreme Court has never extended *Bearden* beyond the context of poverty-based imprisonment")(emphasis in the original).  When indigency is not implicated, furthermore, revocation of supervised release does not become fundamentally unfair merely, because a defendant makes bona fide efforts to comply with the conditions of supervision.  In such circumstances, the Constitution does not require the Court to excuse the violation."

Several Courts of Appeals, including the Tenth Circuit, hold that a finding of willful noncompliance is not necessary before terminating a defendant's supervised release.  <u>See</u> <u>Genet v.</u>

United States, 375 F.2d 960 (10th Cir. 1967)(stating that "under some circumstances the good faith of the probationer need not be controlling and the factual failure of non-compliance may be the prime consideration in exercising judicial discretion"). See also United States v. Brown, 899 F.2d 189, 194 (2d Cir. 1990)("Contrary to Brown's assertions, however, *Bearden* does not prohibit revocation whenever the violation was involuntary."); United States v. Jones, 133 F. App'x 824, 826 (3d Cir. 2005)(unpublished)(noting that the willfulness of the violation "may not matter"); United States v. Clarkson, 208 F.3d 218 (8th Cir. 2000)(unpublished)(per curiam)("Probation is properly revoked when the defendant does not comply with release terms, whether the failure is the result of willfulness, carelessness, or impaired mental capacity."). For example, in Pinjuv, the United States Court of Appeals for the Ninth Circuit upholds a district court's decision to revoke supervised release, where the defendant does not "participate in and successfully complete a mental health program." Pinjuv, 218 F.3d at 1129. In Pinjuv, the defendant argues "she lacks the power of volition to comply with [her condition of supervised release] due to her mental condition." 218 F.3d at 1129. The Ninth Circuit reasons that conditions of supervised release need not always be within a defendant's "volitional power to comply." 218 F.3d at 1131. Distinguishing between fines and conditions that further rehabilitation, the Ninth Circuit states Pinjuv's condition, "unlike the [condition] considered in *Bearden*, is sufficiently related to the remedial goals of supervised release to be valid and enforceable." 218 F.3d at 1132.

The United States Court of Appeals for the Seventh Circuit employs similar reasoning in rejecting a defendant's willfulness argument. See United States v. Warner, 830 F.2d 651, 656 (7th Cir. 1987)("Warner")(stating that "no intent or fault element" is required to revoke probation and "the government need to show only the fact that defendant" did not comply with his conditions). In Warner, the court orders the defendant to file all "delinquent" tax returns. Warner, 830 F.2d at

653.  The defendant does not comply, claiming he is confused about what forms to file and that he lost paperwork necessary to file; therefore, the violation is not willful, and <u>Bearden</u> prevents the court from revoking probation.  <u>See</u> <u>Warner</u>, 830 F.2d at 656.  The Seventh Circuit explains that <u>Bearden</u> advances probation's central aim "'to provide a period of grace in order to aid the rehabilitation of a penitent offender; to take advantage of an opportunity for reformation which actual service of the suspended sentence might make less probable.'"  <u>Warner</u>, 830 F.2d at 657 (quoting <u>United States v. Torrez-Flores</u>, 624 F.2d 776, 783 (7th Cir. 1980)).  Emphasizing probation's remedial purpose, the Seventh Circuit rejects the defendant's willfulness argument, because "probation's purposes have been frustrated . . . even if the probationer did not willfully violate his probation conditions."  <u>Warner</u>, 830 F.2d at 657.  The Seventh Circuit concludes by stating, "[w]hile good faith and lack of willfulness does not preclude finding a probation violation," the defendant can raise that argument as a consideration for not revoking probation. <u>Warner</u>, 830 F.2d at 657-58.

Here, due process does not require a finding of willfulness, because W. Yazzie's special condition of supervision is not financial in nature and is related to the rehabilitative purpose of supervised release.  The requirement that he reside at a RRC serves a rehabilitative purpose, not a punitive one.  <u>See</u> Petition for Modification at 2 (explaining the barriers to rehabilitation W. Yazzie will face at the residence he purposes).  The RRC provides W. Yazzie with access to counseling, employment assistance, and logistical support to attend probation appointments.  The USPO requests the modification of W. Yazzie's supervision terms, in part, because the residence that he proposes is unsuitable for supervision.  <u>See</u> Petition for Modification at 2.  Specifically, the property at which W. Yazzie proposes to stay contains "numerous dogs," two of which are "very aggressive," interfering with USPO's future inspections.  Petition for Modification at 2.

Additionally, remote location makes W. Yazzie's lack of transportation a barrier to attending required meetings and treatment sessions.  See Petition for Modification at 2.  Regardless of W. Yazzie's willfulness argument, allowing him to reside in a location that prevents adequate supervision and limits his access to required check-ins and counseling sessions undermines the very purpose of supervised release, which is to provide a period of grace to aid an offender's rehabilitation and to create an opportunity for reformation that imprisonment might make less likely.

**C.    REVOCATION IS APPROPRIATE, BECAUSE ALTERNATIVES ARE NOT APPROPRIATE.**

Even assuming Bearden applies, outside the indigency context, and requires the Court to consider alternatives to imprisonment, the Court has done so here.  The Court considers whether W. Yazzie may safely return to the residence he proposes, whether continued community supervision without an RRC placement is viable, and whether any less restrictive option would adequately protect the public and facilitate his rehabilitation.  For the reasons discussed above in the Court's analysis of community safety and welfare, and in the rehabilitative purpose of W. Yazzie's condition, none of those alternatives is appropriate.  Allowing W. Yazzie to return home would again place him in proximity to minors, a circumstance that has already resulted in violations during second term of supervision.  See Second Violation Report at 1-2.  The Court cannot ignore that W. Yazzie previously ignores his conditions of supervised release and resides in homes with children, spends nights away from approved housing, and attempts to manipulate his polygraph examinations.  See Second Violation Report at 1-2.  These circumstances foreclose the possibility that continued release in an unstructured environment could satisfy the goals of supervised release and protect the health and welfare of society.

The Court likewise considers, but cannot impose, the alternative of directing W. Yazzie back to Diersen Charities. The record shows that Diersen Charities twice terminates him for noncompliance with its Rules, including conduct that directly undermines the purpose of W. Yazzie's residency. See First Violation Report at 1 (discussing W. Yazzie skipping treatment, not finding employment, and possession illegal substances). Although the Rules require residents to obtain employment within twenty-one days, Diersen Charities affords W. Yazzie approximately 117 days of opportunity before it terminates his residency. See Termination Report at 1. The Court cannot compel Diersen Charities to accept a resident whom it determines it cannot manage, nor can the Court disregard the resistance W. Yazzie's demonstrates to the Court supervision and the supervision Diersen Charities provides. See 2025 Tr. at 32:17-32:25 (Probasco, Loya-Hobbs)(discussing Diersen Charities' staff's observations that W. Yazzie "doesn't want to be there he just want to go home"). As explained above, W. Yazzie's modified special condition to stay at an RRC serves a rehabilitative function; Diersen Charities affords W. Yazzie access to counseling, employment support, transportation assistance, and the monitoring necessary to facilitate lawful reintegration. See 2025 Tr. At 10:4-8 (Rodriguez)(discussing that Diersen Charities' "employment specialist" and "case manager" encourage W. Yazzie to look for employment). W. Yazzie's refusal or inability to comply with those requirements confirms to the Court that continued placement at Diersen Charities is no longer a viable alternative, at this time.

Thus, even if Bearden requires consideration of alternatives to incarceration for violating conditions other than paying a fine, and even if the Court assumes that no safety exception exists, the outcome remains the same. The Court considers reasonable alternative measures and finds them inappropriate or ineffective. The alternatives available either expose the community to unacceptable risk or fail to provide the structure necessary to further supervised release's

rehabilitative purposes. Because the Court undertakes the inquiry due process requires and reasonably determines that no lesser sanction can satisfy the goals of supervised release, the Court concludes that revocation complies with <u>Bearden</u> and the requirements of fundamental fairness.

## IV.    W. YAZZIE DOES NOT DEMONSTRATE THAT HE MAKES GOOD-FAITH EFFORTS TO FIND EMPLOYMENT.

Even if fundamental fairness requires more protections than <u>Bearden</u> outlines, and that due process prohibits revocation when a defendant makes bona fide efforts to comply with the conditions of supervision, the record here does support finding W. Yazzie makes such efforts. W. Yazzie does not demonstrate he makes bona fide efforts to comply with his modified conditions of supervised release or with the Rules, but, rather, his pattern of conduct demonstrates continued, willful noncompliance rather than good-faith attempts at adherence. Thus, even under W. Yazzie's expanded due process framework, which is more protection than <u>Bearden</u> mandates, the Court's analysis leads to the same result.

The Supreme Court's holding in <u>Bearden</u> applies to defendants who have "demonstrated" sufficient bona fide efforts to comply with their conditions. 461 U.S. at 671. <u>See</u> <u>Smallwood v. Commonwealth</u>, 867 S.E.2d 297, 300-01 (2022)("As the individual who would have all the relevant information on this issue, the burden was on [the defendant] to make the necessary showing.")(citing <u>Bearden</u>, 461 U.S. at 673). The Tenth Circuit, in <u>United States v. Ballard</u>, 16 F.3d 1110 (10th Cir. 1994), states that the defendant "has the burden to prove her inability to pay the fine." 16 F.3d at 1114. <u>See</u> <u>United States v. Carney</u>, 271 F. App'x 700, 702 (10th Cir. 2008)(unpublished)(beginning its analysis with the proposition that "the burden of proof was on [defendant] to show that he was unable to pay the fine"); <u>United States v. Echols</u>, 33 F. App'x 376, 378 (10th Cir. 2002)(unpublished)(noting that the defendant "failed to present any evidence outlining . . . that he could not have afforded to pay for" a condition of his supervised release).

W. Yazzie is not contesting his ability to pay a fine, but his ability to comply with the terms of his modified conditions or the Rules. Accordingly, the Court concludes that W. Yazzie bears the burden of demonstrating that he makes bona fide efforts to comply with the terms of his modified conditions and the Rules.

Here, W. Yazzie does not demonstrate that he makes bona fide efforts to comply with the terms of his modified conditions and the Rules, and the testimony that he offers amounts to excuses for the absence of bona fide efforts. The Court previously evaluates these justifications in determining that W. Yazzie is not "actively looking" for a job, so here the Court' analysis is brief. First, W. Yazzie asserts that his inability to apply for jobs stems from his telephone confiscation. See 2025 Tr. at 36:3-36:7 (W. Yazzie). While the Court acknowledges that not having his telephone limits his ability to apply for jobs online, Rodriguez' testimony indicates that, even when W. Yazzie has his telephone, his efforts to seek employment are insufficient. See 2025 Tr. at 17:8-17:12 (Marjon, Rodriguez). Diersen Charities places W. Yazzie on a zero-tolerance contract because of his failure to substantiate active job search efforts, including accessing Workforce Connections and Goodwill. See 2025 Tr. at 11:10-11:12 (Rodriguez). The telephone history coupled with the fact that W. Yazzie does not secure employment during his first stay at Diersen Charities, when he has a telephone, supports the Court's conclusion that confiscation is not a determining factor in the Court's analysis.

Second, W. Yazzie contends that his pinkie injury impedes his ability to seek employment. See 2025 Tr. at 36:11-36:18 (W. Yazzie). The Court sees no evidence, however, to support W. Yazzie's assertion that the injury hinders his efforts. W. Yazzie can perform basic tasks such as writing and filling out job applications, see 2025 Tr. at 36:11-36:18 (Probasco), and his use of a bicycle for transportation further suggests that the injury does not prevent him from actively

pursuing employment, see Timecard at 1. Rodriguez testifies that W. Yazzie does not exhibit signs of disability and that W. Yazzie does not complain of joint pain, see 2025 Tr. at 54:13-54:20 (Probasco, Rodriguez), and the timecard records corroborate this by listing only the pinkie injury and general fatigue as reasons for leaving the RRC, see Timecard at 1.

## V.    W. YAZZIE DOES NOT MAKE BONA FIDE EFFORTS TO COMPLY WITH HIS SUPERVISED RELEASE TERMS.

Having addressed W. Yazzie's justifications for the absence of evidence supporting his defense of bona fide efforts, the Court now turns to evidence that is in the record. Put simply, the record demonstrates the opposite of bona fide efforts to comply. The evidence includes documentation and testimony that contradicts W. Yazzie's claims of good-faith efforts. In the following section, the Court examines this evidence in detail, highlighting how W. Yazzie's conduct reflects a pattern of noncompliance rather than any good-faith attempts to meet his supervised release requirements.

The record is consistent and paints a picture regarding W. Yazzie's efforts to stay at Diersen Charities. W. Yazzie begins supervision in 2023. See 2025 Tr. at 29:8-29:9 (Loya-Hobbs). His supervised release's modified conditions require W. Yazzie to reside at an RRC for six months and to comply with its Rules. See 2025 Tr. at 31:17-32:4 (Loya-Hobbs, Probasco). W. Yazzie arrives at Diersen Charities on February 27, 2024. See 2025 Tr. at 20:3-20:4 (Rodriguez). Loya-Hobbs testifies that, during Diersen Charities' intake, on February 27, 2024, the USPO explains to W. Yazzie in person that he must comply with the Rules and that he must reside at Diersen Charities for six months; she also testifies that W. Yazzie signs documentation acknowledging both requirements. See 2025 Tr. at 31:22-32:7 (Probasco, Loya-Hobbs). Diersen Charities requires all residents to obtain employment within twenty-one days of arrival. See 2025 Tr. at 9:19-10:3 (Probasco, Rodriguez). W. Yazzie acknowledges understanding this rule,

see 2025 Tr. at 31:17-32:4 (Probasco, Rodriguez), and, despite staff's multiple reminders, see 2025 Tr. at 9:9-9:18 (Probasco, Rodriguez), he remains unemployed for almost four months, see Termination Report at 1. W. Yazzie does not comply with the Rules even though this termination is not W. Yazzie's first termination from Diersen Charities. See Termination Report at 1. During his supervised release's first term, Diersen Charities terminates W. Yazzie for violations of its rules and regulations, leading to revocation of his first supervision term. See 2025 Tr. at 29:8-29:15 (Loya-Hobbs). See First Violation Report at 1. That history provides W. Yazzie notice that Diersen Charities strictly enforces the Rules.

In response to W. Yazzie's noncompliance, Diersen Charities places him on a two-week "zero-tolerance" contract -- essentially a final opportunity to comply with the employment requirement -- before it terminates his residency, again. 2025 Tr. at 20:3-20:7 (Rodriguez). Given this final opportunity to remain at Diersen Charities and in compliance with his supervised release terms, the Court expects W. Yazzie to approach the task of finding employment with a sense of urgency, making use of the RRC's resources, following staff guidance, and treating each day as a chance to demonstrate a willingness to comply with the employment requirement. That urgency does not occur. As Rodriguez explains, W. Yazzie makes only three documented job-search attempts during the entire zero-tolerance period. See 2025 Tr. at 10:17-10:18 (Rodriguez). Giving W. Yazzie yet another opportunity to succeed, Diersen Charities extends his zero-tolerance period by an additional week, hoping the extra time might prompt improvement. See 2025 Tr. at 20:3-20:7 (Rodriguez). This extension does not yield any efforts, because, as the Timecard shows, W. Yazzie makes no additional attempts. See Timecard at 6-9. Rodriguez testifies that by comparison, other residents, given the same amount of time, make about eighteen attempts. See 2025 Tr. at 12:22-13:3 (Probasco, Rodriguez). W. Yazzie's actions, further, illustrate his lack of

urgency, as on each of the three documented attempts, he returns to the RRC early, leaving hours of available time unused.  See Timecard at 1-9.

During cross-examination, defense counsel questions Rodriguez why his testimony refers only to three outings when the timecards appear to show a fourth.  See 2025 Tr. at 14:5-25 (Majon, Rodriguez).  Rodriguez explains that the additional entry covers a sign-out of only seventeen minutes.  See 2025 Tr. at 16:3-16:7 (Rodriguez).  W. Yazzie confirms this fact, acknowledging that he does not search for work that day, because it is raining.  See 2025 Tr. at 49:2-49:6 (W. Yazzie).  The Court notes that, at this point, W. Yazzie is under a zero-tolerance contract with Diersen Charities and his compliance window is closing.  See Termination Report at 1.  Yet, even the mildest obstacle appears sufficient to deter him from finding employment.  W. Yazzie testifies that the rain is heavy, see 2025 Tr. at 49:2-49:6, (W. Yazzie), but, on cross-examination, he concedes that using public transportation is an option, see 2025 Tr. at 49:7-49:21 (Probasco, W. Yazzie).  Rodriguez, corroborating W. Yazzie's testimony that options are available, testifies that a covered bus stop is outside the RRC for residents during inclement weather.  See 2025 Tr. at 53:1-53:8 (Rodriguez).  This episode captures the broader pattern evident throughout W. Yazzie's time at Diersen Charities.  Resources and opportunities are available, but he chooses not to use them.  See 2025 Tr. at 11:22-12:11 (Probasco, Rodriguez)(stating that the employment specialist "was not able to gain compliance" from W. Yazzie).  W. Yazzie's timecards from this period, thus, do not demonstrate good-faith or bona fide efforts to comply with the employment requirement; instead, they corroborate Loya-Hobbs and Diersen Charities staff's observations that W. Yazzie is resistant to complying with the conditions of his supervision.  See 2025 Tr. at 32:17-32:25 (Probasco, Loya-Hobbs).  See Timecard at 1-9.

**IT IS ORDERED** that: (i) the Third Petition for Revocation of Supervised Release, filed June 25, 2025 (Doc. 336), is granted; (ii) W. Yazzie commits a Grade C violation pursuant to the Guidelines policy statement § 7B1.1(a)(1),(2), and (3); (iii) W. Yazzie's criminal history category is I; and (iv) W. Yazzie's grade C violation and criminal history category of I, under § 7B1.1 of the United States Sentencing Guidelines establishes a revocation imprisonment range of 3 to 9 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan Ellison
  United States Attorney
Mark Probasco
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Joachim Marjon
Marjon Law
Albuquerque, New Mexico

  *Attorney for the Defendant*